AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | FILED |
| --- | --- |
| | CLERK, U.S. DISTRICT COURT |
| | **7/20/21** |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY: ___ slo ___ DEPUTY |

| | |
| --- | --- |
| United States of America, | |
| v. | Case No.   2:21-mj-03389-DUTY |
| JOHNNY RAY GASCA, | |
| Defendant. | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 19, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1201(a)(2) | Kidnapping |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Michael Fukuda*
*Complainant's signature*

Michael Fukuda, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my

presence. Date:  ___7/20/21___

*John E. McDermott*

*Judge's signature*

City and state:   Los Angeles, California

Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Reidy

## AFFIDAVIT

I, Michael Fukuda, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Johnny Ray GASCA ("GASCA") for a violation of 18 U.S.C. § 1201(a)(2): Kidnapping.

2.   This affidavit is also made in support of an application for warrants to search the following:

a.   The person of GASCA, as described more fully in Attachment A-1;

b.   The premises located at The Dixie Hollywood Hotel, Room #210, 5410 Hollywood Boulevard, Los Angeles, California, 90027 (the "SUBJECT PREMISES"), as described more fully in Attachment A-2; and

c.   The following digital device, seized on July 19, 2021, and in the custody of the FBI, in Los Angeles, California: a Samsung Galaxy S9+ in a black case, IMEI 356420091990556 (the "SUBJECT DEVICE"), as described more fully in Attachment A-3.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1201 (Kidnapping) and 371 (Conspiracy) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I have been a Special Agent with the FBI since September 2008. From May 2015 through September 2019, I was assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, specifically the Los Angeles Metropolitan Task Force on Violent Gangs. From September 2019 to the present, I have been assigned to the Violent Crimes Squad, where I investigate violent crimes, including such crimes as Hobbs Act robberies, bank robberies, and kidnappings.

6.   Through my participation in kidnapping investigations, I have used a variety of investigative techniques, including reviewing physical evidence, reviewing surveillance images and cellular telephone data, and speaking with law enforcement agents and officers. As a result of this experience and my conversations with other law enforcement personnel, including FBI Special Agents and local law enforcement detectives experienced in kidnapping investigations, I am familiar with the methods used by kidnappers and effective investigative methods to solve them.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   GASCA Grabs E.C. on Federal Property, Throws Her in the Back of a Pickup Truck, and Drives Away**

8.   On July 19, 2021, at approximately 11:30 a.m., FBI received a report from the Department of Veteran Affairs Police Department ("VA Police") regarding a kidnapping that had occurred at the West Los Angeles VA Medical Center, 11301 Wilshire Boulevard, Los Angeles, California, 90073, at approximately 8:30 a.m. (the "Wilshire VA").  The Wilshire VA is located on property owned by the United States government.

9.   The VA Police reported the following:

a.   A witness, Valerie Aquino, called 911 around 8:30 a.m. to report a kidnapping.  Aquino told the VA Police that the victim, E.C., was Aquino's nanny in the Philippines where Aquino grew up, and that the two were close friends.  E.C. suffered from dementia and Aquino had power of attorney for E.C. Aquino had brought E.C. to a medical clinic at the Wilshire VA for medical treatment.  After waiting in line at the clinic for a couple of hours, Wilshire VA staff told Aquino and E.C. that they were not eligible to receive medical care at the Wilshire VA.  Aquino and E.C. then walked back to their car in the Wilshire VA parking lot.

b.   As Aquino and E.C. approached their car, GASCA appeared unexpectedly.  GASCA put his arms around E.C. and

pushed her toward a gold-colored pickup truck that was parked
nearby.  GASCA then picked E.C. up and threw her into the rear
portion of the truck's passenger compartment.

10.  FBI agents later interviewed Aquino and she provided
additional details regarding the encounter with GASCA:

a.  Aquino stated that as GASCA approached the E.C.,
GASCA said to her, "What lies have they been feeding you?"  When
GASCA then put his hands on E.C. and began to push her towards
the gold pickup truck, E.C. told GASCA, "No, no, I'm sick!"

b.  Aquino further stated that, when GASCA and E.C.
got next to the gold pickup truck, GASCA picked E.C. up off the
ground, threw her into the truck, turned around to face Aquino,
and told Aquino, "Stay the fuck away from me."  Aquino
recognized GASCA from prior meetings and believed that GASCA and
E.C. had been in some kind relationship previously.

