1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE ANDRE BIROTTE JR., U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,              )
                                            )
6                      Plaintiff,           ) CASE NO.
                                            ) CR 21-351-AB
7          vs.                              )
                                            )
8    JOHNNY RAY GASCA,                      )
                                            )
9                      Defendant.           )
     _____)

10

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 MONDAY, FEBRUARY 27, 2023

16                       11:05 A.M.

17                 LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

            MAREA WOOLRICH, CSR 12698, CCRR
23        FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
24        LOS ANGELES, CALIFORNIA 90012
               mareawoolrich@aol.com
25

1                          **APPEARANCES OF COUNSEL:**

2

3     **FOR PLAINTIFF:**

4         OFFICE OF THE UNITED STATES ATTORNEY
          BY:  KEVIN REIDY
5         -AND-  KATHY YU
          ASSISTANT UNITED STATES ATTORNEYS
6         312 NORTH SPRING STREET, 13TH FLOOR
          LOS ANGELES, CALIFORNIA 90012
7         (213) 894-2434

8

9     **FOR THE DEFENDANT:**

10        JOHNNY RAY GASCA, IN PRO SE
          -AND-
11        FOR THE DEFENDANT - ADVISORY COUNSEL:
          LAW OFFICE MARK A. CHAMBERS
12        BY:  MARK ALLEN CHAMBERS, ATTORNEY AT LAW
          500 LA TERRAZA BOULEVARD, SUITE 150
13        ESCONDIDO, CALIFORNIA 92025
          (760) 489-1808

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 27, 2023

 2                              11:05 A.M.

 3                               -oOo-

 4

 5              THE COURTROOM DEPUTY:  Calling Item No. 1,

 6    Case No. CR 21-351-AB, United States of America versus Gasca,

 7    et al.

 8              Counsel, please state your appearances.

 9              MR. REIDY:  Good morning, Your Honor.  Kevin Reidy

10    and Kathy Yu on behalf of the United States.

11              THE COURT:  All right.  Good morning.

12              MS. YU:  Good morning.

13              THE DEFENDANT:  Good morning, Your Honor.

14              MR. CHAMBERS:  Good morning, Your Honor.

15    Mark Chambers as advisory counsel for Mr. Gasca who is present

16    before the Court.

17              THE COURT:  Good morning to you both.

18              So where I -- I guess since our last status

19    conference, I thought I received -- wasn't there a document

20    that was submitted that laid out an interview -- a joint -- an

21    interview that took place in the presence of the government and

22    the defense investigator?

23              MS. YU:  That's right, Your Honor.  The government

24    filed a supplemental memorandum in opposition to defendant's

25    request for a Rule 17 subpoena.  That was at Docket 146.  And
```

1    in that we included what transpired during the interview with

2    the witness.

3            THE COURT:  If my memory serves me correct -- I

4    don't have it in front of me but -- my apologies.  I don't have

5    it in my file.

6            But if my memory serves me correctly, it seems that

7    she has -- her statement is inconsistent with what Mr. Gasca

8    had hoped that she would say.

9            MS. YU:  That's correct, Your Honor.  Defendant said

10   that, you know, he had witnessed them speak several times a

11   week, and just prior to coming to Los Angeles, the victim had

12   made plans to visit this witness upon her return.

13           The witness instead said that she had not, you know,

14   talked to the victim for approximately three years and had not

15   seen her in four years.  And so with that testimony, you know,

16   her recollection of what happened, we don't think she has any

17   relevant evidence to offer at trial.

18           THE COURT:  Okay.  Mr. Gasca, anything that you wish

19   to say in response?

20           THE DEFENDANT:  Yes.  First, you instructed my

21   investigator and the government to contact her at the same

22   time.  That was not done.  The agent contacted her first.

23           THE COURT:  Okay.

24           THE DEFENDANT:  Then several things I want to say.

25   But pertaining to the first thing, I said I saw her personally

1    speak to her several times.  Your Honor said, well, all we have

2    to really go is your word.  But I'd like to read to you from

3    that report that you received.  It says here, right, "She came

4    down to my husband's birthday party five years ago.  I saw her

5    a year later," which would be four years ago.  "I spoke to her

6    one other time after that at which time she told me she wanted

7    to give her father's flag and she would be sending it in the

8    mail.  I haven't heard from her since.  When she used to come

9    around, she was very thankful because she was involved in my

10   son's life.  She used to come down every month to see her son."

11           Now, just a few questions later, she's asked:

12           "Were there ever any plans to meet with Estrellita

13   after her Los Angeles visit at 21?

14           "Response:  She didn't think so, no."

15           Now, that would be consistent with what the

16   government is saying to the Court, but she goes on.

17           "The last time they talked, she believes she told

18   her she was going to a wedding out in Los Angeles."

19           Now, how could both those things be true?  She told

20   her the last time she spoke to her was what I said, when we

21   were coming out to Los Angeles for the wedding, and she

22   admitted it right here very clearly.  That's two very, very

23   different statements.  One she said I haven't seen her since.

24   She called me once and said she was going to send me a flag and

25   I haven't seen her since.

1          Then she says here, you know what I mean:

2          "Response:  She didn't think so, no.  The last time

3   they talked, she believes she was going to a wedding out in

4   Los Angeles."

5          Oops.  You know what I mean?  So she was caught

6   lying there.

7          THE COURT:  What's the government's response, if

8   any?

9          MS. YU:  Your Honor, it could have been another

10  wedding that she was going to.  I don't know.  But either way

11  she was unequivocal in saying that she had not talked to her in

12  three years or seen her in four and --

13         THE COURT:  Seen the victim; right?

14         MS. YU:  Yeah, seen the victim.  And so I don't know

15  how she could possibly testify as to her mental state which is

16  what defendant said he would -- he proffered, you know, her

17  ability to do so.

18         THE COURT:  Exactly.

19         Mr. Gasca, here's the problem.  You want her to

20  testify as to what?

21         THE DEFENDANT:  Several things.  One of the things I

22  had asked the government to be excused, and I had to offer

23  this -- you didn't excuse them that time.  And so I was forced

24  to give up one thing which is that Valerie called this lady and

25  tried to get personal information about her father's social

1   security number.  This relates to a bank account that I know

2   her father had.

3              THE COURT:  Okay.  But that -- I'm not sure what the

4   relevance of that is.

5              THE DEFENDANT:  Well, it's relevant because she had

6   her sequestered at that time.  And what it shows is she was not

7   just like -- the government portrays her as a family friend.

8   She is not a family friend.  She hasn't seen Estrellita in

9   years.  But Estrellita visited her, and she kept Estrellita.

10  Sometime later she called this lady.

11             When I called this lady to inform her that her mom

12  had been kidnapped and I was trying to locate her and if she

13  called, to please let her know I was interested in contacting

14  her.  I don't know what these people are telling her.

15             And she said to me, look, a lady called here, you

16  know, and she's asking me for my father's social security

17  number because she said Estrellita couldn't collect her VA

18  payments unless she had my father's social security number.

19  And I said to her that's a lie because the payments are sent

20  direct to her bank account.  So she wouldn't need that.

21             She said -- I said to her who the hell are you?  Let

22  me speak to my mother.  And she hung up on me.  Now, that I

23  wanted to say out of the presence of the government because I

24  wanted to hit her with that question while she was on the

25  stand.

1          THE COURT:  Hit who?

2          THE DEFENDANT:  Valerie, the one who had -- who took

3    Estrellita from me when I brought her out here.  I brought her

4    to California.  I brought her for the wedding.  You know what I

5    mean?  They are playing stupid it could have been another

6    wedding.  There's no other wedding.  She knows -- they know

7    what wedding it was for.  I brought Estrellita out here for a

8    wedding.  That's when she was taken.

9          THE COURT:  Okay.  Hold on.  But the part that I'm

10   struggling with is -- okay.  Let's assume -- you want to bring

11   her out here to do what?  To say that -- to say that the

12   other -- her other family members were conspiring against you

13   or --

14         THE DEFENDANT:  Well, I know from one trial -- and

15   I'm sure Your Honor knows because you've done many more trials

16   than me -- that what a person says on the phone to an

17   investigator, even in person to the police is much different

18   than what they say when they get sworn in on that stand.  You

19   know what I mean?

20         THE COURT:  Hold on.  But you are not going to be

21   able to fly someone in from across the country because you hope

22   it's going to be different.

23         THE DEFENDANT:  I don't hope it's going to be

24   different.  I want her to repeat what she said to me.  Now --

25         THE COURT:  But she was interviewed, and she didn't

1  say what she said to you in the interview.

2          THE DEFENDANT:  All right.  If I may say one other

3  thing and then we can pass on that issue, whatever you decide.

4  I'd like to say one other thing on it.

5          So this is her husband.  He was interviewed by the

6  FBI.  Now, there's a little game of telephone going on here.

7  But this is what he says.  He says, "Estrellita was not feeling

8  well, lost her ID and needed her social security number for her

9  dead husband so she could collect his benefits."

10          That was the testimony.  So I didn't make it up out

11  of the air.  Her husband who I've never spoke to spoke to an

12  FBI agent and said that version as well.  Now this version was

13  changed.  Here's the thing.  She came up with a reason which

14  was a medical reason, but she didn't come up with that on her

15  own.  The agent spoke to her first, and then she came up with

16  that.  That was the key thing I wanted to keep.  But my whole

17  thing is I said that to you, and then the husband said that to

18  an FBI agent.  So we didn't make that up.

19          Now, what I believe she'll come to say is that, you

20  know, that girl called her, and that girl tried to get her

21  personal information.  Later on what my investigator asked her,

22  you know, if she asked for a social security card -- a social

23  security number, she said yeah, she believes so, you know.

24          But the thing is this lady, why would she lie?  You

25  know what I mean?  I could understand her lying because maybe

1    she don't want to be bothered.  But she said a calculated lie

2    here.  She gave a medical reason.  She said the girl called her

3    and was asking for medical information because she wanted --

4    she wanted some medical help and she was sick.

5              Okay.  If the girl was sick, why would she give her

6    mother -- I mean, I'll make that argument -- I don't want to

7    give it all away now.  But why wouldn't she ask -- well, my

8    mother is sick, let me give you my mother's information.

9              THE COURT:  But, sir, you can make those arguments

10   without her testimony.  You don't need her testimony for that.

11   Those arguments, you could make them all day with or without

12   her.

13             The issue I'm trying to get is do I -- is there a

14   basis to force someone from out of the district -- because the

15   rules are limited when they are out of the district -- to force

16   someone to come over here.  Based on what I'm hearing, I don't

17   see it because the statements that you had thought she would

18   say, she's saying something different.  The parts you are

19   talking about now, that goes to a broader credibility issue

20   that you can attack all the other witnesses with.

21             So is there anything more you want to say on this

22   point?

23             THE DEFENDANT:  Yes.  That it doesn't contradict

24   what I said.  I said I heard her talking with the lady, and the

25   lady admitted herself the last time she talked to her was when

1    she was coming out to Los Angeles was for a wedding.  So I

2    wasn't lying to you.

3              THE COURT:  I'm not saying you were lying to me.

4              THE DEFENDANT:  I wanted to make sure that I got

5    that one out.

6              THE COURT:  Okay.  Fine.  So look, based on what

7    I've heard, I'm not going to order a woman from -- I'm not

8    going to grant the request for the out of state subpoena.  I

9    believe that you have enough information based on what you

10   described to attack the credibility of other witnesses.  So the

11   motion for the ex parte subpoena will be denied.

12             What else is outstanding that we need to deal with

13   today, Mr. Gasca?

14             THE DEFENDANT:  When I first asked for a phone, I

15   asked for a mirror of my phone.  That was given in

16   November 22nd.  The judge ordered that that be taken over and

17   that my investigator consult with them.

18             Then they told my lawyer during that time would he

19   be able to take a mirror from the mirror we have so that he

20   won't have to go back to the original phone?  And I consulted

21   my investigator, and he said, yeah, that would serve the same

22   purpose of having all the messages there and none being

23   removed, said I would be able to get that.

24             Then Miss Yu took up a month.  She didn't say

25   nothing.  And she told my lawyer the last week we are going to

1    need the hard drives to hand that over.  So he handed her hard

2    drives.  They didn't give my lawyer no indication it was any

3    different.  Then when we came here in court, she argued to

4    Your Honor against giving up the phone.  You had already

5    ordered them to give up the phone.

6            She said, oh, don't give up the phone.  And you went

7    back and forth.  And what you said at that time was do you want

8    him to come back every week?  You know what I mean?  They're

9    just -- and she said, well, there is personal information on

10   there of the witness.  You know what I mean?  You said, well,

11   then block it out.

12           Then she got overly excited which is why it came to

13   my mind later, okay, so it's just the messages and just the --

14   then she wrote down what it was, and she was happy not to give

15   up the phone.

16           Now I know and they know, you hear me, there's

17   exculpatory evidence on that phone.  Kevin Reidy when you asked

18   him, and he's not as skilled yet at lying to your face as

19   Miss Yu is, is there anything exculpatory on the phone, and he

20   said, yeah, it's argumentative that it is.  You know what I

21   mean?

22           I asked for a mirror of the phone.  There's plenty

23   on my phone that says, you know what I mean, what my feelings

24   were for this lady and what my relationship was.  They know

25   that, you know.  But she gave some stuff over the phone.  I

UNITED STATES DISTRICT COURT