c.  Aquino also told agents that she suspected that
GASCA may have taken some of E.C.'s money from her bank and
retirement accounts.  During a visit with Aquino in May 2021,
E.C. told Aquino that her retirement fund manager had spoken
with GASCA.  E.C. also told Aquino that some of her credit cards
had gone missing.  Aquino and E.C. then went to E.C.'s bank and
asked to see transaction records for E.C.'s accounts.  Those
bank records showed a $35,000 withdrawal from E.C.'s retirement
account followed by a number of Venmo, Moneygram, and Paypal
transactions that depleted the amount of funds in E.C.'s
account.  Aquino believes that E.C., who is elderly and suffers

from dementia, did not have the knowledge or wherewithal to use Venmo, Moneygram, or Paypal.

        d.   Aquino later provided FBI agents with a copy of E.C.'s bank records which showed a $35,050.33 deposit had been made into her account on March 5, 2021.  The bank records also show a number of transfers out of E.C.'s account using Venmo and Moneygram.

11.  On July 19, 2021, FBI agents reviewed surveillance video from around the time of the abduction at the Wilshire VA. The video shows two women walking in the parking lot who are then approached by a man wearing a blue t-shirt.  The man wearing the blue t-shirt grabs one of the women and motions to a nearby gold-colored pickup truck.  The gold-colored pickup truck then drives over and stops near where the man wearing the blue t-shirt and the woman are standing.  The man wearing the blue t-shirt then pushes the woman toward the gold-colored pickup truck, opens the passenger side door, and throws the woman into the truck's rear passenger seat.  The man wearing the blue t-shirt then gets into the truck's front passenger seat before the truck drives away.

### B.   FBI Locates GASCA and E.C. at the SUBJECT PREMISES and Recovers the SUBJECT DEVICE

12.  On the morning of July 19, 2021, Aquino provided law enforcement with the number for E.C.'s cellular telephone.  Law enforcement later issued an Emergency Disclosure Request for location information for E.C.'s phone to E.C.'s cellular service provider in order to find her and her kidnapper.

13.  Between approximately 3:00 p.m. and 3:59 p.m., law enforcement received location information for E.C.'s phone indicating that the phone was within approximately 50 meters of the SUBJECT PREMISES in Hollywood.

14.  An FBI task force officer approached the front desk staff for the SUBJECT PREMISES and was provided with check-in information for the SUBJECT PREMISES.  Front desk staff confirmed that GASCA had checked into the SUBJECT PREMISES for one night and had provided his California driver's license during check-in.

15.  Law enforcement then set up surveillance on Hollywood Boulevard outside the SUBJECT PREMISES.  GASCA and E.C. were later seen leaving the hotel.  GASCA was wearing a blue t-shirt similar to that worn by the individual depicted in the Wilshire VA surveillance video.  After walking out of the hotel doors, GASCA and E.C. stopped and GASCA adjusted E.C.'s hat and clothing in a manner suggesting that he wished to make E.C. look presentable.  GASCA then walked slightly ahead of E.C. down Hollywood Boulevard.  Shortly after, law enforcement approached GASCA and E.C. and placed GASCA under arrest.  Law enforcement recovered the SUBJECT DEVICE from GASCA's person during the arrest.

16.  FBI is still attempting to locate the driver of the gold-colored truck during the abduction of E.C. at the Wilshire VA.

C.   **GASCA's Statements**

17.   After his arrest, FBI agents transported GASCA to an FBI facility, advised him of his <u>Miranda</u> rights, and GASCA agreed to speak with investigators.

18.   GASCA reported that he and E.C. stopped at a bank after he had picked up E.C. from the Wilshire VA.  GASCA stated that E.C. withdrew $15,000 from her account at the bank--$7,500 in cash and $7,500 in checks.  GASCA stated that E.C. was his girlfriend.  GASCA had called the Wilshire VA in advance to find out if E.C. had scheduled an appointment there.  GASCA also told agents that when he approached E.C. in the parking lot, he asked E.C. if E.C. wanted to go with him and she said, "Yes."  He further stated that Aquino was holding E.C. against her will and that GASCA went to the Wilshire VA to get her back.  GASCA stated that he merely guided E.C. to the gold-colored truck and then lifted her up into the truck because she was too short to get in by herself.  GASCA said he had hurried E.C. along because he was worried that Aquino would cause an incident.