```
 1   haven't received it yet.  My lawyer showed me some of it in the
 2   limited time he had last time.
 3          I skimmed through it.  It was pictures of some text
 4   messages that had nothing relevant with this case, you know.
 5   The main thing I want are the audio messages because I mostly
 6   spoke in confident with one friend of mine.  They're taking two
 7   messages out, two messages out pertaining to money when I have
 8   two months of messages.  And who knows if the phone even goes
 9   back more.  But it's in the context of the two months she was
10   taken from me how I felt about her.
11          THE COURT:  Let me stop you there.  What is the
12   status of the phone, audio messages, mirror copy, what's the
13   status?
14          MS. YU:  Your Honor, we agreed back in January when
15   this was discussed that we would get a native verse of the
16   audio messages, photos, and videos, and that's what he'd be
17   getting, and PDFs of the messages.
18          THE COURT:  Okay.
19          MS. YU:  That is what we have produced.  I
20   understand --
21          THE COURT:  All the audio messages?
22          MS. YU:  Yes.  We have not, you know, screened it.
23   That's what was on the phone.  That was what was produced to
24   Mr. Chambers.  He has it.  I assume they are going through it.
25          But I do want to say that he's saying that there are
```

```
 1   messages between him and a person he spoke to in confidence.

 2   Those would still be hearsay, Your Honor.  And with that --

 3           THE COURT:  I get that.  Here's my question.  Hold

 4   on.  I get that there would be hearsay.  But were those

 5   messages turned over?

 6           MS. YU:  Yes.  We did not screen it for relevancy or

 7   by content.  Those buckets that we discussed and that we -- I

 8   thought we had agreed upon were produced.

 9           THE COURT:  Are there any messages out there?

10           MS. YU:  No.  We talked about messages and Facebook

11   messages.  And those were requested.  We got those.

12           THE COURT:  All of those?

13           MS. YU:  Yes.

14           THE COURT:  Okay.  Mr. Gasca?

15           THE DEFENDANT:  Yeah.  There's text messages which

16   involves audio text when I'm talking on the phone and Facebook

17   audio.  Those two messages --

18           THE COURT:  She's saying that's been turned over.

19           THE DEFENDANT:  And text audio?

20           THE COURT:  When you say text audio, meaning like

21   you speak into it and the receiving person hears your voice?

22           THE DEFENDANT:  Yes.  So when I -- normally I would

23   be editing it and I'd be speaking to my friend and I would

24   speak and I had two modes of speaking.  Text message, most of

25   the speaking was done through that, Instagram audio, and
```

1    Facebook audio.

2              THE COURT:  All of that has been turned over?

3              MS. YU:  Yes, Your Honor.  But to the extent they

4    were deleted on the phone, we can't, you know, recover that.

5              THE COURT:  Right.  Okay.  So --

6              MS. YU:  Yeah.  So what we have on there relating to

7    text messages, Facebook audio, text message audio, we have

8    produced.

9              THE COURT:  Mr. Chambers?

10             MR. CHAMBERS:  Yes, Your Honor.  Everything

11   that's being discussed right now was produced in in production

12   No. 23.  Production No. 23 in its entirety has been put on a

13   drive and sent in to MDC.  Mr. Gasca has it.  So he's got

14   29,000 pages of email stuff as part of what was turned over.

15   He's got everything.

16             While I'm standing, there is a second production,

17   No. 24, that has the reports of the doctors that Mr. Gasca/I

18   requested.  Those have been also produced by the government.

19   They have not been provided to Mr. Gasca, and I have not got

20   over to show them to him yet because they are privileged by the

21   government.  So that's been produced.

22             To my understanding, where I left off is that

23   everything that's been asked for for the government has been

24   produced.  I don't believe that Mr. Gasca exactly agrees with

25   that.  But everything that has been produced by the government,

```
 1   he has or I am in a position to show him the doctor's reports

 2   from production No. 24 sometime this week, probably Thursday or

 3   Friday.

 4           THE COURT:  Okay.  Mr. Gasca?  Go ahead.

 5           THE DEFENDANT:  I haven't received that hard drive.

 6   But, again, as soon as I received it, and I'll be happy to look

 7   through it.  Just what he showed --

 8           THE COURT:  Hold on.  Hold on you received a

 9   drive --

10           THE DEFENDANT:  No.

11           THE COURT:  -- production No. 23 --

12           THE DEFENDANT:  No.

13           THE COURT:  -- that has all the audio, video text

14   messages?