D.   **E.C.'s Statements**

19.   FBI agents also interviewed E.C.  E.C. told agents that she and her "niece," Aquino, went to the Veteran Affairs office to have a doctor's appointment.  When E.C. was not able to see a doctor, she and Aquino began walking towards their car to go home.  E.C. then saw her boyfriend, GASCA, walking toward her and this surprised her because she did not know that GASCA was watching her.  GASCA said, "I'm Johnny Ray, remember?" GASCA then took E.C. to a small truck, grabbed E.C.'s forearms,

and put her inside of it.  E.C. asked GASCA "Why? Am I sick?"
E.C. was scared to run away from GASCA because she was scared
that he would do something to her or the truck might hit her.
E.C. wanted to call Aquino but she could not find her phone.
E.C. also stated that GASCA and someone else had gone to a bank
during the day, but E.C. told GASCA that she did not have any
money.

**E.   In May 2021, GASCA Contacted E.C.'s Family Members to Ask After E.C.'s Whereabouts**

20.   In May 2021, GASCA reached out by telephone to B.G., a
stepdaughter of E.C.'s.  In a statement to an FBI agent, B.G.
stated that GASCA had told her that he and E.C. had been living
together in New York but that GASCA had not heard from E.C. in
about a month.  According to GASCA, he and E.C. had traveled to
Los Angeles for a wedding and E.C. had not returned to New York
after that trip.  GASCA also said that it was unlike E.C. to go
so long without getting in touch with GASCA.

## IV. <u>TRAINING AND EXPERIENCE ON KIDNAPPINGS</u>

21.   From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct kidnapping investigations, I am aware of
the following:

a.   Kidnappers often engage in advance planning
before abducting their victim to minimize their risk of
apprehension by law enforcement.  Among other matters,
kidnappers will often strategize regarding the location where
they will abduct the victim, the route of travel they will take

with the victim following the abduction, and the location to which they will take the victim after the abduction has taken place.  Kidnappers will often use digital devices, including cellphones and computers, to strategize and research as part of their advance planning.

b.   Although a kidnapper can certainly act alone, it is common for kidnappers to work in groups.  This is because kidnapping an individual can be risky given the number of variables that need to be controlled from physically taking the victim without notice to concealing the victim from law enforcement.

c.   It is not unusual for kidnappers to know their victims.  This is because kidnappers often have information about the victim – from daily routines to financial information – that someone unknown to the victim would not.

d.   Kidnappers are often financially motivated.  That is, kidnappers often think that their kidnapping will result in some type of financial benefit to them.  Such financial benefits can come from a number of sources, but common ways are from forced bank withdrawals or payment of a ransom.

e.   Once the kidnapping has occurred, the perpetrator typically does not allow his/her hostage to be separated from them because when the hostage taker loses direct control of the hostage there is an increased chance the hostage will escape or call for help.

f.   Although kidnapping victims can be and often are moved from one location to another, frequent movement of a

9

hostage in a short period of time is unusual.  This is in part because such movement allows a victim more chances to escape or call for help, but also because it potentially gives law enforcement the ability to track the kidnapper, whether visually or by cellphone tracking.

g.   Although kidnapping victims often comply with their captor's demands to protect themselves – and can try to placate the kidnapper with compliant or obsequious behavior – typically victims fear their takers and are not working collaboratively with them.  To the extent a victim is complying with a kidnapper's demands, it is usually only insofar as is necessary to effectuate the kidnapper's demands so as not to be harmed by the kidnapper.  Kidnappers infrequently trust their victims enough to give them latitude to do things outside the direct control of the hostage taker, including making purchase or interacting with the public.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

22.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

11

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

24. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a. Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GASCA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GASCA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>REQUEST FOR NIGHT SERVICE</u>

26.   Law enforcement asks permission to execute this warrant as soon as possible, before 6:00 a.m., in order to minimize risks that evidence pertinent to the investigation will be destroyed before the warrant could be executed.  Since approximately 5:00 p.m., agents have been preventing ingress or egress from the SUBJECT PREMISES in an attempt to preserve any evidence inside the location.  Law enforcement believes that the SUBJECT PREMISES contains additional digital devices belonging to GASCA, E.C., or one of GASCA's accomplices.  Law enforcement believes that immediate entry into the SUBJECT PREMISES is necessary to seize any digital devices inside in order to mitigate the risk that one of GASCA's accomplices, such as the individual who drove the gold truck away from the Wilshire VA, will remotely delete pertinent information located on one or more of the digital devices in the SUBJECT PREMISES.

## VII. <u>CONCLUSION</u>

27.  For all of the reasons described above, there is probable cause to believe that GASCA has committed a violation of 18 U.S.C. § 1201(a)(2): Kidnapping.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person of GASCA described in Attachment A-1, the SUBJECT PREMISES described in Attachment A-2, and the SUBJECT DEVICE described in Attachment A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>20th</u> day of
July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

15