15           THE DEFENDANT:  No.

16           THE COURT:  Okay.  So, Mr. Chambers?

17           MR. CHAMBERS:  Your Honor, when I send him drives,

18   when I send him material to MDC, I track it.  I send it with a

19   tracking mechanism so I can see that it arrives.  It's arrived.

20   Okay?  So he's got it, MDC has got it, somebody has got it.

21   But the mail service doesn't have it anymore and it's in that

22   facility.

23           THE DEFENDANT:  I'm sure I'll get it then any day

24   now, you know.

25           Pertaining to the hearsay argument --
```

1          THE COURT:  We are not going to talk about that

2    today.  That -- I just want to make sure you have what you

3    have.  We'll deal with whether it's admissible at a different

4    time.

5          THE DEFENDANT:  Okay.

6          THE COURT:  Because I'm trying to figure out are we

7    going to have this trial on March 20th or not.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Go ahead.  What's next?

10         THE DEFENDANT:  Well, my investigator went to speak

11   to the head nurse.  He called her.  This is a phone number that

12   the same lady, Valerie, that I'm discussing produced to the FBI

13   and said here, you can call the head nurse any time.  This is

14   her phone number.

15         He called her.  And she said, yes, she spoke to him.

16   And then she said, okay, well, let me look through the medical

17   file, and I'll get back with you.  She hasn't got back with

18   him.  He's left numerous messages.  She doesn't -- she's

19   avoiding him.

20         So he said he can go to the hospital and talk to

21   her, but he needs permission from the Court because that's out

22   of district.  That hospital is just out of district.  He said

23   it's out of district.  I can't go unless I have permission from

24   the Court.

25         THE COURT:  Where is the hospital?

UNITED STATES DISTRICT COURT

```
 1              MR. CHAMBERS:  It's in the Southern District of
 2   California, Your Honor.
 3              THE COURT:  Oh, like -- okay.
 4              THE DEFENDANT:  I asked him to come today, but he
 5   had an identification.  There's a witness down in a precinct
 6   and he couldn't come.
 7              THE COURT:  Is there any objection from the
 8   government on that?  I mean, is she going to be a witness for
 9   the government?
10              MS. YU:  No.  And, Your Honor, we did try to
11   facilitate a meeting.  She reached out to the government.  And
12   so I left a message saying we'd be happy -- you know, you can
13   talk to the defense if you want to.  It's totally up to you.
14   But if you want a joint meeting, we can also help you.  And she
15   has not responded to the government since then even though she
16   was the one who initiated contact.  We object on relevance
17   grounds.
18              THE COURT:  That's a different story.  If he wants
19   to do an investigation, that's fine.
20              So look, how -- to the extent you need a minute
21   order that says I authorize your investigator to go out of
22   district to try to reach the head nurse, what's the name of the
23   nurse, if you know?
24              THE DEFENDANT:  Yes.  Carlita Terry.  Is that her
25   name?
```

1          MR. CHAMBERS:  Carlita Terry, T-e-r-r-y, Your Honor.

2          THE COURT:  All right.  So then I will authorize the

3    investigator to go out of district to interview or attempt to

4    interview Carlita Terry.

5          MR. CHAMBERS:  And the doctor, Your Honor.

6          MR. REIDY:  It's actually Carlotta.  I think it's

7    C-a-r-l-o-t-t-a.

8          THE DEFENDANT:  Yeah.

9          THE COURT:  Carlotta Terry.  And who else?

10         THE DEFENDANT:  And the doctor because she said --

11         THE COURT:  What's the doctor's name?

12         THE DEFENDANT:  I don't know the doctor's name

13    because she said that she had that in her medical file so he

14    said he wouldn't be able to get the name until he spoke to her

15    but he would go and speak to her and then get the information

16    from her, the doctor's name.

17         THE COURT:  No.  Let him -- do you know the name of

18    the doctor?

19         THE DEFENDANT:  No.

20         THE COURT:  No, Mr. Chambers.  I'm sorry.

21         MR. CHAMBERS:  Your Honor, I believe the doctor that

22    we don't know the name of is exact -- is Nurse Practitioner

23    Terry, okay, who has signed off on some of the reports as the

24    treating physician.

25         THE COURT:  Is that different than Carlotta Terry?

```
 1              MR. CHAMBERS:  No, it's the same one.

 2              THE COURT:  Oh, it's the same person?

 3              MR. CHAMBERS:  Same person.

 4              THE COURT:  Okay.  So then I'm going to authorize

 5    the investigator to go speak to the head nurse.  And then if he

 6    needs additional stuff, he'll let you know.

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  Okay.  What's next?

 9              THE DEFENDANT:  The last time you said you were

10    going to put that issue on hold.  It was the issue of the bank

11    video and Daniel Plaza.  So I wanted him to come and testify.

12    My investigator said that's not normal that the FBI agent asks

13    for a special favor unless it was some extreme emergency, those

14    cases happen.  She said to you, oh, they do that all the time.

15    You know what I mean?  My investigator said, no, that's not

16    done all the time.

17              THE COURT:  So the issue about whether or not the

18    tape has been --

19              THE DEFENDANT:  The FBI agent asked the person who

20    has this tape, the head of security -- he's not just the video

21    guy, the head of security -- for this tape, you know what I

22    mean, to get the tape.  The FBI agent claims that he didn't

23    give him a second tape which is the actual tape of me going in

24    the bank with her and her getting her money.

25              So then he called him back when I start asking for
```

```
 1    it.  He called him back and didn't ask for the second video.

 2    He just asked for another copy of the first one.  And the guy

 3    said well, that's been erased.  It was a long time ago.  So

 4    what I'm asking is -- you know what I mean?  It's very

 5    unlikely.

 6              I mean, when I mention it to marshals and staff,

 7    they laugh, you know what I mean, that I went into the bank

 8    with her and there's no bank footage of me going in the bank

 9    with her.  You know, that's highly unlikely.  I'm sure

10    Your Honor finds that highly unlikely.

11              So all I'm asking is to have that same person, you

12    know what I mean, come to here --

13              THE COURT:  Which person?

14              THE DEFENDANT:  Daniel Plaza, the head of security,

15    and explain, you know what I mean, why there was no second

16    video produced, if there was no second --

17              THE COURT:  Have you had any contact with this

18    individual, Daniel Plaza?

19              MS. YU:  Yes.  We already talked about this at the

20    last hearing.  Your Honor denied it.  Essentially Mr. Plaza --

21    Mr. Chambers asked if we could ask Mr. Plaza if there was

22    additional footage.  The -- Mr. Plaza confirmed that he'd given

23    us what we, you know, had asked for originally and there was no

24    remaining footage, like nothing -- you know, the video is

25    erased or, you know, their normal turnover, and there was
```

1    nothing new to produce.

2              My understanding is defendant wants to call

3    Mr. Plaza in order to essentially impeach the case agent.  And

4    so Your Honor already denied this last time.  There's no good

5    cause for re-raising it now.  And we would ask the Court just

6    to deny it once again.

7              THE DEFENDANT:  You didn't deny it last time.  You

8    said you were going to put that issue on hold.

9              THE COURT:  So Plaza would just say I did it and the

10   videotape takes over itself after a certain time period?

11             MS. YU:  And the agent asked me to pull footage, and

12   I did it without a subpoena.

13             THE DEFENDANT:  I --

14             THE COURT:  Stop.  Look.  Can you reach out to him,

15   get him to come up here if that's what he's going to say?  I

16   mean, what more -- I mean, is this a burden for the government

17   to get him to come up here and testify to that?

18             MS. YU:  It's just not relevant.  It can --

19             THE COURT:  Well, he's saying that -- he's claiming

20   there was some kind of conspiracy to cover the tape or to

21   destroy evidence.

22             MS. YU:  But, Your Honor, there's no shred of

23   evidence in the record to go to that point.

24             THE COURT:  I get it.

25             MS. YU:  It's a fishing expedition.

1          THE COURT:  But he's saying -- I mean, unless -- has

2    your investigator talked to Plaza?

3          THE DEFENDANT:  Investigator talked to Plaza.

4          THE COURT:  Does he have a statement from Plaza that

5    lays everything out?

6          THE DEFENDANT:  About, 90 percent.  He said he asked

7    him, you know what I mean, the agent, to do him a favor, and

8    not -- and he specifically said and not go the usual route and

9    could he get a tape.

10          Now, he's claiming that he only got a tape of the

11    first time I went in the bank.  That's highly unlikely that he

12    didn't get a tape of the second time I went in the bank.  I

13    mean, this is a bank we are talking about.  We are talking

14    about Chase Bank.  You know what I mean?

15          What I would ask Your Honor to consider is that I'm

16    not here today asking to suppress this or suppress that or

17    suppress this.  I'm asking include this.  I just want to get

18    everything in front of you and then let you decide.  If it

19    comes out that there's no relevant evidence, then it comes out.

20          But, again, it's -- I dealt with police officers and

21    FBI agents before, only one trial.  And I learned very -- I

22    learned what they say on the stand is very different from what

23    they say in their 302s.  And the witnesses, when they get on

24    the stand, it's a different story.

25          Now, whether this guy is going to come and lie and

1    say that hey, I didn't get that tape up or anything or --

2           THE COURT:  I mean, so your -- is your theory that

3    this second tape would show what?

4           THE DEFENDANT:  Well, when I went with her the

5    second bank -- or the second time into the bank, it was after

6    we went into the social security that -- I want to be limited

7    here.  I don't want to give the government away.  But after we

8    went into the social security office.  And from that time,

9    Your Honor, because you're going to see a video where she's

10    hugging me and kissing me, and then we went to the bank in that

11    same fashion.

12           So in the bank video what you see, you would see us

13    arm in arm and talking -- and talking.  But the government is

14    portraying that that was my kidnapped victim.  She was in

15    terror.  She was in fear for her life.

16           THE COURT:  Hold on.  Hold on.  Are you saying the

17    video that you've seen, is that -- are you saying that that

18    video -- what's shown in the video that you've seen is

19    different than this other video?

20           THE DEFENDANT:  Sorry, Your Honor.  So I went to the

21    bank with Estrellita.  Went to the bank.  She didn't have

22    double ID.  The bank was very helpful.  He said she could just

23    go down to the social security office and she can get this

24    extra thing so that I can process this.  We then went to the

25    social security office, came back.  You know what I mean?  And

```
 1   then she did the process.
 2            Now, I knew, you know what I mean, that it was going
 3   to disappear.  So from day one I've been asking all my lawyers
 4   for the bank video.
 5            THE COURT:  Stop, stop, stop.
 6            THE DEFENDANT:  They don't have a bank video of me
 7   going in and saying --
 8            THE COURT:  Are you saying that you didn't go to the
 9   bank?
10            THE DEFENDANT:  No.  No.
11            THE COURT:  Just help me understand.
12            THE DEFENDANT:  Okay.  I am.
13            THE COURT:  What's the significance of -- is there a
14   difference between the two videos that you think is important?
15            THE DEFENDANT:  Yes.  The first video, the
16   transaction wasn't completed, and I went in with Estrellita.
17   It doesn't show anything bad.  You know what I mean?
18            THE COURT:  Right.
19            THE DEFENDANT:  But the second time, her medication
20   is more cleared up, I do remember that we were more romantic,
21   more -- the issue of where she had been I haven't even
22   discussed.  We were just more loving, you know what I mean, in
23   that bank.  So all I said was I want to make sure -- make sure
24   they get both bank videos.  You know what I mean?
25            THE COURT:  So the second video shows you being more
```

```
 1   affectionate with Miss Estrellita?

 2              THE DEFENDANT:  Yeah.

 3              THE COURT:  And so that -- therefore your theory is

 4   that it shows you could not have kidnapped her?

 5              THE DEFENDANT:  Of course.  They are saying she was

 6   in fear of terror and I forced her to go to the bank and all of

 7   that.  And clearly she's not.  You know what I mean?  Or put it

 8   this way:  You would have a hard time believing that once you

 9   saw the video.

10              But in any case, they don't have a second video.

11   They said no, we don't have a second video.  They are asking

12   the Court to believe they don't have a video of me going in the

13   bank with the lady to get -- that's the money shot, so to

14   speak.

15              THE COURT:  Well, they are saying they don't have

16   it.  They aren't saying it didn't exist.

17              THE DEFENDANT:  Right.

18              THE COURT:  They're saying they don't have it.

19              THE DEFENDANT:  So my investigator called him.  And

20   he said this FBI agent asked me to do him a favor and get him a

21   video without him having to go through the normal process of a

22   subpoena.

23              THE COURT:  Okay.

24              THE DEFENDANT:  He didn't --

25              THE COURT:  But what about that suggests something
```

1    went wrong?  You said do him a favor.  Get me the video.  He

2    got the video.  What about doing him a favor suggests that --

3    you are trying to say do him a favor means delete the second

4    video?

5              THE DEFENDANT:  No.  I don't know what happened at

6    that point.  You know what I mean?

7              THE COURT:  Okay.

8              THE DEFENDANT:  But I find it hard to believe that

9    he didn't give him the second video.  So let's just say --

10             THE COURT:  But wait.  But what evidence that you

11   have -- what evidence do you have to suggest that this guy,

12   Daniel, had a second video and said I got this and I know it

13   shows them all hugged up and I'm not going to give it up?

14             THE DEFENDANT:  I'm not saying that.  I believe he

15   gave the second video.  There's no way they are going to do

16   their investigation and they not have the video of me actually

17   going in there and taking the money out with her.  That's --

18             THE COURT:  So you are saying that the government or

19   the FBI had the second video and they saw that it helped you so

20   they buried it?

21             THE DEFENDANT:  Yes, definitely.  That's what I --

22   that's what I believe happened.

23             Now, when I -- now, when I began to ask for that

24   second video now months later, I've been asking for it for all

25   my lawyers from the beginning, but when I asked for it the

1    second time, then the agent called this guy again before my

2    investigator called him, you know what I mean, and he didn't

3    ask for a second video.  He said I need a copy of that first

4    video according to -- according to the statement that he made

5    to my investigator.  And he said oh, I don't have it.  It's

6    been erased.  You know what I mean?

7            So he wasn't even asking for a second.  He asked for

8    another copy -- I don't even know what he would need it.  But

9    he asked for another copy of the first video.  And he said I

10   don't know.  It's been erased.

11           But all I'm asking is for him to come to the stand

12   and say that there was nothing fishy going on and I gave him

13   the tape and he asked me another time and --

14           THE COURT:  Can't you just ask the FBI agent?

15           THE DEFENDANT:  The FBI --

16           THE COURT:  Hold on.  Hold on.  You can ask him

17   whether or not is there -- the video that was shown only shows

18   one portion of what happened; right?  He's going to have to say

19   yes.

20           There's no video that occurred that you have of me

21   and Estrellita going back while we are all hugged up; right?

22   Yes.  Where is that video?  He didn't get it.  And he's going

23   to say I tried to get it.  I couldn't find it.  How is that any

24   different than Daniel getting up here and saying the same

25   thing?  He asked me for a video.  I gave him a video.  I looked

```
 1   for a second video.  I couldn't find the second video.

 2              THE DEFENDANT:  If that's his testimony, you know

 3   what I mean, then what would be the harm in just having him

 4   come and say that?  That's all I'm asking.  Your Honor is going

 5   to decide, not a jury.  You know what I mean?  So --

 6              THE COURT:  All right.  I've heard enough.  Ask the

 7   agent these questions.  You don't need -- based on what I'm

 8   hearing, based on this theory, you are going to get that

 9   information -- you can get that information out.  There's no

10   second video.

11              THE DEFENDANT:  If the guy erased the video on

12   purpose, I'm not going to get that from the agent.

13              THE COURT:  You are not going to get that from

14   Daniel either.

15              THE DEFENDANT:  Yeah, but I'll get -- I'll get out

16   of -- if there's something else that went wrong, I'll get it

17   from him.  He's only going to lie, but so far I don't believe

18   he's going to get up and lie to cover for the government.  He

19   may say certain things and he may do certain things.  But when

20   you come say, hey, you've been subpoenaed to come to court and

21   testify on the stand, that's a different story.  Then people

22   will only go but so far.

23              THE COURT:  But you have nothing to base -- you have

24   nothing to suggest that Daniel is going to say I deleted the

25   second video or the FBI deleted the second video.  It's not
```

30

1    like Daniel said I gave the FBI two videos.

2              THE DEFENDANT:  He may say that.  I have no evidence

3    of him saying no, he didn't say that.  There's no statement him

4    saying I didn't say that.  He just said hey, I gave him a video

5    and that's all that I gave -- all they had was what I gave

6    them.

7              But I would say this to, Your Honor.  You know, I've

8    been an investigator myself.  For you to even look at that

9    video, you have to come in and sign a book.  This is Chase we

10   are talking about.  We're not talking about -- if you even go

11   near Chase and you play with the -- play with the outside door,

12   they have a video of it.

13             And they keep these things months, years afterward

14   because people have false checks, people do false checks.  And

15   then they say, oh, we don't have a false check history because

16   it was 30 days ago, and we erased the video.  No, these things

17   are done digitally.  They have a bank.  They save them.  You

18   know what I mean?  That's common sense.

19             You know, and, again, you know, if it's not, then

20   let him just come and testify.  What's the harm in him coming

21   to testify?  Just like --

22             THE COURT:  I don't want this trial to be

23   three weeks over something that you are speculating.  You have

24   no idea what he's going to say.

25             THE DEFENDANT:  Okay.  Do you -- do you -- do you

**UNITED STATES DISTRICT COURT**

```
 1    agree that it's normal that I went to a lady and they are
 2    saying I threatened this lady and she took her money out of the
 3    bank and they have no video of it in the bank?  This is
 4    multiple angles.  They have no video of me ever going to the
 5    bank with her a second time.  That's normal?  Just tell me if
 6    you find that normal, you've seen that before.
 7              THE COURT:  I have seen that before.
 8              THE DEFENDANT:  Okay.  Let's go on.
 9              THE COURT:  Next.
10              THE DEFENDANT:  I would like to call a medical
11    expert for my defense.
12              THE COURT:  So you want to be evaluated by a
13    medical --
14              THE DEFENDANT:  No.  I want to call a medical expert
15    to go over some of these reports.  He's an expert.  I'm not
16    going to try to argue on his turf.  But there are reports that
17    he -- there are early reports inconsistent with some of the
18    things he -- he examined her nine months later.  Again --
19              THE COURT:  Is there an expert that you have in mind
20    that you want to hire?
21              THE DEFENDANT:  I have one, the one name that was
22    given to me that my investigator said he works with.
23              THE COURT:  Okay.  What's the name of that expert?
24              THE DEFENDANT:  Dr. Rothberg.
25              THE COURT:  I'm sorry.  Spell the last name.
```

```
 1              THE DEFENDANT:  Rothberg, R-o-t-h-b-e-r-g.

 2              THE COURT:  Okay.

 3              THE DEFENDANT:  If you need more thorough

 4    information, my defense --

 5              THE COURT:  Yeah, I'm going to need more.  I mean,

 6    if you want to hire an expert, I mean, I'm not going to stop

 7    you from doing it.  I mean, it's a challenge -- let me rephrase

 8    that before I say that.  I want to make sure.

 9              I assume the government is going to call -- is the

10    government going to call an expert with respect to the victim's

11    mental status or not?

12              MR. REIDY:  Yes, Your Honor, we are.

13              THE COURT:  Okay.  All right.  So you want an expert

14    to contradict or present an opposing view?

15              THE DEFENDANT:  Clarify -- to clarify, their medical

16    expert that they are calling is one who reviewed Estrellita --

17              THE COURT:  I don't want to hear the argument now.

18    I'm going to -- I'm going to be in this trial.  Okay?  So I'll

19    hear that then.  You want an expert that's going to, in

20    essence -- to present a different view or other way of looking

21    at things as it relates to the government's expert?

22              THE DEFENDANT:  Their medical expert is also coming

23    up in the next issue, because Your Honor hasn't ruled on the

24    next issue, but their medical expert reviewed her nine months

25    later.
```

1           THE COURT:  I know that.

2           THE DEFENDANT:  Okay.  So there's also a ruling

3    Your Honor has to make about their medical expert reviewing

4    some videos that they had.

5           THE COURT:  Hold on.  Wait a minute.  Let's deal

6    with this.

7           THE DEFENDANT:  Okay.  So their medical reports I've

8    seen, which were of the time, you know what I mean, that I --

9    that I retrieved her, of that time there are reports and this

10   lady also who I'm trying to bring was caring for her, the fact

11   that she called -- my investigator talked to her.  She said

12   I'll get back to you and then called the government showing

13   exactly what I know, that she's not neutral.  That means she's

14   biased.  She's probably a friend of Valerie's because Valerie

15   works in a nursing station.  All of that will come out.

16          But this expert, you know what I mean, I want to

17   review the medical records by the time I've seen them.  And the

18   thing is that --

19          THE COURT:  I don't need your theory.  You want a

20   medical expert.

21          Mr. Chambers, can you help facilitate getting a

22   medical expert appointed for Mr. Gasca?

23          MR. CHAMBERS:  Absolutely, Your Honor.  I mean, this

24   is a new name to me.  And I will contact the investigator and

25   get a CV and submit it for funding.

1          THE COURT:  Okay.  Great.  Thank you.

2          MR. REIDY:  Your Honor, I apologize.  I just want to

3    make sure that the scope of the expert's work is going to be

4    clear.  This is just going to be a literature review expert, I

5    mean --

6          THE COURT:  Versus what?

7          MR. REIDY:  There's not going to be any mental

8    examination of the victim and defendant has no basis for

9    which --

10         THE COURT:  I don't -- based on what he's saying,

11   you want -- you want the expert to look at the records and

12   provide his theory?  You are not asking that the victim be

13   examined?

14         THE DEFENDANT:  No.

15         THE COURT:  Correct?

16         THE DEFENDANT:  Yes.

17         THE COURT:  All right.

18         MR. REIDY:  Thank you, Your Honor.

19         THE COURT:  Okay.  What's next?

20         THE DEFENDANT:  I have a witness coming from

21   New York.  Like I said, I referred to a situation may come up.

22   But a witness is coming from New York to testify to

23   Estrellita's mental state and that she visited us many times

24   and saw my interactions and she interacted with her.

25         THE COURT:  He's coming -- he or she is coming out

```
 1   on their own?
 2           THE DEFENDANT:  No.  I'm asking the Court if you
 3   would provide funds for her.  She's a person who's a caretaker
 4   for, in fact, elderly people, can't really come out here.  And
 5   I didn't think to bring her.  But now things just have come up,
 6   and I've asked her, I'm going to need you to come out.  She
 7   said yeah, if you need me to come out, she can come out.
 8           THE COURT:  You want us to subpoena an out of
 9   district witness.  Who is this witness and what is it she --
10           THE DEFENDANT:  Her name is Odalis Carerro.  And
11   she --
12           THE COURT:  Hold on.  Odalis, how do you --
13           THE DEFENDANT:  C-a-r-r-e-r-o.  First name Odalis,
14   O-d-a-l-i-s.
15           THE COURT:  Okay.  She's an RN, a nurse?
16           THE DEFENDANT:  No.  She's a home care attendant.
17   She goes to different homes and houses and stuff like that
18   taking care of people.
19           THE COURT:  Okay.
20           THE DEFENDANT:  And she's --
21           THE COURT:  You want her to testify with respect to
22   the victim's mental state?
23           THE DEFENDANT:  Yes.  She's going to come out here.
24   And our relationship as well, that the relationship the
25   government says is fake, that she can testify that she didn't
```

UNITED STATES DISTRICT COURT

1   see anything about it that was fake.

2           THE COURT:  Okay.  Have you talked to Mr. Chambers

3   about this at all or no?

4           THE DEFENDANT:  Just this morning.  He said I should

5   bring it up to you.

6           MR. CHAMBERS:  No, Your Honor.

7           THE COURT:  All right.  Well, does the government

8   have a position?  I mean, you are hearing this for the first

9   time, I assume?

10          MR. REIDY:  I'm sorry, Your Honor.  I think that we

11  would oppose the provision of funds for this witness.

12          THE COURT:  And what's the basis?  I mean, mental

13  state is going to be key in this case; right?

14          MR. REIDY:  Well, I'm not sure of what her mental

15  state -- it's unclear when this witness viewed their

16  relationship.

17          THE COURT:  I mean, I assume based on what Mr. Gasca

18  is saying that he provided home care for her during what time

19  period?

20          THE DEFENDANT:  She did not provide home care for

21  her.  That's not what I said.  She came and visited her at the

22  house, you know what I mean, as a friend, as a mutual friend.

23  She saw her several times.  She can testify to mental state.

24  And the day that she was in the truck when I got Estrellita, I

25  called her and she videoed her.  And she talked with

```
 1   Estrellita, and they were smiling and laughing, and she'll

 2   testify to that.  And she told -- Estrellita told her I'll see

 3   you when I get to New York.

 4            THE COURT:  So she visited as a mutual friend how --

 5   how far before the incident occurred?

 6            THE DEFENDANT:  Oh, maybe a week as far as that one.

 7   But she visited us like five times, appeared like four or five

 8   times.  We went out with her daughters.  She just interacted

 9   with us.

10            MR. REIDY:  Your Honor, it just might be easier to

11   get a report of the investigator's interview.

12            THE COURT:  Well, here's another thing that's

13   unconventional, but given this trial, why don't we try -- why

14   don't we just get her on Zoom?  Why do we need to fly someone

15   out here?  You'll see her.  I'll see her.  You can

16   cross-examine her.

17            THE DEFENDANT:  I asked if that was possible

18   before --

19            THE COURT:  But you have to be okay with that,

20   Mr. Gasca.

21            THE DEFENDANT:  Sure.  I asked if that was possible.

22   My other lawyer told me no.

23            THE COURT:  Generally it's not.  I'm just trying to

24   avoid -- I'm just trying to get a trial done here.

25            THE DEFENDANT:  That would be great.
```

1          THE COURT:  Mr. Reidy, any -- do you have a --

2     separate and above the relevance issue, do you have an

3     objection, if we utilize one witness here, if she does testify

4     via Zoom?

5          MR. REIDY:  Your Honor, I just -- I'm not sure what

6     the state of the law is on that issue.  I don't have an

7     objection --

8          THE COURT:  Well, he's waiving it for whatever -- I

9     mean, he said he's okay with it so --

10          MR. REIDY:  I think that we -- that we would not in

11     that instance.  But if Your Honor is okay, if we could just go

12     back and take a look --

13          THE COURT:  And run it by the bigger brains in your

14     office?  Not to suggest yours are small.

15          MR. REIDY:  No, it's an accurate suggestion.

16          THE COURT:  At least one of you.  Only speak for

17     yourself, Counsel.

18          MR. REIDY:  Yes.

19          THE COURT:  All right.  So my proposal will be --

20     I'm putting down a proposal, Zoom testimony as to this witness.

21     The government to review and object if necessary.  Gasca agrees

22     to limited use of Zoom for this witness only.

23          All right.  What's next, Mr. Gasca?

24          THE DEFENDANT:  The escorting of Estrellita on the

25     day that she's supposed to come.  I don't mean to trouble the

```
1    Court, but I would like her escorted by marshals.  My

2    understanding is the --

3              THE COURT:  That's not your concern.  That's not

4    your concern.  Next -- next topic.

5              THE DEFENDANT:  I'd like to --

6              THE COURT:  Next topic.  I'm not -- you don't

7    dictate who comes in what -- I mean, this ain't Burger King.

8    You can't have it your way.

9              THE DEFENDANT:  No, they're not bringing the

10   witness.  I'm bringing her.  If they were bringing her, that

11   would be fine.  But they've chosen to do this trial without

12   calling the witness.

13             THE COURT:  So what --

14             THE DEFENDANT:  So I'm asking --

15             THE COURT:  You want me to call Uber X for her?

16   What are you talking about?

17             THE DEFENDANT:  I'm asking for the witness to come,

18   the marshals bring her.  Why would the FBI agent share a

19   three-hour car ride with her?  Why would that be okay with me?

20   An FBI agent is going to be riding --

21             THE COURT:  Well, your objection -- your request is

22   denied.  So next topic.

23             THE DEFENDANT:  I haven't finalized them yet.  Are

24   we coming back another time before --

25             THE COURT:  I would not -- I would like to avoid it.
```

**UNITED STATES DISTRICT COURT**

```
 1    But if you -- because look, we have a trial.  So --

 2              THE DEFENDANT:  Right.  So I have not seen the stuff

 3    that they say they gave.  You know what I mean?  I find it hard

 4    to believe that they are going to give me anything that's

 5    exculpatory in there.  But I'm going to search for it.  You

 6    know what I mean?

 7              At the very least, though we are not dealing with

 8    the issue of hearsay today, it's from the dates that they

 9    take -- if they take something out, my limiting understanding

10    of the law, I'm allowed to have the rest of that.  You know

11    what I mean?

12              So I want to at least make sure I have other

13    messages that exist for the day that they are taking -- they

14    are only taking two messages, I want to make sure I have the

15    rest of that conversation.  So if I don't have that and it's

16    not on there, do I come -- on the day of trial, I bring it

17    up and they --

18              THE COURT:  You can bring it up.  But I want to be

19    clear.  You've heard the government today say, and I believe

20    they said it the last time, they have -- they have what they

21    have.  Okay?  And they provided that to you.  Okay?  If

22    something is not on there, I guess you could say there's

23    another portion of a statement that's not on here?  Is that

24    what you are trying to do?

25              THE DEFENDANT:  To clarify, they are taking a
```

```
 1   statement, and the statement is, you know, oh, Estrellita, she
 2   should have 16 grand if I get her back.  That money came up
 3   later.  But they're saying that that was then was my impetus to
 4   then come out and get her, even though I was already trying to
 5   get her long before that.
 6          But so that conversation that I'm talking with my
 7   friend is never hey, one or two messages.  We talked all the
 8   time, you know.  And I expressed my feelings and worrying about
 9   her and all that.  So they're trying to pretend oh, that's the
10   only reason why he was concerned for her.
11          THE COURT:  And you believe those statements are in
12   the voice messages -- you are hoping that those statements are
13   in the voice messages that have been turned over?
14          THE DEFENDANT:  Yeah.  I don't know if they are.
15          THE COURT:  Right.  Okay.  And so if they are, you
16   can try to -- you can raise it at that time.
17          THE DEFENDANT:  Okay.  So --
18          MR. REIDY:  Sorry, Your Honor.  I apologize.  Just
19   with regard to the Facebook audio messages which seems to be
20   the crux of the defendant's argument, this could be a problem
21   of his own making.  We have defendant in a jail call asking the
22   same friend, Edward Santiago, to delete all Facebook messages.
23          THE COURT:  Right.  But you'll bring that out, I
24   presume, as impeachment.  He's saying that there's other
25   messages that show that they have this longstanding
```

```
 1   relationship --
 2              MR. REIDY:  I understand.
 3              THE COURT:  -- that he cares about her --
 4              MR. REIDY:  I'm sorry, Your Honor.  I understand.  I
 5   just want to make sure that there's another alternative
 6   explanation for the absence of such messages that doesn't
 7   involve this --
 8              THE COURT:  This theory, right.  No, I get it.  And
 9   I'm trying to convey to you --
10              THE DEFENDANT:  They found it on my phone.  They
11   found audio messages on my phone.
12              THE COURT:  Listen.  Listen to what I'm saying.
13   You're -- if you think that the trial will be that, hey, I know
14   I said something in April and you don't have it in these text
15   messages, just because you don't have it doesn't mean that, A,
16   the government intentionally got rid of it and, B, that you get
17   to just say, oh, I said these other things.
18              THE DEFENDANT:  But from July 11th -- at least from
19   July 11, they took a message.  They called a message.  That
20   message was taken from other messages.  So let's just say that
21   the phone erased everything before July 11.  I have to have the
22   messages all the way from July 11 on, July 11th to July 19th.
23   They took another messages on July 15th.  So those Facebook
24   messages exist because they took it.
25              THE COURT:  Right.  But what I'm saying is why don't
```

1    you look at the evidence and see if they exist.

2            THE DEFENDANT:  Yeah.

3            THE COURT:  If there's some statement, you got to

4    tell me which one you think is relevant and that you want to

5    try to introduce it.

6            THE DEFENDANT:  Sure.

7            THE COURT:  Okay?

8            THE DEFENDANT:  They are already saying they don't

9    exist.  But I'll go through it.

10            THE COURT:  All right.  What's next?

11            THE DEFENDANT:  I believe that covers it other than

12    Your Honor has to rule on their medical expert.  They are

13    asking that their medical expert review a video nine months

14    before and give his opinion on it.

15            THE COURT:  Wait a minute.  I'm confused.  The

16    medical expert --

17            THE DEFENDANT:  They are calling a medical expert

18    who reviewed her at nine months.  They attempted to have him

19    give his opinion of before and our relationship and go far

20    back.  Your Honor said no, he can only testify to what he

21    viewed on that date.  You know, they want him to testify to

22    previous medical reports that weren't taken by him.

23            What I'm asking is if any -- if any of those medical

24    reports are brought in, let the doctor come in, not a doctor

25    come nine months later and well, say these other doctors say

**UNITED STATES DISTRICT COURT**

44

1    this.

2            The next thing they asked for in that hearing was

3    they wanted to review videos that we took that day and give his

4    opinion on them.  I mean, you asked them to file a motion, and

5    they filed a motion with you for that.  I opposed that, you

6    know.  You're going to see the videos.  The videos speak for

7    themselves.  Why do you need a medical expert nine months later

8    to tell you yeah, you know, when she was kissing him, you know,

9    that wasn't really a kiss of passion.  That was a kiss of fear

10   for her life.

11           THE COURT:  All right.  Mr. Reidy or Miss Yu?

12           MR. REIDY:  Your Honor, I'm not sure what the

13   defendant is referring to.  There was a motion in limine to

14   exclude the expert's testimony which Your Honor ruled on at the

15   pretrial conference which took place last year.  At that

16   pretrial conference we did discuss the possibility of

17   supplementing our expert disclosure saying that --

18           THE COURT:  You did?

19           MR. REIDY:  We did do that.  And we provided it to

20   defendant and his counsel.

21           THE DEFENDANT:  And you didn't rule on it.  You said

22   you didn't rule on it.

23           THE COURT:  Do I have a copy of it?  I'm sorry.  I

24   didn't --

25           MR. REIDY:  Your Honor, I think that -- I'm not sure

UNITED STATES DISTRICT COURT

```
 1    if there's anything to rule on.  There's been no motion to
 2    exclude that portion.
 3              THE COURT:  No.  But do you -- I don't have a copy
 4    of it; correct?
 5              MR. REIDY:  Correct, Your Honor.
 6              THE COURT:  What does the supplemental say, if you
 7    remember?
 8              MR. REIDY:  The supplemental discovery -- excuse me.
 9    The supplemental disclosure says that Dr. Landy reviewed the
10    videos that defendant -- or that defendant's co-defendant took
11    of the victim on the day of the kidnapping.
12              THE COURT:  Okay.
13              MR. REIDY:  There's approximately two hours, maybe
14    an hour and a half worth of footage.  And Dr. Landy will opine
15    that based on his review of those -- of that footage that the
16    victim displayed the same sort of cognitive deficits that
17    Dr. Landy observed when he examined the defendant -- or the
18    victim in February of last year.
19              THE COURT:  Got it.
20              And you are going to hire an expert that will likely
21    say that's not true?
22              THE DEFENDANT:  Well, my expert was to say what the
23    previous medical reports say.  Why would a doctor -- we need a
24    doctor to tell you what's in the video?  The video speaks for
25    itself.  You're going to see the video.
```

1        THE COURT:  You may -- if you get your expert, you

2   may want to have your expert look at the same video that the

3   government expert looked at.  Your expert may say she doesn't

4   show any cognitive decline.

5        THE DEFENDANT:  I'm not even trying to go that far.

6   I will if I have to.  But I want to make -- I wanted my expert

7   just to speak to the medical things that were taken on the day

8   when I retrieved her, what was her medical condition for that

9   date.  This guy is trying to go back in time nine months, you

10  know what I mean, and predict what he saw in the video.  Yeah,

11  of course --

12       THE COURT:  He's going to -- I mean --

13       THE DEFENDANT:  He's their hack.  Of course he's

14  going to say what they want him to say.

15       THE COURT:  He's an expert.  If they can lay the

16  foundation for him being an expert, he can testify about his

17  examination.  He can testify about what he observed.  And he

18  can say based on my opinion, I think X.

19       You have --  you got an expert that's hired by you

20  that will probably say based on these records, I think a

21  different way.

22       THE DEFENDANT:  Okay.

23       THE COURT:  So, I mean, these cases many times come

24  down to the dueling of experts.  So let the games begin.

25  You'll get your expert.  They'll get their expert.  And they'll

**UNITED STATES DISTRICT COURT**

1    duke it out for lack of a better term.

2         THE DEFENDANT:  I don't think it's fair that an

3    expert would take -- would review something nine months before

4    and give his opinion on it.

5         THE COURT:  Look, experts do a lot of things that

6    people may question or don't question.  If they establish they

7    have the qualifications, they can establish their opinion.

8    It's subject to cross-examination.  You can say well, how --

9    you can say what you just said.  You are making the opinion

10   about someone from nine months earlier?

11        I mean -- and you can try to attack that expert.

12   But that doesn't mean they can't come in.  That's their expert.

13   You are going to have an expert.  And the government is going

14   to try to question the credibility or the qualifications of

15   your expert.  It's going to be the battle of the experts.

16        Mr. Chambers?

17        MR. CHAMBERS:  Yes, Your Honor.  There are certain

18   defense exhibits, photos and some movies, that Mr. Gasca needs

19   to discuss with the Court.

20        Also we'd ask that Mr. Gasca discuss the trial

21   procedures with the Court, potential use of the lectern,

22   potential use of the projector, these nuts and bolts.  If we

23   are not going to have another hearing, I'd like to get some

24   guidance at this point.

25        THE COURT:  For purposes of the trial, I'm assuming

UNITED STATES DISTRICT COURT

```
1   he can use the lectern.  If he has exhibits that he wants to

2   put on the ELMO, he can use those as well.

3           MR. CHAMBERS:  I would ask that Mr. Gasca discuss

4   with the Court the nature of the photos and the movies that he

5   intends to introduce as evidence.

6           THE COURT:  What photos and movies do you intend to

7   introduce?

8           THE DEFENDANT:  Photos of Estrellita and just a

9   trailer of my film that I'm doing.

10          THE COURT:  Okay.  What is the film -- tell me what

11  the film is that you are doing.

12          THE DEFENDANT:  It's a Karate action film.

13          THE COURT:  What's the relevance of it?

14          THE DEFENDANT:  The relevance is that that was what

15  she invested the money for.  The quality of it is important

16  because you will see it's not in the rinky-dink-dink.  I did

17  it.  Estrellita saw me doing it.  She was with me while I was

18  making it.  And she very invested money in it.  That's what she

19  saw.

20          THE COURT:  So you are saying that the money taken

21  from the bank on this date and time?

22          THE DEFENDANT:  No.  The government is saying that

23  money she gave me months before, $35,000, that I somehow in a

24  fake romance conned her out of that money.  You know what I

25  mean?  Though I was with her six months before that happened.
```

```
 1   So fine.  But she invested that money in my movie.  I mean,
 2   that was what --
 3                THE COURT:  What's the proof that she invested the
 4   money in the movie?
 5                THE DEFENDANT:  The proof?
 6                THE COURT:  Like are there receipts or like invoices
 7   or something that shows she gave you the money and you then put
 8   it into the movie?
 9                THE DEFENDANT:  No.
10                THE COURT:  So then just help me understand.
11                THE DEFENDANT:  I have two witnesses that are coming
12   who were in the movie.
13                THE COURT:  Do the witnesses say that she invested
14   money?
15                THE DEFENDANT:  No.
16                THE COURT:  So that's not relevant.  You are going
17   to say -- I assume you are going to testify.  You are going to
18   say she made -- you know, she invested money in this movie.  I
19   made this movie.  If the government challenges the existence of
20   the movie, then that's -- then I guess it may become relevant.
21   But just the fact that you made a movie, I'm not sure I see the
22   relevance.  You are saying she invested money in it --
23                THE DEFENDANT:  $35,000 is not a lot of money.  But
24   for someone to give me that money, I have -- they have to have
25   something that they believed in; right?  So, you know, it's my
```

1  movie.  It's not simply that I was making a movie, but the

2  quality of the movie is important, you know.  Do you see the

3  movie, this looks like a movie that -- you know, it's not a

4  rinky-dink movie.  That will be your opinion.  Like the quality

5  of the movie --

6          THE COURT:  You want me to watch a whole movie?

7          THE DEFENDANT:  No, a trailer, a simple trailer.  A

8  trailer of the movie, it's like two minutes.  I get to play it.

9  I just want to show Your Honor what it is.  You know what I

10 mean?

11         THE COURT:  I have to tell you, I mean, there's

12 going to be -- we are going to go through this trial.  We'll

13 see how it goes.  I'm just -- I'm not sure I see the relevance.

14 To me I thought you were going to say I made a movie.  Here's

15 the movie, and it has her name on the credit, or I got receipts

16 to show, here's our production agreement, she invested X amount

17 of money into this movie.

18         THE DEFENDANT:   The movie is not done yet.  So I

19 can't show you the completed movie.  But I've got pictures of

20 Estrellita on the set.  You know what I mean?  So she --

21         THE COURT:  Okay.  So you got a picture of her on

22 the set.  Okay.  Fine.  So, I mean, that seems more relevant.

23         THE DEFENDANT:  Well, the fact that I say I have a

24 movie, anybody could have a movie.  You could have a video with

25 a home camcorder.

1          THE COURT:  Right.

2          THE DEFENDANT:  You know what I mean?  But to see

3    the quality of the video is important because that's -- I mean,

4    I assume she's going to remember.  You know what I mean?  But I

5    don't know.  I haven't seen her in 18 months, you know.

6          So let's say she comes in here slobbering and only

7    looking at the wall.  Well, you have to believe that she gave

8    her money because she believed in something.  Wouldn't you like

9    to see what she believed in?

10          THE COURT:  But, again, you keep saying that, oh, I

11    see a movie, therefore I have to conclude --

12          THE DEFENDANT:  No, you don't have to conclude.

13          THE COURT:  -- she gave money for a movie.

14          THE DEFENDANT:  You don't have to conclude, but it

15    makes an argument.  I mean, if I -- if I talk to you about

16    being in a movie, that trailer, about five trailers at

17    different times has helped me with different things.  People

18    see it and say, oh, it's a movie.  And people say oh, it's not

19    a rinky-dink, it's a real movie.  You know what I mean?

20          And that's how I acquired actors.  Isaac Singleton,

21    Ali Young, they've done over -- Ali Young done over 150 movies.

22    He's retired.  He came out of retirement to be in my movie but

23    only after he saw the trailer.  He said, you did that?  And I

24    showed him some of the make -- you know what I mean?  Then he

25    agreed to be in it.  But he thought when I was asking, it was

1    going to be some rinky-dink thing.

2            So, you know, I've spent, you know, a lot of money

3    on it.  I won't go into that here.  But along the way,

4    Estrellita chose to invest in the movie.

5            THE COURT:  I got to tell you, I'll keep an open

6    mind.  But I'm just -- I'm not seeing the relevance of it.

7    Let's see what the government's case looks like.  And you'll

8    bring it up again at trial.

9            THE DEFENDANT:  Okay.

10           THE COURT:  What else, if anything, do we need to

11   discuss?  I mean, we can have another status conference.  I

12   just worry that Mr. Gasca will use this as a sword and a

13   shield.  He wants a trial.  I'm trying to give him a trial.

14   Every time we have a status conference, oh, there's something

15   else, there's something else, there's something else.  And I

16   just want to make sure.  Are we going to have this trial

17   on March -- what is it?  March 20th?

18           MR. CHAMBERS:  The 20th, Your Honor.

19           THE COURT:  March 20th.  I just want to keep us on

20   track.  So are there things you think we need to discuss,

21   Mr. Gasca, between now and March 20th?

22           THE DEFENDANT:  No.  I'd like to come in that day

23   and start as well, like I said, assuming that, you know --

24   well, yeah, give me one second, Your Honor.

25           THE COURT:  All right.

1          (Pause in proceedings.)

2          THE DEFENDANT:  There's one delicate issue.  So part

3    of the government's case, right, is the age difference.  She

4    was 65 or 67 or whatever at the time.  And they said that that

5    helps strengthen their case of why I would be with her.  That's

6    a lot of ageism there, but that's what they are proposing.

7    They are proposing the relationship was fake and the age

8    difference shows that it was fake.

9          So I have personal photos of Estrellita.  They've

10   seen other ones because I took some in the hotel at the time

11   that we were in the hotel.  They've seen them.  So it's not

12   anything that they haven't seen.  You know what I mean?

13         But I have some more intimate ones of me and her.

14   And what they display is a woman very fit with a body of a

15   35-year-old.  And maybe if Your Honor can just view them

16   discreetly.  You know what I mean?  It's okay, but I just

17   thought -- you know, it's not something I'm comfortable with.

18   But if you make an argument that, hey, man, she was too old.

19   You were not with her.  She wasn't too old with me.

20         THE COURT:  Well, let's --

21         MR. REIDY:  Your Honor, we would object to --

22         THE COURT:  Well, look, I don't know what the trial

23   is going to present, quite frankly.  Let's hope that I don't

24   have to cross this bridge.  I mean, I'm not sure I see like --

25   okay, so she's fit.  I don't -- okay.  So what?  I don't

54

1   think -- I don't think the government's case is based solely on

2   age.  I don't think that's the issue.  So --

3              THE DEFENDANT:  A large part of their saying the

4   romance was fake, they said to you yourself, we believe -- you

5   said -- we believe the whole relationship was fake.  And you

6   said the whole relationship?  And they said yeah.  And they

7   said we believe that age, you know, something, and they made an

8   argument to you.  They said one of the reasons I gave them --

9   it sounds like they was trying to argue for the romance scam

10  expert.

11             THE COURT:  I get it.

12             THE DEFENDANT:  So they said we believe that the

13  mixed age -- it's not -- can we reserve it at least and then

14  see something later?  Because I spoke to --

15             THE COURT:  I'm not doing this.

16             THE DEFENDANT:  I spoke to my investigator.  And he

17  said the relevance of the pictures in his view, you know what I

18  mean, was that it showed the completion of our relationship.

19  Here was the intimate part.  You were intimate with her.  You

20  know what I mean?  It shows that you -- she was a physically

21  fit woman.

22             THE COURT:  When the investigator becomes a judge,

23  he can make that ruling.  But I'm not --

24             THE DEFENDANT:  I didn't say he said it was

25  relevance.  I'm saying the relevance I said it was.

```
1              THE COURT:  Okay.  And I'm telling you that I don't
2     need to see --
3              THE DEFENDANT:  Okay.
4              THE COURT:  -- a bunch of intimate photos.  You want
5     to show photos of your relationship, that you guys were hugged
6     up or, you know, out and about, hey, that's a different story.
7     But I don't need to see -- I mean, that's -- well, there's no
8     need for it.  I don't see the relevance.  I just don't.  I
9     don't see it.
10             THE DEFENDANT:  Then I would exclude them making any
11    argument about age.  There's no evidence there was anything
12    about age.
13             THE COURT:  That motion is denied.  They are going
14    to present their case.  You present yours.  I'm not -- let's
15    hear the evidence and we'll go from there.
16             THE DEFENDANT:  Okay.
17             THE COURT:  All right.  So look, it probably makes
18    sense we'll have another status conference maybe two weeks
19    before trial.  Well, actually not -- let's see if we can have a
20    status conference on March 13th at 1:30 p.m.  That's the only
21    time I have available.
22             MR. CHAMBERS:  Your Honor, I would request another
23    date.  I have to be in the Southern District on that day.
24             THE COURT:  The problem is I'm not going to do it
25    next week.  I mean, that's not -- that doesn't make any sense.
```

1    And I don't want to do it -- well, we cant -- we could do it on

2    March the 15th at 1:30 p.m.

3              MR. CHAMBERS:  That's fine, Your Honor.

4              THE COURT:  Does that work for the government?

5              MR. REIDY:  Yes, Your Honor.  Thank you.

6              THE DEFENDANT:  Your Honor, I would ask if I could

7    please have a time earlier when I'm back here.  Just so

8    Your Honor knows, I can say --

9              THE COURT:  Mr. Gasca, you tell me this every time,

10   and I try to accommodate you.  But you can't have it your way.

11   I've been doing everything that you want, and I can't --

12             THE DEFENDANT:  Last time --

13             THE COURT:  No.  You are going to listen to me.  You

14   are going to listen to me now.  I can't do it in the morning.

15   I can't do it in the morning at all that week.  If you don't

16   want a status conference before the trial, we can just meet on

17   the 20th and start the trial.

18             I'm trying to do you a solid here.  I can't do it in

19   the morning any day of the week of the 13th.  I understand the

20   jail thing and it takes all the hours.  I get that.  What do

21   you want me to do?  So --

22             THE DEFENDANT:  Okay.  I jut want -- I don't need to

23   set a conference.  But I would like to say because last time

24   you said 1:30, I said nothing.  I'll do it in one day.  The

25   difference is, I just want to explain to Your Honor, when I'm

UNITED STATES DISTRICT COURT

```
1    shackled back there, there's an early go-back often, not all

2    the time, but early go-back, and I get to go back in the

3    afternoon, and I get to make it back.  And then I get to have

4    chow, a hot warm dinner at 5:00.

5              When it's done at 1:30, the marshals try to get me

6    to go back early, but it's a big go-back about 3:30.  And then

7    MDC has to process me.  And so I get a sandwich in a bag and

8    not that -- I'm in shackles all day for that time.  It's not

9    like I'm off shackles and I'm in a cell and I'm just waiting.

10   I'm in shackles all day.

11             THE COURT:  You don't want a status conference?

12             THE DEFENDANT:  No.

13             THE COURT:  You just want to have the trial on the

14   15th?

15             THE DEFENDANT:  Yeah, we'll go on the 15th.

16             THE COURT:  I mean the 20th.

17             THE DEFENDANT:  Yeah.

18             THE COURT:  You are making a -- you are making a

19   mistake.  You are making a mistake.  But that's on you.  You

20   don't want to have a trial.  But don't bring a bunch of issues

21   on the 20th when I gave you the opportunity before.  The whole

22   purpose of this --

23             THE DEFENDANT:  That's not my style.

24             THE COURT:  -- is to deal with this.

25             THE DEFENDANT:  Hasn't been my style.
```

1          THE COURT:  Okay.  All right.  So I want to make

2    sure.  Mr. Gasca, you do not want to have a status conference

3    before the trial?  You want the next trial -- next date to be

4    March 20th to start the trial?

5          THE DEFENDANT:  You've ruled what I can have and

6    what I can't have.  A status conference is what can be done and

7    what cant be done by then.  You know, what can't be done by

8    then --

9          THE COURT:  Is that a yes, you do not want to have a

10   status conference on the 15th?

11         THE DEFENDANT:  No.

12         THE COURT:  You do not want to have it?

13         THE DEFENDANT:  No.

14         THE COURT:  Okay.  Fine.  We'll meet on the 20th for

15   trial.  Please be ready for the -- have your witnesses ready to

16   go.  My hope is that we are going to get this thing going.

17   Mr. Gasca, you are not going to waste a lot of time.  We are in

18   trial.  Okay?  I've ruled the way I've ruled.  We are going to

19   go.  You are not going to bring up a bunch of issues every day

20   because we've had these status conferences to try to deal with

21   all the issues up front.

22         That's why I said I'll do it one more week just to

23   see if there's any loose ends.  You don't want that.  But don't

24   come here on the 20th and saying oh, I need to talk about this,

25   oh, I need to talk about this.  We are going to trial on the

1    20th.  Do you understand that?

2              THE DEFENDANT:  Yeah.

3              THE COURT:  Okay.  Perfect.  I'll see you all on the

4    20th.  Thank you.

5              (At 12:07 p.m. the proceedings adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5            I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7    FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8    THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9    THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12   IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13   CONFERENCE OF THE UNITED STATES.

14

15

16            DATED THIS  18TH  DAY OF MARCH, 2023.

17

18

19            /S/ MAREA WOOLRICH

20            MAREA WOOLRICH, CSR NO. 12698, CCRR
             FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25

**UNITED STATES DISTRICT COURT**