UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
HONORABLE ANDRE BIROTTE, JR., U.S. DISTRICT JUDGE

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| | |
| Plaintiff, | |
| | |
| VS. | No. CR 21-00351-AB-1 |
| | |
| JOHNNY RAY GASCA, ET AL | |
| | |
| Defendant. | |

_____


REPORTER'S TRANSCRIPT OF JURY TRIAL - DAY 1

LOS ANGELES, CALIFORNIA

MONDAY, JUNE 5, 2023

9:00 A.M.


_____

APRIL LASSITER-BENSON, RPR
FEDERAL OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
(213)894-3539

```
 1                    - A-P-P-E-A-R-A-N-C-E-S -

 2

 3     For the Plaintiff:

 4                              MR. KEVIN B. REIDY
                               AUSA - OFFICE OF US ATTORNEY
 5                             GENERAL CRIMES SECTION
                               312 NORTH SPRING STREET
 6                             SUITE 1200
                               LOS ANGELES, CA 90012
 7                             (213)894-8536
                               kevin.reidy@usdoj.gov
 8

 9                              MS. KATHY YU
                               AUSA - OFFICE OF US ATTORNEY
10                             ORGANIZED CRIME DRUG ENFORCEMENT
                               TASK FORCE SECTION
11                             312 NORTH SPRING STREET
                               14TH FLOOR
12                             LOS ANGELES, CA 90012
                               kathy.yu@usdoj.gov
13

14

15     For the Defendant, Johnny Ray Gasca:

16                              MR. MARK ALLEN CHAMBERS
                               LAW OFFICE OF MARK A CHAMBERS
17                             14241 EAST FIRESTONE BOULEVARD
                               SUITE 150
18                             LA MIRADA, CA 90638
                               (213)489-1958
19                             chambers@markchamberslaw.com

20

21

22

23

24

25
```

1                          - I-N-D-E-X -

2

3        **OPENING STATEMENTS**

4        By Ms. Yu                              8

5        By Mr. Gasca                          11

6

7        **TESTIMONY OF GARY WALLACE**

8        Direct Examination
         By Mr. Reidy                          13

9        Cross-Examination
         By The Defendant                      24

10

11       **TESTIMONY OF MICHAEL FUKUDA**

12       Direct Examination
         By Mr. Reidy                          30

13

14       **TESTIMONY OF PAUL GREENWOOD**

15       Direct Examination
         By Ms. Yu                             90

16       Cross-Examination
17       By The Defendant                     100

18       **TESTIMONY OF MICHAEL FUKUDA (CON'T.)**
19
         Redirect Examination
20       By Mr. Reidy                         109

21       Cross-Examination
         By The Defendant                     197

22

23       **TESTIMONY OF VALERIE AQUINO**

24       Direct Examination
         By Ms. Yu                            242

25

1                    – I–N–D–E–X –

2

3     Exhibit No. 6                              15

4     Exhibit No. 7                             184

5     Exhibit No. 8                             245

6     Exhibit No. 14                            249

7     Exhibit No. 17                            262

8     Exhibit No. 18                            112

9     Exhibit No. 19                            188

10    Exhibit No. 21                            118

11    Exhibit No. 24                             22

12    Exhibit No. 26                             51

13    Exhibit No. 27                            256

14    Exhibit No. 28                            157

15    Exhibit No. 29                            157

16    Exhibit No. 30                            157

17    Exhibit No. 31                            157

18    Exhibit No. 33                            113

19    Exhibit No. 35                            276

20    Exhibit No. 36                            280

21    Exhibit No. 68                             41

22    Exhibit No. 69                             41

23    Exhibit No. 70                             41

24    Exhibit No. 71                             41

25

1                          – I-N-D-E-X –

2

3      Exhibit No. 72                                    41

4      Exhibit No. 73                                    41

5      Exhibit No. 74                                    41

6      Exhibit No. 75                                    41

7      Exhibit No. 76                                    41

8      Exhibit No. 77                                    41

9      Exhibit No. 78                                    41

10     Exhibit No. 79                                    41

11     Exhibit No. 80                                   133

12     Exhibit No. 81                                   133

13     Exhibit No. 82                                   133

14     Exhibit No. 83                                   133

15     Exhibit No. 84                                   131

16     Exhibit No. 87                                   135

17     Exhibit No. 89                                   135

18     Exhibit No. 118                                  137

19     Exhibit No. 119                                  137

20     Exhibit No. 122                                  137

21

22

23

24

25

1          MONDAY, JUNE 5, 2023; 9:00 A.M.

2             LOS ANGELES, CALIFORNIA

3       -------------------------------------------

4          **THE COURTROOM DEPUTY:**  Calling Criminal Case,

5    21-351-AB, *United States of America vs. Johnny Ray Gasca*,

6    Court Trial - Day 1.

7             Counsel, state your appearances, please.

8          **MR. REIDY:**  Good morning, Your Honor.  Kevin

9    Reidy and Kathy Yu on behalf of the United States.

10         **THE COURT:**  All right.  Good morning.

11         **MR. CHAMBERS:**  Good morning, Your Honor.  Mark

12   Chambers, advisory counsel for Mr. Gasca, who is present

13   before the Court.  Also, at counsel table, is

14   Investigator Joel Wyenn.

15         **THE COURT:**  All right.  Good morning to

16   you-all.

17            We're going to start with our trial

18   today.  I've got some not so great news, and this is

19   100 percent my fault, so I'm going to apologize up

20   front.  I mis-calendered something for tomorrow, an

21   important court matter I need to take care of that's

22   going to be all morning tomorrow, so we're going to

23   be dark all morning unfortunately.  I didn't

24   realize.  I thought it was a couple weeks later, so

25   my apologies.  So we'll start at 1:00 tomorrow.

```
 1                    I know you had a matter at 11:00 today,

 2   correct?

 3              MR. CHAMBERS:  That's correct, Your Honor.

 4              THE COURT:  Sentencing or ...

 5              MR. CHAMBERS:  It's a sentencing.  I think new

 6   counsel's coming in, so it should be a quick matter.

 7   It's in front of Judge Wilson.

 8              THE COURT:  So depending on how things go,

 9   we'll take an early lunch and just resume at noon or

10   12:30 and then push through the afternoon.

11                    So, today is the first day of trial.

12   I'm assuming, unless there's an objection, both

13   sides are ready to proceed.  We can begin with

14   openings.

15                    Mr. Gasca, I'm just going to share with

16   you just -- in the abundance of caution, I think you

17   know all this already, but opening statements and

18   opportunity for each side to present a statement to,

19   in this case, the Court as to what they believe the

20   evidence will show.  It's not argument.  Neither

21   side needs to present an opening statement, so I

22   leave that up to you-all.

23                    Will the Government be presenting an

24   opening statement?

25              MS. YU:  Yes, Your Honor.
```

1          **THE COURT:**  You may proceed.  You can step to

2     the lectern, please.

3               You may proceed.  Go ahead.

4

5                    <u>**OPENING STATEMENT**</u>

6          **MS. YU:**  Defendant Johnny Ray Gasca has been

7     playing the role of a lifetime, a loving, committed

8     boyfriend who just wanted the best for his then

9     68-year-old girlfriend, the victim in this case, an

10    honorable man who was rescuing her from a controlling

11    friend and the honest recipient of all of the money in

12    her Chase checking account.

13               The evidence in this case will show he

14    was none of those things.  He was a conman, and a

15    good one at that.  He was so good that he fooled

16    everyone:  The victim; her friends; and even his

17    friends.

18               You'll learn in the course of this case

19    that the victim was a widowed, senior woman who was

20    receiving monthly Social Security and veteran's

21    benefits.  You'll also learn that she was suffering

22    from cognitive defects.  The defendant, he knew all

23    that.  In his words, he referred to her as "a

24    retard" and "senile."

25               For the victim, their relationship was

1    about connection; for Defendant, it was about

2    control, physical, emotional, financial.  And when

3    that control began to crumble, he had to take it

4    back by any and all means necessary.

5            You'll hear, in his words, over and over

6    again, the lengths he went to make sure that he

7    could maintain control over this victim, including

8    by kidnapping her and enlisting the co-defendant

9    driver to help him.

10            You'll hear his own words before,

11    during, and after the kidnapping.  Before the

12    kidnapping, you'll hear how he said he needed to get

13    his "golden goose" back.  And that once he did, all

14    will be great again as far as money.

15            During the kidnapping, you'll hear him

16    berate the victim.  He says to her, "You almost

17    didn't want to get in the car.  I had to push you

18    into the car."  He then mocked her dementia, saying,

19    "You didn't want to get in the car.  You said, 'I'm

20    sick, I'm sick.  I want to stay'."  He

21    insisted, "You're not sick."

22            After pushing her into the car, he then

23    took her to a Chase bank to drain all of the money

24    in her account:  $17,504.80.  All of it.  All the

25    while, he coached her on what she would have to say

1    if they were stopped by the police.  You'll see that

2    she couldn't say what he wanted her to say, and he

3    got increasingly agitated.

4            At one point she even said, "Don't punch

5    me" which only angered him further as you'll see.

6    Defendant's compulsive need to control didn't end

7    with the victim, however.  Even after he was

8    arrested in this case, he made calls from jail in

9    which he masterminded ways to keep up this committed

10   boyfriend facade.

11           You'll hear calls in which he told his

12   friend in New York to delete his Facebook and

13   Instagram messages, including what he called "girl

14   stuff" and "sex pictures."  He told his friend in

15   New York to go to his apartment and collect his hard

16   drives and other electronics because, as he put it,

17   "The FBI would be coming for all of that stuff," and

18   this person had to do it as soon as possible.

19           He also asked his friend in New York to

20   contact the co-defendant driver and ask him to

21   conceal that he had been paid for his part in

22   kidnapping the victim.  Despite Defendant's efforts,

23   you'll hear all of these calls, and you'll hear from

24   the co-defendant driver this week, as well.

25           The charade ends today.  At the

1    conclusion of the case, the Government will ask you

2    to render the only verdict consistent with the

3    evidence:  Guilty on kidnapping; extortion; witness

4    tampering; and two counts of obstruction of justice.

5             THE COURT:  Thank you, Counsel.

6             Mr. Gasca, do you wish to make an

7    opening statement at this time, sir?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  All right.  You can step to the

10   lectern.

11            THE DEFENDANT:  May I have these shackles

12   removed?

13            THE COURT:  Right now, you can step to the

14   lectern, please.

15            THE DEFENDANT:  Correct.  Sure.  I actually

16   thought that was going to be much better than it was.

17            THE COURT:  Just give me your statement, sir.

18            THE DEFENDANT:  Yeah.

19

20                    **OPENING STATEMENT**

21            THE DEFENDANT:  I won't say too much because,

22   as I know from experience before, they'll just change the

23   trial, and they'll try to adjust everything they can to

24   what I say.  They care nothing about what's true or

25   what's honest.

1          **THE COURT:** Hold on, Mr. Gasca. We're not

2     going to do this. Okay?

3          Opening statement's your opportunity to

4     tell me what you think the evidence will show, not

5     an editorial on what you think is going to happen

6     and what you think the judge is going to do. So you

7     have got to tell me what you think the evidence is

8     going to show.

9          **THE DEFENDANT:** I'm talking about the

10    Government, the Government's case.

11         **THE COURT:** What do you believe the evidence

12    will show. So go ahead, please.

13         **THE DEFENDANT:** I have nothing to say.

14         **THE COURT:** All right.

15         Government, you want to call your first

16    witness?

17         **MR. REIDY:** Yes, Your Honor.

18         The Government calls FBI Special Agent

19    Gary Wallace.

20         (WHEREUPON, the witness was sworn in by the

21         Courtroom Deputy.)

22         **THE COURTROOM DEPUTY:** Please state and spell

23    your name for the record.

24         **THE WITNESS:** Gary Wallace, G-A-R-Y,

25    W-A-L-L-A-C-E.

 1          **THE COURT:**  All right, Counsel.  You may

 2    proceed.

 3          **MR. REIDY:**  Thank you, Your Honor.

 4                    * * *

 5                **GARY WALLACE,**

 6    was called as a witness, and after having been duly sworn,

 7    took the witness stand and testified as follows:

 8

 9                **DIRECT EXAMINATION**

10    QUESTIONS BY MR. REIDY:

11    *Q.*    Agent Wallace, where do you work?

12    *A.*    FBI.

13    *Q.*    To which squad are you currently assigned to?

14    *A.*    Assigned to C1, which is the violent crimes squad

15    here in Los Angeles.

16    *Q.*    How long have you worked for the FBI?

17    *A.*    Over six years.

18    *Q.*    And how long have you worked on the violent crimes

19    squad?

20    *A.*    Almost five-and-a-half years.

21    *Q.*    Were you involved in the investigation of Johnny

22    Ray Gasca?

23    *A.*    Yes.

24    *Q.*    Did you interact with Mr. Gasca personally during

25    the investigation?

*EXAMINATION OF GARY WALLACE*

1    *A.*    Yes.

2    *Q.*    Do you see Mr. Gasca in the courtroom today?

3    *A.*    Yes.

4    *Q.*    Can you identify him based on where he's seated and

5    an article of clothing that he's wearing?

6    *A.*    He's seated just to the left of you.  He's wearing

7    a blue collared shirt with the top button or two

8    unbuttoned.

9          **MR. REIDY:**  Your Honor, I ask that the record

10    reflect the witness identified the defendant.

11          **THE COURT:**  The record will so reflect.

12          **MR. REIDY:**  Thank you, Your Honor.

13    *BY MR. REIDY:*

14    *Q.*    Agent Wallace, were you involved in the collection

15    of evidence seized during Defendant's arrest on

16    July 19th, 2021?

17    *A.*    Yes.

18    *Q.*    And where was Defendant arrested?

19    *A.*    Outside of The Dixie Hollywood Hotel in Hollywood,

20    California.

21    *Q.*    And what street is The Dixie Hollywood Hotel

22    located on?

23    *A.*    On Hollywood Boulevard.

24    *Q.*    After his arrest, did you take custody of

25    Defendant's wallet and phone that were seized from his

*EXAMINATION OF GARY WALLACE*

1    person during his arrest on Hollywood Boulevard on

2    July 19, 2021?

3    *A.*    Yes.

4    *Q.*    I'm going to show you an exhibit.  Just going to

5    quickly cycle through.  There's four pages in this

6    document, a collection of photographs that have been

7    previously marked as Exhibit 6.

8         Agent Wallace, do you recognize what's shown

9    in Exhibit 6?

10   *A.*    Yes.

11   *Q.*    Is it Exhibit 6 photographs of Defendant's wallet

12   and the cellphone that you collected as evidence on

13   July 19, 2021?

14   *A.*    Yes.

15        **MR. REIDY:**  Your Honor, I'd ask that Exhibit 6

16   be admitted.

17        **THE COURT:**  Any objection to Exhibit 6 being

18   admitted?

19        **THE DEFENDANT:**  No, Your Honor.

20        **THE COURT:**  6 will be admitted.

21        **MR. REIDY:**  Thank you, Your Honor.

22        (WHEREUPON, an item was marked as Exhibit

23        Number 6.)

24   *BY MR. REIDY:*

25   *Q.*    Agent Wallace, after you collected Defendant's

*EXAMINATION OF GARY WALLACE*

1  wallet and cell phone, what did you do with those items?

2  A.    Brought them to FBI Los Angeles' office along with

3  Mr. Gasca, and then I handed those items over to Special

4  Agent Mike Fukuda.

5  Q.    I believe you testified earlier, Agent Wallace,

6  that Defendant was arrested on Hollywood Boulevard in

7  Los Angeles?

8  A.    Yes.

9  Q.    Over the course -- and that was outside The Dixie

10  Hollywood Hotel; is that right?

11  A.    Yes.

12  Q.    Over the course of your involvement in this

13  investigation, did you learn that defendants and

14  Ms. Callahan were staying in Room 210 of The Dixie

15  Hollywood Hotel?

16  A.    Yes.

17  Q.    Were you are also involved in the execution of a

18  search warrant during the early hours of July 20th, 2021,

19  at The Dixie Hollywood Hotel, Room 210?

20  A.    Yes.

21  Q.    And what was your role during the execution of that

22  search warrant?

23  A.    I was the photographer, as well as a general

24  searcher.  I collected evidence.

25  Q.    I'm going to show you another collection of

*EXAMINATION OF GARY WALLACE*

1    photographs previously marked as Exhibit 1.

2         Agent Wallace, I showed you on the screen a

3    collection of eight photographs that have been

4    previously marked as Exhibit 6.  Do you recognize

5    those photographs?

6    A.    Yes.

7    Q.    And is Exhibit 6 photographs of Defendant's wallet

8    and cellphone that you collected -- I'm sorry.  Excuse

9    me.

10         Sorry, sorry, Your Honor.

11         **THE COURT:**  Is it Exhibit 1 or 6?

12         **MR. REIDY:**  Yes.  I apologize, Your Honor.

13   *BY MR. REIDY:*

14   Q.    Let's go back to the first page of Exhibit 1.  I

15   apologize.  So we're looking at the first page of

16   Exhibit 1.

17         Agent Wallace, is this a picture of an FBI

18   form that you filled out with a permanent marker?

19   A.    Yes.

20   Q.    Is that your name written next to the

21   word "photographer"?

22   A.    Yes.

23   Q.    And is the date on the form shown on Page 1 of

24   Exhibit 1, July 20, 2021, and the location identified as

25   5410 Hollywood Boulevard, Room 210, Los Angeles,

1    California 90027?

2    *A.*    Yes.

3    *Q.*    You also looked at Pages 2 through 8 of Exhibit 1

4    briefly.  Are Pages 2 through 8 of Exhibit 1 photographs

5    that you took during the July 20, 2021 execution of the

6    search warrant at Room 210 of The Dixie Hollywood Hotel?

7    *A.*    Yes.

8              **MR. REIDY:**  Your Honor, I'd ask that Exhibit 1

9    be admitted.

10             **THE COURT:**  Any objection to Exhibit 1 being

11   admitted?

12             **MR. CHAMBERS:**  No, Your Honor.

13             **THE COURT:**  Those are all eight photos?

14             **MR. REIDY:**  Yes, Your Honor.

15             **THE COURT:**  Those will all be admitted.

16             **MR. REIDY:**  Thank you, Your Honor.

17             **THE COURT:**  By the way, does the Court have

18   either hard copies or discs that has these exhibits so I

19   can look at them?

20             **MR. REIDY:**  You have hard copies, Your Honor.

21   We can provide a disc --

22             **THE COURT:**  No, that's fine.  If I have hard

23   copies, that's fine.  All right, thank you.

24             **MR. REIDY:**  Yes, Your Honor.

25

*EXAMINATION OF GARY WALLACE*

1    BY MR. REIDY:

2    Q.    Let's go to Page 2 of Exhibit 1.

3          Agent Wallace, what is shown on Page 2 of

4    Exhibit 1?

5    A.    So this is inside of Room 210.  There is a brown

6    shelf.  On top of that, is a blue backpack and some

7    personal affects, and I think digital devices.

8    Q.    Let's go to Page $3 of Exhibit 1.  So I'm going to

9    direct your attention to the top of Page 3 of Exhibit 1.

10   On the top portion of Page 3 of Exhibit 1, does that show

11   the same blue backpack that we just looked at on Page 2

12   of Exhibit 1?

13   A.    Yes.

14   Q.    And there are some items laid out with the blue

15   backpack on what appears to be a bed on Page 2 of

16   Exhibit 1 -- excuse me, Page 3 of Exhibit 1.

17         Were all of these items that are laid out on

18   the bed next to the blue backpack found inside the

19   blue backpack?

20   A.    Yes.

21   Q.    Did you find a laptop, a camera, and a men's

22   T-shirt with the words "New York, New York" on it inside

23   the blue backpack?

24   A.    Yes.

25   Q.    In the middle of Page 3, it appears to be a

*EXAMINATION OF GARY WALLACE*

1    prescription bottle.  I'm highlighting that.  Do you see

2    that?

3    A.    Yes.

4    Q.    Okay.  Let's go to Page 4 of Exhibit 1.

5          So, is Page 4 of Exhibit 1 a close-up

6    version of the pill bottle that we just looked at

7    on Page 3?

8    A.    Yes.

9    Q.    Okay.  Let's go back to Page 3.  Is -- I'm sorry

10   before we do that, can you read the name on the pill

11   bottle on Page 4 of Exhibit 1?

12   A.    "Johnny Ray Gasca."

13   Q.    Let's turn back to Page 3.

14         On the right side of Page 3 of Exhibit 1, do

15   you see a boarding pass, a Chase check, some cash,

16   and a document of some kind?

17   A.    Yes.

18   Q.    Did you find all of these items inside the blue

19   backpack along with Defendant's prescription medication?

20   A.    Yes.

21   Q.    Let's turn to Page 5 of Exhibit 1.  Is Page 5 of

22   Exhibit 1 a close-up view of the items we just discussed

23   from the right side of Page 3 of Exhibit 1?

24   A.    Yes.

25   Q.    I'm going to ask you about some of these items.

*EXAMINATION OF GARY WALLACE*

1  Let's start on the left-hand side of Page 5.

2      Does the left-hand side of Page 5 of

3  Exhibit 1 show a Jet Blue boarding pass that was

4  issued to Johnny R. Gasca for a flight from New

5  York, Kennedy airport to Los Angeles International

6  Airport?

7  A.   Yes.

8  Q.   Does the boarding pass reflect that Defendant

9  boarded Flight 1723 from New York's JFK airport to LAX?

10 A.   Yes.

11 Q.   And does the boarding pass further reflect that the

12 flight was scheduled to leave at 9:00 p.m. on July 18,

13 2021, and land at 12:19 a.m. on July 19, 2021?

14 A.   Yes.

15 Q.   And does the boarding pass also reflect that the

16 confirmation code for Defendant's flight from New York to

17 Los Angeles was "HAMOGI"?

18 A.   Yes.

19 Q.   Let's take that down for a second.

20     Agent Wallace, I'm showing you what's been

21 previously marked as 1Exhibit 24.  And I'll briefly

22 show you Pages 2 and 3 of Exhibit 24.

23     **MR. REIDY:**  And, Your Honor, Pages 2 and 3 of

24 Exhibit 24 are a 90211 business records certificate.  And

25 so, I'd ask, based on the representations made in that

*EXAMINATION OF GARY WALLACE*

```
 1  certificate, that the Court admit Exhibit 24.
 2          THE COURT:  You said it's two pages, correct?
 3          MR. REIDY:  Yes, Your Honor.  I can show you
 4  the second page.
 5          THE COURT:  Please.
 6           Mr. Gasca, have you had a chance to look
 7  at this document?
 8          THE DEFENDANT:  One second, Your Honor.
 9           (Reviews document.)
10           Yes, that's fine.  I have no objection.
11          THE COURT:  No objection.  All right.  So,
12  based on that, Exhibit 24 will be admitted.
13          MR. REIDY:  Thank you, Your Honor.
14           (WHEREUPON, an item was marked as Exhibit
15           Number 24.)
16  BY MR. REIDY:
17  Q.   Agent Wallace, I'm showing you what's been
18  marked -- what's been admitted as Exhibit 24 which is a
19  Jet Blue record of a flight.  And on Page 1 of
20  Exhibit 24, does that show that Defendant purchased a
21  ticket for a Jet Blue flight 1723 from JFK to LAX,
22  departing at 9:00 p.m. on July 18th with the confirmation
23  code -- sorry, let me just nix that -- with the
24  confirmation code HAMOGI?
25  A.   Yes.
```

*EXAMINATION OF GARY WALLACE*

1   Q.    Okay.  Let's go back to Exhibit 1, specifically

2   Page 5.  Just beneath the boarding page on Page 5 of

3   Exhibit 1, is that a cashier's check issued to Estrellita

4   Callahan in the amount of $8,504.80?

5   A.    Yes.

6   Q.    Was that check also found in the blue backpack that

7   we looked at on Pages 2 and 3 of Exhibit 1?

8   A.    Yes.

9   Q.    Just below the check on Page 5 of Exhibit 1, do you

10  see a large stack of $100 bills?

11  A.    Yes.

12  Q.    Was that cash also found in the blue backpack?

13  A.    Yes.

14  Q.    And approximately how much cash was recovered from

15  Defendant's backpack during the search warrant on

16  July 20, 2021?

17  A.    I believe $6,900.

18  Q.    On the right-hand side of Page 5 of Exhibit 1, is

19  that a document from the Social Security Administration

20  with the name Estrellita Callahan on it?

21  A.    Yes.

22  Q.    Then let's move on to Page 7 of Exhibit 1.

23        On the bottom left-hand corner of Page 7 of

24  Exhibit 1, do you see an appointment reminder for

25  the West Los Angeles VA?

1    *A.*    Yes.

2    *Q.*    Is that an appointment reminder for an appointment

3    on July 19, 2021, at 8:30 a.m.?

4    *A.*    Yes.

5    *Q.*    Was that appointment reminder found in a suitcase

6    in Room 210 during the execution of the search warrant on

7    July 20, 2021?

8    *A.*    Yes.

9            **MR. REIDY:**  Your Honor, if I could just have a

10   moment?

11           **THE COURT:**  All right.

12           **MR. REIDY:**  No further questions.

13           **THE COURT:**  Mr. Gasca, at this time, do you

14   wish to cross-examine the witness?

15           **THE DEFENDANT:**  Yeah.

16

17                        **CROSS-EXAMINATION**

18   QUESTIONS BY THE DEFENDANT:

19   *Q.*    I don't remember.  Maybe my memory's clear.  Are

20   you the officer who took me in the side room and gave me

21   water?

22   *A.*    I'm an agent.

23   *Q.*    Agent.  Are you the agent that did it?

24   *A.*    When we got to the Los Angeles field office, I

25   cannot recall.  But I do know that you were placed into a

*EXAMINATION OF GARY WALLACE*

1  side room, yes.

2  Q.   You don't remember if you were the agent that

3  stayed with me for three hours?

4  A.   I was the agent that stayed with you for three

5  hours.  If I was also the agent that gave you the water,

6  then, yes.  That being said, I know you were provided

7  water.  If it was specifically me, I cannot recall.

8  Q.   There was only one agent, so, I honestly don't

9  remember if it was you.  There was an agent that stayed

10  in the room with me for three hours.  There was only one

11  agent that went back and forth while the head agent,

12  Fukuda, was preparing to question me.  Was you the agent

13  that stayed with me three hours or not?  I don't

14  remember.  I'm asking you.

15  A.   I believe you asked me -- the first question was if

16  I was the agent that gave you water.  And I answered that

17  I was the agent that was with you in the side room.  It's

18  very likely that I gave you water, but your first

19  question was specifically if I was the agent that gave

20  you water.

21  Q.   Okay.  Well, now I'm asking you whether you're the

22  agent that stayed with me for three hours in the room.

23          **MR. REIDY:**  Objection, Your Honor.  Asked and

24  answered.

25          **THE DEFENDANT:**  He didn't answer.

1      **THE COURT:**  Overruled.

2          **THE WITNESS:**  I was with you for an amount of

3   time.  If I was -- if -- I do not necessarily recall if I

4   was the only agent with you.  I do know that my partners

5   were in the building.  It very may likely be that I was

6   the only agent and/or there was another agent there.  And

7   it was possibly three hours.  The specifics of all of

8   that are not something that I greatly recall.

9   *BY THE DEFENDANT*:

10  *Q.*    Well, I vaguely remember you.  But if you are that

11  agent, you remember me discussing with you about my

12  previous federal case?

13         **MR. REIDY:**  Objection, Your Honor.  Hearsay.

14  Relevance.

15         **THE COURT:**  I'll allow it.  You may answer.

16         **THE WITNESS:**  Yes.

17  *BY THE DEFENDANT*:

18  *Q.*    So it was you.

19           How many times did you go out of the room to

20  consult with the head agent, Fukuda, Mike Fukuda,

21  before you came back to speak to me?

22  *A.*    I do not recall.

23  *Q.*    No?  I recall twice.  I recall very specifically.

24  Whoever was the agent, I presume it was you, left the

25  room twice.  There was only one agent with me.  You

1    returned both times to -- and asked me to continue

2    telling my story.  And the second time that you returned,

3    you returned with a second phone that you had recording.

4    I didn't let you know that I know it was recording, but

5    you returned with a second phone that you had recording

6    you during that interview.  Do you remember that?

7    A.    Could you please restate -- you're saying that I

8    returned with a phone that I had recording; is that

9    correct?  Or that you had recording?

10   Q.    No.  The first time we were in the room, I was

11   talking to you.  I was talking to you about my old case,

12   very careful not to mention this case.  And then you left

13   the room.  You felt this guy's talking, consulted with

14   Mike.  You were gone for about 20 minutes, and then you

15   returned.  When you returned, you had two phones.  And

16   then you put them there as if I didn't see the bottom

17   phone.  You were talking, and sort of put it there to get

18   the recording clear and had me talk.  Were you recording

19   me with a second phone?

20   A.    No.

21   Q.    Were you recording me with any phone?

22   A.    No.

23   Q.    So, why did you leave and then return with two

24   phones and place them there on the desk while I was

25   talking?

*EXAMINATION OF GARY WALLACE*

1    A.    First, why I left, I cannot necessarily recall.  It

2    may have been so that I could use the restroom.  It may

3    have been that I had a question for one of the agents

4    that was outside of the room.

5    Q.    And why did you return with two phones?

6    A.    Because I typically carry two phones:  One being

7    for work and one being personal.  And why I

8    specifically -- to answer your other question -- placed

9    them on the desk in front of me or wherever I placed

10   them, it's typically because I don't like to put them in

11   my back pocket, so I'm not sitting on them.  And also, I

12   typically stack them there because I'm usually grabbing

13   them with one hand, and in order to grab them more

14   easily, if they're in a single stack, then I can pick

15   them up and they take up less space.

16   Q.    You had one phone that you were using, and then you

17   returned with two phones.  The second phone Mike Fukuda,

18   somebody, gave to you so that you could record.  That's

19   what happened; right?  You didn't magically appear with

20   two phones.  You had one phone, and then you left the

21   room.  You were gone.  You were consulting with whoever

22   you were consulting with, and then you returned with two

23   phones.  I continued talking, making like I didn't see.

24   And then you neatly stacked them there right in front,

25   one on top of the other, to hide the second one and moved

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   it a little towards me, and I continued talking as if I

2   didn't see them, but I saw them.

3   A.    Generally --

4           **MR. REIDY:**  I'm not sure there's a question

5   there.

6           **THE COURT:**  Yeah.  I'm sorry, Mr. Gasca.  Help

7   me out here.  What's the specific question you have for

8   the witness?

9   *BY THE DEFENDANT*:

10  Q.   So you're telling this judge, under oath, that you

11  didn't have a second phone for recording me?  You just

12  had the second phone because you liked to stack them.

13  The reason it looked to me like you were hiding it was

14  because you just stacked them great so you can grab them

15  with one hand.  Is that what you're telling the judge?

16  A.    Yes.

17  Q.    Okay.

18          **THE DEFENDANT:**  That's it, Your Honor.  No

19  questions.

20          **THE COURT:**  Any redirect?

21          **MR. REIDY:**  No, Your Honor.

22          **THE COURT:**  All right.  May this witness be

23  excused?  Any objection from the Government?

24          **MR. REIDY:**  No, Your Honor.

25          **THE COURT:**  Mr. Gasca?

1          **THE DEFENDANT:**  No, Your Honor.

2          **THE COURT:**  All right.  Thank you, sir.  You

3     may step down.

4               (Witness excused.)

5          **THE COURT:**  You may call your next witness.

6          **MR. REIDY:**  The Government calls FBI Special

7     Agent Mike Fukuda.

8               (WHEREUPON, the witness was sworn in by the

9               Courtroom Deputy.)

10          **THE COURTROOM DEPUTY:**  Please state add spell

11     your name for the record.

12          **THE WITNESS:**  Michael Fukuda.  M-I-C-H-A-E-L.

13     Fukuda is "F" like in Frank, U-K-U-D-A.

14          **THE COURT:**  All right.  Counsel, you may

15     proceed.

16          **MR. REIDY:**  Thank you, Your Honor.

17                    * * *

18                **MICHAEL FUKUDA,**

19     was called as a witness, and after having been duly sworn,

20     took the witness stand and testified as follows:

21

22              **DIRECT EXAMINATION**

23     QUESTIONS BY MR. REIDY:

24     *Q.*    Agent Fukuda, where do you work?

25     *A.*    I work for the Federal Bureau of Investigation.

1  I'm currently stationed or assigned to a field office in

2  Los Angeles.

3  Q.    And to which squad are you currently assigned?

4  A.    Squad C1.

5  Q.    And what squad is that?

6  A.    Squad C1 is the Violent Crime Squad.

7  Q.    How long have you been working for the FBI?

8  A.    I've been an agent with the FBI for approximately

9  15 years.

10  Q.    And how long have you worked on the Violent Crime

11  Squad?

12  A.    Approximately four years.

13  Q.    As part of the Violent Crime Squad, what types of

14  cases have you worked?

15  A.    I've investigated cases such as robberies, bank

16  robberies, kidnappings, and murder-for-hire cases.

17  Q.    You mentioned "kidnappings".  Approximately how

18  many kidnappings have you investigated over the course of

19  your career with the FBI?

20  A.    Approximately, five or six.

21  Q.    And what types of investigative tools have you used

22  to look into kidnappings?

23  A.    The investigative tools that I've experienced in

24  include physical, electronic surveillances; review of

25  physical and digital evidence; the service of subpoenas;

*EXAMINATION OF MICHAEL FUKUDA*

1    the execution of arrest and search warrants; and handling

2    sources.  Those would be some of the techniques I've

3    used.

4    Q.    Have you also sought emergency disclosure requests

5    or EDR orders?

6    A.    I have.

7    Q.    What is an EDR order?

8    A.    An EDR is -- that's the acronym for an Emergency

9    Disclosure Request.  And those requests are made to, for

10   example, phone companies when there's an exigent

11   circumstance and information is sought.

12   Q.    What type of information do you seek from a phone

13   company in the context of an emergency disclosure order?

14   A.    An example would be for location data for that

15   phone.

16   Q.    For a phone that you suspect to be involved in a

17   kidnapping, for example?

18   A.    Correct.

19   Q.    Agent Fukuda, were you involved in the

20   investigation of Johnny Ray Gasca?

21   A.    Yes, I was.

22   Q.    Did you meet Mr. Gasca over the course of your

23   investigation?

24   A.    Yes, I did.

25   Q.    Did you interview Mr. Gasca for over an hour during

1    the course of your investigation?

2    A.    Yes, I did.

3    Q.    Do you see Mr. Gasca in the courtroom today?

4    A.    I do.

5    Q.    Please identify him based on where he's seated and

6    an article of clothing that he's wearing.

7    A.    He's the gentleman seated at defense counsel's

8    table.  He's wearing a blue-collared shirt and black

9    glasses.

10          **MR. REIDY:**  Your Honor, I'd ask that the

11   record reflect that the witness identified the defendant.

12          **THE COURT:**  All right.  The record will so

13   reflect.

14   *BY MR. REIDY*:

15   Q.    Agent Fukuda, did your involvement in this

16   investigation begin on July 19, 2021?

17   A.    It did.

18   Q.    That morning, did you learn of a possible

19   kidnapping at the Greater Los Angeles VA Healthcare

20   System campus in Los Angeles?

21   A.    Yes.

22   Q.    Did you go to the VA Los Angeles campus to

23   investigate?

24   A.    I did.

25   Q.    While at the VA Los Angeles campus, did you speak

*EXAMINATION OF MICHAEL MASUDA*

1  with a women named Valerie Aquino?

2  A.   Yes, I did.

3  Q.   Did you speak to Ms. Aquino on the telephone?

4  A.   Yes.

5  Q.   In general terms, what did Ms. Aquino tell you?

6  A.   Ms. Aquino advised me that she had gone to the VA,

7  or the Veteran Affairs hospital, that morning with --

8           **THE DEFENDANT:**  Objection.

9           **THE COURT:**  I'm sorry.  Go ahead, sir.

10          **THE DEFENDANT:**  Hearsay.

11          **THE COURT:**  Counsel, what's your response?

12          **MR. REIDY:**  Effect on the listener, Your

13  Honor.

14          **THE COURT:**  All right.  It's not being offered

15  for the truth of the matter then?

16          **MR. REIDY:**  No, Your Honor.

17          **THE COURT:**  All right.  So based on that, it

18  will be introduced for that limited purpose.

19          **MR. REIDY:**  Thank you, Your Honor.

20          **THE COURT:**  Go ahead.  Please continue, sir.

21          **THE WITNESS:**  Ms. Aquino had advised me that

22  she had gone that morning with Estrellita Callahan for a

23  medical appointment.  Upon her arrival at the VA, she

24  had -- first, I believe they had stopped for some coffee

25  or some breakfast.  Then proceeded to their medical

1    appointment.  As they were at their appointment, they

2    were advised that there was a complication with the

3    Veteran Affairs access that she would have, and so, they

4    left, went to the parking lot.  At that point, Ms. Aquino

5    backtracked and wanted to go back and see if she could

6    obtain some records for Ms. Callahan's history, medical

7    history.

8              As she was on her way back there, they

9    were suddenly approached by Mr. Gasca.  Mr. Gasca

10   confronted both of them and proceeded to take

11   Ms. Callahan forcefully and put her inside the

12   truck.

13   *BY MR. REIDY:*

14   *Q.*    And how would you describe Ms. Aquino's demeanor

15   during this telephone conversation with you?

16   *A.*    She was extremely distraught, extremely

17   traumatized.  She had a hard time getting her words out

18   at times.

19   *Q.*    During this conversation, did Ms. Aquino tell you

20   Ms. Callahan's cellphone number?

21   *A.*    Yes.

22   *Q.*    And did Ms. Aquino tell you that Ms. Callahan had

23   her cellphone in her possession?

24   *A.*    Yes.

25   *Q.*    And what did law enforcement do with this

*EXAMINATION OF MICHAEL MATSUDA*

1  information?

2  A.    We immediately sought an EDR for that phone.

3  Q.    Did Ms. Callahan's cellphone provider send GPS

4  location data for her phone to law enforcement?

5  A.    Yes.

6  Q.    Did you review GPS location data for Ms. Callahan's

7  phone on July 19, 2021?

8  A.    I did.

9  Q.    Did the GPS location data for Ms. Callahan's

10  cellphone lead law enforcement to believe that

11  Ms. Callahan had traveled to the area near The Dixie

12  Hollywood Hotel located at --

13  A.    That's --

14  Q.    Sorry.  Located at 5410 Hollywood Boulevard in

15  Los Angeles?

16  A.    That's correct.

17  Q.    On the afternoon of July 19, 2021, did law

18  enforcement eventually find Defendant and Ms. Callahan?

19  A.    Yes.

20  Q.    And where did they find Defendant and Ms. Callahan?

21  A.    On Hollywood Boulevard outside of The Dixie

22  Hollywood Hotel.

23  Q.    And was Defendant placed under arrest at that time?

24  A.    He was.

25  Q.    Did law enforcement officers recover a Samsung

*EXAMINATION OF MICHAEL FUKUDA*

1  Galaxy S9+ device and a wallet from Defendant's person

2  during the arrest?

3  A.   Yes.

4  Q.   And were the phone and wallet given to Special

5  Agent Gary Wallace, who then provided those items to you?

6  A.   Yes.

7  Q.   I'm going to show you a document that's been

8  previously admitted as Exhibit 6.  I'm going to start on

9  the first page of Exhibit 6.  Agent Fukuda, do you

10 recognize the first page of Exhibit 6?

11 A.   I do.

12 Q.   Is Exhibit 6 a photograph of Defendant's wallet

13 that you collected as evidence on July 19, 2021?

14 A.   Yes, it is.

15 Q.   Then on Page 3 of Exhibit 6, is Page 3 of Exhibit 6

16 the Samsung phone that you collected as evidence on

17 July 19, 2021?

18 A.   Yes.

19 Q.   Did you eventually obtain a federal search warrant

20 for Defendant's phone on July 20, 2021?

21 A.   I did.

22 Q.   If we could look at Page 2 of Exhibit 6.

23      Does Page 2 of Exhibit 6 reflect the cards

24 that were found in Defendant's wallet?

25 A.   Yes.

1   Q.    And calling your attention to the middle of the

2   screen, on the left-hand side of Page 2 of Exhibit 6.  Is

3   that Ms. Callahan's New York State Identification Card?

4   A.    Yes, it is.

5   Q.    And was that identification card found in

6   Defendant's wallet?

7   A.    Yes, it was.

8   Q.    I want to ask you about your interview of the

9   defendant.  After his arrest, did you interview the

10  defendant?

11  A.    I did.

12  Q.    And did the interview take place on the night of

13  July 19, 2021?

14  A.    Yes.

15  Q.    Were you present for the entire interview?

16  A.    I was.

17  Q.    And before you started talking to the defendant,

18  did you advise him of his Miranda rights?

19  A.    I did.

20  Q.    Did the defendant agree to talk to you at that

21  point?

22  A.    Yes.

23  Q.    Did Defendant, in fact, ask that the interview be

24  recorded?

25  A.    Yes, he did.

1    Q.    And was the interview, in fact, recorded?

2    A.    Yes, it was.

3    Q.    I'm showing you what's been previously marked as

4    Exhibit 68 through 79.

5          Do you recognize this image?

6    A.    Yes.

7    Q.    And are those your initials on the top left-hand

8    side of that flash drive shown in Exhibit 68 through 79?

9    A.    Yes.

10   Q.    And did you initial this flash drive after

11   reviewing Exhibit 68 through 79?

12   A.    Yes.

13   Q.    Do Exhibit 68 through 79 contain audio files of

14   portions of your interview with Defendant on July 19,

15   2021?

16   A.    Yes.

17   Q.    Are the clips found in Exhibits 68 through 79 fair

18   and accurate recordings of portions of your July 19, 2021

19   interview of Defendant?

20   A.    Yes, they are.

21         **MR. REIDY:**  Your Honor, I ask that Exhibit 68

22   through 79 be admitted.

23         **THE COURT:**  Any objection?

24         **THE DEFENDANT:**  One second, Your Honor.

25         **THE COURT:**  All right.

1          **THE DEFENDANT:**  (Conferring with elbow

2   counsel.)

3               I would object to any portions of the

4   clips being played unless they're going to play the

5   whole thing.

6          **THE COURT:**  All right.  And what's the basis?

7   You're saying that's not complete, is that it?

8          **THE DEFENDANT:**  Sure.

9          **THE COURT:**  What's the Government's response,

10  if any?

11         **MR. REIDY:**  Your Honor, I don't think that's

12  an objection to the admissibility of these --

13         **THE COURT:**  Well, I think one might argue the

14  objection is -- it violates, potentially, the rule of

15  completeness.  I mean, how long is this interview?

16         **MR. REIDY:**  The interview, I believe, took

17  place somewhat over an hour, Your Honor.

18         **THE COURT:**  And then these portions,

19  approximately how long is each clip that you -- I assume

20  you're going to play all these clips, correct?

21         **MR. REIDY:**  Yes, Your Honor.

22         **THE COURT:**  How long is each clip?

23         **MR. REIDY:**  Somewhere between a few seconds to

24  a couple of minutes.

25         **THE COURT:**  All right.  So I'll overrule the

*EXAMINATION OF MICHAEL FUKUDA*

1    objection at this time.

2                But, Mr. Gasca, if there's something

3    that you believe is not complete or adds some

4    further context to a clip that's referenced, let's

5    me know, and then we can visit the issue at that

6    time.

7                **THE DEFENDANT:**  Thank you, Your Honor.

8                **THE COURT:**  So with that, the objection is

9    noted but overruled without prejudice.

10               So you may continue.

11               **MR. REIDY:**  Yes, Your Honor.  Just to be

12   clear, Exhibit 68 through 79 are admitted?

13               **THE COURT:**  68 through 79, yes.

14               **MR. REIDY:**  Thank you, Your Honor.

15               (WHEREUPON, documents were marked as Exhibit

16               Numbers 68 through 79.)

17   *BY MR. REIDY:*

18   *Q.*   Agent Fukuda, there are some transcripts that we'll

19   play along with Exhibit 68 through 79 and other audio

20   clips that we'll be discussing today.  Did you review the

21   transcripts that are going to be shown today in court?

22   *A.*   I did.

23   *Q.*   To the best of your ability, do all of the

24   transcripts fairly and accurately capture the

25   intelligible portions of the audio clips that we'll be

*EXAMINATION OF MICHAEL FUKUDA*

1   listening to today?

2   A.    Yes.

3   Q.    In the transcripts, are your statements -- in your

4   transcripts of the interview specifically, are your

5   statements identified with "SAF" for Special

6   Agent Fukuda?

7   A.    Yes.

8   Q.    And are Defendant's statements identified with

9   "JRG" for Johnny Ray Gasca?

10  A.    Correct.

11  Q.    Let's start with Exhibit 68.

12        At the beginning of your interview of

13  Defendant, did you ask the defendant where he lives

14  currently?

15  A.    I did.

16  Q.    I'm going to play Exhibit 68.

17        **THE COURT:**  I just want to make sure.  The

18  transcripts, are they in the exhibit binders

19  corresponding to each exhibit?

20        **MR. REIDY:**  No, Your Honor.  Because the clips

21  are in English, the transcripts themselves are not

22  admissible.

23        **THE COURT:**  No.  I know they're not

24  admissible.  But I guess my question is, as it relates to

25  the prior objection, did Mr. Gasca have transcripts of

*EXAMINATION OF MICHAEL FUKUDA*

1    what's about to be played?

2            **MR. REIDY:**  We produced the exhibits,

3    including the transcripts, to the defendant.

4            **THE COURT:**  So you're just going to play this

5    clip right now?

6            **MR. REIDY:**  There will be a transcript

7    underneath that will sort of follow along the various

8    statements for the Court.

9            **THE COURT:**  Okay.  Go ahead.

10            (Video started.)

11    *BY MR. REIDY:*

12    *Q.*    All right.  Agent Fukuda, in Exhibit 68, did

13    Defendant tell you that he lived at 354 East 193rd Street

14    in the Bronx, New York?

15    *A.*    Yes.

16    *Q.*    Did Defendant also say that Ms. Callahan had lived

17    in his Bronx apartment with him for approximately seven

18    months?

19    *A.*    He did.

20    *Q.*    Let's move on to Exhibit 69.

21            **MR. REIDY:**  Your Honor, just bear with me a

22    moment.  I'm going to see if I can turn up the volume.

23            **THE COURT:**  All right.  That would be helpful.

24    Thank you.

25

EXAMINATION OF MICHAEL FUKUDA

1    BY MR. REIDY:

2    Q.    Agent Fukuda, during your interview, did you ask

3    Defendant about how and when he had traveled from New

4    York to Los Angeles before July 19, 2021?

5    A.    Yes, I did.

6              **MR. REIDY:**  Let's play Exhibit 69.

7              (Video started.)

8    BY MR. REIDY:

9    Q.    Agent Fukuda, in the clip we just heard in

10   Exhibit 69, did Defendant tell you that he had flown

11   from -- flown to Los Angeles from New York before his

12   arrest?

13   A.    Yes.

14   Q.    And when Defendant said that he had flown on Sunday

15   night into Monday morning, did you understand him to mean

16   that he had left New York on Sunday July 18, 2021, and

17   arrived just after midnight in Los Angeles on July 19,

18   2021?

19   A.    Yes.

20   Q.    Did Defendant also tell you that he had flown from

21   New York to Los Angeles to get Ms. Callahan?

22   A.    Yes.

23   Q.    Let's move on to Exhibit 70.

24         Agent Fukuda, did Defendant tell you during

25   your interview about when he had found out that

1    Ms. Callahan would be at the Los Angeles VA?

2    *A.*    Yes.

3              **MR. REIDY:**  Let's listen to Exhibit 70.

4              (Video started.)

5    *BY MR. REIDY:*

6    *Q.*    All right.  Agent Fukuda, did Defendant tell you

7    that he had found out that Ms. Callahan would be at the

8    Los Angeles VA about a week before he had come to get

9    her, and then planned to fly out from New York to get

10   her?

11   *A.*    Yes.

12   *Q.*    Let's move on to Exhibit 71.

13           Did Defendant tell you how he had learned

14   that Ms. Callahan would be at the Los Angeles VA?

15   *A.*    Yes, he did.

16              **MR. REIDY:**  Playing Exhibit 71.

17              (Video started.)

18   *BY MR. REIDY:*

19   *Q.*    Agent Fukuda did you understand Defendant to be

20   saying, in Exhibit 71, that he had called the VA and

21   claimed to be Ms. Callahan's home caretaker in order to

22   find out when her appointment would be?

23   *A.*    Yes.

24   *Q.*    And based on your investigation, to this point, at

25   any point was the defendant's Ms. Callahan's home

 1 caretaker?

 2 A.    No.

 3 Q.    Let's move on to Exhibit 72.

 4       During your interview, Special Agent Fukuda,

 5 did Defendant tell you how he and Ms. Callahan had

 6 met in New York?

 7 A.    Yes.

 8       **MR. REIDY:**  I'll now play Exhibit 72.

 9       (Video started.)

10 *BY MR. REIDY*:

11 Q.    Agent Fukuda, in Exhibit 72 did Defendant claim his

12 relationship with Ms. Callahan started when he met her

13 cleaning the bathroom in his apartment building?

14 A.    Yes, that's correct.

15 Q.    Let's move on to Exhibit 73.

16       Did you ask the defendant about additional

17 details about his and Ms. Callahan's claimed

18 relationship?

19 A.    Yes.

20       **MR. REIDY:**  I'll now play Exhibit 73.

21       (Video started.)

22 *BY MR. REIDY*:

23 Q.    Did you understand Defendant to be telling you that

24 he and Ms. Callahan had lived together for seven months

25 between approximately November 2020 and May 2021 in the

*EXAMINATION OF MICHAEL ARRUDA*

1   clip we just listened to in Exhibit 73?

2   A.    Yes.

3   Q.    Let's move on to Exhibit 74.

4         Did you also ask Defendant about his

5   knowledge of Ms. Callahan's personal identifying

6   information?

7   A.    Yes.

8   Q.    Did you also ask Defendant, during your interview,

9   about how Ms. Callahan's financial transactions were

10  handled?

11  A.    Yes.

12          **MR. REIDY:**  Play Exhibit 74 now.

13          (Video started.)

14  *BY MR. REIDY*:

15  Q.    So there's a few things I want to ask you about in

16  Exhibit 74.  First, when Defendant said that Ms. Callahan

17  "didn't even know how to do online," what did you

18  understand Defendant to mean?

19  A.    I understood him to mean that Ms. Callahan didn't

20  know how to use online applications, such as the ones you

21  would find on your phone and also applications you might

22  find on a computer.

23          **THE DEFENDANT:**  Objection.  I didn't hear any

24  testimony about she didn't understand applications on the

25  phone.

1           **THE COURT:**  The question was what did he

2    understand that to mean.

3           **THE DEFENDANT:**  Okay.

4    *BY MR. REIDY:*

5    *Q.*    Second, when Defendant said that Ms. Callahan was

6    "a little off," what did you understand him to mean?

7    *A.*    I believe he was referring to her mental

8    capacities.

9    *Q.*    And did Defendant tell that you Ms. Callahan did

10   not know her own Social Security number?

11   *A.*    He did.

12   *Q.*    And did you understand Defendant to be saying in

13   Exhibit 74 that he handled all of Ms. Callahan's

14   financial transactions?

15   *A.*    Yes.

16          **THE DEFENDANT:**  I didn't hear that in

17   testimony.

18          **THE COURT:**  I'm sorry.  What's your objection?

19   Are you saying that it's --

20          **THE DEFENDANT:**  Speculation.

21          **THE COURT:**  All right.  Sustained.

22   *BY MR. REIDY:*

23   *Q.*    Let's move on to Exhibit 75.

24          Agent Fukuda, did you and Defendant discuss

25   his withdrawal of $35,000 from Ms. Callahan's

*EXAMINATION OF MICHAEL FUKUDA*

1   retirement accounts during your interview?

2   A.   Yes.

3            **MR. REIDY:**   I'm going to play Exhibit 75.

4            (Video started.)

5   *BY MR. REIDY:*

6   Q.   Agent Fukuda, in Exhibit 75, did you understand

7   Defendant to be telling you that he obtained $35,000 from

8   Ms. Callahan's Roth retirement accounts?

9   A.   Yes.

10   Q.   Did Defendant tell you that he had called

11   Ms. Callahan's retirement fund manager and learned that

12   she had $35,000 in her account?

13   A.   Yes, he did.

14            **THE DEFENDANT:**   No.  The testimony wasn't

15   that.  The testimony was that she called, and then I

16   spoke to the guy.

17            **THE COURT:**   All right.  The document speaks

18   for itself or the transcript speaks for itself.

19   *BY MR. REIDY:*

20   Q.   Did Defendant tell you that he had obtained that

21   $35,000 to help pay for his moving?

22   A.   Yes.

23   Q.   At some point during your interview, did Defendant

24   tell you that he was making a martial arts movie of some

25   kind?

*EXAMINATION OF MICHAEL FUKUDA*

1    A.    Yes.

2    Q.    Over the course of your investigation, did you find

3    any documentary evidence showing a partnership agreement

4    or any other type of contractual arrangement between the

5    defendant and Ms. Callahan regarding her financing of his

6    movie?

7    A.    No.

8    Q.    Over the course of your investigation, did you

9    learn that Ms. Callahan's Primerica Roth IRA retirement

10   accounts had been emptied of approximately $35,000?

11   A.    Yes.

12   Q.    Agent Fukuda, I'm going to show you a document

13   that's been previously marked as Exhibit 26.  It's a

14   6-page document.  I'm just going to cycle through the

15   pages quickly so you can review them on the screen.

16        Go back to Exhibit 1 -- I'm sorry, Page 1 of

17   Exhibit 26.

18        Agent Fukuda, is Exhibit 26 records from

19   Ms. Callahan's retirement accounts with Primerica?

20   A.    Yes.

21   Q.    I'm turning your attention to Page 6 of Exhibit 26.

22        Did you receive the records in Exhibit 26

23   from Bank of New York Mellon pursuant to a

24   subpoena?

25   A.    I did.

*EXAMINATION OF MICHAEL FUKUDA*

1  Q.   Did you also receive Page 6 from Exhibit 26 from

2  Bank of New York Mellon along with these records?

3  A.   Yes.

4  Q.   Does Page 6 of Exhibit 26 reflect that the records

5  in Exhibit 26 are genuine copies of business records of

6  the Bank of New York Mellon Corporation?

7  A.   Yes.

8           **MR. REIDY:**  Your Honor, I'd ask that

9  Exhibit 26 be admitted.

10          **THE COURT:**  Any objection?

11          **THE DEFENDANT:**  No.

12          **THE COURT:**  All right.  Exhibit 26 will be

13  admitted.

14          (WHEREUPON, an item was marked as Exhibit

15          Number 26.)

16  BY MR. REIDY:

17  Q.   Let's go back to Page 1 of Exhibit 26.

18       Agent Fukuda, is that Ms. Callahan's name on

19  the top left of the first page of Exhibit 26?

20  A.   Yes, it is.

21  Q.   Then let's go to Page 3 of Exhibit 26.  Does the

22  top of Page 3 of Exhibit 26 reflect that all of the funds

23  from Ms. Callahan's four retirement accounts with

24  Primerica were withdrawn between January 1, 2021, and

25  December 31, 2021?

1    A.    Yes.

2    Q.    Then we'll briefly cycle through.

3          Do Pages 3 of Exhibit 26 have transaction

4    details by fund for each fund of Ms. Callahan's

5    with Primerica?

6    A.    Yes.

7    Q.    At the bottom portion of Page 3 of Exhibit 26, does

8    that reflect a withdrawal of all of the funds from one of

9    Ms. Callahan's accounts in the amount of $10,738 on

10   March 2nd of 2021?

11   A.    Yes.

12   Q.    At the top portion of Page 4 of Exhibit 26 -- and

13   we'll just do all of these.

14         Does Page 4 of Exhibit 26 show three more

15   distributions of all of the funds from three

16   separate retirement accounts of Ms. Callahan's with

17   Primerica?

18   A.    Yes, it does.

19   Q.    Were all those withdrawals made on March 2, 2021?

20   A.    Yes.

21   Q.    Based on your knowledge of the investigation, were

22   these withdrawals made during the time period that

23   Defendant said that he and Ms. Callahan were living

24   together in New York?

25   A.    Yes, that's correct.

1    Q.    Let's move on to Exhibit 76.  We'll go back to your

2    interview.

3          During your interview of Defendant, did you

4    discuss Defendant's control over Ms. Callahan's

5    finances?

6    A.    I did.

7          **MR. REIDY:**  Let's play Exhibit 76.

8          (Video started.)

9    BY MR. REIDY:

10   Q.    Let's talk about the clip we just heard in

11   Exhibit 76.  Agent Fukuda, did Defendant tell you that

12   there was no need for Ms. Callahan to send him money

13   because -- on mobile apps because he already had access

14   to all of her finances?

15   A.    Yes, that's correct.

16   Q.    Did you understand Defendant to be saying that he

17   had control over Ms. Callahan's banking?

18   A.    Yes.

19   Q.    And then, did Defendant acknowledge that his

20   control over Ms. Callahan's finances was not normal?

21   A.    Can you repeat that question?

22   Q.    During the clip that we just heard on Exhibit 76,

23   did Defendant acknowledge that his control over

24   Ms. Callahan's finances was not normal?

25   A.    Yes.

1          **THE DEFENDANT:**  Objection.

2          **THE COURT:**  What's the grounds?

3          **THE DEFENDANT:**  The document doesn't say that.

4  It says -- it says that I said her concern for money,

5  that she didn't care about money, was not normal.  I

6  didn't say my control over her finances is not normal.

7          **THE COURT:**  And I'm sorry.  In looking at the

8  transcript, it says, "I know it doesn't sound normal."

9  So the document -- I mean, the transcript speaks for

10  itself.  So the objection is sustained.

11          **THE DEFENDANT:**  It says --

12          **THE COURT:**  The objection is sustained.

13          **THE DEFENDANT:**  Sorry.

14          **MR. REIDY:**  I'm just going to play Exhibit 77.

15          **THE DEFENDANT:**  Your Honor, I would just like

16  to say, before we move on, that those sentences, it

17  starts with, "Ask her," you know what I mean?  So I was

18  referring to what she thought of it.

19          **THE COURT:**  No, I understand that.  I

20  understand.

21           Go ahead, Mr. Reidy.

22          **MR. REIDY:**  Playing Exhibit 77.

23           (Video started.)

24  *BY MR. REIDY:*

25  *Q.*    In the clip we just listened in Exhibit 77,

1   Agent Fukuda, did Defendant tell you that he had all of

2   Ms. Callahan's personal identifying information written

3   down for himself?

4   *A.*   Yes, he did.

5   *Q.*   Did that include her Social Security number?

6   *A.*   Yes.

7   *Q.*   Did Defendant also say that he used Ms. Callahan's

8   personal information when he called Ms. Callahan's bank?

9   *A.*   Yes.

10  *Q.*   And did Defendant also say that Ms. Callahan did

11  not know her own --

12          **THE DEFENDANT:**  Excuse me.  That's a

13  misstatement of what it says.  It says I did it with her.

14  It didn't say I called her bank and used her information.

15          **THE COURT:**  All right.  The objection --

16  that's overruled.

17              Go ahead.

18  *BY MR. REIDY*:

19  *Q.*   Did Defendant also say in Exhibit 77 that

20  Ms. Callahan did not know her own Social Security number

21  when they went to the bank on July 19, 2021?

22  *A.*   That's correct.

23  *Q.*   Move on to Exhibit 78.

24              (Video started.)

25

*EXAMINATION OF MICHAEL FUKUDA*

1    *BY MR. REIDY*:

2    *Q.*    Agent Fukuda, did you understand Defendant to say

3    that he transferred Ms. Callahan's money to himself

4    without asking?

5    *A.*    Yes.

6    *Q.*    Move on to Exhibit 79.

7         Agent Fukuda, during your interview, did

8    Defendant discuss how much money he said received

9    from Ms. Callahan over the course of their

10   relationship?

11   *A.*    Yes.

12              **MR. REIDY**:  Play Exhibit 79 now.

13              (Video started.)

14   *BY MR. REIDY*:

15   *Q.*    Agent Fukuda, in Exhibit 79, did you understand

16   Defendant to say that received approximately $50,000 from

17   Ms. Callahan over the course of their relationship?

18   *A.*    Yes.

19   *Q.*    During your interview of Defendant, did Defendant

20   also insist that Ms. Callahan had been kidnapped by

21   someone named Valerie?

22   *A.*    Yes.

23   *Q.*    Did you understand Defendant to be referring to

24   Ms. Valerie Aquino?

25   *A.*    I did.

1    Q.    In the course of your investigation, did you find

2    any evidence to support this claim?

3    A.    No.

4    Q.    In the course of your investigation, did you

5    uncover any motive for Ms. Aquino to kidnap Ms. Callahan?

6    A.    No.

7    Q.    Did you uncover any evidence that Ms. Aquino had

8    used Ms. Callahan's money for Ms. Aquino's benefit?

9    A.    No, I did not.

10    Q.    Did you uncover any evidence that Ms. Aquino had

11    plotted to abduct Ms. Callahan?

12    A.    No, I did not.

13    Q.    We talked earlier about Defendant's cellphone and

14    the search warrant you obtained to search his phone.

15    Pursuant to that search warrant, did FBI extract the data

16    from Defendant's cellphone that was seized on July 19,

17    2021?

18    A.    Yes.

19    Q.    And did you review the data from Defendant's phone

20    to look for evidence related to this case?

21    A.    I did.

22    Q.    Did you find on Defendant's phone Facebook

23    Messenger messages that Defendant had sent related to

24    Ms. Callahan?

25    A.    Yes.

1    Q.    Are you familiar with an application called

2    "Facebook Messenger"?

3    A.    I am.

4    Q.    And what is Facebook Messenger?

5    A.    Facebook Messenger is a messaging application on

6    Facebook that allows Facebook account holders to message

7    or text each other using that app.

8    Q.    Can a user send both written messages and audio

9    messages on Facebook Messenger?

10   A.    Yes.

11   Q.    Did the FBI recover both written messages and audio

12   messages from Facebook Messenger on Defendant's phone?

13   A.    Yes, we did.

14   Q.    Let's start with the Facebook written messages.

15   I'm going to show you a document that's been previously

16   marked as Exhibit 11.  It's a 6-page document.  I'm just

17   going to cycle through the pages quickly on the screen.

18         Agent Fukuda, do you recognize Exhibit 11?

19   A.    Yes, I do.

20   Q.    Is Exhibit 11 a chart created by the data review

21   software you used to review data from Defendant's

22   cellphone?

23   A.    Yes.

24   Q.    Does Exhibit 11 contain several dozen Facebook

25   Messenger text messages that were recovered from

1    Defendant's phone?

2    A.    Yes.

3    Q.    Is the message data in Exhibit 11 presented in

4    chronological order from the earliest to the most recent

5    message?

6    A.    Yes, it is.

7    Q.    Exhibit 11 does not contain all of the Facebook

8    Messenger messages that you recovered from Defendant's

9    phone; correct?

10   A.    That's correct.

11   Q.    Does Exhibit 11 capture a Facebook Messenger

12   message exchange between Defendant and someone named

13   Edward W. Santiago between July 10th, 2021, and July 19,

14   2021?

15   A.    Yes.

16   Q.    Does Exhibit 11 fairly and accurately show the

17   date, time, sender, message content, and other data for

18   these Facebook Messenger text messages that were

19   recovered from Defendant's phone?

20   A.    Yes.

21          **MR. REIDY:**  At this time, I would ask that

22   Exhibit 11 be admitted.

23          **THE COURT:**  Any objection?

24          **THE DEFENDANT:**  That they're admitted all

25   complete 'cause he said there's only some messages that

1    he felt relevant.  I just want complex and completeness.

2    If he wants to admit it, as long as they're all complete

3    from day start to day finish.

4           **THE COURT:**  So I guess what I'd ask you to do,

5    Mr. Gasca, is that the objection is noted.  I'd ask you

6    to take a look to see that if there are messages that

7    provide a further context of what's being admitted, when

8    you go back and look at the documents, let me know, and

9    we can revisit whether or not the additional portions

10   should be added in addition to what's been admitted.  All

11   right.  So the objection is overruled without prejudice.

12          Go ahead, Counsel.

13          **MR. REIDY:**  Your Honor, just for the record,

14   is Exhibit 11 admitted?

15          **THE COURT:**  Yes, without prejudice.

16          **MR. REIDY:**  Thank you, Your Honor.

17   *BY MR. REIDY:*

18   *Q.*   Let's go back to the first page of Exhibit 11.  I

19   want to ask you about the columns on Page 1 of

20   Exhibit 11.  The first two columns on the left,

21   Agent Fukuda, "From" and "To," do they show who the

22   message is from and to whom it was sent?

23   *A.*   Yes.

24   *Q.*   And in the "Direction" column, the third column

25   from the left, does that tell you whether the message was

1    outgoing or not?

2    A.    It does.

3    Q.    And were outgoing messages sent from Defendant to

4    another recipient?

5    A.    Yes.

6    Q.    Were the messages without the word "Outgoing," were

7    those received by Defendant from another messenger?

8    A.    Yes.

9    Q.    The column next to "Direction," "Body," does that

10    contain the content of the Facebook Messenger message?

11    A.    Yes, it does.

12    Q.    And the column farthest to the right, "Timestamped

13    Time," does that have the date and time during which the

14    message was sent?

15    A.    Yes.

16    Q.    And there's a column that's second from the right

17    that states "Source."  Does that column reflect --

18         (Reporter clarification.)

19    BY MR. REIDY:

20    Q.    The second column from the right, Agent Fukuda,

21    it's identified as "Source."  Does that column reflect

22    from what application on Defendant's phone the message

23    originated?

24    A.    Yes.

25    Q.    And as we look through Pages 1 through 6 of

1  Exhibit 11, did all of the messages in Exhibit 11

2  originate from Facebook Messenger?

3  *A.*    Yes.

4  *Q.*    We mentioned earlier that Exhibit 11 shows a

5  Facebook Messenger conversation between Defendant and

6  Edward W. Santiago.  Based on your investigation, who is

7  Edward Santiago?

8  *A.*    Edward Santiago is a friend of Mr. Gasca's.

9  *Q.*    Let's start with the second, third, fourth, fifth,

10  and seventh rows on the first page of Exhibit 11.

11      So the second and third rows, do those show

12  messages that Defendant sent on July 11, 2021, at

13  9:22 a.m. and 9:23 a.m.?

14  *A.*    Yes.

15  *Q.*    Does the fifth row -- I'm sorry, does the fourth

16  row show a message that Edward Santiago sent to Defendant

17  at 9:23:26 a.m. on July 11th?

18  *A.*    Yes.

19  *Q.*    Does the fifth row show a message that Defendant

20  sent back to Mr. Santiago -- excuse me -- a few seconds

21  later, at 9:23:39 a.m.?

22  *A.*    Yes.

23  *Q.*    And then, finally, the seventh row, does that show

24  a message that Defendant on July 11, 2021, at

25  9:24:23 a.m.?

1    A.    Yes, it does.

2    Q.    So all these messages that we just looked at on

3    Page 1 of Exhibit 11, these were sent about eight days

4    before Ms. Callahan was taken?

5    A.    Correct.

6    Q.    Can you read what Defendant wrote in the second and

7    third rows of Page 1 of Exhibit 11?

8    A.    "I put money away" --

9          **THE DEFENDANT:**  Objection.  I would ask that

10   they be read in completion, not under-context.

11         **THE COURT:**  Do you have evidence that there's

12   another context to this message?

13         **THE DEFENDANT:**  You said, "I put money away

14   not to touch in case I come up and move and get

15   arrested."  The conversation doesn't start there.

16         **THE COURT:**  Okay.  Well, the objection is

17   noted but overruled.  Like I said, if you find other

18   portions of it, you can attempt to introduce those at a

19   later time.

20         **THE DEFENDANT:**  Okay.

21         **THE COURT:**  Go ahead.

22         **THE WITNESS:**  "I put money away not to touch

23   in case I have to up and move or get arrested.  So I am

24   just living off the weekly money for the moment."

25

1  *BY MR. REIDY:*

2  *Q.*   Can you read Mr. Santiago's response to Defendant a

3  few seconds later in the fourth row of Page 1 of

4  Exhibit 11?

5             **THE COURT:**  So, Counsel, let me ask you:

6  What's the grounds for that statement?  That's hearsay;

7  isn't it?

8             **MR. REIDY:**  Effect on the listener.  And also

9  for --

10            **THE COURT:**  Effect on who, Mr. Gasca?

11            **MR. REIDY:**  Yes, Your Honor.  And also for

12  context of the conversation.

13            **THE COURT:**  Well, but the statement is just an

14  acknowledgment.  I'm not sure --

15            **MR. REIDY:**  Happy to move on if Your Honor --

16            **THE COURT:**  Let's move on, please.

17            **MR. REIDY:**  Yes, Your Honor.

18  *BY MR. REIDY:*

19  *Q.*   The fifth row on Page 1 of Exhibit 11, can you read

20  the message that Defendant sent there?

21  *A.*   "If I get Estrellita back, all will be great again

22  as far as money."

23  *Q.*   And based on your knowledge of the investigation,

24  Agent Fukuda, who is Estrellita?

25  *A.*   Estrellita is Estrellita Callahan.

1   Q.   And was Estrellita Callahan the woman who was taken

2   from the VA on July 19, 2021?

3   A.   Yes.

4   Q.   Seventh row, a message that Defendant sent on

5   July 11th at 9:24:23 a.m.  Can you read that, please?

6   A.   "I am only looking for her to agree.  This light is

7   thin.  I'm snatching her and being out."

8   Q.   Move on to the second page of Exhibit 11.

9          **THE DEFENDANT:**  I'm sorry.  You skipped a

10  message there for context.  Do you want me to bring it in

11  when I cross?

12         **THE COURT:**  Which message, the one right

13  before?

14         **THE DEFENDANT:**  Yes.

15         **THE COURT:**  What are you referring to just so

16  I can look at it?  It's a little small, so my eyes are --

17         **THE DEFENDANT:**  "Unless they severely

18  medicated her, I will get her back."

19         **THE COURT:**  Wait.  I'm sorry.  Is this on the

20  screen?  Yes.  Well, that statement will come in, as

21  well.

22         Go ahead.  Please continue, Mr. Reidy.

23         **MR. REIDY:**  Yes, Your Honor.

24  *BY MR. REIDY*:

25  Q.   Move on to the second page of Exhibit 11.

```
 1              Does the first row --
 2                    THE DEFENDANT:  I'm sorry.  I don't want to
 3     keep interrupting, Your Honor.  I just want to
 4     understand.
 5                    The following statements are relevant.
 6     Do I bring them in when I cross, or do I object to
 7     them now?
 8                    THE COURT:  You can bring them in, in cross.
 9     Just so you know, this document is all in evidence, so I
10     have all of this.  You can highlight them, if you wish,
11     during cross.  What I was referring to is that if you
12     think there are other statements that are not in this
13     document that provide context, you can try to bring those
14     in later.  But right now, all of these statements are in
15     evidence.  All right?
16                    THE DEFENDANT:  Thank you.
17                    THE COURT:  All right.
18     BY MR. REIDY:
19     Q.    Agent Fukuda, the first row of the second page of
20     Exhibit 11, does that show a message that Defendant sent
21     on July 12, 2021, at 5:34 p.m.?
22     A.    Yes.
23     Q.    Can you read what defendant wrote in that message?
24     A.    "I have Uber working on one card.  Uber Eats on
25     another.  Western Union on another.  And Amazon on the
```

1   other.  Two cards working on one app for the other."

2   Q.    Then let's direct -- I'm going to direct your

3   attention to the last six rows of Page 2, Exhibit 11.

4   The last six rows show messages that Defendant sent

5   between 5:37 -- excuse me -- 5:37:41 p.m. on July 12,

6   2021, and 5:42:31 p.m. on that date.

7   A.    Yes.

8   Q.    Let's start with the first message that's

9   highlighted on the screen, the sixth row from the bottom

10  on Page 2 of Exhibit 11.  Can you read that message,

11  please?

12  A.    "I've got Leoscel on the Western Union app now and

13  Genesis on the PayPal so those are the main ones."

14  Q.    Based on your investigation, who are Leoscel and

15  Genesis?

16  A.    Leoscel and Genesis are contacts of Mr. Gasca's

17  that live in the Philippines that he was in communication

18  with.

19  Q.    Then can you read the portion of Page 2 of

20  Exhibit 11 with the messages that Defendant sent at

21  5:37:54 p.m. and 5:38:12 p.m.?

22  A.    "I have no more money for anyone else.  They only

23  get it because they have children."

24  Q.    Then the last three rows of Page 2 of Exhibit 11,

25  the messages that Defendant sent at 5:41:38, 5:41:47, and

1    5:42:31 p.m. on July 12, 2021.  Can you please read

2    those?

3    A.    "If I get Estrellita back, that will be great, but

4    I am not counting on that.  I'm going to try to stick her

5    out a little if I see she has a little pause and just get

6    her the fuck away from that lady.  I want to hurt that

7    lady so badly, but I will keep my cool that day and stick

8    to the mission to retrieve Estrellita."

9    Q.    On to Page 3 of Exhibit 11.  I can ask you to read

10   the last message of Page 3 of Exhibit 11 that Defendant

11   sent on July 15, 2021, at 6:14 a.m.?

12   A.    "Have to rescue the golden goose."

13   Q.    All right.  Agent Fukuda, this message was sent

14   four days before Defendant took Ms. Callahan?

15   A.    Yes.

16   Q.    Move on to Page 4 of Exhibit 11.

17         So the first three rows of Exhibit 11, do

18   those show as messages that Defendant and Edward

19   Santiago sent on July 17, 2021?

20   A.    Yes.

21   Q.    And July 17, 2021, that was -- was that two days

22   before Ms. Callahan was taken?

23   A.    It was.

24   Q.    Can you read the first row on Page 4 of Exhibit 11,

25   the message sent by Defendant on July 17th, 2021, at

1    7:06 a.m.?

2    *A.*    "If I get my" --

3              **THE DEFENDANT:**  Objection.  This is a whole

4    context of a conversation, and I don't see it anywhere

5    here.

6              **THE COURT:**  All right.  So the objection is

7    noted.  If you find the excerpts or additional portions

8    that provide context, bring them to my attention either

9    later today or tomorrow, and we'll discuss it at that

10   time.

11             **THE DEFENDANT:**  Okay.

12             **THE COURT:**  Go ahead, please.

13             **THE WITNESS:**  "If I get my UBI Estrellita

14   back, she has 16 grand returned to her from her bank plus

15   a few grand."

16   *BY MR. REIDY:*

17   *Q.*    In the second row from the top of Page 4 of

18   Exhibit 11, can you read Mr. Santiago's response at

19   07:07 a.m.?

20   *A.*    "Wow, like 20Gs."

21   *Q.*    And if you can read the third row from the top on

22   Page 4 of Exhibit 11, Defendant's reply on July 17, 2021,

23   at 7:49 a.m.

24   *A.*    "Get Estrellita back, and it's a wrap."

25   *Q.*    The next two rows on Page 4 of Exhibit 11, do those

1    show messages that Defendant sent on July 18th, 2021, at

2    11:27:40 and 11:28 p.m.?

3    A.    Yes.

4    Q.    These messages, were they sent the night before

5    Ms. Callahan was taken?

6    A.    Yes.

7    Q.    Can you read those messages please?

8    A.    "11:30 p.m. here, 2:30 for you.  Let you know as

9    soon as I have a result tomorrow.  You'll know by 11:30

10   a.m. your time."

11   Q.    Agent Fukuda, did you understand Defendant in the

12   message from July 18, 2021, at 11:27:40 to be indicating

13   that Mr. Santiago was three hours ahead of him?

14   A.    Yes.

15   Q.    Okay.  Let's go to the sixth row.

16         So the sixth-to-the-last row of Page 4 of

17   Exhibit 11 and the seventh -- I guess the

18   fifth-from-last row on Page 4 of Exhibit 11, do

19   those show messages Defendant sent on July 19,

20   2021, between 2:56 a.m. and 3:46 a.m.?

21         I'm sorry.  Sorry, I guess the sixth and the

22   seventh messages -- fifth and sixth messages from

23   the bottom on Page 4 of Exhibit 11.  Do these

24   messages show -- are these messages that Defendant

25   sent at 2:56 a.m. on July 19th, 2021?

1    A.    Yes.

2    Q.    And this is the early morning before Defendant took

3    Ms. Callahan from the VA?

4    A.    That's correct.

5    Q.    And at this point, Defendant had arrived in

6    Los Angeles?

7    A.    Yes.

8    Q.    Can you read the message that Defendant sent at

9    2:56:02 a.m.?

10   A.    "3:00 in the morning.  Parked by beach sleeping and

11   a huge pickup truck.  Dead silence.  And a van comes by

12   blasting Star Wars by Meco Disco version.  That's gotta

13   be a sign.  LOL."

14   Q.    And then, can you read the message that's the

15   third-from-the-bottom row on Page 4 of Exhibit 11 that

16   Defendant sent at 3:45:36 a.m.?

17   A.    "I'm trying to sleep, but I actually keep seeing us

18   pulling away with Estrellita."

19   Q.    Then finally the bottom two rows on Page 4 of

20   Exhibit 11, can you read the messages that Defendant sent

21   at 3:45:47 a.m. and 3:46:24 a.m. on July 19, 2021?

22   A.    "I'm like if they with the husband, he better not

23   reach out for Estrellita.  I'm going to hit him so hard."

24   Q.    Based on your investigation, to whom is Defendant

25   referring when he says "the husband" in these messages?

1    *A.*    He's referring to the husband of Ms. Aquino.

2    *Q.*    Move on to Page 5 of Exhibit 11.

3          So the first row on Page 5 of Exhibit 11,

4    does that show a message that Edward Santiago sent

5    to the defendant at 3:46:49 a.m.?

6    *A.*    Yes.

7    *Q.*    Can you read that message?

8    *A.*    "I pray it's that easy.  Not another crazy Johnny

9    Ray adventure."

10          **THE COURT:**  So, Counsel, I just need to know,

11    what's the purpose of that statement?

12          **MR. REIDY:**  Effect on the listener and context

13    for Defendant's statements that I'm going to highlight in

14    a moment, Your Honor.

15          **THE COURT:**  All right.

16    *BY MR. REIDY:*

17    *Q.*    And, Agent Fukuda, could you read the message from

18    Mr. Santiago on July 19, 2021, at 3:47:44 a.m. on

19    July 19th?

20    *A.*    "The element of surprise is on your side."

21    *Q.*    And the next three rows, Rows 4 through 6 on Page 5

22    of Exhibit 11, are those messages that Defendant sent in

23    response to Mr. Santiago at 3:47 a.m.?

24          **THE DEFENDANT:**  I'm sorry.  You skipped two

25    messages there.

1        **THE COURT:**  Well, you can bring them up on

2    cross-examination.

3        **THE DEFENDANT:**  Okay.

4    *BY MR. REIDY:*

5    *Q.*    The next three rows, Row 4 through 6 on Page 5 of

6    Exhibit 11, do those show as messages that Defendant sent

7    in response to Mr. Santiago at 3:47 a.m., 3:48 a.m., and

8    3:49 -- 3:49 a.m., excuse me, on July 19, 2021?

9    *A.*    Yes.

10   *Q.*    Can you read those messages, please?

11   *A.*    "And fear.  They will be shocked and scared when

12   they see me.  No security, no security posts, no parking

13   attendants.  All open."

14   *Q.*    The second-to-last row and the last row on Page 5

15   of Exhibit 11, do those show messages that Defendant sent

16   at 3:54:23 and 3:45:56 a.m. on July 19, 2021?

17   *A.*    Yes.

18   *Q.*    Can you read those messages from Defendant?

19   *A.*    "Even she says she wants to stay, I'll tell her

20   that you and my mom and Roxanne are waiting for her back

21   at the hotel.  Just let them know you're okay, and you

22   can come back.  I'm just going to usher her out of there,

23   not start a conversation."

24   *Q.*    What did you understand Defendant to mean when he

25   said, "Even she says she wants to stay, I'll tell her

1    that you and my mom and Roxanne are waiting for her back

2    at the hotel.  Just let them know you're okay, and you

3    can come back."

4    A.    I believe Mr. Gasca was saying that he would tell

5    Ms. Callahan that Edward Santiago, Mr. Gasca's mother,

6    and Roxanne were at the hotel waiting for her, and that

7    once they knew that she was okay, she could --

8    Ms. Callahan could come back.

9    Q.    Based on your knowledge of the investigation, was

10    Mr. Santiago in Los Angeles on July 19, 2021?

11    A.    No, he was not.

12    Q.    Was Defendant's mother in Los Angeles on July 19th,

13    2021?

14    A.    No, she was not.

15    Q.    Move on to the last page of Exhibit 11.

16         So the first two rows from the top of Page 6

17    of Exhibit 11, do those show messages that

18    Defendant sent at 3:56 and 4:01 a.m. on July 19,

19    2021?

20    A.    Yes.

21    Q.    And, again, this is the morning that Ms. Callahan

22    was taken?

23    A.    Yes, it is.

24    Q.    Can you read what Defendant wrote in those

25    messages?

*EXAMINATION OF MICHAEL FUKUDA*

1    A.    "We have a big ass truck so we can sit comfortably

2    hidden until the moment to spring out.  If I get her,

3    I'll go straight to the bank, then airport."

4    Q.    Go down to the third and second rows from the

5    bottom.  Actually, let's just move on.

6          Agent Fukuda, earlier you mentioned you also

7    found audio Facebook messages on Defendant's phone,

8    as well?

9    A.    Yes.

10    Q.    I'm going to show you a document that's been

11    previously marked as Exhibit 10.  Do you recognize

12    Exhibit 10?

13    A.    Yes, I do.

14    Q.    With the exception of the first column on the left,

15    is Exhibit 10 a chart created by the data review software

16    used to examine data from Defendant's cellphone?

17    A.    Yes, it is.

18    Q.    Does Exhibit 10 contain the data associated with

19    six Facebook Messenger audio messages that were recovered

20    from Defendant's phone?

21    A.    Yes.

22    Q.    Is the data in Exhibit 10 presented in

23    chronological order from the earliest to the most recent

24    message?

25    A.    Yes, it is.

1  Q.    And the first column of Exhibit 10, is that

2  information that was put into the chart identifying the

3  exhibit number associated with each audio message

4  recovered from Defendant's phone?

5  A.    Yes.

6  Q.    Does Exhibit 10 fairly and accurately show the

7  information that was extracted from Defendant's phone

8  related to each Facebook Messenger message identified in

9  the chart?

10 A.    Yes.

11 Q.    And then, let's move on to Exhibits 58 through of

12 63.

13       Agent Fukuda, do you recognize this image?

14 A.    I do.

15 Q.    Are those your initials on the top left of the

16 flash card that contains Exhibits 58 through 63?

17 A.    They are.

18 Q.    Do Exhibits 58 through 63 -- I'm sorry.  Did you

19 initial this flash drive after reviewing Exhibits 58

20 through 63?

21 A.    Yes, I did.

22 Q.    Do Exhibits 58 through 63 contain the Facebook

23 Messenger audio message files recovered from Defendant's

24 phone?

25 A.    Yes.

1  Q.    Do each of the files contain audio of Defendant's
2  voice?
3  A.    Yes.
4  Q.    How do you recognize Defendant's voice?
5  A.    I have spoken with Mr. Gasca in person, and I've
6  also listened hours of jail calls from Mr. Gasca.
7  Q.    Do some of Exhibits 58 through 63 also contain
8  audio of Ms. Callahan's voice and David Richard
9  Tscherny's voice?
10  A.    Yes.
11  Q.    How do you recognize Ms. Callahan's voice?
12  A.    I've met with Ms. Callahan on multiple occasions
13  and spoken with her face to face.
14  Q.    How did you recognize Mr. Tscherny's voice?
15  A.    I've also met with Mr. Tscherny face to face and
16  spoken with him.
17  Q.    Do the clips found in Exhibit 58 through 63 contain
18  a fair and accurate copy of the audio associated with the
19  Facebook Messenger audio messages recovered from
20  Defendant's cellphone?
21  A.    Yes.
22  Q.    Is the information associated with each audio clip,
23  in Exhibits 58 through 63, fairly and accurately
24  described in the chart we just looked at in Exhibit 1010?
25  A.    Yes.

 1            **MR. REIDY:**  Your Honor, I'd ask

 2   that Exhibits 10, 58 through 63 be admitted.

 3                 **THE COURT:**  Any objection?

 4                 **THE DEFENDANT:**  Same.  Just to put on the

 5   record that I --

 6                 **THE COURT:**  Completeness?

 7                 **THE DEFENDANT:**  Yes.

 8                 **THE COURT:**  So the objection's noted but

 9   overruled without prejudice.  So if you find additional

10   information, Mr. Gasca, you can either ask during cross

11   or revisit it at a later time.  So they will be admitted.

12                 **MR. REIDY:**  Thank you, Your Honor.

13   *BY MR. REIDY*:

14   *Q.*    Agent Fukuda, there are some transcripts that will

15   play along with Exhibits 58 through 63.  Did you review

16   the transcripts that will be shown here in court?

17   *A.*    Yes.

18   *Q.*    To the best of your ability, do the transcripts

19   accurately capture the intelligible portions of

20   Exhibits 58 through 63 and correctly identify the

21   speakers?

22   *A.*    Yes.

23   *Q.*    In the transcripts, are Defendant's statements

24   identified with "JRG," Ms. Callahan's identified with

25   "EC," and Mr. Tscherny's statements identified with "DT"?

1    A.    Yes.

2    Q.    Let's take a look at Exhibit 10, the third column

3    of Exhibit 10 -- I'm sorry, the second column of

4    Exhibit 10.  Let's start there.

5          Does the second column of Exhibit 10

6    indicate that the author of all the Facebook audio

7    message from Exhibit 10 is the defendant?

8    A.    Yes.

9    Q.    All right.  Does the first row of Exhibit 10 show a

10   message that's been marked as Exhibit 58 recorded on the

11   day before Ms. Callahan was taken near midnight on

12   July 18, 2021?

13   A.    Yes.

14   Q.    And in Exhibit 58, did you understand Defendant to

15   be discussing his plan for when he encountered

16   Ms. Callahan at the VA?

17   A.    Yes.

18   Q.    Let's listen to Exhibit 58.

19             (Video started.)

20   BY MR. REIDY:

21   Q.    In Exhibit 58, did you understand Defendant say

22   that he would approach Ms. Callahan and start guiding her

23   away right away and just shuffle her off?

24   A.    Yes.

25             **THE DEFENDANT:**  Objection.

1          **THE COURT:**  Well, the document speaks for

2     itself, I mean, so ...

3          **THE DEFENDANT:**  But the document's taken out

4     of context.

5          **THE COURT:**  No, no.  But you'll have an

6     opportunity if you have other messages that you can bring

7     in, as well, all right?

8          **THE DEFENDANT:**  Yes.

9          **THE COURT:**  Go head.  Continue, Mr. Reidy.

10    *BY MR. REIDY:*

11    *Q.*    Did you also understand Defendant to say that he

12    would tell Ms. Callahan that his mother and Mr. Santiago

13    were waiting for her?

14    *A.*    Yes.

15    *Q.*    Let's go back to Exhibit 10.

16          The second row of Exhibit 10, does that show

17    a message identified as Exhibit 59 that was

18    recorded around 9:30 a.m. on July 19th, 2021?

19    *A.*    Yes.

20    *Q.*    And based your knowledge of the investigation, at

21    9:30 a.m. on July 19th, 2021, had Ms. Callahan already

22    been taken from the Los Angeles VA campus?

23    *A.*    Just on -- an issue on time, mine shows 9:35.

24    *Q.*    I'm sorry, yes.  9:35 a.m. on July 19th, 2021.

25          By that time, had Ms. Callahan already been

*EXAMINATION OF MICHAEL BEAUDA*

1    taken from the Los Angeles VA campus?

2    A.    Yes.

3    Q.    In Exhibit 59, in the clip we're about to listen

4    to, did you understand Defendant to discuss his taking of

5    Ms. Callahan and what he planned to do with her?

6    A.    Yes.

7    Q.    I'm going to play Exhibit 59 now.

8              (Video started.)

9    BY MR. REIDY:

10   Q.    In Exhibit 59, did Defendant say that he had

11   successfully taken Ms. Callahan?

12   A.    Yes.

13   Q.    Did you understand Defendant to mean that he was

14   hopeful he could get the money out of Ms. Callahan's

15   account?

16   A.    Yes.

17   Q.    Did you also understand Defendant to say that he

18   was going to get a Social Security number because he

19   needed another form of identification?

20   A.    Yes.

21   Q.    Did you also hear Ms. Callahan's voice at the end

22   of Exhibit 59?

23   A.    Yes, I did.

24   Q.    Let's go back to Exhibit 10.

25             The third row of Exhibit 10 shows a message

1  previously marked as Exhibit 60 that Defendant

2  recorded around 10:44 a.m. on July 19th, 2021.

3  A.    Correct.

4  Q.    Let's listen to Exhibit 60.

5          (Video started.)

6  BY MR. REIDY:

7  Q.    Agent Fukuda, aside from the Facebook audio

8  messages in Exhibits 58 to 63, have you also listened to

9  recordings of Defendant's calls that he made from jail?

10  A.    Yes, I have.

11  Q.    About how many of Defendant's jail calls, roughly,

12  have you listened to?

13  A.    Numerous.

14  Q.    Did you occasionally listen to the same jail call

15  multiple times?

16  A.    Yes.

17  Q.    Approximately how many hours have you spent

18  listening to Defendant's jail calls and audio messages?

19  A.    Dozens.

20  Q.    During your review of the jail call recordings

21  and Exhibits 58 through 63, the audio message recordings,

22  did you occasionally hear Defendant add an extra syllable

23  to the words that he said?

24  A.    Yes.

25  Q.    Based on your review of these calls and these

1    messages, when would Defendant typically add the extra

2    syllable to the words that he said?

3    A.    Whenever Mr. Gasca was saying something that would

4    be incriminating or he felt that authorities might be

5    listening, he would insert an extra syllable into the

6    words.

7              THE DEFENDANT:  Objection; speculation.

8              THE COURT:  Sustained.

9    BY MR. REIDY:

10   Q.    Agent Fukuda, were you able to decipher the words

11   Defendant actually said by removing the extra syllable

12   from the word?

13   A.    Yes.

14   Q.    Let's take a look at the transcript for Exhibit 60.

15         And at the beginning of the call --

16   exhibit -- excuse me, the beginning of the message

17   on Exhibit 60, did you hear Defendant say "There

18   cagollen de pagopo pagopos pagollen magee"?

19   A.    Yes.

20   Q.    So let's translate that into regular spoken English

21   first.  Can you take the extra syllable out of those

22   words to decipher what Defendant was actually saying?

23   A.    Yes.

24   Q.    What was defendant actually saying?

25   A.    He was saying, "So they're calling the popo, popos

*EXAMINATION OF MICHAEL BISGUDA*

1    calling me, no problem."

2    Q.    Based on the context of the recording, who is

3    Mr. Gasca referring to when he says "popo" or "pagopo."

4    A.    The police.

5    Q.    What did you understand Defendant to mean when he

6    said "Let them be busy with that.  So they're not get the

7    magoney part yet.  So once I get the money, I'll break

8    out with her"?

9    A.    Mr. Gasca was referring to law enforcement's

10   initial response and development of the investigation.

11   He was referring to -- when he says, "Let them be busy

12   with that," he was referring to law enforcement being

13   busy with that stage of the investigation which would

14   give him the time to then go and withdraw funds from

15   Ms. Callahan's account.

16   Q.    And what did you understand Defendant to mean when

17   he says, "She got about twigenny jeggies, so pull it out,

18   I'll be out"?

19   A.    He was referring to the amount of money

20   Ms. Callahan had left in her bank account which was about

21   $20,000 or 20Gs.

22   Q.    And what did he mean when he said -- what did you

23   understand him to mean when he said "Pull it out, I'll be

24   out"?

25   A.    By that, he meant pull out the 20,000 from her bank

1    account.

2    Q.    Based on your investigation, how much money did

3    Ms. Callahan have in her Chase bank account on July 19,

4    2021?

5    A.    It was approximately 16 or $17,000.

6    Q.    And near the end of Exhibit 60, did you hear

7    Mr. Tscherny's voice captured on the audio?

8    A.    Yes, I did.

9    Q.    Let's go back to Exhibit 10.  The fourth row of

10   Exhibit 10.

11        Does that show an audio message identified

12   as Exhibit 61 that was recorded at approximately

13   11:44 a.m. on July 19th, 2021, about an hour after

14   the message we just listened to in Exhibit 60?

15   A.    Yes.

16   Q.    Let's play Exhibit 61.

17            (Video started.)

18   BY MR. REIDY:

19   Q.    Agent Fukuda, what did you understand Defendant to

20   be saying when he said, "I GAG OT SAG 17 grand, we're

21   heading to an airport" in Exhibit 61?

22   A.    He was saying that he got 17 grand or that he had

23   withdrawn $17,000 from Ms. Callahan's account and that he

24   was now heading to -- or that he and Ms. Callahan were

25   heading to an airport.

1    Q.    Go back to Exhibit 10.

2          The second row from the bottom on

3    Exhibit 10.  Does that show a message identified as

4    Exhibit 62 that was recorded around 1:00 p.m. on

5    July 19, 2021?

6    A.    Yes.

7    Q.    And in Exhibit 62, did Defendant discuss how the

8    taking of Ms. Callahan had transpired?

9    A.    Yes.

10   Q.    Did you also understand Defendant to be discussing

11   how Ms. Callahan reacted to being taken in Exhibit 62?

12   A.    Yes.

13   Q.    I'll play Exhibit 62.

14              (Video started.)

15   BY MR. REIDY:

16   Q.    Agent Fukuda, near the start of Exhibit 62, did

17   Defendant say, "As anticipated, she was a little hesitant

18   to get into the -- to get in the truck with me"?

19   A.    Yes.

20   Q.    Did Defendant also say that Ms. Callahan had

21   said "I'm sick" and looked scared when he approached her

22   at the VA?

23   A.    Yes.

24   Q.    And what did you understand Defendant to mean when

25   he said, "She definitely would not have gone with the

*EXAMINATION OF MICHAEL BUDA*

1    police officers, do you want to go with him the type of

2    way like"?

3    A.    I believe he was -- when Mr. Gasca said that, he

4    was referring to his attempt to coach her in what to say

5    to the police and that she would not have done as he had

6    instructed her.

7    Q.    Did Defendant also say that he had to force

8    Ms. Callahan to get in the truck with him?

9    A.    Yes.

10   Q.    Did you also hear Mr. Tscherny's voice on

11   Exhibit 62?

12   A.    Yes, I did.

13   Q.    Based on your investigation, did Mr. Tscherny drive

14   Defendant and Ms. Callahan to LAX on July 19, 2021?

15   A.    Yes.

16   Q.    And in Exhibit 62, did you hear Mr. Tscherny say

17   the words "Jet Blue LAX"?

18   A.    Yes.

19   Q.    Right.  Let's go back to Exhibit 10.

20        **THE COURT**:  Why don't we stop at this time?  I

21   don't want Judge Wilson to get upset with me.  I know

22   Mr. Chambers needs to go upstairs at 11:00, it's five

23   'til.  In the abundance of caution, what don't we just

24   take an early lunch break.  Come back at 12:15.

25        Hopefully Mr. Gasca will get lunch.  At

```
 1    that time, we'll resume at 12:15 and try to push

 2    through the afternoon.  Any issues or anything that

 3    I need to be made away from the Government's

 4    respective before we break?

 5            MS. YU:  Yes, Your Honor.  Can we have our

 6    romance scam elder fraud expert go on today even if it

 7    means interrupting Mr. Fakuda's --

 8            THE COURT:  I don't have any problem with

 9    that.  Mr. Gasca, any objection from your end?

10            THE DEFENDANT:  No.

11            THE COURT:  So if we have need to call

12    witnesses out of order, that's what we need to do.

13                Anything from your end, Mr. Gasca, that

14    we need to discuss before we break from lunch?

15            THE DEFENDANT:  No.

16            THE COURT:  So I'll see everyone back at

17    12:15.  Thank you.

18                (Lunch break.)

19            THE COURT:  All right.  Why don't we -- the

20    agent resume his testimony on the stand.

21            MS. YU:  Your Honor, would you mind having the

22    expert --

23            THE COURT:  Oh, you want to call the expert

24    right now?

25            MS. YU:  If we could.
```

 1              **THE COURT:**  That's fine.  Call your next

 2   witness.

 3              **MS. YU:**  Would it be okay if the Government

 4   streamlined the background of the witness, given your

 5   familiarity with his CV and that it was already litigated

 6   in the motions in limine?

 7              **THE COURT:**  That's fine with me.

 8               Any objections with Mr. Gasca?

 9   **THE DEFENDANT:**  No.

10              **THE COURT:**  Okay.  All right.

11              **MS. YU:**  Thank you.

12              **THE COURT:**  All right.  Step forward, sir, so

13   you can be sworn in.

14              (WHEREUPON, the witness was sworn in by the

15              Courtroom Deputy.)

16              **THE WITNESS:**  Thank you.

17              **THE COURTROOM DEPUTY:**  Please state and spell

18   produce your name for the record.

19              **THE WITNESS:**  Thank you.  Good afternoon.

20   Paul Greenwood, G-R-E-E-N-W-O-O-D.  First name, Paul,

21   P-A-U-L.

22              **THE COURT:**  All right.  Counsel, you may

23   proceed.

24              **MS. YU:**  Thank you, Your Honor.

25   //

*EXAMINATION OF PAUL GREENWOOD*

```
1                              * * *
2                          PAUL GREENWOOD,
3      was called as a witness, and after having been duly sworn,
4      took the witness stand and testified as follows:
5
6                       DIRECT EXAMINATION
7      QUESTIONS BY MS. YU:
8      Q.    Mr. Greenwood, what do you currently do?
9      A.    I'm a lawyer.  I have a bar -- a license with the
10     State of California.  And I'm currently doing two things:
11     Spending a lot of my time teaching and trainings for
12     A.A.R.P. and other organizations, including law
13     enforcement, and my other -- second prong is consulting
14     for other attorneys.
15     Q.    In that capacity, do you consult as it relates to
16     romance scams and elder fraud?
17     A.    I do.  In fact, I do that for both prongs.  I spend
18     a lot of my time doing trainings about romance scams and
19     other frauds that impact older adults.  And I've
20     consulted with other attorneys on such cases.
21     Q.    Have you taught as it relates to these subjects?
22     A.    Many times, yes.  I mean, over 24 years, I've been
23     teaching about frauds, particularly.  And, in the last
24     10 years, specifically about romance scams which has come
25     to the forefront.
```

*EXAMINATION OF PAUL GREENWOOD*

1  Q.    Have you authored articles as it relates to elder

2  fraud and romance scams?

3  A.    I have -- I've written no books, but I've authored

4  chapters on elder fraud for the American Prosecutor's

5  Handbook and for other agencies, too.

6  Q.    Over the course of your career, have you become

7  familiar with romance scams and elder fraud.

8  A.    I have indeed?

9         **MS. YU:**  Your Honor, at this time, the

10  Government would offer Mr. Greenwood as an expert in

11  romance scam and elder frauds.

12         **THE COURT:**  He will be so offered over defense

13  objection.

14         **MS. YU:**  Understood.

15  *BY MS. YU:*

16  Q.    I want to talk about your work on this case,

17  Mr. Greenwood, about how many hours have you worked in

18  connection with this case?

19  A.    Well, including travel in November and then today,

20  15 hours, approximately.

21  Q.    And approximately what rate are you charging the

22  Government?

23  A.    I'm charging a flat rate of $250 an hour.

24  Q.    Is it an accepted and normal part of your work to

25  be paid?

1    A.    It is, although I do do quite a bit of pro bono

2    work when called upon.

3    Q.    You mentioned earlier that you're a lawyer by

4    trade.

5    A.    Yes.

6    Q.    To be clear, today -- you know, you weren't at all

7    involved in the prosecution of this particular case?

8    A.    That is correct.

9    Q.    Your role today is to serve as an expert?

10   A.    It is.

11   Q.    What did you do in order to prepare for your

12   testimony today?

13   A.    I reviewed various documents that your office sent

14   to me, including the initial complaint that was filed.  I

15   listened to an audio tape of the interview between FBI

16   agents and the defendant in this case.  I reviewed two

17   videos that are purportedly shot inside of a moving

18   vehicle between what appeared to be the defendant and the

19   alleged victim in this case.

20         **THE DEFENDANT:**  Your Honor, I'm going to

21   object.  I remember you ruling specifically that he can

22   talk about romance scams, but he can't say anything about

23   this case.

24         **THE COURT:**  No.  He's just saying what he

25   reviewed in connection with the case.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Go ahead.  Continue.

2          **THE WITNESS:**  The final document that I

3    reviewed was your office's opposition of a motion filed

4    by the defendant's lawyer at that time seeking to exclude

5    my testimony.

6    *BY MS. YU:*

7    *Q.*    Well, can you explain what elder fraud is?

8    *A.*    Sure.  In California, in the State courts, an elder

9    is described as anybody over the age of 65.  In other

10   states, that age range can vary.

11          But fraud against an older adult can take

12   many different forms from straight theft to

13   diversionary tactics, to using undue influence, to

14   using purported affection to secure assets from an

15   older adult.  It really covers a whole variety of

16   fraudulent conduct targeted against somebody who is

17   older.

18   *Q.*    What about a romance scam?

19   *A.*    A romance scam is one type of elder fraud.  And it

20   can, again, take place in various circumstances.

21   Typically, people, when they refer to a romance scam,

22   think of the online romance Internet scams which, of

23   course, are very prevalent today.  But there's also a

24   second type of face-to-face meetings between alleged

25   victims and suspects where the suspect will have --

1    cultivate a relationship which purportedly appears to be

2    full of affection and emotion, but ultimately, the goal

3    is to extract assets from the alleged victim.

4    Q.    How is a target able to cultivate such a

5    relationship with their victim?

6    A.    In my experience, based upon reviewing many, many

7    cases -- actually, prosecuting a few cases and then

8    consulting on many cases, it can be done in a variety of

9    ways.

10          But, ultimately, one of the approaches is to

11    build a position of trust with the victim to then

12    cultivate a relationship where the suspect is able

13    to gain knowledge of the victim's assets, possibly

14    sometimes using Powers of Attorney, sometimes

15    adding their name to a bank account, sometimes

16    through diverting victim's mail to the suspect's

17    address.

18          A variety of ways where the victim is lead

19    to believe that there is true love between suspect

20    and victim and when either requested or even

21    without their knowledge, assets are transferred, it

22    is done without protest.

23    Q.    What are some signs that you've seen through you're

24    training and experience that distinguish a real romantic

25    relationship and -- between that and a romance scam?

*EXAMINATION OF PAUL GREENWOOD*

1   A.    What I've observed over 22 years is -- I liken it

2   to what we see so often in human trafficking cases, which

3   is a grooming by the suspect of the victim.  Suspects are

4   often very patient in the way that they go about their

5   plans of transferring assets from victim to suspect.

6        They will use endearment terms.  They will

7   try to find out enough about the victim so that the

8   victim is attracted to the suspect because of what

9   the suspect is telling the victim.  And,

10   ultimately, a lot of undue influence is exerted by

11   the suspect to gain power and control over the

12   victim.

13   Q.    Are there certain personality or other traits that

14   you've seen that make victims more susceptible to this

15   type of scam?

16   A.    There are many victims who are sometimes lonely.

17   It may be because of enforced bereavement because of a

18   terminated relationship, often living on their own.

19   Somebody who will seize upon a new relationship will

20   regard this new person, this new friend as being a

21   lifeline, will become very much dependent upon this

22   individual, will be told so often by the suspect that any

23   person in their immediate circle of family or friends is

24   not a good person that -- the victim is persuaded by the

25   suspect that these family and friends have bad motives.

*EXAMINATION OF PAUL GREENWOOD*

1   And, ultimately, the victim is somebody who is either

2   willing or almost taken hostage into an isolated

3   situation where friends and family drop off.

4   Q.   What role, if any, do cognitive defects play?

5   A.   They can play a significant role.  Not that every

6   victim of a rom scandal I've worked on or read about is

7   somebody with cognitive impairment, but, certainly, if

8   there is demonstrative evidence of cognitive impairment,

9   suspects will often focus on that, will exploit it,

10  sometimes it is short-term memory deficits that will work

11  to the advantage of the suspect.  Sometimes it's

12  emotional vulnerability which the suspect will exploit.

13  Q.   Now, you mentioned a financial component in these

14  types of scams, what type of conduct have you seen in

15  terms of obtaining financial control of a victim?

16  A.   Again, in a majority of the cases, it's been a

17  steady process of the suspect gaining the victim's trust

18  and by using sometimes the method of a power of attorney,

19  sometimes the method of saying "I've got this business

20  opportunity" or I've got this emergency situation could

21  I "Borrow some money from you" where the trust has

22  already been established.

23       Sometimes it is by actually defrauding the

24  victim who is not knowing about this by getting to

25  know their personal details such as their bank

*EXAMINATION OF PAUL GREENWOOD*

1    account details, such as their Social Security

2    number, and they actually start using the victim's

3    phone identity and stealing their identity that

4    way.  Again, it can cover a whole range of

5    different tactics.

6    Q.    Does age play a role in romance scams?

7    A.    Yes, it can, not that romance scams are exclusively

8    to the people in their late 60s or 70s, no.  But

9    certainly at that time of life, when I'm talking about

10   victims over the age of 65, by then, those victims are an

11   attraction to predators.

12        And I do call them predators, because some

13   of these victims have established monies.  They

14   have money in a bank account which is sitting there

15   readily accessible and available to the suspect.

16   And, again, it is people who may have gone through

17   a divorce or lost a loved one or a life partner who

18   become more emotionally vulnerable to being

19   approached by a suspect.

20   Q.    Have you noticed in your training and experience a

21   reluctance, on the part of older adults, to report any

22   victimization?

23   A.    Very much so.  While I was a deputy district

24   attorney, there were many times when victims were too

25   embarrassed to report that they were victims or because

1    of cognitive impairment, they were unable to appreciate

2    that they were victims.  So, thankfully, the actual

3    discovery of these crimes came through other sources.

4         But when we talk about victim silence,

5    often -- and I would have victims tell me face to

6    face, I would ask them very gently, "Why didn't you

7    say anything?"  And very often they would say to

8    me, Mr. Greenwood, I did not want my own children

9    to find out because I'm fearful that if anyone

10   finds out what has happened, that they would try

11   to "Put me in a safe place," meaning a nursing

12   home.

13   *Q.*   And based on your training and experience is there

14   a power disparity between what you've called

15   the "Predator" and their victim?

16   *A.*   Yes.  I've noticed this - sometimes it's in

17   personality.  The suspect can be very overbearing, very

18   controlling with their words, with their conduct.  I've

19   had suspects literally go into a bank with victims with

20   their arm around them, dominating conversations, speaking

21   on behalf of the victim.

22        Again, that is an indication to me of power

23   and control.  And, ultimately, in many of these

24   cases, the suspect wants the victim to feel totally

25   reliant upon the suspect so that if there's any

1    dissention between the two of them, one word by the

2    suspect says, Well, I can leave you.  Well, leave

3    the victim feeling paralyzed and not wanting that

4    to happen.

5    Q.    And is that reliance why these victims don't leave

6    these relationships once fraud is even suspected?

7    A.    Certainly because by then, in many of these cases,

8    the isolation has already taken place so that the victim

9    has now lost contact with family and friends because of

10   the suspect's ability to isolate the victim from these

11   folks.

12        And so, the dependency on the suspect

13   becomes even more so -- and the fear of losing the

14   suspect, no matter what damage is being done to the

15   victim, it is too much to bear for many of these

16   victims.

17   Q.    And based on your training and experience then, do

18   these victims develop real feelings for their victimizer?

19   A.    Oh, they do.  And I've seen it time and time again.

20   In fact, in some of some my cases, I've had victims walk

21   into the courtroom, look at the defense table and blow a

22   kiss to the defendant.

23        It's not unnatural for victims, for whatever

24   reason, to feel still affection towards the person

25   who has actually financially harmed them.  And the

1    power and the impact of emotions overtakes the

2    logic that should be there in the brain.

3    *Q.*    You've described a variety of red flags or common

4    things that you have seen in these types of cases.

5         Do you see every single one in every single

6    case?

7    *A.*    No, I don't.  And that's the fascinating part about

8    these kinds of cases.  There are certain common

9    denominators that I will see -- and consistently in a lot

10   of cases, the power, control, the isolation factor,

11   methods that the suspect will use to gain access to the

12   victim's financial assets.

13        But each case, again, rests on its own

14   merits and on its own facts.  And some red flags

15   appear in one case and others in another.

16             **MS. YU:**  Your Honor, may I have a moment?

17             **THE COURT:**  Yes.

18             **MS. YU:**  Nothing further for this witness.

19             **THE COURT:**  All right.

20              Cross-examination.

21

22                    **CROSS-EXAMINATION**

23   QUESTIONS BY THE DEFENDANT:

24   *Q.*    Good afternoon.

25   *A.*    Good afternoon, Mr. Gasca.

1   Q.    You have no bias in this case, right, you're not

2   trying to help the Government in any way, right?

3   A.    No bias.  I say it as I see it.

4   Q.    So in the case you saw a person walk into the bank

5   with their arm around the victim, what case is that?

6   A.    I've had several cases.

7   Q.    Yeah, which case is this?  Give me a name.

8           **MS. YU:**  Objection, Your Honor.

9   Argumentative.

10          **THE COURT:**  Just slow down.  Just slow down.

11  Let him answer the question, please.

12          **THE WITNESS:**  Well, you're testing my memory

13  here.  I can't --

14          **THE DEFENDANT:**  I'm sure I am.  I'm sure you

15  can't give me one.

16          **THE COURT:**  Hold on.  Mr. Gasca, you've got to

17  let the witness answer the question.  You're going to

18  have a chance.  There's a back and forth.  You know the

19  drill.

20          **THE DEFENDANT:**  Yes, sir.

21          **THE COURT:**  All right.

22          **THE WITNESS:**  Yeah.  So I can't give you a

23  name of the defendant case right now because it was

24  five years since I left the DA's office, but they're out

25  there.

*EXAMINATION OF PAUL GREENWOOD*

1    BY THE DEFENDANT:

2    Q.    But you said you've seen plenty of cases where

3    they've come into court -- these cases where the person

4    blow the person a kiss, even.

5         You can't name me a case, you can't name me

6    one?

7    A.    Well, I know of one case.

8    Q.    Yeah.  What case is that?  Tell me.

9    A.    Sure.  Case -- it was a male victim actually

10   against a male defendant.  It was called *People vs.*

11   *Harris*.

12   Q.    Tell me about the case.

13   A.    The -- Harris was a defendant who was a caregiver

14   who was heterosexual.  The male was an elderly man who

15   was gay.  He just lost his life partner, and the

16   defendant used his undue influence to convince the victim

17   that he had stronger feelings for him.

18   Q.    He was a caretaker?

19   A.    Yes.

20   Q.    Now, you said, right, that the person -- first step

21   is to isolate them, right?

22   A.    Often, it is; sometimes, it's the first.

23   Q.    How often?

24   A.    It can happen in -- I would say a -- 50 to

25   75 percent of the cases.

1    Q.    Okay.  And one of the things you mentioned twice,

2    in fact, was that the person would often exert power of

3    attorney, right?

4    A.    Will use the document of a power of attorney,

5    correct.

6    Q.    Right.  And that they get their name added on to

7    the person's bank account?

8    A.    Yes, that can happen a lot.

9    Q.    Okay.  And, essentially, your whole testimony was

10   that the person controls the person, this person is very

11   controlling, right?

12   A.    I've seen that happen in many cases, particularly

13   with conversations between the victim and suspect where

14   the suspect will convince the victim "This is what needs

15   to happen, you agree, do you not?"

16   Q.    Right.  And, in those cases, the person doesn't

17   want them to have friends, like you said, and doesn't

18   want them to be in contact with their family, like you

19   said?

20   A.    That's true.

21   Q.    Right.  So it would be highly unlikely for a person

22   who is engaged in this scam, you know, to have the person

23   freely associating with their friends, freely associating

24   with people in church, freely associating with people in

25   the neighborhood, going on vacations, that wouldn't be --

1    that would seem opposite of what you're saying, is it

2    not?

3    A.    In some cases, it might, yes.  But, no -- again,

4    it's different tactics and different techniques for

5    different suspects.

6    Q.    Okay.  So tell me -- because what you testified to

7    was the controlling one.  So tell me about the

8    noncontrolling one.  Tell me about the Don DeMarco one.

9    I'm not answering -- "yes" or "no" questions.  I'm giving

10    you a chance to explain all you want.

11         Tell me -- because you've testified about a

12    controlling one, right, that one gets a power of

13    attorney and one that adds their name in the bank

14    account.  Now, you've said you've read my case, so

15    unless you're confused, I didn't do those things.

16    So maybe you got confused about your testimony

17    because you're testifying to the person who

18    kidnapped her.  But I want you, sir, to do what you

19    tried to do and address your testimony to something

20    that matches my case.

21         So tell me how my case is familiar with

22    you're experience.  Go ahead.  Take your time.

23    A.    Thank you.

24         Well, I haven't read a lot of your case, but

25    I did review the --

1            **THE DEFENDANT:**  No further questions, Your

2    Honor.

3            **THE WITNESS:**  May I finish the question?

4            **THE COURT:**  He's allowed to answer the

5    question.

6            **THE DEFENDANT:**  I'm sorry.  Go ahead and

7    answer.

8            **THE WITNESS:**   I did review the two videos that

9    showed yourself in a vehicle that was moving where you

10   were in the front passenger seat, conversing with the

11   alleged victim in the rear seat.  And what struck me

12   about those two conversations was the controlling nature

13   of the relationship that you had with the alleged victim

14   where you were constantly telling her in the video that I

15   watched "This is that you need to tell them," and you

16   became very frustrated when the alleged victim did not

17   give you the answers that you were looking for before you

18   got apparently to a bank.

19   *BY THE DEFENDANT*:

20   *Q.*   And I hit her?

21   *A.*   I did not see any physical violence.  You raised

22   your voice many times.

23   *Q.*   Did I threaten her?

24   *A.*   Sorry?

25   *Q.*   Did I threaten her?

*EXAMINATION OF PAUL GREENWOOD*

1   A.    You -- no, I don't believe you used those

2   threatening words, but your --

3   Q.    So my loud voice to you, seemed like I was

4   controlling?

5   A.    It wasn't just your loud voice, sir, it was the

6   words that you were using.

7   Q.    What words?

8   A.    That you were repeating to her.

9   Q.    Repeat them.  Go ahead.

10          **THE COURT:**  Mr. Gasca, I know this is

11  important to you.  But it's hard for our court reporter

12  to get down back and forth.

13          **THE DEFENDANT:**  I'm sorry.

14          **THE COURT:**  So you've got to let him answer

15  and then follow-up.  So just slow down just a little bit,

16  please.

17          **THE DEFENDANT:**  I apologize, ma'am.

18  *BY THE DEFENDANT*:

19  Q.    What words?

20  A.    It was the words about "This is what you need to

21  tell the police."  "If we get stopped, this is what you

22  need to tell them."  You wanted to make sure that this

23  lady responded in a way that showed any officer that she

24  was with you willingly and that this was a very

25  consensual relationship.  You were very emphatic about

*EXAMINATION OF PAUL GRASSO* *GREENWOOD*

1    that.

2    Q.    Right.  And my emphaticness [sic] -- you would have

3    to know the context of our relationship to be able to

4    interpret what that -- what was going on.

5         Were you there the first time I talked to

6    Estrellita?

7    A.    No.  I've not been anywhere where you and the

8    victim have been.

9    Q.    Did you review the first time I had a conversation

10   with her and enticed her, entrapped, and tricked her and

11   controlled the -- whatever it is that you'd want to say,

12   were you there?

13   A.    If that's what you say you did, no.  I've not

14   reviewed anything other than what I've said.

15   Q.    Okay.  So you don't know about the first time we've

16   kissed, about the first time we've hugged, nothing?

17   A.    No.  But that doesn't surprise me, if there was a

18   physical relationship, because in -- so often in these

19   cases, there was a physical relationship in a romance

20   scams.

21   Q.    So you know of cases -- because I don't want to go

22   back over that again where the person lives with her for

23   seven months and the person makes love to her virtually

24   every night?

25             **MS. YU:**  Objection, Your Honor.  You already

1    ruled before.  That's irrelevant.

2             **THE COURT:**  I'll allow it.  It's overruled.

3    *BY THE DEFENDANT*:

4    *Q.*    You said intimate nature, so we were there

5    together.  Do you know if we made love every night or

6    when we had intimacy, or do you know?

7    *A.*    I do not know.

8             **THE DEFENDANT:**  That's about it, Your Honor.

9             **THE COURT:**  Redirect.

10            **MS. YU:**  No, thank you, Your Honor.

11            **THE COURT:**  May this witness be excused?

12            **MS. YU:**  Yes, from the Government.

13            **THE COURT:**  Any objection, Mr. Gasca?

14            **THE DEFENDANT:**  Nope.

15            **THE COURT:**  Thank you, sir.  You may step

16   down.

17            (Witness excused.)

18            **THE COURT:**  You want to review the testimony

19   of the agent?

20            **MR. REIDY:**  Yes, Your Honor, if that's okay

21   with the Court.

22            **THE COURT:**  Okay.  Go ahead, Mr. Reidy.

23            **MR. REIDY:**  Thank you, Your Honor.

24            Would it be all right if I do

25   questioning from behind the lecturn?  I think the

1    cord was having a little bit of trouble during the

2    last portion --

3                **THE COURT:**  That's fine.  There's microphones

4    there.

5                **MR. REIDY:**  All right.  Thank you.

6                             *   *   *

7                       **MICHAEL FUKUDA,**

8    **having been already duly sworn, resumed the witness stand**

9    **and testified further as follows:**

10

11                   <u>**DIRECT EXAMINATION (CON'T)**</u>

12

13   <u>**QUESTIONS BY Mr. Reidy**</u>:

14   *Q.*    Okay.  Agent Fukuda, I'm showing you Exhibit 10,

15   which is the chart of messages related to the defendant's

16   Facebook Messenger.

17   *A.*    Yes.

18   *Q.*    And so, if we could look at the last row of

19   Exhibit 10.  Does the last row of Exhibit 10 show

20   information for a message identified as Exhibit 63 that

21   defendant recorded around 4:45 p.m. on July 19, 2021?

22   *A.*    I have 4:49 p.m.

23   *Q.*    Oh, I'm sorry, yes.  4:49 p.m. on July 19, 2021?

24   *A.*    Yes.

25   *Q.*    Thank you.

1          In Exhibit 63, did Defendant provide

2     additional details about the taking of

3     Ms. Callahan?

4     *A.*     Yes, he did.

5     *Q.*     I'm going to play 63 now.

6               (Video started.)

7     *BY MR. REIDY*:

8     *Q.*     Agent Fukuda, in Exhibit 63, did Defendant say that

9     20 minutes before Ms. Callahan was taken, there was a

10    police car parked nearby?

11    *A.*     Yes.

12    *Q.*     Did Defendant also say regarding that police

13    car "Lucky they were not there.  They would have saw it"?

14    *A.*     Yes, he did.

15    *Q.*     Did Defendant also say in Exhibit 63 that the

16    original plan was for Mr. Tscherny to pull up right

17    alongside, and he would just throw Ms. Callahan in the

18    truck?

19    *A.*     Yes.

20    *Q.*     Did Defendant also say that Mr. Tscherny took a

21    little long, so defendant had to shuffle --

22               **THE DEFENDANT:**  Excuse me.  It didn't

23    say "Throw her in the truck."

24               **THE COURT:**  Counsel, look -- well, I think I

25    understand what you're doing, but I can read.  I can

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   hear.  So isn't this better for closing argument?  I

2   mean --

3               **MR. REIDY:**  Sure, Your Honor.  We can move on.

4               **THE COURT:**  All right.  Thank you.

5   *BY MR. REIDY:*

6   *Q.*   Agent Fukuda, when you reviewed data from

7   Defendant's cellphone, did you also find contact

8   information for an Eddie?

9   *A.*   Yes.

10  *Q.*   I'm going to show you a 1-page document that's been

11  previously marked as Exhibit 18.

12       Do you recognize Exhibit 18?

13  *A.*   Yes, I do.

14  *Q.*   Is Exhibit 18 a chart created by the data review

15  software used to examine data from Defendant's cellphone?

16  *A.*   Yes, it is.

17  *Q.*   Does Exhibit 18 contain two contact entries that

18  were recovered from Defendant's cellphone?

19  *A.*   Yes.

20  *Q.*   Does Exhibit 18 fairly and accurately reflect the

21  data recovered from Defendant's cellphone regarding these

22  contacts?

23  *A.*   Yes.

24              **MR. REIDY:**  Your Honor, I'd ask that

25  Exhibit 18 be admitted.

1              **THE COURT:**  Any objection?

2              **THE WITNESS:**  No, Your Honor.

3              **THE COURT:**  Exhibit 18 will be admitted.

4              (WHEREUPON, an item was marked as Exhibit

5              Number 18.)

6    BY MR. REIDY:

7    Q.    So the first entry on Exhibit 18, do you see the

8    entry for Eddie Warrior?

9    A.    Yes.

10   Q.    And is the number listed under Eddie Warrior

11   212-882-1124?

12   A.    Yes, it is.

13   Q.    Agent Fukuda, did you letter obtain subscriber

14   information for this number as part of your

15   investigation?

16   A.    Yes.

17   Q.    I'm going to show you Exhibit 33.  It's a 5-page

18   document.  I'm just going to scroll through the pages

19   quickly.

20         Agent Fukuda, do you recognize Exhibit 33?

21   A.    I do.

22   Q.    Looking at Page 1 of Exhibit 33, is it the

23   subscriber -- the T-Mobile subscriber information for a

24   number 212-882-1124 that was produced to you by T-Mobile

25   in connection with this case?

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    *A.    Yes.*

2    *Q.    And turning to Page 5 of Exhibit 33, is Page 5 of

3    Exhibit 33 a business record certification from T-Mobile

4    regarding this document?*

5    *A.    It is.*

6              **MR. REIDY:**  Your Honor, I'd ask that

7    Exhibit 33 be admitted.

8              **THE COURT:**  Any objection?

9              **THE DEFENDANT:**  No, Your Honor.

10             **THE COURT:**  All right.  33 will be admitted.

11             (WHEREUPON, an item was marked as Exhibit

12             Number 33.)

13   *BY MR. REIDY:*

14   *Q.    Let's go back to Page 1 of Exhibit 33.

15          Agent Fukuda, who did T-Mobile identify as

16   the subscriber of the -1124 Eddie Warrior number

17   we've been discussing?*

18   *A.    Edward Santiago.*

19   *Q.    And turning back to Exhibit 11.

20          And Defendant exchanged Facebook Messenger

21   messages, as we looked at in Exhibit 11, with an

22   Edward Santiago; is that correct?*

23   *A.    Yes.*

24   *Q.    Let's turn back to Exhibit 18.

25          So on Exhibit 18 below the Eddie Warrior*

*EXAMINATION OF MICHAEL SESUDA CON'T*

1   entry, do you see a second entry for "Eddie's

2   burner"?

3   A.    Yes.

4   Q.    And is the number listed under Eddie's burner

5   212-658-1689?

6   A.    Yes.

7   Q.    Let's stick with Eddie Warrior for a second.  Did

8   you find text messages between Defendant and the Eddie

9   Warrior number on Defendant's cellphone?

10  A.    Yes, I did.

11  Q.    I'm going to show you what's been previously marked

12  as Exhibit 21.  It's an 11-page document.  I'm just going

13  to cycle through the pages quickly.

14          **THE DEFENDANT:**  Before we go much further,

15  Your Honor.  I don't have Exhibit 33.

16          **THE COURT:**  Is it in the binder?  Let me just

17  look and see if it's in mine, 33.

18          **MR. REIDY:**  It should be, Your Honor.

19           Yeah, Your Honor.  We did produce it in

20  discovery, but I guess it might be ...

21          **THE COURT:**  And my binder doesn't have

22  Exhibit 33.

23          **MR. REIDY:**  I understand, Your Honor.  We can

24  get copies of it to the defendant.

25          **THE COURT:**  Well, can we do that -- how soon?

1    I mean, so that he can look at it, right?  I mean, he

2    needs to see ...

3              **MS. YU:**  He has 21.

4              **MR. REIDY:**  Thirty-three.

5              **MS. YU:**  That's the one he's looking for right

6    now.

7              **THE DEFENDANT:**  That's okay, Your Honor.

8              **THE COURT:**  I'm sorry.

9              **THE DEFENDANT:**  I'm fine.

10             **THE COURT:**  Can you see what's on the screen?

11             **THE DEFENDANT:**  Yes.

12             **MR. REIDY:**  Yeah.  I think the one that we're

13   looking at right now, the defendant has.  I think 33 was

14   the subscriber record.

15             **THE COURT:**  You're saying that that was

16   produced during discovery.

17             **MR. REIDY:**  It was, Your Honor.

18             **THE COURT:**  Right.  No, but I think what he --

19   I think his point is you say Exhibit 33.  You look in the

20   binder.  There's nothing in there.

21             **MR. REIDY:**  I understand.

22             **THE COURT:**  So ...

23             **MR. REIDY:**  We can get him a copy.  I think we

24   can send it.

25             **THE COURT:**  That's fine.  I am curious.  Why

1    is it not in the binder?  I mean, it's a hard copy.  I

2    mean --

3                    **MR. REIDY:**  I'm not sure, Your Honor.

4                    **THE COURT:**  Okay.  Fair enough.  Continue.

5    *BY MR. REIDY:*

6    *Q.*    So, Agent Fukuda, in Exhibit 21 -- do you recognize

7    exhibit -- I'm sorry, yeah.

8            Exhibit 21, do you recognize Exhibit 21?

9    *A.*    Yes, I do.

10   *Q.*    And we'll go back to Page 1 of Exhibit 21.

11           Is Exhibit 21 portions of a text message

12   conversation between Defendant's phone -- or from

13   Defendant's phone, excuse me, between Defendant and

14   telephone number 212-882-1124, identified as Eddie

15   Warrior?

16   *A.*    Yes.

17   *Q.*    Just quickly looking at Page 4 of Exhibit 21, there

18   are some blue bubbles on the left side of that page and

19   green bubbles on the right.

20           What are the green bubbles on the right-hand

21   side on Page 4 of Exhibit 21?

22   *A.*    Can you expand one of those green boxes?

23   *Q.*    Sure.

24   *A.*    So, the green box is going to be the text messages

25   that originated from Mr. Gasca and was sent to Eddie

*EXAMINATION OF MICHAEL GASCA CON'T*

1   Warrior's phone.

2   *Q.*    And the blue boxes?

3   *A.*    Can you expand one of those?

4   *Q.*    Yes.

5   *A.*    This is going to -- the blue boxes represent text

6   messages from Eddie Warrior to Mr. Gasca.

7   *Q.*    Does Exhibit 21 -- is the message data in

8   Exhibit 21 presented in chronological order from earliest

9   to most recent message?

10  *A.*    Yes.

11  *Q.*    Does Exhibit 21 capture a text message exchange

12  between Defendant and --

13          **THE DEFENDANT:**  Excuse me.  Exhibit 21 is not

14  what he said.  It skips pages.  It skips dates.

15          **THE COURT:**  I'm sorry.  Say that one more

16  time, Mr. Gasca.

17          **THE DEFENDANT:**  He asked him a question,

18  exhibit from the earliest to the latest.  It's not

19  complete.  It have several messages and it skips a day.

20  It goes to one message, then it skips another date.  It

21  jumps 11 days.

22          **THE COURT:**  So, Mr. Reidy, you want to clarify

23  your question if, in fact, that's accurate?

24          **MR. REIDY:**  I think that the next question

25  might clarify.

1      **THE COURT:** All right. Go ahead.

2    *BY MR. REIDY:*

3    *Q.*    Does Exhibit 21 capture a text message exchange

4    between Defendant and the Eddie Warrior number on

5    June 26th, 2013, in between March 9th, 2021, and

6    March 22nd, 2021?

7    *A.*    Yes.

8    *Q.*    Does Exhibit 21 fairly and accurately show the

9    date, time, sender, message content, and other data for

10   these text message that were recovered from Defendant's

11   phone?

12   *A.*    Yes, it does.

13          **MR. REIDY:** Your Honor, I'd ask that

14   Exhibit 21 be admitted.

15          **THE COURT:** Any objection?

16          **THE DEFENDANT:** No.

17          **THE COURT:** All right. 21 will be admitted.

18          (WHEREUPON, an item was marked as Exhibit

19          Number 21.)

20   *BY MR. REIDY:*

21   *Q.*    Start with the first page of Exhibit 21. You have

22   21.

23          On Page 1 of Exhibit 21, there's a green

24   bubble with a message sent to Edward Santiago on

25   June 26th, 2013. Do you see that?

 1   A.    Yes.

 2   Q.    Can you read that message?

 3   A.    "Call me please, Johnny Ray."

 4   Q.    Turn to Page 2 of Exhibit 21.  The last two green

 5   bubbles on the bottom half of Page 2 of Exhibit 21, are

 6   those messages that Defendant sent to Mr. Santiago on

 7   March 9th, 2021 at 8:03 p.m. and 8:04 p.m.?

 8   A.    Yes.

 9   Q.    And based on your investigation in this case, were

10   Defendant and Ms. Callahan living together in New York

11   throughout March of 2021?

12   A.    Yes, they were.

13   Q.    Can you read the last two messages on Page 2 of

14   Exhibit 21 that Defendant sent on March 9th, 2021?

15   A.    "Estrellita is a real bitch.  She's that bitch who

16   is the sucker for the guy who is dicking her down."

17   Q.    Turn to Page 3 of Exhibit 21.

18         Does Page 3 of Exhibit 21 show four messages

19   that Defendant sent on March 9th, 2021?

20              THE DEFENDANT:  Your Honor, I'm going to

21   object.  He just read a text to have context.  We don't

22   know it's about or anything.  He's just jumping to

23   another text.

24              THE COURT:  Right.  But, as I said earlier, if

25   you believe that there's other text messages that provide

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    context, you can bring those in.

2    BY MR. REIDY:

3    Q.    So on Page 3 of Exhibit 21.

4            THE DEFENDANT:  I'm sorry.  I'm a little

5    confused.  Do I bring them in now, or do I bring them in

6    cross-examination?

7            THE COURT:  Cross-examination.

8            THE DEFENDANT:  Okay.

9    BY MR. REIDY:

10   Q.    On Page 3 of Exhibit 21, Agent Fukuda, does that

11   show four messages that Defendant sent to Mr. Santiago on

12   March 9th, 2021, between 8:08 p.m. for the first message

13   and 8:10 p.m. on the fourth message?

14   A.    Yes.

15   Q.    Are all these messages discussing Ms. Callahan?

16   A.    Yes.

17   Q.    Specifically, are the messages on Page 3 of

18   Exhibit 21 discussing a conversation that Defendant had

19   with Ms. Callahan's daughter about Ms. Callahan?

20   A.    One second, please.

21   Q.    I can make them bigger.

22   A.    Can I see the next two?

23         Yes.

24   Q.    If you could just read the second, third, and

25   fourth messages on Page 3 of Exhibit 21?

1    *A.*    "She also told me Estrellita bought a house with

2    someone in Connecticut with no contract so the person

3    took it over and Estrellita left and didn't get her money

4    back.  That was probably the eight grand I saw she took

5    out previously from the Roth IRA."

6    *Q.*    Based on your investigation, Agent Fukuda, what did

7    you understand Defendant to be referring to when he

8    said "The Roth IRA"?

9    *A.*    This was going to be Ms. Callahan's retirement

10   account.

11   *Q.*    Go to Page 4 of Exhibit 21.

12         On the bottom right of Page 4 of Exhibit 21,

13   are those two messages that Defendant sent to

14   Edward Santiago on March 9th, 2021, both at 8:14

15   p.m.?

16   *A.*    Yes.

17   *Q.*    Can you read those messages?

18   *A.*    "She's just acting like a full retard now.  I can't

19   even call her daughter to get her."

20   *Q.*    Page 5 of Exhibit 21.

21         Does Page 5 of Exhibit 21 show four messages

22   Defendant sent to Mr. Santiago again on March 9th,

23   2021, starting with the first message at 8:16 p.m.,

24   ending with the fourth message at 8:18 p.m.?

25   *A.*    Can you expand the Text Bubbles 2 and 3?

*EXAMINATION OF MICHAEL MATSUDA CON'T*

1    Q.    Sure.

2    A.    Yes.

3    Q.    If you could just read the messages on Page 5 of

4    Exhibit 21?

5    A.    "I'm just trying to ignore but even her daughter

6    said she will look for the one thing -- one thin'

7    (verbatim) that annoys you and do that.  She'd do the

8    exact opposite of anything you tell her.  Don't know what

9    the hell I'm going to do with her.  Just try to get her

10   to go" --

11   Q.    Oh, sorry.

12   A.    "Just try to get her to go hang out with her

13   friends."

14   Q.    Page 6 of Exhibit 21.

15         The last bubble on page six, does that show

16   a message that Mr. Santiago sent to the defendant

17   on March 9th, 2021, at 8:19 p.m.?

18   A.    Yes.

19   Q.    And can you read that message?

20   A.    "Did her daughter say one day she changed or she

21   was twisted for a long time?"

22   Q.    Based on your investigation, what did you

23   understand Mr. Santiago to be referring to in that

24   message?

25   A.    Mr. Santiago was referring to Ms. Callahan's --

1              **THE DEFENDANT:**  Objection; speculation.

2              **THE COURT:**  I'm sorry.  One more time.  I

3    couldn't hear you.

4              **THE DEFENDANT:**  All right.  Objection;

5    speculation.

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  Ms. Callahan was -- I'm sorry,

8    Mr. Santiago was referring to Ms. Callahan's mental

9    impairment and was asking if it was something that

10   happened overnight or quickly or it's something that took

11   some time to onset.

12   *BY MR. REIDY*:

13   *Q.*   Page 7 of Exhibit 21.

14         So the first blue bubble at the top of

15   Page 7 of Exhibit 21, is that a duplicate of the

16   message that we looked at that was on the last

17   bubble on Page 6 of Exhibit 21?

18   *A.*   Yes, it is.

19   *Q.*   And then, the next bubble, second message bubble on

20   Page 7 of Exhibit 21, is that a response that Defendant

21   sent at 8:20 p.m. to Mr. Santiago?

22   *A.*   Yes, it is.

23   *Q.*   Right.  Can you read that message?

24   *A.*   "Always been that way, but actually doesn't know

25   her now as she has little to do with her."

1   Q.    On to Page 9 of Exhibit 21.

2         Does the first bubble on Page 9 of

3   Exhibit 21 show a message Defendant sent to

4   Mr. Santiago on March 11th, 2021, at 8:22 a.m.?

5   A.    Yes.

6   Q.    Can you read that message?

7   A.    "How she survived this long is my luck, I guess.

8   I tried really hard to be cool with her, but I hate her

9   too much."

10  Q.    And the second to last message on Page 9 of Exhibit

11  21, does that show a message Defendant sent to

12  Mr. Santiago, again, on March 11, 2021, at 9:42 a.m.?

13  A.    Yes.

14  Q.    Can you read that message?

15  A.    "The question I have to struggle with is, do I

16  want two live with a retard for five grand a month."

17  Q.    Moving on to Page 10 of Exhibit 21.

18        The last two bubbles on the bottom of Page

19  10 of Exhibit 21, do those show the same message

20  that Mr. Santiago sent to Defendant on March 22,

21  2021 at 1:43 p.m.?

22  A.    Yes.

23  Q.    Can you read that message?

24        **THE COURT:**  Counsel I'm going to stop -- like,

25  what's the relevance of this?  Is it hearsay?  Is it

1    being offered for effect on the listener?  What's the

2    story here?

3              **MR. REIDY:**  Your Honor, I don't think it's

4    hearsay because I think that these might be

5    co-conspirator statements, but I think even if it --

6              **THE COURT:**  You're alleging that Mr. Gasca is

7    now in a conspiracy with Mr. Eddie Warrior.

8              **MR. REIDY:**  Yes, Your Honor.  And I can get to

9    that in a moment, but I think even if the Court didn't

10   agree with that rationale, I'm trying to --

11             **THE COURT:**  I'm not inclined to.  I mean, this

12   is the first I've heard of it, but go ahead.

13             **MR. REIDY:**  I understand.  I'm showing

14   Agent Fukuda these messages because on the last page of

15   Exhibit 21, there are additional messages from the

16   defendant in direct response to this message, and so I

17   want the Court to have that context.

18             **THE DEFENDANT:**  Direct response is 11 days

19   later.

20             **THE COURT:**  Duly noted.  Thank you.

21              But go ahead.  I'll allow it.

22   *BY MR. REIDY:*

23   *Q.*   Can you read the messages, the last two -- I guess

24   they're the same message.  But in the last two bubbles on

25   Page 10 of Exhibit 21?

1   A.    There's an emoji of a face that's laughing/crying,

2   and it says, "Don't kill Estrellita."

3   Q.    And the last page of Exhibit 21, Page 11.

4          Do the first two bubbles on Page 11 of

5   Exhibit 21 show messages that Defendant sent to

6   Mr. Santiago on March 22, 2021, at 1:44 p.m.?

7   A.    Yes.

8   Q.    Can you read those messages, please?

9   A.    It's going to be the same emoticon or emoji, and

10  the text message following says, "We're cool now.  I just

11  accept she's senile."

12  Q.    Agent Fukuda, on July 20, 2021, did Defendant have

13  his initial appearance in a detention hearing in this

14  district?

15  A.    Yes.

16  Q.    Was Defendant ordered detained pending trial at

17  that hearing?

18  A.    He was.

19  Q.    Was Defendant detained at the San Bernardino County

20  Sheriff's Department, central detention center in July

21  and August of 2021.

22  A.    Yes, he was.

23  Q.    Does the San Bernardino County Sheriff's Department

24  run the central detention center?

25  A.    Yes.

1    Q.    Based on your experience in investigating other

2    cases, does the San Bernardino County Sheriff's

3    Department maintain call detail records and audio

4    recordings of inmate's jail calls at the jail facilities

5    that it runs?

6    A.    Yes, they do.

7    Q.    As part of your investigation in this case, did you

8    request jail call records from the San Bernardino County

9    Sheriff?

10   A.    I did.

11   Q.    Specifically, did you request and receive records

12   of all calls that Defendant made from his specific inmate

13   account at the central detention center?

14   A.    I did.

15   Q.    Did the records reflect that Defendant had made

16   multiple calls to Edward Santiago's number, the Eddie

17   Warrior contact we've been discussing, 212-882-1124?

18   A.    Yes.

19   Q.    I'm just going to put Exhibit 33 back up.

20         Looking at what's been previously admitted

21   as Exhibit 3 on Page 1, during your investigation,

22   Agent Fukuda, did you learn Defendant Santiago's

23   address?

24   A.    I did.

25   Q.    Was that address the address listed on Page 1 of

 1  Exhibit 33?

 2  A.    Yes.

 3  Q.    In November of 2022, did you fly out to New York in

 4  an effort to track down Edward Santiago near that

 5  address?

 6  A.    It was in October.

 7  Q.    I'm sorry.  In October 2022, did you fly to New

 8  York to attempt to track Mr. Santiago down near that

 9  address?

10  A.    Yes.

11  Q.    Did you use cellular phone location data for the

12  212-882-1124 number as part of your investigation?

13  A.    Yes, I did.

14  Q.    How did you do that?

15  A.    I obtained a search warrant for his phone to

16  provide geo location in realtime.  And based on the pings

17  I received back, I was able to locate his whereabouts at

18  any given time.

19  Q.    Did you also use a DMV photo of Mr. Santiago to

20  identify him on the street?

21  A.    Yes.

22  Q.    Did you locate Mr. Santiago in the Bronx?

23  A.    I did.

24  Q.    Did you speak to him?

25  A.    I did.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    Q.    What did you speak about?

2    A.    We spoke about places to go visit in New York.

3    Q.    How long did you speak with Mr. Santiago?

4    A.    It was at least a couple minutes.

5    Q.    And based on that conversation, are you familiar

6    with Mr. Santiago's voice?

7    A.    I am.

8    Q.    Well, let's go back to your request for Defendant's

9    jail calls.  Did you obtain jail calls from the San

10   Bernardino County Sheriff that Defendant made from his

11   own inmate account?

12   A.    Yes.

13   Q.    Did the sheriff's department also provide you with

14   jail calls made to Eddie Santiago's phone numbers from

15   Defendant's inmate account as well as any other inmate's

16   account?

17   A.    Yes.

18   Q.    I'll show you a document that's been marked as

19   Exhibit 84.

20        Agent Fukuda, is Exhibit 84 a business

21   record certification from the San Bernardino County

22   Sheriff's Department?

23   A.    It is.

24   Q.    Does Exhibit 84 reflect that all of the call detail

25   records and audio recordings that the sheriff produced

*EXAMINATION OF MICHAEL SHIMADA CON'T*

1   from the central detention center facility between

2   July 1st, 2021, and December 2021, for calls made from

3   Defendant's inmate account to any telephone number are

4   true and correct copies of the records regularly kept and

5   maintained by the sheriff?

6   A.   Yes.

7   Q.   Does Exhibit 84 further reflect that all the call

8   detail records and the audio recordings that the San

9   Bernardino County Sheriff produced from the central

10   detention center facility between July 1st, 2021, and

11   December of 2021, are calls made from any inmate account

12   to telephone number 212-882-1124 are true and correct

13   copies of records regularly recorded and maintained by

14   the sheriff?

15   A.   Yes.

16           **MR. REIDY:**  Your Honor, at this time, I'd ask

17   that Exhibit 84 be admitted.

18           **THE COURT:**  Any objection?

19           **THE WITNESS:**  I'm sorry, Your Honor.

20           **THE COURT:**  It's Exhibit 84.  You want to take

21   a moment to look at it?

22           **THE DEFENDANT:**  It's a verification of Eddie's

23   records.

24           **THE COURT:**  Verification of the records, yeah.

25           **THE DEFENDANT:**  That's fine.  Let it in.

1                   **THE COURT:**  All right.  They will be admitted.

2                   **MR. REIDY:**  Thank you, Your Honor.

3                   **THE DEFENDANT:**  Thank you.

4                   (WHEREUPON, an item was marked as Exhibit

5                   Number 84.)

6    *BY MR. REIDY:*

7    *Q.*   Let's look at Exhibits 81 and 82.

8          Agent Fukuda, on the left-hand side, is

9    Exhibit 81; on the right-hand side of your screen

10   is Exhibit 82.

11         Do you see that?

12   *A.*   Yes.

13   *Q.*   And just looking at Exhibit 81 first.

14         Does Exhibit 81 contain call detailed

15   records generated by the certain San Bernardino

16   County Sheriff's Office for calls that were made

17   from Defendant's inmate account to any telephone

18   number in July and August of 2021?

19   *A.*   Yes, it does.

20   *Q.*   And does Exhibit 82 also show call detail records

21   from Defendant's inmate account during that same period?

22   *A.*   Yes.

23   *Q.*   Do the charts in Exhibits 81 and 82 include

24   information about the calls such as:  The cite where the

25   call was made; the date and the time of the call; the

1    number the party called; the duration of the call, and

2    the name and inmate account number associated with the

3    call?

4    A.    Yes.

5    Q.    Let's take a look at Exhibit 83.  Just highlighted

6    the first few rows.

7         Is Exhibit 83 call detail records generated

8    by the San Bernardino County Sheriff's of calls

9    that were made from any inmate account to

10   Mr. Santiago's phone number, the Eddie Warrior

11   contact we've been talking about, 212-882-1124 from

12   July to October of 2021?

13   A.    Yes, it does.

14   Q.    And, finally, let's turn to Exhibit 80.

15        Is Exhibit 80 a chart containing a portion

16   of the call detailed records we just looked at in

17   Exhibit 83 for only those audio recordings that

18   will be introduced as exhibits at this trial?

19   A.    Yes.

20        **MR. REIDY:**  Your Honor, I'd ask pursuant to

21   their representations in Exhibit 84 that Exhibits 80, 81,

22   82, and 83 be admitted.

23             **THE COURT:**  Any objection?

24             **THE DEFENDANT:**  No, Your Honor.

25             **THE COURT:**  All right.  80 through 83 will be

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    admitted.

2             (WHEREUPON, documents were marked as Exhibit

3             Numbers 80; 81; 82; and 83.)

4    *BY MR. REIDY*:

5    *Q.*    Agent Fukuda, did San Bernardino County Sheriff's

6    also provide the actual recordings for all of the calls

7    that were listed in Exhibits 80 through 83?

8    *A.*    Yes.

9    *Q.*    Did you listen to the recordings of these jail

10    calls?

11    *A.*    I did.

12    *Q.*    Let's turn back to Exhibit 81.

13       Just looking at a blown-up portion of

14    Exhibit 81.  Does Exhibit 81 contain call detail

15    records for calls that were made from Defendant's

16    inmate account to various numbers?

17    *A.*    Yes, it does.

18    *Q.*    I want to specifically draw your attention to

19    line 15 of Exhibit 81.

20       Does line 15 reflect a call that was made

21    from Defendant's account to telephone number

22    727-244-6919 on August 2nd, 2021 at 5:27 p.m.?

23    *A.*    It does.

24    *Q.*    Did you review the audio recording for this call?

25    *A.*    I did.

*EXAMINATION OF MICHAEL SEPULVEDA CON'T*

1    Q.    And who was on this call?

2    A.    This was Mr. Gasca and Mr. Gasca's mother.

3    Q.    And how do you know that?

4    A.    Based on the context of the call.

5    Q.    I'm showing you a document that's been identified

6    or marked as Exhibits 97 through 99.

7          Do you recognize this image?

8    A.    Yes, I do.

9    Q.    Are those your initials on the top left of the

10   flash drive identified as Exhibits 97 through 99?

11   A.    They are.

12   Q.    Did you initial this flash drive after reviewing

13   Exhibits 97 through 99?

14   A.    I did.

15   Q.    Do Exhibits 97 through 99 contain audio files of

16   portions of the jail call that was made from Defendant's

17   account to telephone number 727-244-6919 on August 2nd,

18   2021 at 5:27 p.m.?

19   A.    Yes.

20   Q.    Do the clips found in Exhibits 97 through 99 fairly

21   and accurately reflect those portions of the call

22   contained in each exhibit?

23   A.    Yes.

24         **MR. REIDY:**  Your Honor, I would ask that

25   Exhibits 97 through 99 be admitted.

1              THE COURT:  Any objection?

2              THE DEFENDANT:  Are they clips of the calls?

3              THE COURT:  Yeahs.  That's what he indicates,

4    yes.

5              THE DEFENDANT:  My same objection.  Play

6    the whole call.

7              THE COURT:  Objection -- sorry -- and so the

8    objection is noted but overruled.  But, again, you'll

9    have the opportunity to either cross or if you have the

10   full call, you can try to admit that at a later time.

11             THE DEFENDANT:  Okay.

12             THE COURT:  Mr. Reidy, go ahead.

13             THE DEFENDANT:  I don't mean to keep repeating

14   the same one.  I understand what you said several times.

15   I just want to make sure I put it on the record.

16             THE COURT:  You're doing exactly what you need

17   to do.

18             (WHEREUPON, documents were marked as Exhibit

19             Numbers 87 and 89.)

20   BY MR. REIDY:

21   Q.   Let's go back to Exhibit 82.

22        Agent Fukuda, is Exhibit 82 a chart of jail

23   calls made from Defendant's account to telephone

24   number 212-658-1689?

25   A.   Yes, it is.

*EXAMINATION OF MICHAEL LARUDA CON'T*

1    Q.    When we looked at Defendant's contacts from his

2    phone, Exhibit 18, that 212-658-1689 number, was

3    identified as "Eddie burner," correct?

4    A.    That's correct.

5    Q.    Drawing your attention to line 1 of Exhibit 82.

6          Does line 1 reflect a call that was made

7    from Defendant's account to telephone number -- the

8    Eddie burner telephone number we've been discussing

9    on August 17th, 2021, at 6:20 p.m.?

10   A.    Yes.

11   Q.    Did you review the audio recording for this call?

12   A.    I did.

13   Q.    Did you recognize Defendant's voice and Edward

14   Santiago's voice on this call?

15   A.    Yes, I did.

16   Q.    Showing you what's been marked as Exhibits 118,

17   119, and 122.  Are those your initials on Exhibits 118,

18   119, and 122?

19   A.    They are.

20   Q.    Did you initial this flash drive after reviewing

21   Exhibits 118, 118, 19?

22   A.    Yes.

23   Q.    Do Exhibits 118, 119, and 122 contain audio files

24   of portions of the jail call made from Defendant's

25   account to 212-658-1689 on August 17, 2021, at 6:20 p.m.?

*EXAMINATION OF MICHAEL FAKUDA CON'T*

1   A.   Yes.

2   Q.   And do the clips found in Exhibits 118, 119, and

3   122 fairly and accurately reflect those portions of the

4   call contained in each exhibit?

5   A.   Yes.

6        **MR. REIDY:**  Your Honor, I'd ask that Exhibits

7   118, 119, and 122 be admitted.

8        **THE COURT:**  Same objection, Mr. Gasca?

9        **THE DEFENDANT:**  Yes.

10       **THE COURT:**  Yeah.  So they will be admitted

11  over Defendant's objection.  Go ahead.

12       **MR. REIDY:**  Thank you, Your Honor.

13       (WHEREUPON, documents were marked as Exhibit

14       Numbers 118; 119; and 122.)

15  *BY MR. REIDY:*

16  Q.   I'm going to go back to Exhibit 80.  Blowing up a

17  portion of Exhibit 80.

18       Agent Fakuda, is Exhibit 80 call detail

19  records generated by the San Bernardino County

20  Sheriff's Office for calls that were made from any

21  inmate account at the facility to the Eddie Warrior

22  number 212-882-1124 between July and August of

23  2021?

24  A.   Yes.

25  Q.   Did you review the audio recordings for all the

*EXAMINATION OF MICHAEL TERUDA CON'T*

1  calls listed in Exhibit 80?

2  *A.*    I did.

3  *Q.*    And Exhibit 80 is just a subset of the list of

4  calls made to the Eddie Warrior number that we previously

5  looked at in Exhibit 83?

6  *A.*    Yes.

7  *Q.*    Did you recognize Defendant's voice and Edward

8  Santiago's voice on each of the calls that are listed on

9  Exhibit 80?

10  *A.*    I did.

11  *Q.*    Showing you what's been marked as Exhibits 85

12  through 96, 100 through 117, and 120 to 121.

13         Are these initials on this flash drive?

14  *A.*    Yes.

15  *Q.*    Did you initial this flash drive after reviewing

16  Exhibits 85 through 96, 100 through 117, and 120 to 121?

17  *A.*    Yes.

18  *Q.*    Do Exhibits 85 through 96, 100 through 117 --

19                (Reporter clarification.)

20  *BY MR. REIDY:*

21  *Q.*    Do Exhibits 85 through 96, 100 to 117, and 120 to

22  121 contain audio files of portions of the jail calls

23  from various inmate accounts to the Eddie Warrior number

24  from July to August 2021, that are listed in Exhibits 80

25  and 83?

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    *A.*    Yes.

2    *Q.*    Do the clips found in Exhibits 85 through 96, 100

3    through 117, and 120 to 121 fairly and accurately reflect

4    those portions of the call contained in each exhibit?

5    *A.*    Yes.

6            **MR. REIDY:**  Your Honor, I'd ask that

7    Exhibits 85 through 96, 100 through 117, and 120 to 121

8    be admitted.

9            **THE COURT:**  And, again, these are all clips

10   of -- are these complete calls or clips of calls while in

11   custody?

12           **MR. REIDY:**  They are clips of calls, Your

13   Honor.

14           **THE COURT:**  I assume same objection,

15   Mr. Gasca?

16           **THE DEFENDANT:**  Yes, Your Honor.

17           **THE COURT:**  So the objection is noted and

18   overruled.

19               You may continue.  And they are

20   admitted.

21           **MR. REIDY:**  Thank you, Your Honor.

22               (An off-the-record discussion was held.)

23   *BY MR. REIDY:*

24   *Q.*    Agent Fukuda, there are some transcripts that we'll

25   play along with the jail calls we'll be discussing today.

*EXAMINATION OF MICHAEL SEPULVEDA CON'T*

1            Did you review the transcripts that will be

2    shown here in court?

3    *A.*    I did.

4    *Q.*    And to the best of your ability, do all of the

5    transcripts fairly and accurately capture the

6    intelligible portions of the jail call audio clips we'll

7    be discussing today?

8    *A.*    Yes.

9    *Q.*    And the transcripts are Defendant's statements

10   identified with "JRG," Mr. Santiago's statements

11   identified with "ES," and Defendant's mother's statements

12   identified with "MOM"?

13   *A.*    Yes.

14   *Q.*    Let's start with Exhibits 97 through 99 just to

15   orient ourselves, showing line 15 from Exhibit 81.

16           Does Exhibit 81, line 15 show the call that

17   we will be hearing portions of in Exhibits 97

18   through 99?

19   *A.*    Yes.

20   *Q.*    So Exhibits 97 through 99 contain portions of a

21   call Defendant made from his own account to 727-244-6919

22   on August 2nd, 2021, at 5:37 p.m.; is that correct?

23   *A.*    Yes.

24   *Q.*    Let's play Exhibit 97.

25           (Video started.)

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   *BY MR. REIDY*:

2   Q.    In Exhibit 97, did Defendant address the person he

3   called as "Ma"?

4   A.    Yes, he did.

5   Q.    And based on this statement and others during the

6   call, is it your understanding that Defendant's speaking

7   to his mother?

8   A.    Yes.

9   Q.    Play Exhibit 98.  Another clip from the same call.

10            (Video started.)

11  *BY MR. REIDY*:

12  Q.    All right.  Agent Fukuda, what did you understand

13  Defendant's mother to be talking about when she said, "I

14  didn't want you to go get her because you don't know,

15  especially if you say that her mind is, like, little,

16  like she's not all there"?

17  A.    She was referring to Ms. Callahan, and she was

18  referring to Ms. Callahan's diminished mental capacity.

19            **THE DEFENDANT:**  Objection.

20            **THE COURT:**  It's sustained.

21            Counsel, I can read this.  I mean, so --

22  let's move on.

23            **MR. REIDY:**  Yes, Your Honor.  We'll move on.

24            Let's listen to Exhibit 99.

25            (Video started.)

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1  *BY MR. REIDY*:

2  *Q.*    All right.  Agent Fukuda, what did you understand

3  Defendant to be asking his mother to do in the first

4  portion of Exhibit 99?

5  *A.*    He was coaching on her what to say if she was

6  questioned.

7            **THE DEFENDANT**:  Objection.  Speculation.

8            **THE COURT**:  Sustained.

9  *BY MR. REIDY*:

10  *Q.*    Let's move on to Exhibit 100.

11           First, just to figure out what call we're

12  talking about.  I'm showing you Exhibit 80,

13  Line 17.  Does Exhibit 80, Line 17 identify the

14  call that we will be hearing a portion of in

15  Exhibit 100, which is a call made to the Eddie

16  Warrior number from Defendant's own account on

17  August 2, 2021 at 5:59 p.m.?

18  *A.*    Yes.

19  *Q.*    And did Defendant place this call just a few

20  minutes after he had the call with his mother that we

21  heard in Exhibits 97 through 99?

22  *A.*    Yes.

23            **MR. REIDY**:  Play Exhibit 100.

24            (Video started.)

25

EXAMINATION OF MICHAEL FUKUDA CON'T

1   BY MR. REIDY:

2   Q.    Agent Fukuda, did you understand Defendant to be

3   talking about his previous call with his mother that we

4   listened to in Exhibits 97 through 99?

5   A.    Yes.

6   Q.    And when Defendant talked about the call with his

7   mother, did he add an extra syllable to some of his

8   words?

9   A.    He did.

10  Q.    So, for example, when defendant said, "I was like

11  you know, [sic] I togld her the phgone was being

12  recgorded.  Be cagreful what you sagy," what did you

13  actually understand him to mean in regular spoken

14  English?

15  A.    Can you scroll down on the message or on the

16  transcript?

17  Q.    Sure.

18  A.    Mr. Gasca said, "I told her the phone was being

19  recorded.  Be careful what you say."  She says, "I told

20  you not to go there because you know her mental state."

21  Q.    Agent Fukuda, at some point, did you learn that

22  Defendant had made efforts to hide or destroy evidence

23  while in jail?

24  A.    Yes.

25  Q.    Did you also learn that Defendant had tried to get

*EXAMINATION OF MICHAEL BERMUDA CON'T*

1  witnesses to change their testimony, while in jail?

2  *A.*    Yes.

3  *Q.*    Did Defendant make these efforts through jail

4  calls?

5  *A.*    He did.

6  *Q.*    Did Defendant make calls about destroying evidence

7  or witness tampering, mostly from other inmates'

8  accounts?

9  *A.*    Yes.

10 *Q.*    Are these calls the basis for the witness tampering

11 and obstruction of justice charges in the second

12 superceding indictment?

13 *A.*    Yes, they are.

14         **THE DEFENDANT:**  Objection.  That's yet to be

15 proven.  That's an accusation.

16         **THE COURT:**  Sustained.

17 *BY MR. REIDY:*

18 *Q.*    I want to ask you about how you discovered

19 Defendant was making calls from other inmates' accounts.

20 Let's talk about Exhibit 122, and just to figure out what

21 call we're talking here.

22         I'm going to direct you to Exhibit 82, Line

23 1.  So, is Exhibit 82, Line 1 -- sorry, is this the

24 call that we will hear a portion of in Exhibit 122,

25 specifically, a call that Defendant made from his

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   own account on August 17, 2021, at 6:20 p.m. to

2   Edward Santiago at the Eddie burner number?

3   A.   Yes.

4            **MR. REIDY**:  Let's hear Exhibit 828.

5            (Video started.)

6   *BY MR. REIDY*:

7   Q.   Agent Fukuda, what did you understand Mr. Santiago

8   to be talking when he said, "This is on your, um, this is

9   on your um"?

10  A.   Mr. Santiago was trying to clarify if they were

11  talking on Mr. Gasca's jail phone account.

12  Q.   And what did you understand Defendant to mean what

13  he replied, "Yeah, yeah, this is on mine.  But we could

14  talk, I mean, just talk.  It's been a week"?

15  A.   Mr. Gasca was saying this is on my phone account,

16  but it's been a week, so let's talk.

17  Q.   Based on this conversation in Exhibit 122 and

18  Mr. Santiago's reluctance to talk, did you suspect that

19  Defendant had made other calls to Mr. Santiago from other

20  inmates' accounts?

21  A.   I did.

22  Q.   Was this the call that caused you to request jail

23  calls that were made from any inmate account to

24  Mr. Santiago at the Eddie Warrior number, 212-882-1124?

25  A.   Yes.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   Q.   Let's talk about Exhibits 85 through 89 and 120.

2   But first, let's go to Exhibit 80 so we can figure out

3   what call we're talking about.

4        So I'm highlighting Line 1 of Exhibit 80.

5   And does Line 1 of Exhibit 80 show the call that we

6   will hear portions of in Exhibits 85 through 89 and

7   120, specifically, a call that Defendant made to

8   the Eddie Warrior number on July 27, 2021, at

9   2:46 p.m.?

10  A.   Yes.

11  Q.   Was July 27th, 2021, about eight days after

12  Defendant's arrest in this case?

13  A.   Yes.

14          **MR. REIDY:**  Let's listen to Exhibit 120 first.

15          (Video started.)

16  *BY MR. REIDY*:

17  Q.   Agent Fukuda, in Exhibit 120, did Defendant add

18  extra syllables to some of the words that he said?

19  A.   Yes, he did.

20  Q.   So, what did you understand Defendant to actually

21  be saying when he said, [sic] "Homeboy had hgooked me up

22  so I'm on somebody else's phgone"?

23  A.   "When I call on mine, if you have time and collect,

24  do not say anything, to not even talk."

25  Q.   Sorry.  I'm actually asking about a statement a

*EXAMINATION OF MICHAEL SOUDA CON'T*

1    little bit farther up or a little bit earlier in the

2    call.

3          Do you see where -- or did you hear the

4    defendant say, [sic] "Homeboy had hgooked me up, so

5    I'm on somebody else's phgone"?

6    *A.*    Yes.

7    *Q.*    In plain English, what did Defendant actually say?

8    *A.*    He says, "When I call on my call, this one's not

9    collect.   This one's a -- homeboy hooked me up."  He's

10   saying that he's on somebody else's phone -- jail phone

11   account.

12   *Q.*    And what did you understand Defendant to actually

13   be saying when he said, [sic] "When I cagll on mgine, if

14   you have tgime and collect -- for collect, do not say

15   anygthing."

16   *A.*    He was saying when Mr. Gasca was calling on his own

17   jail phone account, the one that's assigned to him, that

18   when he talked to -- when Mr. Santiago talked to

19   Mr. Gasca, he wasn't to say anything that would be

20   incriminating towards Mr. Gasca.

21   *Q.*    And what did you understand Defendant to actually

22   be saying when he said --

23          **THE DEFENDANT:**  I'm going to object to that.

24   That's speculation.

25          **THE COURT:**  Overruled.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   *BY MR. REIDY*:

2   *Q.*    What did you understand Defendant to mean in plain

3   English when he says, [sic] "Not even tgalk like thgis or

4   ngothing."

5   *A.*    He was -- Mr. Gasca was saying don't even talk like

6   this, meaning don't even insert extra syllables.  Don't

7   talk in code.

8   *Q.*    Let's go to Exhibit 85.

9            **MR. REIDY:**  I'm going to play Exhibit 85.

10           (Video started.)

11           **MR. REIDY:**  Sorry, Your Honor.

12   *BY MR. REIDY*:

13   *Q.*    All right. Agent Fukuda, what did you understand

14   Defendant to be saying when he said, [sic] "Immediately

15   ergase all our mgessages"?

16   *A.*    Mr. Gasca was referring to all the messages they

17   had between each other on Facebook Messenger.

18   *Q.*    And what did you understand Defendant to mean when

19   he said, [sic] "Because we have all the conversgations of

20   me saying things like 'golden goose'"?

21   *A.*    He was speaking of messages that would include

22   message about the golden goose.

23   *Q.*    Agent Fukuda, do you recall in Exhibit 11 on Page 3

24   discussing a message that Defendant sent on July 15,

25   2021, at 6:14 a.m.?

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    A.    Yes, I do.

2    Q.    Can you -- this is on the last row of Page 3 of

3    Exhibit 11.  Can you read what that -- the print's a

4    little small.  Can you read what that message says?

5    A.    "Have to rescue the golden goose."

6    Q.    So was it your understanding that this was one of

7    the messages that Defendant asked Mr. Santiago to delete

8    in Exhibit 85, the clip we just heard?

9    A.    Yes.

10          **MR. REIDY:**  Let's listen to Exhibit 86.

11          (Video started.)

12   *BY MR. REIDY*:

13   Q.    Agent Fukuda, to whom did you understand Defendant

14   to be referring when he said, [sic] "The hgome boy who

15   came in [sic] dragoton whose name was Dgavid?"

16   A.    Mr. Gasca was referring to Mr. David Tscherny.

17   Q.    And in Exhibit 86, did you understand Defendant to

18   be asking Mr. Santiago to log into Defendant's Facebook

19   account and erase all messages with Mr. Tscherny?

20   A.    Yes.

21   Q.    Did you understand Defendant to say that he wanted

22   those messages erased because law enforcement was looking

23   to arrest Mr. Tscherny?

24   A.    Yes.

25          **MR. REIDY:**  Let's listen to Exhibit 87.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1          (Video started.)

2              **MR. REIDY:**  And Exhibit 88, a clip from the

3    same call.

4          (Video started.)

5              **MR. REIDY:**  And Exhibit 89.

6          (Video started.)

7    *BY MR. REIDY:*

8    *Q.*    Let's move on to talk about Exhibits 90 and 121.

9          Before we do that, let's look at Exhibit 80

10   Line 3.

11         Does Exhibit 80, Line 3 show the call that

12   we will hear portions of in Exhibits 90 and 121,

13   specifically, a call that Defendant made to the

14   Eddie Warrior number from another inmate's account

15   on July 27, 2021, at 3:32 p.m.?

16   *A.*    Yes.

17             **MR. REIDY:**  Let's play Exhibit 90.

18         (Video started.)

19             **MR. REIDY:**  Agent Fukuda, based on your work

20   in this case, what is the significance of the

21   35,000 number that Defendant mentioned in Exhibit 90?

22   *A.*    The $35,000 is -- or the 35 -- the 35,000 number is

23   a reference to the $35,000 that was in Ms. Callahan's

24   retirement account that was depleted.

25   *Q.*    And did Defendant tell you in his interview that he

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   had obtained $35,000 from Ms. Callahan's retirement

2   accounts?

3   *A.*    Yes, he had.

4               **MR. REIDY:**  Let's play the other clip from the

5   July 27, 2021 call at 3:32 p m., which is Exhibit 21.

6               (Video started.)

7   *BY MR. REIDY:*

8   *Q.*    Agent Fukuda, did Defendant tell Mr. Santiago to

9   erase his messages with someone named Loescel in the clip

10  we just listened to in Exhibit 21?

11  *A.*    Yes.

12  *Q.*    Let's move on to Exhibits 92 through 94.

13          Let's look at Line 5 first of Exhibit 80.

14  Does Line 5 of Exhibit 80 show the call information

15  that we will hear a portion of in Exhibits 92

16  through 94, specifically, is Exhibits 92 and 94

17  clips from a call Defendant made from another

18  inmate's account to the Eddie Warrior number,

19  Mr. Santiago, on July 27, 2021, at 9:45 p.m.?

20  *A.*    Yeah -- yes.

21              **MR. REIDY:**  Let's play Exhibit 92.

22              (Video started.)

23  *BY MR. REIDY:*

24  *Q.*    At the beginning of Exhibit 92, Agent Fukuda, what

25  did you understand Defendant to actually be saying when

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    he asked, [sic] "Did you already ergase all my

2    megssages"?

3    A.    Mr. Gasca was asking if all the messages had been

4    erased.

5    Q.    And what was Mr. Santiago's response?

6    A.    Yes.  That he was doing that right now.

7    Q.    And what did you understand Defendant to actually

8    be saying when he said, [sic] "Like ours, between me and

9    ygou dude, all of them.  Go down all my mgessages that I

10   have from the maybe last seven or eight pegople and

11   delgete all of them to you"?  Mr. Gasca was telling

12   Mr. Santiago to erase all the Facebook messages between

13   himself and Mr. Santiago, and then he also told

14   Mr. Santiago to erase the last seven or eight text

15   threads that were populating in Facebook Messenger.

16   Q.    In Exhibit 92, did Defendant also mention two

17   individuals named Leoscel and Genesis?

18   A.    Yes.

19   Q.    And when we looked at Defendant's text messages in

20   Exhibit 11 -- I'm sorry on Page 2 of Exhibit 11,

21   Defendant also mentioned Leoscel and Genesis in a message

22   that he sent on July 12, 2021, at 5:37 p.m.?

23   A.    Yes.

24   Q.    Is it your understanding that those Leoscel and

25   Genesis mentioned in Exhibit 92 are the same individuals

1    mentioned in Exhibit 11?

2    *A.*    Yes.

3    *Q.*    Going back to Exhibit 92 --

4              **THE DEFENDANT:**  Your Honor, I don't have

5    these -- these printouts that they're doing on the

6    screen.

7              **THE COURT:**  The printouts only show when they

8    play the transcript, and the transcripts are not admitted

9    into evidence.  What gets admitted into evidence is the

10   actual playback, so the only thing I -- this is just to

11   assist -- if there was a jury to assist it -- but you

12   should have all the recordings.

13              Is that a fair statement from the

14   Government?

15              **MR. REIDY:**  Yes, Your Honor.

16              **THE COURT:**  Okay.

17   *BY MR. REIDY:*

18   *Q.*    So Agent Fukuda, what did you understand Defendant

19   to actually be saying when he said, [sic] "They'll trgy

20   to plgay goff hger and be like, oh, so you in love with

21   hger but you were messaging these other ggirls"?

22   *A.*    "They'll try to play off her and be like, oh, so

23   you are in love with her but you were messaging these

24   other girls."

25   *Q.*    And who is the "they" that Defendant is referring

1    to in that sentence?

2    A.    Law enforcement.

3         **MR. REIDY:**  Let's listen to Exhibit 93.

4         **THE DEFENDANT:**  The whole sentence said "blah

5    blah," all that stuff.

6         **THE COURT:**  Right.  That's admitted.

7         **MR. REIDY:**  I'm going to play Exhibit 93.

8         (Video started.)

9    BY MR. REIDY:

10   Q.    All right.  Agent Fukuda, what did you understand

11   Defendant to actually be saying when he told

12   Mr. Santiago, "Get rid of all that ggirl stuff because

13   they'll try to bring in, oh, you were using her mgoney to

14   send mgoney to other ggirls."?

15   A.    Can you scroll up, please?

16   Q.    Sure.

17        **THE DEFENDANT:**  I didn't see "Her money."

18   BY MR. REIDY:

19   Q.    Let me blow it up.

20        **THE DEFENDANT:**  It don't say "Her money."

21   BY MR. REIDY:

22   Q.    That's right.  Let me reread that.

23        Agent Fukuda what did you understand

24   Defendant to be saying when he said, [sic] "Get rid

25   of all that ggirl stuff because they'll try to

1    bring in, oh, you were using mgoney to send to

2    mgoney to other ggirls and all that stgguff"?

3    A.    Mr. Gasca was saying that he -- that law

4    enforcement would try to make the case that he was using

5    money to send that money to other girls.

6    Q.    And the clip that we listened to in Exhibit 92,

7    there were two women's names mentioned during that clip.

8    Do you recall what names those were?

9    A.    Leoscel and Genesis.

10    Q.    Okay.  I'm going to direct your attention -- I

11    think she actually did say "money" but it may not be

12    reflected in the transcript.

13            **MR. REIDY:**  Your Honor, do you mind if I play

14    Exhibit 93 one more time?

15            **THE COURT:**  Go ahead.

16    *BY MR. REIDY:*

17    Q.    And, Agent Fukuda, if you could just listen

18    carefully when the Defendant says, "You were using

19    mgoney," and see if you hear the word "her".

20            (Video started.)

21    *BY MR. REIDY:*

22    Q.    All right.  Pause it right there.

23            Agent Fukuda, did you hear the Defendant

24    say, "Oh, you were using her mgoney to send mgoney

25    to other girls"?

*EXAMINATION OF MICHAEL YASUDA CON'T*

1   A.   No, I didn't.

2   Q.   We'll move on.

3        I'm going to direct your attention to what's

4   been previously marked as Exhibit 28.  Do you

5   recognize Exhibit 28?

6   A.   Yes.

7   Q.   The first page, the top of Exhibit 28, are these --

8   is Exhibit 28 records from Ms. Callahan's JPMorgan Chase

9   Bank account ending in 8364 -- let me just highlight that

10  number.

11  A.   Yes.

12  Q.   And the bottom of Page 1 of Exhibit 28, do you see

13  a reference number SB1247531-F1?

14  A.   Yes.

15  Q.   Let's go to Exhibit 31.

16       On the bottom left of exhibit -- of Page 1

17  of Exhibit 1, do you see the same reference number

18  from the first page of Exhibit 28?

19  A.   I do.

20  Q.   And is Page 1 of Exhibit 1 a certification from

21  JPMorgan Chase Bank that was provided, along with the

22  records that we looked at in Exhibit 28?

23  A.   Yes, it is.

24  Q.   Does Page 1 of Exhibit 31 reflect that the records

25  produced by Chase, including the documents in Exhibit 28,

 1   were regularly maintained in the course of Chase's

 2   business and are true and correct copies of the documents

 3   in their possession?

 4   *A.*   Yes.

 5   *Q.*   Pages 2 through 4 of Exhibit 31, are Pages 2

 6   through 4 of Exhibit 31 business records circumstances

 7   for records that were produced by Chase in connection

 8   with this case?

 9   *A.*   Yes.

10          **MR. REIDY:**  Your Honor, I'd ask that

11   Exhibits 28 and 31 be admitted.

12          **THE COURT:**  Any objection?

13          **THE DEFENDANT:**  No.

14          **THE COURT:**  28 through 31 will be admitted.

15          (WHEREUPON, documents were marked as Exhibit

16          Numbers 28 through 31.)

17   *BY MR. REIDY:*

18   *Q.*   Go back to Exhibit 28.

19          We'll start -- go to Page 30 of Exhibit 28.

20   So, looking at Page 30 of Exhibit 28, is this

21   statement for Ms. Callahan's account at Chase bank

22   for the period of April 13, 2021, to May 12, 2021?

23   *A.*   Yes, it is.

24   *Q.*   And based on your knowledge of the investigation,

25   was Mr. Callahan living with the defendant between

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    April 13 and May 12 of 2021?

2    A.    Yes.

3    Q.    Let's go to Page 33 of Exhibit 28.

4          In the middle of Page 33 of Exhibit 28, do

5    you see an entry for a PayPal payment to a

6    recipient Genesisfire76 made from Ms. Callahan's

7    Chase account on May 29, 2021?

8    A.    Yes.

9    Q.    And do you see another entry for a payment again to

10   Genesisfire76 recipient from Ms. Callahan's account on

11   May 3 of 2021?

12   A.    I do.

13   Q.    Let's go to Page 34.

14         At the bottom of Page 4 -- I'm sorry Page 34

15   of Exhibit 28, do you see an entry for a PayPal

16   payment to Genesisfire76 from Ms. Callahan's

17   account on May 7, 2021?

18   A.    Yes.

19   Q.    Page 35 of Exhibit 28.

20         I'm just going to highlight several -- I

21   think there are a total of seven entries of PayPal

22   payments to Genesisfire76 via PayPal from

23   Ms. Callahan's account on May 10th, 2021, as well

24   as one payment on May 12, 2021.  Let me just

25   highlight those for you.

1           Do you see a total of six payments to

2    Genesis on May 10th and one payment on May 12th

3    from Ms. Callahan's account reflected on Page 35 of

4    Exhibit 28?

5    A.    I do.

6    Q.    Let's go back to Exhibit 93.

7           To whom did you understand Defendant to be

8    referring when he said, "But they can throw a lot

9    of dirty stuff in the middle of the hearings"?  Who

10   is "they"?

11   A.    "They" is law enforcement.

12             **MR. REIDY**:  Let's listen to Exhibit 94.

13             (Video started.)

14   BY MR. REIDY:

15   Q.    Agent Fukuda, in Exhibit 94, did Defendant refer to

16   Instagram?

17   A.    He did.

18   Q.    What is Instagram?

19   A.    Instagram is another social media app.

20   Q.    And what are some of the features associated with

21   the Instagram application?

22   A.    Like Facebook Messenger, Instagram has its own

23   messaging platform.

24   Q.    And what did you understand Defendant to actually

25   be saying when he said, "You go into Instagram, right, on

*EXAMINATION OF MICHAEL YASUDA CON'T*

1   our Instagram, right, and you blgock me, and that takes

2   out all the messages and everygthing.  They can't even

3   sgee them because I don't think Instagram does the

4   you-can-erase-all-the-messages thing"?

5   A.    Mr. Gasca was -- and Mr. Santiago were discussing

6   ways to erase all his messages on Instagram.  Mr. Gasca

7   had a notion that you couldn't delete all the messages on

8   Instagram like you can on Facebook, but by blocking each

9   other, that was a way to get the messages on Instagram at

10  least temporarily deleted.

11  Q.    When Defendant said, "They can't even sgee them,"

12  who is they" referring to?

13  A.    "They" would be law enforcement.

14          **THE DEFENDANT:**  Um, FBI is what I -- they just

15  keep saying "Law enforcement." It's FBI.

16          **THE COURT:**  Well, FBI fits within that

17  category.  I don't think it -- well, the objection's

18  overruled.

19  *BY MR. REIDY:*

20  Q.    Okay.  I want to ask you now about Exhibits 112 and

21  114.

22          Before we do that, let's turn to Exhibit 80,

23  Line 28.

24          Does Exhibit 80, Line 28 show the

25  information related to the call that we'll hear

1    portions of in Exhibits 112 and 114, specifically,

2    a call that Defendant made to Mr. Santiago from

3    another inmate's account on August 5, 2021, at

4    7:59 p.m.?

5    A.    Yes.

6            **MR. REIDY:**  Let's listen to Exhibit 112.

7            (Video started.)

8            **MR. REIDY:**  Let's listen to Exhibit 114.

9            (Video started.)

10   BY MR. REIDY:

11   Q.    All right.  Agent Fukuda, based on the conversation

12   in Exhibit 114, did Mr. Santiago read some of Defendant's

13   Facebook messages from his account?

14   A.    Yes.

15   Q.    And one of the messages that Mr. Santiago read was

16   from someone named Genesis?

17   A.    Yes.

18   Q.    And the message from Genesis, did that state, "Miss

19   you every day.  I love you" among other expressions of

20   affection?

21   A.    Yes.

22   Q.    After Mr. Santiago read the message from Genesis in

23   Exhibit 114, did Defendant say, "Erase that message of

24   hers.  Any romantic messages, you delete that, you

25   heard"?

1    *A.*    He did.

2    *Q.*    What did you understand Defendant to be talking

3    about when he said, "'Cause they will use anything and

4    everything.  Especially with their case so weak, they

5    will say, 'Who is Genesis?  You were messaging her that

6    you love her while you supposedly' -- you know, they'll

7    try to do anything they can"?

8    *A.*    Mr. Gasca was referring to the romantic text

9    messages and how law enforcement could use those text

10    message to construe or to nullify -- or to --

11            **THE DEFENDANT:**  Well, try.

12            **THE WITNESS:**  Let me go back again.  Law

13    enforcement was going to use his text messages against

14    him.

15            **THE DEFENDANT:**  Going to try.  It says "try."

16            **THE COURT:**  Hold on.  Let him answer the

17    question.  You're going to get a chance to question to

18    answer him afterward.

19             Go ahead, sir.

20            **THE WITNESS:**  Actually, can you ask the

21    question?

22    *BY MR. REIDY*:

23    *Q.*    Sure.  Why don't we start with a simpler one.  The

24    defendant mentioned, "They will use anything and

25    everything.  They'll try to do anything they can."  Who

 1    is "they"?

 2    A.    Law enforcement.

 3    Q.    What did you understand Defendant to be saying

 4    about how law enforcement would use romantic messages?

 5    A.    They would use those text messages to show that,

 6    while he was supposedly in a relationship with

 7    Ms. Callahan, he was also in communication, had a

 8    relationship with these other people.

 9    Q.    What did you understand Defendant to be saying in

10    Exhibit 114 when he said, "Go to my Facebook and delete

11    those messages.  Just keep deleting any romantic ones?"

12    A.    He wanted all the romantic messages deleted.

13    Q.    All right.  Agent Fukuda, do you recall a clip that

14    we played in Exhibit 86 where Defendant told Mr. Santiago

15    to erase all messages between Defendant and his

16    co-defendant in this case, Mr. Tscherny?

17    A.    Yes.

18    Q.    Did Defendant also ask Mr. Santiago to contact

19    Mr. Tscherny about this case, during other jail calls?

20    A.    Yes, he did.

21    Q.    I'm going to ask you about Exhibits 95 and 96.

22    Let's identify the call that we're talking about.  On

23    Line 5 of Exhibit 80, does this contain the information

24    about the call that we will hear portions of in

25    Exhibits 95 and 96, excuse me, specifically, a call that

1   Defendant made from another inmate's account to

2   Mr. Santiago on July 27, 2021, at 9:45 p.m.?

3   A.   Yes.

4   Q.   All right.

5          **MR. REIDY**:  Let's listen to Exhibit 95.

6          (Video started.)

7   BY MR. REIDY:

8   Q.   Agent Fukuda, what did you understand Defendant to

9   mean when he said in Exhibit 5, "Get hgomeboy's ngumber.

10  Get hgomeboy's ngame, Dgavid sguch and sguch.  You'll see

11  it right on my Fgacebook"?

12  A.   Mr. Gasca was telling Mr. Santiago to get on to

13  Mr. Gasca's Facebook and through that, to locate his

14  homeboy, or David Tscherny, his name and also his contact

15  number.

16  Q.   And what did you understand Defendant to actually

17  be saying when he said, "You mgessage him yourgself.

18  Say, yo, what's up?  This is Johnny's boy.  Give me a

19  ring.  And you tell him on" -- I'm sorry.  "And you tell

20  him on the DL Johnny says no matter what, he swears,

21  don't worry, he will not give up your name, but they are

22  lgooking for his so-called agccomplice"?

23  A.   Mr. Gasca was telling Mr. Santiago to get in touch

24  with Mr. Tscherny and let him know that Johnny, or

25  Mr. Gasca, was not going to give up Mr. Tscherny to law

*EXAMINATION OF MICHAEL YAMADA CON'T*

1  enforcement.

2  *Q.*    So at the time that Defendant made this call in

3  Exhibit 95 on July 27, 2021, had Mr. Tscherny been

4  arrested or made his initial appearance in this case?

5  *A.*    Yes.

6  *Q.*    He had been arrested?

7  *A.*    What was the date?

8  *Q.*    July 27, 2021.

9  *A.*    I'm sorry.  No, he had not.

10  *Q.*    And what did you understand Defendant to mean when

11  he said, "You tell him I erased all your messages of his

12  Fgacebgook"?

13  *A.*    Mr. Gasca was telling Mr. Santiago to tell

14  Mr. Tscherny that all the Facebook messages between

15  Mr. Gasca and Mr. Tscherny had been deleted.

16  *Q.*    And what did you understand Defendant to mean when

17  he said, "If they ever do cgatch up to ygou, I mean, just

18  sgay, hey, man, he just asked me to go help him with that

19  girl, and there was nothing wrgong"?

20  *A.*    Mr. Gasca was telling, through Mr. Santiago, what

21  Tscherny -- how Tscherny was to respond to law

22  enforcement, and the instructions were that he was just

23  there to --

24          **THE DEFENDANT:**  Objection.

25          **THE COURT:**  What's the grounds, sir?

1          **THE DEFENDANT:**  He's speculating on -- he was

2    instructing him what to say.  It's very clear what it

3    says there.

4          **THE COURT:**  I think the transcript speaks for

5    itself, so I'll sustain the objection.

6    *BY MR. REIDY:*

7    *Q.*    And what did you understand Defendant to mean when

8    he told Mr. Santiago to tell Mr. Tscherny, "When I gave

9    him that jaygee, right, when we got the cgash, 'cause

10   just tell him that Estrellita's not going to remember

11   that detail.  Don't even mention thgat if they happen to

12   cgatch up to you"?

13   *A.*    Mr. Gasca, by "cash," he was referring to the

14   $1,000 that he had paid to Mr. Tscherny.  And that

15   Mr. Tscherny was not to worry about that information

16   coming out because Ms. Callahan was not going to -- did

17   not have the wherewithal to realize that and was not

18   going to tell that to law enforcement.

19         **THE DEFENDANT:**  Objection.  I didn't say that,

20   I didn't have the wherewithal to realize that is --

21         **THE COURT:**  The objection is sustained.

22   *BY MR. REIDY:*

23   *Q.*    And, Agent Fukuda what did you understand the

24   Defendant to be saying when he said, "Estrellita's not

25   going to remember that detail.  Don't even mention thgat

*EXAMINATION OF MICHAEL ARAUDA CON'T*

```
 1    if they happen to cgatch-up to you"?
 2    A.    That Estrellita didn't have the mental capacities
 3    to remember --
 4              THE DEFENDANT:  Again, speculation.
 5              THE COURT:  It's overruled.
 6               Go ahead, please continue.
 7              THE WITNESS:  That Estrellita didn't have the
 8    mental capacity to remember that incident from happening,
 9    so he didn't have to worry about that information coming
10    out from her.
11    BY MR. REIDY:
12    Q.    And when Mr. Gasca said -- or when Defendant said,
13    "If they happen to cgatch up to you," who is "they" in
14    that sentence?
15    A.    "They" is law enforcement.
16    Q.    And when Defendant said, "Don't even mention
17    thgat," what was the Defendant referring to?
18    A.    Sorry, what line is that on?
19    Q.    Let me see if I can blow it up.
20    A.    Mr. Gasca was saying that Estrellita was not going
21    to remember the incident of the money being paid to
22    Mr. --
23              THE DEFENDANT:  It's detail.  He caught
24    himself.
25              THE COURT:  Hold on.  What's the objection?
```

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    **THE DEFENDANT:**  The objection is he's

2    expounding.  It says what it says.  He caught himself

3    when he went to say "details" and not "incident."

4    **THE COURT:**  The objection is sustained.

5    Why don't we take a 15-minutes break at

6    this time.

7    I'll just ask the Government, how much

8    more of this do we have?

9    **MR. REIDY:**  I think another 45 minutes to an

10   hour, Your Honor.

11   **THE COURT:**  Of the witness?

12   **MR. REIDY:**  Yes.

13   **THE COURT:**  Of the witness.  Okay.  How much

14   more of this testimony, I mean of the transcript

15   testimony, or is that what --

16   **MR. REIDY:**  Oh, I'm sorry, Your Honor.  For

17   this particular call?

18   **THE COURT:**  Right.

19   **MR. REIDY:**  Just two or three more questions.

20   **THE COURT:**  Let's take a 15-minute recess.

21   We'll come back.  For what it's worth, I mean, I can

22   read, and I can see.  Unless there's some import as it

23   relates to some hidden language, I'm not sure we need to

24   have the agent tell me what --

25   **MR. REIDY:**  Understand, Your Honor.

1          **THE COURT:** -- it says, all right?

2          **MR. REIDY:** Yes, Honor.

3          **THE COURT:** Let's take a 15-minute recess.

4          (Short break.)

5          **THE COURT:** All right.  You may proceed.

6     Although, I've been handed Exhibit 33.  This is the

7     exhibit referenced earlier or is this a new exhibit?

8          **MR. REIDY:** No, Your Honor.  This was an

9     exhibit that was inadvertently omitted from the binders

10    that were provided to the Court and defense counsel.  So

11    we will also provide the Court with an original copy with

12    yellow tab, but we wanted the Court to have a copy of

13    Exhibit 33.  And the defendant also has --

14         **THE COURT:** I was going to say, more

15    importantly, as long as Mr. Gasca has it, that's fine.

16         All right.  Please proceed.

17         **MR. REIDY:** Thank you.

18    *BY MR. REIDY:*

19    *Q.*    Agent Fukuda, we were talking about Exhibit 95.

20         **MR. REIDY:** Oh, I'm sorry, Your Honor.  Before

21    I get started, does the Court intend to continue to 6:00?

22         **THE COURT:** I thought that's what you-all

23    asked for; right?

24         **MR. REIDY:** That's right, Your Honor.  We just

25    didn't know if the Court had agreed to that.

*EXAMINATION OF MICHAEL MASUDA CON'T*

1              **THE COURT:**  We are going to move forward, yes.

2              Are you bringing dinner?  No, just

3    kidding.

4              Mr. Gasca?

5              **THE DEFENDANT:**  If it was up to me, I'd go all

6    night, but I've got nothing better to do.  But when the

7    marshals take me back, even though they take me back from

8    here pretty much expediently, I checked with the MDC

9    about it, and I'll have to wait for a counselor to come

10   down.  Just by the time I get booked in, I'll have maybe

11   half-an-hour to eat and shower and whatever.  That's just

12   really tedious.  I would love to go to 6:00, but it's

13   just if I can cut it at 5:00.

14             **THE COURT:**  So what --

15             **THE DEFENDANT:**  More or less, if it has to go

16   to 6:00, then go to 6:00.  But it's just, you know, 5:00

17   is a big difference to me.

18             **THE COURT:**  Okay.  So --

19             **THE DEFENDANT:**  I checked with her yesterday.

20   The marshals will get me back when I get done, no

21   problem.  But it's MDC, the processing.  They say, well,

22   you missed the process of the last bus, you just sit here

23   until whenever.  Even if they lock --

24             **THE COURT:**  Let's just try to get as much as

25   we can today.  Okay?

1        **THE DEFENDANT:**  Yes, sir.  Thank you.

2        **THE COURT:**  Go ahead.

3        **MR. REIDY:**  Thank you, Your Honor.

4   *BY MR. REIDY:*

5   *Q.*    Agent Fukuda, based on your knowledge of the

6   investigation, did Defendant give Mr. Tscherny $1,000

7   cash for his help in taking Ms. Callahan?

8   *A.*    Yes, he did.

9   *Q.*    Is $1,000 commonly referred to as a "grand" or a

10  "G" for short?

11  *A.*    Yes.

12  *Q.*    So, is it your understanding that Defendant told

13  Mr. Santiago to tell Mr. Tscherny not to tell law

14  enforcement about Defendant paying Mr. Tscherny $1,000 in

15  cash?

16  *A.*    Yes.

17  *Q.*    Did you and another FBI agent interview

18  Mr. Tscherny as part of your investigation?

19  *A.*    Yes.

20       **MR. REIDY:**  Let's listen to Exhibit 96.

21       (Video started.)

22  *BY MR. REIDY:*

23  *Q.*    Agent Fukuda, when listening to Defendant's jail

24  calls, did you hear discussions with Mr. Santiago in

25  which Defendant expressed concern about his electronic

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   devices in his apartment in the Bronx?

2   A.   Yes.

3   Q.   Okay.  Let's start with Exhibits 101 and 102.  Just

4   for reference, let's go back to Exhibit 80, Line 19.

5        Does Exhibit 80, Line 19 show the call we

6   are going to hear portions of in Exhibits 101 and

7   102, specifically, a call Defendant made from his

8   own account to Mr. Santiago on August 3, 2021, at

9   12:08 p.m.?

10  A.   Yes.

11           **MR. REIDY:**  Let's listen to Exhibit 101.

12           (Video started.)

13  *BY MR. REIDY:*

14  Q.   Agent Fukuda, what did you understand Mr. Santiago

15  to mean when he said, "I got into your crib"?

16  A.   Mr. Santiago was letting Mr. Gasca know that he got

17  into Mr. Gasca's apartment in the Bronx.

18  Q.   And in Exhibit 101, did Mr. Santiago then talk

19  about how a woman had tried to prevent him from getting

20  into Defendant's apartment building?

21  A.   Yes.

22  Q.   Did Mr. Santiago say that the woman had said the

23  landlord told me the police said you can't go up there?

24  A.   Yes.

25           **MR. REIDY:**  Let's listen to Exhibit 102.

1        (Video started.)

2    BY MR. REIDY:

3    Q.    All right.  Agent Fukuda, what did you understand

4    Defendant to mean in Exhibit 102 when he told

5    Mr. Santiago or when he referred to,*"That dangerous

6    sentence when she says the police said nobody can go in

7    there because that means she may kngow that there's

8    something going ogn with the police thgere"?

9    A.    Mr. Gasca was referring to the woman that is

10   referenced here, knowing that there was police activity

11   involving that room.

12   Q.    When you say "that room," what are you referring

13   to?

14   A.    The apartment that Mr. Gasca resides in or resided

15   in.

16   Q.    Let's move on to Exhibit 103.

17        Turn to Exhibit 80 and look at Line 20.

18        Does Line 20 of Exhibit 80 show a call that

19   we're going to hear a portion of in Exhibit 103,

20   specifically, a call that Defendant made from his

21   own account to Mr. Santiago on August 3, 2021, at

22   12:30 p.m.?

23   A.    Yes.

24   Q.    And if we look at both Lines 19 and 20 of

25   Exhibit 80.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1          Line 19 of Exhibit 80, that was the call

2     that we just listened to in Exhibits 101 and 102?

3     *A.*    Yes.

4     *Q.*    So Defendant made the call to Mr. Santiago that

5     we'll hear in Exhibit 103 pretty soon after the call we

6     listened in Exhibits 101 and 102?

7     *A.*    That's correct.

8              **MR. REIDY:**  Let's listen to Exhibit 103.

9              (Video started.)

10    *BY MR. REIDY*:

11    *Q.*    Agent Fukuda, in Exhibit 103 did Defendant describe

12    the various devices that were in his apartment in New

13    York?

14    *A.*    He did.

15    *Q.*    And what did you understand Defendant to mean when

16    he said, "There is a possgibility that they could segnd

17    somgebody thgere"?

18    *A.*    Mr. Gasca was saying there's a possibility that

19    they could send somebody, meaning law enforcement could

20    go to his apartment with a search warrant.

21    *Q.*    All right. Let's turn to Exhibits 104 through 106

22    and 108 through 109.

23          First, let's figure out what call those are

24    from, so we'll turn back to Exhibit 80, Line 22.

25          Does Exhibit 80, Line 22 show the

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   information for the call we're going to hear

2   portions of in Exhibits 104 through 106 and 108 to

3   109, specifically, a call Defendant made from

4   another inmate's account to Mr. Santiago on

5   August 3, 2021 at 3:29 p.m.?

6   A.   Yes.

7           **MR. REIDY:**  Let's start with Exhibit 104.

8           (Video started.)

9   *BY MR. REIDY*:

10  Q.   Starting at the beginning of Exhibit 104,

11  Agent Fukuda, what did you understand Defendant to be

12  talking about when he said, "I'm cengtain they'll trgy to

13  make some type of finangcial cgase because they were

14  asking all type of financial qugestions"?

15  A.   Mr. Gasca was saying that the FBI would be

16  conducting a financial investigation.

17  Q.   And what did you understand Defendant to be saying

18  when he said, "They're going to try to make the cgase

19  they can mgake, especially connected with Estrellgita"?

20  A.   That the financial investigation would center

21  around Estrellita.

22  Q.   And who is Estrellita?

23  A.   Estrellita is Estrellita Callahan or Ms. Callahan.

24  Q.   After mentioning the potential financial case

25  involving Ms. Callahan, did you understand Defendant to

*EXAMINATION OF MICHAEL YASUDA CON'T*

1    instruct Mr. Santiago to collect all the hard drives from

2    his room, in Exhibit 104?

3    A.    Yes.

4    Q.    Did Defendant tell Mr. Santiago to collect hard

5    drives that are on "that desk" in his room?

6    A.    Yes, he did.

7    Q.    Did Defendant also tell Mr. Santiago to collect the

8    hard drives from a shelf in his closet?

9    A.    Yes.

10   Q.    Did Defendant specifically direct Mr. Santiago to

11   hard drives that were in a gray Styrofoam container, a

12   little orange container in a little black case?

13   A.    Yes.

14   Q.    And in Exhibit 104, did Defendant also give

15   detailed instruction on how to pack up his devices from

16   his room and put them in a suitcase?

17   A.    He did.

18   Q.    And what did you understand Defendant to mean when

19   he said, "Those four things are my most valued

20   possessions so got to get Victor to meet up with you.  If

21   not, you take it, and then you hand it off to him later"?

22   A.    He was instructing Mr. Santiago to collect his four

23   most treasured possessions, which would be those digital

24   devices, and to get them out of the apartment.

25   Q.    Move on to Exhibit 105.

1              **MR. REIDY:**  I'll play that now.

2              (Video started.)

3    *BY MR. REIDY:*

4    *Q.*    Agent Fukuda, what did you understand Defendant to

5    be talking about when he said, "They're going to do it

6    any day.  They're going to go there, and they may secure

7    the place and take whatever because they are only going

8    to take electrongics"?

9    *A.*    In this circumstance -- or this instance, he was

10   talking about the FBI going to his apartment in New York,

11   serving a search warrant, and taking his devices.

12             **MR. REIDY:**  Let's play Exhibit 106.

13             (Video started.)

14   *BY MR. REIDY:*

15   *Q.*    Agent Fukuda, is Defendant describing your

16   post-arrest interview with him in Exhibit 106?

17   *A.*    Yes, he is.

18   *Q.*    And after Defendant had discussed your interview,

19   what did you understand him to mean when he said,

20   "They'll kind of look for that angle.  They will go for

21   any type of electronics, so they'll take the comgputers

22   for sure"?

23   *A.*    He was saying that the FBI was going to seize his

24   computers and electronic devices.

25             **MR. REIDY:**  Let's listen to Exhibit 108.

1         (Video started.)

2    BY MR. REIDY:

3    Q.    Agent Fukuda, in Exhibit 108, did you understand

4    Defendant to be telling Mr. Santiago what to do with the

5    stuff from his apartment?

6    A.    Yes.

7    Q.    And what did you understand Defendant to mean when

8    he said, "Give it to Vigck under the terms of, you know,

9    yo, the feds may be looking for it.  He might get scared.

10   You know, just say, yo, Johnny Ray say hold this because

11   he trusts you the most"?

12   A.    He was telling Mr. Santiago -- Mr. Gasca was

13   telling Mr. Santiago to give the electronic devices that

14   he took from Mr. Gasca's apartment to Vick and to let him

15   know that he's giving it to Vick because Johnny Ray, or

16   Mr. Gasca, trusts Vick to take care of it.

17         **MR. REIDY:**  Let's listen to Exhibit 109.

18         (Video started.)

19   BY MR. REIDY:

20   Q.    I want to talk about Exhibits 110 and 111.  Just to

21   reference what call we're speaking about, I'll go back to

22   Exhibit 80, Line 23.

23         Is Exhibit 80, Line 23 the call we're going

24   to hear portions of in Exhibits 110 and 111,

25   specifically, clips of a call Defendant made from

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    his own account to Mr. Santiago on August 3, 2021,

2    at approximately 4:02 p.m.?

3    *A.*    Yes.

4    *Q.*    And just looking at Lines 22 and 23 of Exhibit 80,

5    is the call that we'll hear portions of in Exhibits 110

6    and 111, did that take place just a few minutes after the

7    call we just listened to in Exhibits 104 through 106 and

8    108 through 109?

9    *A.*    Yes, it did.

10           **MR. REIDY:**  Let's listen to Exhibit 110.

11           (Video started.)

12   *BY MR. REIDY*:

13   *Q.*    All right.  Agent Fukuda, what did you understand

14   Defendant to mean when he said, "Really get that stuff

15   out of thgere as soon as pgossigble"?

16   *A.*    Mr. Gasca was asking Mr. Santiago to get his

17   electronic devices out of Mr. Gasca's apartment as soon

18   as possible.

19           **MR. REIDY:**  Let's listen to Exhibit 111.

20           (Video started.)

21   *BY MR. REIDY*:

22   *Q.*    I want to move on to Exhibit 113.

23           And just to show what call Exhibit 113 is

24   from, turn back to Exhibit 80, Line 28.  Highlight

25   that.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

```
 1         Is Exhibit 113 -- I'm sorry, does
 2   Exhibit 80, Line 28 show the information for the
 3   call we'll be hearing be a portion of in
 4   Exhibit 113, specifically, a call that Defendant
 5   made from another inmate's account to Mr. Santiago
 6   on August 5th, 2021 at 7:59 p.m.?
 7   A.    Yes.
 8              MR. REIDY:  Let's hear Exhibit 113.
 9              (Video started.)
10   BY MR. REIDY:
11   Q.    Agent Fukuda, in Exhibit 113, did Defendant iterate
12   how he would like Mr. Santiago to collect and transport
13   his hard drives and laptop out of his apartment?
14   A.    He did.
15   Q.    Did Defendant ask Mr. Santiago to do that because
16   the FBI would be coming to take those items?
17   A.    Yes.
18   Q.    What did you understand Defendant to mean when he
19   said, "They don't think in terms of, ah, we don't really
20   need anything, just they'll get everything we can, and
21   we'll look through it.  You'll never know what we'll get.
22   That's how they think.  Please try to do it.  Like I
23   said, any day now they're going to snatch that stuff"?
24   A.    He was saying that the FBI is thorough, and they
25   were going to come and execute a search warrant and seize
```

*EXAMINATION OF MICHAEL ARGUDA CON'T*

1    his devices.

2    Q.    Let's turn to Exhibits 115 through 117.

3          Just to identify the call, we'll be talking

4    about -- we'll go back to Exhibit 80 and look at

5    Line 29.  Does Line 29 of Exhibit 80 show

6    information for a call that we will hear portions

7    of in Exhibits 115?

8              **THE DEFENDANT:**  I just want to make sure that

9    I do raise the objection.  Because I'm going to show the

10   rest of that call.  I don't know if they're going to be

11   here quiet.

12             **THE COURT:**  Okay.

13   *BY MR. REIDY:*

14   Q.    So does Line 29 of Exhibit 80 show the information

15   for the call that we will hear portions of in

16   Exhibits 115 through 117, specifically, a call that

17   Defendant made to Mr. Santiago from another inmate's

18   account on August 5th, 2021 at 8:23 p.m.?

19   A.    Yes.

20   Q.    And Defendant -- did Defendant make the call we'll

21   hear portions of in Exhibits 115 through 117 from an

22   inmate account other than his own?

23   A.    Yes, he did.

24   Q.    And just looking at Exhibit 80, Lines 28 and 29,

25   did Defendant make the call we'll hear in Exhibits 115

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    through 117 very soon after he had finished the call we

2    just heard in Exhibit 113?

3    A.    Yes.

4              **THE DEFENDANT:**  Your Honor, before we go on, I

5    just want to make sure so when I do cross it can go flow

6    smoothly.  I'm not looking all over for everything.  Is

7    calls 104 through 113, where I'm talking about my hard

8    drives, all on the same call?  I've got exhibits numbered

9    1, 2, 3, 4.  I don't know how many --

10             **THE COURT:**  I don't know that either.  I'm

11   assuming you have the discovery.  You got to look through

12   the evidence to see the call itself if you want to play

13   more of it.  I don't know the answer to your question.  I

14   just don't.

15             Go ahead, Mr. Reidy.  Continue.

16             **MR. REIDY:**  Yes, Your Honor.

17             Let's listen to Exhibit 115.

18             (Video started.)

19   BY MR. REIDY:

20   Q.    Agent Fukuda, what is the Defendant talking about

21   in Exhibit 115?

22   A.    Mr. Gasca is saying it's just a matter of time

23   before the FBI comes to his apartment with a search

24   warrant.

25             **MR. REIDY:**  Let's play Exhibit 116.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1              (Video started.)

2              **MR. REIDY:**  We'll play Exhibit 117.

3              (Video started.)

4    *BY MR. REIDY:*

5    *Q.*    We've been talking about Defendant's calls to

6    Mr. Santiago regarding the importance of getting into his

7    apartment and is worried about the FBI might search it.

8    Agent Fukuda, did the FBI, in fact, obtain a federal

9    search warrant for Defendant's apartment at 354 East 193

10   Street, Second Floor, Bronx, New York 10458?

11   *A.*    Yes, we did.

12   *Q.*    Did you and other FBI agents execute that search

13   warrant on the morning of August 16, 2021?

14   *A.*    Yes, we did.

15   *Q.*    And you were present in Defendant's apartment

16   during the execution of the search warrant on that date?

17   *A.*    Yes.

18   *Q.*    Did you collect evidence from Defendant's apartment

19   that day?

20   *A.*    Yes.

21   *Q.*    Did one of the agents with you take photographs of

22   Defendant's apartment during the search?

23   *A.*    Yes.

24   *Q.*    I'm going to show you a collection of 11

25   photographs.  That's been previously marked as Exhibit 7.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1          Agent Fukuda, I just showed a collection of

2   11 photographs from Exhibit 7.  Do the photographs

3   in Exhibit 7 fairly and accurately show defendant's

4   apartment at 354 East 193 Street, Second Floor,

5   Bronx, New York 10458, and items found in that

6   apartment as they appeared on the morning of

7   August 16, 2021?

8   *A.*    They do.

9          **MR. REIDY:**  Your Honor, I would ask that

10  Exhibit 7 be admitted.

11             **THE COURT:**  Any objection?

12             **THE DEFENDANT:**  No.

13          **MR. REIDY:**  7 will be admitted.

14             (WHEREUPON, an item was marked as Exhibit

15             Number 7.)

16  *BY MR. REIDY*:

17  *Q.*    Let's start with the first page of Exhibit 7.  On

18  the right-hand side of the first page of Exhibit 7, there

19  appears to be a dresser with an open drawer and a chair

20  in front of the open door.  Do you see that?

21  *A.*    I do.

22  *Q.*    Did it appear that the dresser was being used as a

23  desk?

24  *A.*    Yes.

25  *Q.*    On top of the dresser and desk on Page 1 of

1    Exhibit 11, there's a -- sorry, to the left of the

2    television screen, there's a black object.  Let me just

3    blow that up.  Do you see that?

4    A.    Yes.

5    Q.    And what is that object?

6    A.    Do you have another angle?

7    Q.    That's okay.  We can -- I'll - we'll ask that again

8    when we get to another photograph.

9          Agent Fukuda, did you find any hard drives

10   on top of the desk that's shown on Page 1 of

11   Exhibit 7?

12   A.    Yes.

13   Q.    Let's move on to Page 2 of Exhibit 7.

14         And does Page 2 of Exhibit 7 show the area

15   to the left of the TV screen on Defendant's desk?

16   A.    Yes, it does.

17   Q.    And what -- what is this object in the center of

18   Page 2 of Exhibit 7?

19   A.    That's a laptop computer.

20   Q.    Let's move on to Page 3 of Exhibit 7.

21         Does Page 3 of Exhibit 7 show the part of

22   the desk behind the TV screen?

23   A.    Yes.

24   Q.    Does Page 3 of Exhibit 7 show a number of hard

25   drives?

*EXAMINATION OF MICHAEL LASKUDA CON'T*

1    A.    Yes.

2    Q.    Did you collect approximately 10 hard drives from

3    the area on the desk behind the TV pursuant to the search

4    warrant?

5    A.    Yes.

6    Q.    Were some of the hard drives labeled with tape?

7    A.    Yes.

8    Q.    Did you collect a black WD Elements hard drive

9    labeled "Master bKUP & M" from behind the TV in

10   Defendant's apartment?

11   A.    Yes.

12   Q.    Did you assign the FBI Item Number 1b42 to that

13   hard drive?

14   A.    Yes.

15   Q.    Did you later review the contents of the hard drive

16   from Defendant's desk that was identified as Item Number

17   1b42?

18   A.    I did.

19   Q.    I'll direct your attention to Page 11 of Exhibit 7.

20   Does Page 11 of Exhibit 7 show the hard drive that was

21   labeled "1b42" that was collected during the search

22   warrant from the area behind the TV on the desk in

23   Defendant's apartment?

24   A.    Yes, it does.

25   Q.    And let's move on to what's been previously marked

1    as Exhibit 19, which consists of two photographs and an

2    e-mail.  I am just going to briefly cycle through the

3    pages.

4         Agent Fukuda, are the first two pages of

5    Exhibit 19 digital photographs that contained

6    Ms. Callahan's personal identifying information

7    including her Social Security number; date of

8    birth; personal identification number or PIN

9    number; phone number; and debit account number?

10   A.    Yes.

11   Q.    And did you find the first two pages of Exhibit 19

12   on the hard drive from behind the TV on Defendant's desk

13   that was identified as FBI Item Number 1b42?

14   A.    Yes, I did.

15   Q.    In December of 2022, did you identify the file path

16   for the images shown in the first two pages of

17   Exhibit 19?

18   A.    Yes.

19   Q.    And the file path is essentially a detailed

20   accounting of the folders one would need to access on the

21   1b42 hard drive to locate the two images from

22   Exhibit 19 -- from the first two pages of Exhibit 19?

23   A.    That's correct.

24   Q.    Did you also look up when the images from the first

25   two pages of Exhibit 19 had been modified?

*EXAMINATION OF MICHAEL IWAKUDA CON'T*

1   *A.*    Yes.

2   *Q.*    And in December of 2022, did you copy and paste the

3   file path and modify date information for the photographs

4   in the first two pages of Exhibit 19 into an e-mail and

5   then send that e-mail to counsel for the Government?

6   *A.*    I did.

7   *Q.*    And turning to Page 3 of Exhibit 19, is the third

8   page of Exhibit 19 an e-mail message with the correct

9   file path information and correct modified date

10  information for the first two images that we looked at on

11  the first two pages of Exhibit 19?

12  *A.*    Yes.

13  *Q.*    And did you create the e-mail message on Page 3 of

14  Exhibit 19 as part of your job activities in connection

15  with this case?

16  *A.*    I did.

17          **MR. REIDY:**  Your Honor, I would ask that

18  Exhibit 19 be admitted.

19          **THE COURT:**  Any objection?

20          **THE DEFENDANT:**  No.

21          **THE COURT:**  All right.  19 will be admitted.

22          (WHEREUPON, an item was marked as Exhibit

23          Number 19.)

24  *BY MR. REIDY*:

25  *Q.*    Let's look at the first page of Exhibit 19 first.

1          Does the first page of Exhibit 19 show

2    Ms. Callahan's Social Security number; her date of

3    birth; and other personal identifying information?

4    A.    Yes.

5    Q.    And the second page of Exhibit 19, does that also

6    show Ms. Callahan's Social Security number; ID number;

7    date of birth; as well as her personal identification

8    number or PIN?

9    A.    Yes, it does.

10   Q.    Does it also contain her debit account information?

11   A.    Yes.

12   Q.    Let's turn to Page 3 of Exhibit 19.

13          So, looking at the highlighted text in the

14   middle of Page 3 of Exhibit 19, does that

15   highlighted text contain the file path information

16   and the modified date information for the pictures

17   we looked at on Pages 1 and 2 of Exhibit 19?

18   A.    It does.

19   Q.    And does Item 150153 correspond with the image on

20   Page 1 of Exhibit 19?

21   A.    Yes, it does.

22   Q.    And does Item 159147 correspond with the image

23   found on Page 2 of Exhibit 19?

24   A.    Yes.

25   Q.    I want to ask you to look at the file paths for

*EXAMINATION OF MICHAEL MASUDA CON'T*

1    both images.  One of the folders in the file path for

2    the -- for both pages of exhibit -- both of the first two

3    pages of Exhibit 19 is labeled "Master backup and more."

4    Do you see that?

5    A.    I do.

6    Q.    And then, looking at the third page of Exhibit 19.

7              **THE DEFENDANT:**  That's not the file path.

8    That's the drive master back up and more.

9              **THE COURT:**  What's the objection, sir?

10             **THE DEFENDANT:**  The objection is, he labeled

11   it wrong.  He answered -- he asked the question -- asked

12   and answered wrong.  He said, "The file path was master

13   backup," but the file path is actually screenshots that's

14   the last --

15             **THE COURT:**  Well, the document -- the document

16   speaks for itself.  The document's in evidence so you can

17   ask questions about it during cross-examination.

18             **THE DEFENDANT:**  Okay.

19   *BY MR. REIDY:*

20   Q.    And the label "Master backup and more" is that

21   consistent with the labeling on the flash drive

22   identified as Item Number 1b42 that we looked at on

23   Page 11 of Exhibit 7?

24   A.    It is.

25   Q.    And the file path for both Exhibit 19 images, do

*EXAMINATION OF MICHAEL LABUDA CON'T*

1    they also reference folders, camera dumps, Galaxy phone

2    cameras, GS9?

3    A.    Yes.

4    Q.    And did Defendant have a Samsung Galaxy S9 phone in

5    his possession when he was arrested in this case?

6    A.    He did.

7    Q.    And that was the phone you searched pursuant to the

8    search warrant in this case?

9    A.    Yes.

10    Q.    So are these file paths consistent with these

11    images in the first two pages of Exhibit 19 coming from

12    Defendant's Galaxy S9+ phone?

13    A.    Yes.

14    Q.    The image from the first page of Exhibit 19, Item

15    150153, do the file name 20210407 and the modified date

16    of April 7, 2021, do those reflect that the file was

17    created or modified on April 7, 2021?

18    A.    Yes.

19    Q.    And the image from the second page of Exhibit 19,

20    do the file name "Screenshot 20210514" and the modified

21    date of May 14, 2021, are those consistent with the fact

22    that the image from the second page of Exhibit 19 was

23    created and/or modified on May 14, 2021?

24    A.    Yes.

25    Q.    And based on your knowledge and investigation,

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    Agent Fukuda, were Defendant and Ms. Callahan living in

2    New York in April and May of 2021?

3    A.    Yes.

4    Q.    Let's go back to Exhibit 7, Page 4.

5          In the middle of Page 4 of Exhibit 7, is

6    that a closet?

7    A.    It is.

8    Q.    And did you collect more hard drives from that

9    closet during your search of the defendant's apartment?

10   A.    Yes.

11   Q.    Let's go to Page 5 of Exhibit 7 is Page 5 of

12   Exhibit 7 a close-up picture of the defendant's closet

13   that we looked at on Page 4 of Exhibit 7?

14   A.    Yes.

15   Q.    In the middle of Page 5, is that some gray

16   Styrofoam packaging?

17   A.    Yes.

18   Q.    Are those hard drives stacked on top of the gray

19   Styrofoam on Page 5?

20   A.    Yes, they are.

21   Q.    And do you see some black cases and orange cases on

22   the right-hand side of Page 5 of Exhibit 7?

23   A.    Yes.

24   Q.    Let's go to Page 7 of Exhibit 7.  Excuse me.

25         On Page 7 of Exhibit 7 there's a person

1    shown in the reflection of the TV screen taking the

2    photograph.  Do you see that?

3    A.    Yes.

4    Q.    Who is that person?

5    A.    That's Special Agent Caitlin Bowdler.

6    Q.    On the bottom left of Page 7 of Exhibit 7 there is

7    a red object.  Do you see that?

8    A.    Yes.

9    Q.    And what is that?

10    A.    That's a suitcase.

11    Q.    Page 8 of Exhibit 7 and Page 9 of Exhibit 7, what

12    was shown on pages -- what is shown on Pages 8 and 9 of

13    Exhibit 7?

14    A.    This was mail -- some of the mail that we found in

15    the apartment.

16    Q.    Did some of the mail that you found in the

17    apartment, was that addressed to Ms. Callahan?

18    A.    Yes.

19    Q.    And did you find mail from the Department of

20    Veterans Affairs addressed to Ms. Callahan?

21    A.    Yes.

22    Q.    Did you also find mail related to credit card

23    applications?

24    A.    Yes.

25    Q.    That was addressed to Ms. Callahan?

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   A.    Yes.

2              **THE DEFENDANT:**  To clarify, "At that address"?

3              **THE COURT:**  I'm sorry.  So, sir, look, you're

4   going to have plenty of time to ask questions, so, save

5   them for that time.

6              **THE DEFENDANT:**  Okay.

7              **THE COURT:**  Continue.

8   BY MR. REIDY:

9   Q.    Did you also find mail addressed to Ms. Callahan

10  related to her accounts at Chase bank?

11  A.    I did.

12  Q.    And on Page 10 of Exhibit 7.

13         Does Page 10 of Exhibit 7 show a package

14  that was addressed to Edward Santiago that you

15  found in Defendant's apartment during the execution

16  of the search warrant?

17  A.    Yes.

18  Q.    Take that off the screen.

19         Agent Fukuda, did Defendant make any calls

20  from jail to Mr. Santiago after the FBI executed a

21  search warrant at his apartment?

22  A.    He did.

23  Q.    I want to ask you about Exhibits 118 and 119.

24  First, for reference, let's go to Exhibit 82,

25  specifically, Line 1.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

```
 1              Does Exhibit 82, Line 1 show information for
 2     the call that we're going to be hearing in
 3     Exhibits 118 and 119, specifically, a call that
 4     Defendant made to Mr. Santiago's Eddie burner
 5     number on August 17, 2021 at 6:20 p.m.?
 6     A.    Yes.
 7     Q.    And this call was made the day after you executed
 8     the search warrant at Defendant's apartment in the Bronx?
 9     A.    Correct.
10              MR. REIDY:  Let's listen to Exhibit 118.
11              (Video started.)
12              MR. REIDY:  All right.  Let's listen to
13     Exhibit 119.
14              (Video started.)
15     BY MR. REIDY:
16     Q.    Agent Fukuda, what did you understand Defendant to
17     be saying when he said, "I wish it could have been done
18     differently, but it's too late now"?
19     A.    Mr. Gasca wished that Mr. Santiago had been able to
20     get into the apartment and recover his devices before the
21     FBI served or executed their search warrant.
22     Q.    And what did you understand Defendant to mean when
23     he said, "Really the day I that talked to -- I told you,
24     too, that time was in essence, so, really, the day that I
25     talked to you, the very next day you should have got that
```

1   stuff"?

2   A.    Just like Mr. Gasca said, "Time was of the essence;

3   the FBI was coming sooner or later," and he had insisted

4   that Mr. Santiago had wished Mr. Santiago had acted more

5   quickly.

6            THE COURT:  Mr. Reidy, can you play that tape

7   again because I don't -- I don't think I heard the last

8   sentence.

9            MR. REIDY:  Sure, Your Honor.

10           (Video started.)

11           THE COURT:  So, what -- where does he say the

12   very next day you should have got the stuff?  Was that --

13           MR. REIDY:  They were talking over each other,

14   so it was a little difficult to hear.

15           THE COURT:  Okay.  All right, go ahead.

16   Continue.

17           MR. REIDY:  Your Honor, can I have moment?

18           THE COURT:  Yes.

19           MR. REIDY:  (Conferring with co-counsel.)

20            No further questions for the witness.

21           THE COURT:  All right, cross-examination.

22           THE DEFENDANT:  One second, Your Honor.

23           THE COURT:  All right.

24           THE DEFENDANT:  I have to go back a few times,

25   Your Honor.

1              **THE COURT:**  All right.

2

3                       <u>**CROSS-EXAMINATION**</u>

4    QUESTIONS BY THE DEFENDANT:

5    *Q.*    I want to keep this as simple as possible so the

6    judge can follow us, okay?  All right.

7              With the calls that they just went over and

8    I was talking about imperative to get my stuff, you

9    know there's a deception going on there.  You don't

10   have any -- that everything that you've heard there

11   is complete?

12   *A.*    I don't think I understand your question.

13   *Q.*    Okay.  Didn't I say several times that it's

14   important you get my stuff?  That's my most valuable

15   stuff and I know the FBI.  They'll take it and they'll

16   break it on spite.  I've dealt with them before.  They'll

17   take it, and they'll break it on spite.

18             Didn't I emphasize that at the end of two or

19   three of those calls?  Tell me you never heard that

20   before.

21   *A.*    I don't remember you saying --

22   *Q.*    I figured you'd say it.  Okay.  I'm going to make

23   sure that I play that for you.

24             **THE COURT:**  Hold on.  Hold on.  Again,

25   Mr. Gasca, I know you want to get your case to me.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1   You've got to let him answer the question so there's a

2   record of it.  Okay?  So let him answer the question and

3   then ask the next question.

4   *BY THE DEFENDANT*:

5   *Q.*   You don't remember ever hearing that?

6   *A.*   If you're -- part of what you said is true.  I do

7   remember you talking about your valuable possessions, but

8   the part about the FBI breaking into your devices out of

9   spite, I never heard that, no.

10  *Q.*   No?  Okay.  Well, I'm going to play that, you know

11  what I mean.

12      But for someone who heard those messages,

13  wouldn't that be important?  I mean, you're

14  presenting to the judge that I -- the reason I had

15  them take those advices [sic] out because I was --

16  some financial thing was going on there.  You know

17  what I mean?  But that's -- I told them

18  specifically why.  You need to get my stuff because

19  I know the FBI.  They'll break my stuff on purpose.

20  I went through this before with them.

21      You don't remember any of that?  I remember

22  I dealt with the FBI before.  Every time you get

23  caught lying, you say I don't remember.

24          **THE COURT:**  Hold on.  Mr. Gasca, you've got to

25  ask a question.  Now you're -- you're arguing.  You're

1   going to have a chance to do that at the end, but I'm not

2   sure there's a question.

3                    **THE DEFENDANT:**  Okay.

4   *BY THE DEFENDANT:*

5   *Q.*   You've presented to this judge with the prosecutors

6   this scenario that I wanted to get my stuff out because I

7   was hiding some evidence; right?

8   *A.*   The prosecutor asked me questions, and I answered

9   the questions.

10  *Q.*   Oh, okay.

11       And what you found on one of the hard drives

12  was screenshots that come from my phone; right?

13  *A.*   Correct.

14  *Q.*   Okay.  There was another photo -- if not, I'll take

15  it up here and show it -- that showed a Styrofoam in my

16  closet, and it showed hard drives.  Remember that?

17  *A.*   Yes.

18  *Q.*   Okay.  You didn't take any of those hard drives.

19  Where are those hard drives?

20  *A.*   Those hard drives were taken.

21  *Q.*   There's 15 hard drives in there.  They're not --

22  they're not in any discovery I have.  In fact, you can

23  see where you flipped it up.

24                    **THE DEFENDANT:**  I don't know how to work this,

25  Your Honor.  Is there something I can show these photos?

1            **THE COURT:**  What are you trying to show?

2            **THE DEFENDANT:**  A photo of the room search.

3            **THE COURT:**  So is it in the exhibit binder?

4            **THE DEFENDANT:**  Yes.

5            **THE COURT:**  So the witness has the exhibit

6     binders, and I have a binder.  So if you tell the

7     exhibit, I can look at it, the witness can look at it,

8     and you can look at it.

9            **THE DEFENDANT:**  Okay.  It's in Exhibit 11 --

10    I'm sorry, it's Exhibit 7, Your Honor.  Photos of my

11    room.

12           **THE COURT:**  Of the Government's --

13    Government's exhibit, the Government's binder?

14           **THE DEFENDANT:**  Yes.

15           **THE COURT:**  Exhibit 7.

16           **THE DEFENDANT:**  Page 1.

17           **THE COURT:**  Hold on.  Hold on.  Let me just

18    get to it as well.

19             Exhibit 7, okay.  Yeah, okay.

20    *BY THE DEFENDANT*:

21    *Q.*   Now, in Exhibit 7, I have photo here of a

22    Styrofoam?

23           **THE DEFENDANT:**  Is there any way I can show

24    this on the monitor?

25           **THE COURT:**  If you pull out the monitor.

*EXAMINATION OF MICHAEL MASUDA CON'T*

1    *BY THE DEFENDANT*:

2    Q.    That's the photo you went over with the agent, and

3    these are the hard drives right on the top.  And that's

4    the Styrofoam that I directed Eddie to take.  The

5    Styrofoam is full of hard drives right there.  That's why

6    it's a big Styrofoam there.  You took all of that?

7    A.    We collected numerous devices from your apartment.

8    All the devices that -- the search procedures that we

9    followed were the same procedures that we follow for

10    every search warrant in that all the devices or all the

11    evidence that was seized is documented in both a log, a

12    photo log, and in the 302.

13          So, all the evidence that was taken from the

14    apartment was documented in a 302 and turned over

15    in discovery.

16    Q.    Here's another photo.  Now, you've turned -- you've

17    turned over the hard drive -- you've turned over the

18    Styrofoam, the hard drives are gone from the top, and

19    you've opened the little black thing there which I had

20    another hard drive that had my Shaw Brothers films on

21    top.  You can see that is opened there. Do you see it,

22    that white lid there that had another hard drive inside?

23          **THE COURT:**  Mr. Gasca, you might help us out

24    here.  What are you pointing to?

25          **THE DEFENDANT:**  Okay.  So, in this photo

EXAMINATION OF MICHAEL MASUDA CON'T

1        here --

2                **THE COURT:**  You can drive draw it on the

3        screen.  If you touch the screen, it will -- okay.

4                **THE DEFENDANT:**  Okay.

5                **THE COURT:**  So there's a black --

6                **THE DEFENDANT:**  Before we get to that, Your

7        Honor.

8                **THE COURT:**  Okay.

9                **THE DEFENDANT:**  The hard drives that were on

10       top, they were in Styrofoam in the previous photo, here.

11               **THE COURT:**  Okay.

12               **THE DEFENDANT:**  They're gone.

13               **THE COURT:**  So the hard drives that are

14       wrapped in like --

15               **THE DEFENDANT:**  Yes.

16               **THE COURT:**  -- bubble wrap.

17               **THE DEFENDANT:**  They're gone.

18                And the reason they're wrapped in bubble

19       wrap is because they don't fit in the Styrofoam.

20       The Styrofoam is filled with 10 hard drives and then

21       that's -- that's there.  The Styrofoam was -- is

22       tipped over.  You can see now the Styrofoam has been

23       tipped over.

24               **THE COURT:**  When you say, "tipped over," you

25       mean it's not there or?

*EXAMINATION OF MICHAEL AZUDA CON'T*

1   **THE DEFENDANT:**  No, it's there.  But it's

2   gone -- they took the hard drives off the top and they

3   flipped the hard drive -- the Styrofoam over.  So you can

4   see that -- if you look at the Styrofoam, you don't see

5   the lines.  In this you see the lines of the Styrofoam.

6   That's because it's face-up.

7           And then in this next photo, you don't

8   see any lines because it's turned over now on its

9   side.

10  **THE COURT:**  Okay.

11  **THE DEFENDANT:**  So the hard drives that are in

12  that -- in that hard drive in that black box, you can see

13  they left open on top there, there's also an SD drive.  I

14  don't have none of those hard drives in my discovery.  I

15  have the hard drives that are listed in the back of TV

16  and on TV you can see them, but I have none of those

17  other hard drives.

18  **THE COURT:**  So what's your question of this

19  witness?

20  **THE DEFENDANT:**  He said he confiscated them.

21  Where are they?  I don't have them.

22  **THE COURT:**  Well, I think what he said was

23  what they confiscated is on a list in the 302.  I don't

24  know if this is part of it or not.

25

*EXAMINATION OF MICHAEL AZUDA CON'T*

1    BY THE DEFENDANT:

2    Q.    Okay.  Did you confiscate those hard drives?

3            **THE COURT:**  When you say "those hard drives,"

4    just so I understand what you're talking about.

5            **THE DEFENDANT:**  The ones that are on top of

6    the Styrofoam here.

7            **THE WITNESS:**  We seized --

8             May I?

9            **THE COURT:**  Yes, please.

10           **THE WITNESS:**  We seized numerous devices from

11    the apartment that day, and like I said before, these

12    devices that we -- or the evidence we took were

13    documented in numerous forms, including a 302.  For those

14    devices, specifically, that I'm looking at there, I don't

15    know what they are -- how they ascribe with the items

16    that are documented in the 302.  So I can't answer your

17    question.

18    BY THE DEFENDANT:

19    Q.    Okay.  So there's a possibility that you would not

20    have taken those drives?

21    A.    There's a possibility, yes.

22    Q.    What possibility would there be that the FBI would

23    find these drives in a closet and say, nah, we don't need

24    them?  Remember we're not talking to a jury.  It's a

25    judge.  Play stupid, it's not going to work this time.

*EXAMINATION OF MICHAEL ARUDA CON'T*

1          **MR. REIDY:**  Objection, Your Honor.

2   Argumentive.

3   *BY THE DEFENDANT:*

4   *Q.*    Under what circumstance would the FBI find these

5   drives there and decide no, we're not going to take them?

6   *A.*    I'm not sure I understand your question.

7   *Q.*    You said it's a possibility that you wouldn't take

8   them.  What possibility -- under what circumstance would

9   that possibility exist?

10  *A.*    I'm sorry.  I don't understand your hypothetical

11  question.

12  *Q.*    Okay.  You see those drives there?  Is there a

13  scenario in which you wouldn't take those drives?

14          **MR. REIDY:**  Objection.  Speculation, Your

15  Honor.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  If the drives that we're looking

18  at over there did not meet the requirements that were set

19  forth in the search warrant for seizable items, then we

20  would have left them.

21  *BY THE DEFENDANT:*

22  *Q.*    Okay.  Well, they're the same drives that are in

23  the back of TV.  All the drives on the TV you took.

24  They're the same drives.  And how would you know

25  specifications they would meet?  You're not doing any

1    diagnostic, you're not doing any checkings of them.  So

2    there's a simple -- hard drives there, so what you're

3    saying doesn't make any sense to me.  Help me understand.

4    A.    Can you ask me a specific question?

5    Q.    Sure.

6          Is there a scenario under which you wouldn't

7    take the hard drives?

8    A.    Yes.  I've already described that if there were

9    items that were not listed as seizable items in the

10   search warrant, we would not have seized them.

11   Q.    But it was listed in the search warrant, take hard

12   drives and electronic devices.  You know the drill.

13   You're an FBI agent.  You're not a mall agent.  You took

14   all of my other hard drives.  Why wouldn't you take these

15   in the closet?

16   A.    I don't know what's in the Styrofoam packaging

17   there --

18   Q.    You can see those are hard drives.  He asked you,

19   and you said, yeah, those are hard drives.  Obviously,

20   they're hard drives.  You can see they're hard drives.

21         Isn't it true that you took my hard drives?

22   You took all of them, you know, I mean, but you

23   only spitefully listed what you list there.  It is

24   the --

25              **MR. REIDY:**  Objection, Your Honor.

*EXAMINATION OF MICHAEL YAMAGUDA CON'T*

1   Argumentative.

2           **THE COURT:**  It is argumentative.  Just ask the

3   question, sir.

4   *BY THE DEFENDANT:*

5   *Q.*   Okay.  So you're expecting this judge to believe

6   that you came across these hard drives and you said, nah,

7   we don't need those?

8   *A.*   I'm saying that those specific hard drives there,

9   without knowing what numbers they attribute to in the

10  302, I can't definitively say that those hard drives that

11  we're looking at were taken by the FBI.

12       Now, if there was a way that I'd be able to

13  connect them to 1B numbers in our 302, then I could

14  say, yes, we definitively took those devices.

15  *Q.*   Okay, so --

16          **THE DEFENDANT:**  Help me to look for the search

17  warrant photos that, there's a search warrant listing of

18  what was taken.

19  *BY THE DEFENDANT:*

20  *Q.*   But what was listed behind the TV is very clear.

21  There's some that are marked -- all my hard drives are

22  marked, but the ones that are marked on the back of the

23  TV you marked them and you cataloged them.  So in the

24  302's it only lists those.  So if we count them up, you

25  know what I mean, you're going to come up short with

 1  these, here.  There's four -- four on top there, you know

 2  what I mean.  I'll say three for you to make it easier,

 3  you know what I mean.  So again, you know what I mean,

 4  you've presented -- you've already said, oh yeah, if they

 5  didn't meet what was in the search warrant we wouldn't

 6  take them.  How would they not meet what was in the

 7  search warrant?  You -- there to collect all electronic

 8  devices.  How would they meet that they're not in the

 9  search warrant?  I'm stuck there before I can even go

10  further.  That's crazy to me, so ...

11  A.    If they're not listed in the 302 as seized items,

12  then those items were not seized.

13  Q.    So, again, you're telling this judge that there was

14  hard drives in the room that you came across and you

15  felt, nah, we don't need to seize them?

16         MR. REIDY:  Objection, Your Honor.

17  Mischaracterizes prior testimony.  And again,

18  argumentative.

19         THE COURT:  Sustained.  Ask the question

20  again, sir.

21         THE DEFENDANT:  Okay.

22  BY THE DEFENDANT:

23  Q.    You, as an FBI agent, would go into a room for the

24  express purpose of collecting my electronic devices.  But

25  you would find a closet full of 13 hard drives -- and

*EXAMINATION OF MICHAEL LASSUDA CON'T*

1    that's the least is about 15 or 16, but I can't swear to

2    that, but I know there's at least 13 of them -- and you

3    wouldn't take them?

4    A.    Well, we have spent quite some time today listening

5    to jail calls where you gave some very specific details

6    about some of the devices and where they were located and

7    what they looked like.  And so, those would be the kind

8    of devices that we targeted and focused on.

9    Q.    I'm glad you said that because in the jail calls I

10   specifically told Eddie, go to the closet, the gray

11   styrofoam.  We just went and looked at those messages,

12   and the hard drives are in there.  Remember the hard

13   drives that I said you left in New Jersey, and you picked

14   them up, the same styrofoam.  They're in there.  So

15   why -- that just fits your description, so why didn't you

16   follow Eddie's directions since you said that's what you

17   were doing?

18   A.    Well, you are correct.  Those were -- that was a

19   recording that we did listen to, a call that was made.

20   However, I can't tell you at this time when I was able to

21   review these jail calls.  It's possible that I reviewed

22   these jail calls after the search warrant was done.

23   Q.    Oh.

24   A.    We had enough information to know that you were

25   trying to get devices out the apartment.  However, it's

*EXAMINATION OF MICHAEL SUDA CON'T*

1    possible I didn't know the full details at that time of

2    what devices we were looking for.

3    *Q.*    Okay.  So you didn't know the few details of --

4    these are like three jail calls -- you played a lot of

5    clips but they're from, like, three calls.  You listed,

6    the first call, we said we're going to listen to a call

7    from this item number, and you listed, like, three.

8         So, let's pretend you only heard one call

9    and then you rushed to New York, and then you

10   didn't hear the other call, so you didn't know

11   Eddie's instructions, right.  You weren't -- you

12   didn't think, well, there, let me find the

13   instructions.  I could find out where to look for

14   the hard drives.  That was not relevant to you.

15   Let's pretend that.  You come into the hard drive,

16   you don't need Eddie's instructions.  You took a

17   picture of it --

18         (Court reporter admonishment to slow down.)

19   *BY THE DEFENDANT*:

20   *Q.*    You took a picture of it.  So, you took a picture

21   and you said, uh, Eddie didn't describe that.  We'll

22   leave that alone, and you walked away from the hard

23   drives?

24         **MR. REIDY:**  Objection, Your Honor.

25   Speculation.  Foundation.

*EXAMINATION OF MICHAEL ARGUDA CON'T*

1              **THE COURT:**  Overruled.

2              **THE WITNESS:**  Correct.

3              **THE DEFENDANT:**  Okay.  I'm going to move on

4     for the moment.

5              **THE COURT:**  Have him answer the question to

6     the extent he can understand it.

7              **THE DEFENDANT:**  Oh.

8     *BY THE DEFENDANT*:

9     *Q.*    To the extent you understand it, you went to the

10    room looking for electronic devices, you came upon those,

11    took a picture of them, and then took a picture after

12    they're moved -- they moved somewhere because you took a

13    picture after they were gone.  In Photo 1 they're there.

14    In Photo 2 they're gone.  But you said, you know what,

15    Eddie didn't describe these.  Let's leave them here.  And

16    then you put them somewhere else.  That what happened?

17    *A.*    It's possible.

18    *Q.*    (Laugh)  Okay.  You surprised me with that answer.

19         But I do remember, you play stupid when

20    you're caught lying.

21              **MR. REIDY:**  Objection, Your Honor.

22    Argumentative.

23              **THE COURT:**  Mr. Gasca, you've got to remember

24    it's a judge, right.  It's not TV.  So, I mean, I don't

25    need the side comments.  Okay?

1          **THE DEFENDANT:**  Okay.

2          **THE COURT:**  Thank you.

3    *BY THE DEFENDANT:*

4    *Q.*    In the calls that you described, in fact, in the

5    motions that the prosecutors prepared for this Court,

6    they prepared in the motion they said things, like, you

7    know, the defendant called his friend and told his friend

8    to collect his stuff from the apartment before the FBI

9    could seize them and learn of his financial exploitation

10   of Estrellita.  But nothing said that on the call.  There

11   was nothing that said anything on the call.

12        You mention and I mentioned to Eddie that

13   they're going to try to make some financial case of

14   this, but that's separate from when I then go ahead

15   and describe to him to get my stuff.  And I say my

16   most precious stuff, my most valuable stuff.

17        We'll go with what you heard.  I'm going to

18   look for the call and make sure I play the call for

19   the judge where I said to him, the FBI's spiteful.

20   They'll take my stuff, and they'll break it.

21        **MR. REIDY:**  Sorry, Your Honor.  I think that

22   Counsel's testifying, at this point.

23        **THE COURT:**  Well, I'm waiting to see if

24   there's a question.

25

*EXAMINATION OF MICHAEL AZZUDA CON'T*

1    *BY THE DEFENDANT*:

2    *Q.*    My question is --

3              **THE DEFENDANT**:   I'm sorry.

4    *BY THE DEFENDANT*:

5    *Q.*    -- using the calls that we heard here, you know

6    what I mean, you continually went, very thorough, piece

7    by piece, right.  He said, erase all the messages -- I'm

8    sorry.  Let me go here.

9         Eddie enter the room, get the hard drives,

10   get my backup drives.  In 103, I specifically tell

11   him, you know, there's a backup of my movie.  They

12   have my movie in the hotel, but there's a backup of

13   my movie on the hard drive, so make sure you get

14   it.  Then I go on and say collect all the hard

15   drives.  I describe to him the Styrofoam, the

16   purple Styrofoam.  And I expressly say in the clip

17   that they play "my most valuable possessions."  You

18   know, with those just those electronic devices.

19        In another section, I mention securing them

20   because it had Shaw Brother films and my camera.

21   So my camera couldn't hold any evidence on it,

22   could it?  But I told him make sure you get my

23   camera out of there.  Why was I afraid for the FBI

24   taking any camera?  Why would I be afraid of the

25   FBI taking my camera?

*EXAMINATION OF MICHAEL AZUDA CON'T*

1            **MR. REIDY:**  Objection.  Foundation.

2            **THE COURT:**  Sustained on that -- yeah,

3    sustained.

4            **THE DEFENDANT:**  Okay.

5            **THE COURT:**  Rephrase your question, sir.

6            **THE DEFENDANT:**  Yes.

7    *BY THE DEFENDANT:*

8    *Q.*   Did I not -- and I'll play it also for the judge,

9    you know what I mean -- say that in my previous case on

10   the phone calls, the same phone calls you're taking clips

11   from, last time my case I won my equipment, 11 VCRs, two

12   cameras, and a computer.  They returned it to me all

13   destroyed.  He even said on the call, "Wow." I said, yeah

14   I told you that before.  You must have forgot.  The FBI

15   will take my stuff and they'll break everything.  Make

16   sure you secure it.  You didn't hear none of that?

17   *A.*   I don't recall.

18   *Q.*   So why would I be asking Eddie, if I'm trying to

19   hide evidence, to secure my camera?

20           **MR. REIDY:**  Objection.  Foundation.  And

21   argumentative, Your Honor.

22           **THE COURT:**  Sustained.

23   *BY THE DEFENDANT:*

24   *Q.*   Is there any reason you can think of why, as part

25   of my trying to hide evidence, I would ask Eddie to hide

1   my camera, as well?

2           MR. REIDY:  Same objections, Your Honor.

3           THE COURT:  Sustained.

4           THE DEFENDANT:  In the call to -- want to make

5   sure I don't jump all over, Your Honor, to confuse you.

6   *BY THE DEFENDANT*:

7   *Q.*    In the call to Tscherny, my co-defendant, I told my

8   friend, right, Eddie, tell them the truth.  You didn't do

9   anything wrong.  You know what I mean.  And then I say in

10  there, just say when he gave me the "G" that we got the

11  cash, and just don't tell them that because Estrellita

12  won't remember that detail.  That's the word that you got

13  caught on before and you kept saying "circumstance."

14          When I made that call, I had already talked

15  to you and the FBI.  I had already been interviewed

16  by you, had I not?

17  *A.*    Yes.

18  *Q.*    And even I forgot that detail because did I not

19  tell you in the interview -- I didn't tell you who.  But

20  I told you the person who helped me, I paid him $1,000

21  for the gas money and to come out?

22          MR. REIDY:  Objection, Your Honor.  Hearsay.

23          THE COURT:  Overruled.

24          THE WITNESS:  What's your question, Mr. Gasca?

25

*EXAMINATION OF MICHAEL MASUDA CON'T*

1    *BY THE DEFENDANT*:

2    *Q.*    Did I not tell you during the interview that I gave

3    $1,000 to Tscherny?  I told you I'm not going to tell you

4    his name.  You find that out on your own.  I won't to

5    give him up, his name.  But I did pay him $1,000.

6    *A.*    You did mention that, yes.

7    *Q.*    So even I forgot when I'm telling him my friend

8    here, this is not hiding of evidence.  I tell him say we

9    didn't do nothing wrong, but when they ask you, don't

10    mention that money.  Estrellita probably won't remember

11    that detail.

12       So, I'm helping him.  I'm not helping me.

13    I'm not telling him, tell him we didn't kidnap her.

14    Tell him this.  Tell him hide the evidence.  Stuff.

15    Tell them, hey, tell them you didn't do nothing

16    wrong, but don't mention that detail about money.

17    So the point is even I forgot.  When I played my

18    recording was when I remembered, oh, I didn't even

19    I told the agent that.  So even I forgot that

20    detail.

21       **THE COURT**:  Wait a minute, Counsel.  That's

22    not a question.  That's a statement.

23    *BY THE DEFENDANT*:

24    *Q.*    So isn't it true that I even forgot that detail?

25       **MR. REIDY**:  Objection.  Foundation.

1            **THE COURT:**  Sustained.

2   *BY THE DEFENDANT*:

3   Q.    But you do remember when I talked to you that I

4   told you that I paid him, and I paid him $1,000?

5   A.    Yes.

6   Q.    Okay.  Is it your personal technique or just a

7   technique of the FBI to -- when you're interviewing a

8   person, try to get them to change their testimony while

9   you're interviewing them?

10  A.    When I'm interviewing -- when I interviewed you,

11  you weren't providing testimony.

12  Q.    I'm sorry?

13  A.    You were not providing testimony when I interviewed

14  you.

15  Q.    When you're interviewing somebody, anybody, is it

16  your technique to try to coach them to get a different

17  answer than the one they're giving?

18  A.    No.  The only thing I want is the truth.

19  Q.    Really?

20        So, when you were questioning Tscherny and

21  Tscherny told you exactly what happened, and then

22  you read him a document stating the law --

23            **MR. REIDY:**  Objection, Your Honor.  Hearsay.

24            **THE WITNESS:**  I haven't finished my question.

25            **THE COURT:**  Let me hear the question.

*EXAMINATION OF MICHAEL MIKADO CON'T*

1  *BY THE DEFENDANT*:

2  Q.    You read him a document stating the law, and then

3  you told him tell you again.  And he attempted to tell

4  you the same story exactly again.  But you kept

5  interjecting and telling him different answers than what

6  he was saying.  He was said nope that's it.  He kept on,

7  nope, I didn't say that.  We're going to play that tape

8  for the judge too.  Do you remember that?

9        **MR. REIDY:**  I renew my hearsay objection, Your

10  Honor.  To the extent this is a question.

11        **THE COURT:**  Mr. Tscherny's going to testify?

12        **MR. REIDY:**  Yes, Your Honor.

13        **THE COURT:**  So I think, Mr. Gasca, you can

14  probably get that information out through in Tscherny.

15        **THE DEFENDANT:**  Okay.

16  *BY THE DEFENDANT*:

17  Q.    When you ask him like you say you're just out for

18  the truth -- you know, when you were investigating this

19  case, you're how long an FBI agent?

20  A.    Approximately 15 years.

21  Q.    Fifteen years.  So when you were investigating this

22  case, you got a bank video of when I entered the bank

23  with Estrellita.  And then, you know, that I went to the

24  Social Security office.  We came back, and we went to the

25  bank a second time.  Why didn't you pursue a bank the

EXAMINATION OF MICHAEL ARUDA CON'T

1    second time?  The tape?  We have no tape of the second

2    encounter, the actual money shot, as they say.

3    A.    Yes.  You're referring to the bank, internal bank

4    surveillance videos.  We did obtain bank surveillance

5    videos for the first time that you went to the bank with

6    Ms. Callahan.  That was provided to us by the bank.

7    We -- I did not realize until later on that it did not

8    include the second visit like I had requested.

9    Q.    And you didn't realize that?  This case, two years

10   ago.  How long did it take you before you didn't realize

11   that, that there's no second bank tape?

12   A.    I don't know exactly.  I don't remember how much

13   time had elapsed.  But I did check with the bank as soon

14   as I realized that we didn't have it and was advised that

15   they do not keep video footage past 90 days.

16   Q.    Isn't it true that you checked with the bank guy

17   again only after like -- days before I argued it in

18   court.  And after that, and maybe days before my

19   investigator contacted him he said, hey, you called.  And

20   he said we don't have a second tape.  Isn't that the

21   timeframe you're talking about?

22   A.    Yes.

23   Q.    Okay.  So I know you were prepared for this

24   question.  And before I get to that key one.

25        On the first one, you asked him do you a

*EXAMINATION OF MICHAEL ARZOUDA CON'T*

1   favor and give you the tape with no search

2   warranted; right?

3   *A.*    Correct.

4   *Q.*    Why did you do that?  Why didn't you ask -- take a

5   search warrant and get it the way you're supposed to git

6   it instead of asking him to do you a favor?

7            **MR. REIDY:**  Objection, Your Honor.

8   Argumentative.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  We -- I had asked them for

11  surveillance footage from the bank, and he provided it to

12  me.  If he had requested a further legal authority to

13  obtain that information, then I would have sought it out.

14  But at the time, he provided it to me just upon request.

15           **THE DEFENDANT:**  No.  You specifically asked

16  him to do you a favor and forego the normal procedure of

17  seeking a search warrant.  I can have my investigator

18  take the stand if --

19           **THE COURT:**  Hold on.  I think the question

20  he's asking is did you ask the bank personnel to do you a

21  favor, "yes" or "no"?

22           **THE WITNESS:**  No.

23  *BY THE DEFENDANT:*

24  *Q.*    So he's lying?

25           **MR. REIDY:**  Objection.

1           **THE COURT:**  Who's lying?

2           **THE DEFENDANT:**   The bank -- the person that

3   he's saying, my investigator went and talked to him.

4   When I asked to please him to court, Your Honor, you know

5   what I mean.  And he said that he asked him to do him a

6   favor and specifically said to not follow the normal

7   route of seeking --

8           **THE COURT:**  At the appropriate time, if you

9   want to try to impeach this witness with another

10  statement, you can try.  I'm not saying it may be

11  successful.  If it's that important, you can call the

12  investigator and see if you can get it in that way.

13  *BY THE DEFENDANT:*

14  *Q.*    Okay.  So he gave it to you on his own.  You didn't

15  ask a favor?

16  *A.*    No.  I wouldn't use the word "favor."  In the

17  normal course of his duties and in the normal course of

18  my duties in conducting this investigation, I did ask him

19  for footage, and he provided to me.

20  *BY THE DEFENDANT:*

21  *Q.*    And the bank security guy who has numerous security

22  lists would just give you something.  You wouldn't have

23  to have no legal document?  He'd say, oh, yeah, sure I

24  got that for you and just pull it for you and give it to

25  you?

1    *A.*    That's correct.

2    *Q.*    That's not what my investigator acquired.  That's

3    not what he said when he talked to my investigator.  So

4    if those are not the words that he said, his version is

5    not matching your version, who is lying?

6         **MR. REIDY:**  Objection, Your Honor.

7    Argumentative.

8         **THE COURT:**  It is argumentative.  Sustained.

9    *BY THE DEFENDANT*:

10   *Q.*    Now, I knew you were prepared for that question, so

11   you can help the judge with this one, okay?

12        Now, it's possible that you didn't know

13   about the second tape like you said until a year

14   and a half later.  Everyone else that I mentioned

15   that to was astonished, but it's possible.  The

16   judge even said when I was arguing, that he seen

17   that before.

18        Can you explain to the judge how is it

19   possible that while you may play that stupid, how

20   these two play that stupid and they didn't ask for

21   the tape in a year and a half?

22        **MR. REIDY:**  Objection, Your Honor.

23   Foundation.

24        **THE COURT:**  Mr. Gasca, I'm trying to work with

25   you here but this is all argument.  And I'm not sure what

1    the relevance of it is.  I mean --

2                    THE DEFENDANT:  I went into the bank --

3                    THE COURT:  Hold on.  Just hear me out.

4                There's no footage.  There's no second

5    footage, right, of this video.  There isn't any.  So

6    that's a fact.  You can argue it later on that

7    there's no footage and then say that the

8    Government -- maybe argue that that shows how weak

9    the Government's case is.  But asking questions of

10   the witness as to why or why not or accusing the

11   prosecutors of being stupid or saying how could they

12   be that stupid, that's just argument, and it's not

13   moving the ball forward.

14                    THE DEFENDANT:  I'm sorry.  I want to move the

15   ball forward.  But at the time you said, I would ask him

16   about the question and then I would cross-examine him, so

17   I'm cross-examining him.  I want to know.  You know what

18   I mean, it seems like a relevant fact to me how he could

19   be -- let's call it "incompetent" if not stupid, and

20   don't ask for a second tape.

21                But then that wouldn't be possible

22   because then these two would have to be also

23   incompetent.  Nobody thought to ask for the second

24   tape, Hey, let's get the money shot.  He went in the

25   bank and got the money with Estrellita.  Nobody

*EXAMINATION OF MICHAEL MATSUDA CON'T*

1    thought to ask for that?

2             **THE COURT:**  You asked the witness.  He told

3    you his version of events as it relates to the first time

4    and the second time.  You can argue that that's

5    incompetent.  But going after the prosecutors, they're

6    not witnesses to the case.  It's not necessary.

7    *BY THE DEFENDANT*:

8    Q.    Okay.  So when you discussed this case with the

9    prosecutors, they never mentioned to you a second tape

10   either?

11   A.    Well, as you mentioned already, we did discuss it

12   at some point.

13   Q.    At what point?

14   A.    The point that you described.

15   Q.    So when I argued it in court?

16   A.    Yes.

17   Q.    That's the only time that you and two prosecutors

18   thought, Oh, yeah, maybe we should get the second tape,

19   that's what you're asking the judge to believe?

20   A.    If you're asking if we care about evidence, the

21   answer is, yes, we do.

22   Q.    That's not what I asked.  I asked that a year and a

23   half later, I argued it here in court.  You know what I

24   mean, I argued it because I was trying to get it for the

25   longest, but, regardless ...

1          And then, now you say you don't get the

2    tape, okay.

3          So what happened in the year and a half?

4    Can you say to me, Yeah, we discussed the case and

5    neither Kevin Reidy or Kelly Yu -- Kathy Yu,

6    whatever her name is, and you, you discussed it --

7    the case a whole bunch of times, but nobody ever

8    said, Hey, what about that second tape when they

9    went in the bank?  You never discussed that, it

10   never came up in a year and a half?

11   A.    We discussed many things that pertained to the

12   case.  We didn't -- I didn't get the second round of

13   footage, and that was a mistake I made.

14   Q.    Yeah.  And, as I said, I'm not asking that, all

15   right?  I'm asking when you discussed it all the times,

16   right -- as you just said, it's a mistake you made, but

17   it's impossible you could make that mistake.

18         You could make it all on your own, but you

19   can't make it with the two prosecutors.  So I'm

20   asking, in all the time that you talked with them,

21   none of you three ever said, It might be a good

22   idea to get that second tape?

23         **MR. REIDY:**  Your Honor, asked and answered

24   several times.

25         **THE DEFENDANT:**  He answered something else.

*EXAMINATION OF MICHAEL IACUSUDA CON'T*

```
 1                THE COURT:  No, no.  Look, you have the
 2   witness, he said he made a mistake.  I'm not going to let
 3   you get into this -- I think theory about why wouldn't
 4   the prosecutors have been -- why would the prosecutors
 5   have any role in that mistake?  He says he made a
 6   mistake.  You got what you needed.
 7                THE DEFENDANT:  Okay.
 8   BY THE DEFENDANT:
 9   Q.    When you interviewed --
10                THE DEFENDANT:  I'm sorry, Your Honor.  One
11   second.
12                THE COURT:  Okay.
13   BY THE DEFENDANT:
14   Q.    When you interviewed me, you interviewed me for
15   nearly two hours, right?
16   A.    It was about that time, yes.
17   Q.    Yes.
18          And in that two hours, I told you the whole
19   story of me and Estrellita.  And out of that
20   two hours, you only played a clip when I was
21   discussing the money aspect.  And you played the
22   clip here because it's important that you get to
23   the money aspect of this case, right?
24   A.    Yes.
25   Q.    Okay.  So, now, in Estrellita's 302's where you
```

*EXAMINATION OF MICHAEL YAMAGUDA CON'T*

1    questioned her, how long did you question her?

2    A.    It was probably about 20 to 30 minutes.

3    Q.    20 to 30 minutes.

4          And in 20 to 30 minutes, can you show me

5    where in the 302 you asked her about her money?

6    A.    What is the Exhibit Number for that 302?

7    Q.    It's Bates 517.

8          **THE COURT:**  So is your question whether or not

9    he asked Estrellita any questions about money during her

10   interview?

11         **THE DEFENDANT:**  Yeah.

12         **THE COURT:**  I'm just asking the -- is that the

13   question you're trying to get to?

14         **THE DEFENDANT:**  Yes.

15   *BY THE DEFENDANT*:

16   Q.    Did you ask Estrellita about her money?

17   A.    I would have to review the 302 to recall the

18   specific details on that.

19         **THE DEFENDANT:**  Can I give it to him, Your

20   Honor?

21         **THE COURT:**  Is there an extra copy of the 302

22   of Estrellita that the Government has, or is it in a

23   binder or anything?

24         **MR. REIDY:**  Yes, sir.  We have our copy of the

25   302.

*EXAMINATION OF MICHAEL FUKUDA CON'T*

1    **THE COURT:**  Just make sure it's the same one

2    that he's referencing, Bates numbers.

3          **MR. REIDY:**  Bates number 517.

4          **THE COURT:**  Bring it up to the witness.  This

5    way, Mr. Gasca doesn't have to keep coming back and

6    forth.

7          **THE DEFENDANT:**  Yes, Your Honor.

8          **THE COURT:**  So the agent's looking at --

9    what's the Bates number, Mr. Gasca?

10         **THE DEFENDANT:**  517, Your Honor.

11         **THE COURT:**  Bates 517 of an FBI 302 that

12   purports to be of Estrellita Callahan's interview with

13   the agent; is that correct?

14         **THE DEFENDANT:**  Yes.

15         **THE COURT:**  So take a look at it, sir, and see

16   if you can answer the question that Mr. Gasca has about

17   whether or not during the course of your interview with

18   her, did you ask any questions about money; is that

19   right, Mr. Gasca?

20         **THE DEFENDANT:**  Yes, Your Honor.

21         **THE COURT:**  All right.

22         **THE WITNESS:**  (Reviews document.)

23          Yes.  The question about money did come

24   up and was asked.

25

*EXAMINATION OF MICHAEL MATSUDA CON'T*

1    BY THE DEFENDANT:

2    Q.    Yeah.  Where?

3    A.    On Page 2.

4    Q.    Yes?

5    A.    The second to the last paragraph.

6    Q.    Yes?

7    A.    Can I read it to him?

8    Q.    Go ahead.

9            **THE COURT:**  Go ahead.

10           **THE WITNESS:**  The paragraph reads:  "Gasca and

11   someone else went to the bank.  She told him she did not

12   have money.  And she did not give Gasca any credit

13   cards."

14                Then it follows --

15   BY THE DEFENDANT:

16   Q.    Go ahead.

17   A.    The next paragraph, the name is redacted, "told her

18   that Gasca spent her money," and the name, again, is

19   redacted.  *This is, I believe, the victim.  It

20   states "is not good with money."

21   Q.    Okay.  So, that's all in a case like this, that's

22   all that you got from her?

23   A.    We did ask questions about her finances, and she

24   did answer them, yes.

25   Q.    But they're not listed here?

*EXAMINATION OF MICHAEL ARGUDA CON'T*

 1    A.    I just described them to you.

 2    Q.    No, you described one question.

 3          She said, right, that someone else went to

 4    the bank.  She told them she didn't have any money.

 5    She did not give Gasca any credit cards.  And the

 6    next sentence says, "Aquino told her that Gasca

 7    spent her money," not that she told but that Aquino

 8    told her that Gasca spent her money.

 9          Now, she didn't say "Gasca," that's your

10    word, you wrote that, right?

11    A.    No.  It says, "Gasca spent her money."

12    Q.    She said "Gasca"?

13    A.    It's right there in the last paragraph.

14    Q.    But I'm asking you, you wrote this, right?  She

15    calls me "John Ray."  She never called me Gasca.  So I'm

16    asking you, she said that to you?  Aquino told me "Gasca"

17    took my money.

18    A.    She may have used the word "John Ray."

19    Q.    Okay.  So that's all there is about him in this --

20    * you would ask her, Hey, is this guy using apps without

21    your permission?  Was this guy take $35,000 from you from

22    your account?  Why would you give him so much money?

23    Where's all those questions?

24    A.    She wasn't asked those questions.

25    Q.    She wasn't asked those questions.

*EXAMINATION OF MICHAEL AZUUDA CON'T*

1          You've been an FBI agent -- is that another

2   mistake?  I'm not an FBI agent and I would have

3   thought to ask those basic questions in a case like

4   this.

5   *A.*     No.  She wasn't asked those questions because she

6   had a hard time answering some of the questions that we

7   asked her because of her diminished mental capacities.

8   *Q.*     That's the reason you chose not to even try to ask

9   her the questions?

10  *A.*     It was a very difficult interview because she was

11  not comprehending a lot of what was asked of her.

12  *Q.*     I'm glad you said that.

13          So, according to you, right, here's a lady

14  who has been violently kidnapped, she's been taken,

15  and now a mere hours later, she doesn't remember

16  anything about the incident?  That's what you have

17  here in your 302.  And she was so difficult to get

18  a story out of that you didn't ask her about her

19  money?  You knew that was going to be an important

20  element of this case.  You're an investigator.  The

21  point of you interviewing someone is to try to get

22  evidence for a case, it's not for fun.

23          **MR. REIDY:**  Objection, Your Honor.

24  Argumentative; and hearsay.

25          **THE COURT:**  It is argumentative.  Next

1    question, please.

2            **THE DEFENDANT:**  Okay.

3    *BY THE DEFENDANT:*

4    *Q.*    So you chose not to ask her about the question.  It

5    wasn't that you asked her and she gave you an answer that

6    you didn't like?  You would never do that, right?  You

7    would never -- she give questions and you didn't -- you

8    don't write her answers down?

9            **MR. REIDY:**  Objection, Your Honor.

10    Argumentative.  Foundation.

11            **THE COURT:**  Yeah.  Rephrase the question, if

12    you would, Mr. Gasca.

13            **THE DEFENDANT:**  Okay.

14    *BY THE DEFENDANT:*

15    *Q.*    Isn't it true that she did answer those questions

16    and you did ask her, but they weren't the answers that

17    you were looking for?

18            **MR. REIDY:**  Objection.  Calls for hearsay, and

19    argumentative.

20            **THE COURT:**  Overruled.

21            **THE WITNESS:**  That's not true.

22    *BY THE DEFENDANT:*

23    *Q.*    Okay.  So give me one second here.

24            When she -- one second.

25            When she said, "Gasca's movies cost a lot of

*EXAMINATION OF MICHAEL ARZUDA CON'T*

```
1    money," and Callahan is not working anymore.  I
2    doubt she would refer to herself as "Callahan," but
3    "Callahan is not working anymore, Gasca did not
4    share any plans with her for the evening or for
5    tomorrow."
6         But this sentence here is the one I'm
7    curious about.  She just mumbled, "Gasca's movies
8    cost a lot of money"?
9              MR. REIDY:  Objection.  Hearsay.
10             THE COURT:  Overruled.
11   BY THE DEFENDANT:
12   Q.    It's on the last page, the first sentence on the
13   top, "Gasca's movies cost a lot of money."
14   A.    Yes.
15   Q.    Well, she just mumbled that out?
16   A.    She said that.
17   Q.    Yeah.  But did she just mumble that out of context.
18   You said the interview was difficult, she was saying
19   things, you couldn't get an interview to her, so --
20   A.    I don't remember if she mumbled it or how she said
21   it.
22   Q.    So isn't it more likely that you asked her, Why
23   would you give him $35,000, and that then she would say
24   because his movies cost a lot of money?  Isn't that what
25   happened?  The scenario -- this whole thing is chopped up
```

*EXAMINATION OF MICHAEL ARUDA CON'T*

```
 1    here.  You're asking a federal judge --
 2                THE COURT:  Just ask the question, please.
 3    BY THE DEFENDANT:
 4    Q.    Isn't that what happened?
 5    A.    Isn't what what happened?
 6    Q.    You asked her, "Why would you give him money," and
 7    she said, "Because Gasca's movies cost a lot of money?"
 8    A.    Why would you, or why wouldn't you?
 9    Q.    Why would you give him $35,000?  That's what this
10    case is about, right, according to you, you didn't think
11    to ask her.  But I'm curious to know why she would make a
12    statement like that, "Gasca's movies cost a lot of
13    money."
14    A.    I don't remember what I asked her that prompted her
15    to respond in this way.  So it's possible I asked
16    questions regarding her finances, and this is what came
17    out.  But I don't remember the question I asked that
18    caused her to answer in this way.
19    Q.    Okay.  And being since you didn't get any vital
20    evidence from that interview, let's say that she was
21    messed up -- and like you said, was difficult to
22    interview, wouldn't that prompt you to then say, you know
23    what, we better record her statements because I don't
24    know what's going on here, she can't even remember what
25    happened a couple hours ago?
```

1          So she's -- according to you, she's severely

2     gone here -- so just a couple hours later, wouldn't

3     you say, you know what, we better record her

4     interview, the FBI do record interviews, you didn't

5     think to record her interview either?

6     *A.*    No.  We did not record her interview.

7     *Q.*    You didn't think to record her interview?

8     *A.*    We typically do not record our interviews with

9     victims.

10    *Q.*    But this victim is supposed to be suffering from

11    severe dementia.  So suffering that you couldn't even ask

12    her questions that you needed for this case.  The victim,

13    in this case, you couldn't ask her about money that was

14    taken from her, not one question, just general question

15    here, but nothing else in the 30 minutes that you

16    interviewed her.  No problem.

17          Why didn't you record it?  You would then

18    go -- the normal procedure is to then ask the

19    supervisor, hey, you know, we need to record this

20    interview if she was having dementia problems, but

21    you didn't do that?

22    *A.*    Well, like I said, we don't typically record our

23    interview with our victims.

24    *Q.*    You don't typically have a victim that her dementia

25    is going to be in question.  You know that.

1          At this time, you mention nothing of it in

2    the case, nothing in your reports.  It's the other

3    witnesses that are saying she has dementia?

4          **THE COURT:**  Mr. Gasca, you've got to ask a

5    question, please.  You've made your point.

6          **THE DEFENDANT:**  Okay.

7    *BY THE DEFENDANT:*

8    *Q.*    So you didn't think to interview her then.  But

9    then, time went on, and you have several opportunities

10   and several reports, including your own, when my attorney

11   went to visit her, and you also went with a doctor who

12   examined her nine months later.  And the doctor has in

13   his report that the agent states she significantly

14   declined since the first time that he's interviewed her.

15   So at any point in time, you could have went and

16   interviewed her, but you didn't go and interview her at

17   another time and record her?  You didn't think to do

18   that?

19   *A.*    No.

20   *Q.*    So you didn't ask her any questions here?  You have

21   no questions here about finances, why she gave me the

22   money.  You know, do you hope that when she comes to

23   court to testify, that she won't remember why she gave me

24   the money?

25         **MR. REIDY:**  Objection, Your Honor.

*EXAMINATION OF MICHAEL YAGUDA CON'T*

1    Argumentative.

2                **THE COURT:**  Sustained.

3                **THE DEFENDANT:**  So -- give me one second, Your

4    Honor, please.

5                **THE COURT:**  All right.

6    *BY THE DEFENDANT:*

7    *Q.*    In this interview, she says I'm a nice guy, she

8    knows my mom.  You know, it's all this favorable stuff.

9    Is that the reason why you and the prosecutor chose not

10   to call her?

11               **MR. REIDY:**  Objection, Your Honor.

12   Foundation.  Hearsay.  Argumentative.

13               **THE COURT:**  Sustained.

14   *BY THE DEFENDANT:*

15   *Q.*    Okay.  If this interview had been incriminating, we

16   certainly would have evidence of it, a recording or

17   something like that, wouldn't we?

18               **MR. REIDY:**  Objection, Your Honor.

19   Speculation.

20               **THE COURT:**  Sustained.

21   *BY THE DEFENDANT:*

22   *Q.*    So, okay.  When you interviewed Tscherny, and you

23   were prompting him, you were interrupting him when he was

24   giving you answers and changing his answers.  You don't

25   remember that, of course?

```
 1              MR. REIDY:  Objection, Your Honor.  Hearsay.
 2              THE COURT:  Sustained.  And argumentative.
 3   BY THE DEFENDANT:
 4   Q.    When you interviewed Tscherny, and he gave you
 5   answers, and they were answers that didn't fit what you
 6   needed, did you attempt to get him to change those
 7   answers?
 8              MR. REIDY:  Objection, Your Honor.  Hearsay.
 9   And argumentative.
10              THE COURT:  It's argumentative.
11               Mr. Gasca, I think you've covered this
12   already.
13   BY THE DEFENDANT:
14   Q.    Okay.  Did Tscherny say to you she was medicated
15   when we got her -- I haven't finished -- then you say to
16   him, no, she wasn't medicated because she just went to
17   the hospital and they checked her.  She couldn't have
18   been medicated?
19              MR. REIDY:  Objection, Your Honor.  Hearsay.
20              THE COURT:  It is hearsay.  I mean, testify.
21   BY THE DEFENDANT:
22   Q.    Did you tell Tscherny that, no, she couldn't have
23   been medicated because she was just at the hospital, and
24   they would have checked her?
25              THE DEFENDANT:  I'm asking him.  I'm not
```

1    asking what Tscherny said.  I'm asking him what he said.

2              **MR. REIDY:**  It's still hearsay.  It's out of

3    court.

4              **THE COURT:**  I'll allow you to ask what he

5    said, not what Tscherny said.

6              **THE DEFENDANT:**  Yep.

7    BY THE DEFENDANT:

8    Q.    Did you not tell Tscherny, no, she was not

9    medicated because she was just examined by the doctors,

10   and there's no way that -- if she was on some drugs, they

11   would have found it; right?

12   A.    I don't remember asking that.

13   Q.    You don't remember that?

14   A.    No.

15             **THE DEFENDANT:**  Well, I'll play that for the

16   Court too.

17   BY THE DEFENDANT:

18   Q.    The thing is you, at that time, knew because, you

19   had interviewed Valerie, that she told you we didn't get

20   to see the doctor.  He wasn't in.  So when you went to

21   see Tscherny two weeks or so later, you already knew that

22   she was not examined by the doctor, but you attempted to

23   change his answer anyway?

24             **MR. REIDY:**  Objection.  Argumentative.

25             **THE COURT:**  It is argumentative.  Sustained.

*BY THE DEFENDANT*:

Q.    Okay.  Now, you mentioned that you didn't find any evidence that Valerie Aquino kidnapped her.  You weren't looking for any evidence on Valerie, were you?

A.    No.

Q.    Okay.

          **THE DEFENDANT:**  I would ask, Your Honor, that I be able to recall this witness at a later time.

          **THE COURT:**  All right.  Well, he's going to be here.  All right.  That's fine.

          **THE DEFENDANT:**  Okay.

          **THE COURT:**  Any further questions?

          **THE WITNESS:**  No, Your Honor.

          **THE COURT:**  Any redirect?

          **MR. REIDY:**  No redirect, Your Honor.

          **THE COURT:**  All right.  You may step down, sir.  Thank you.

               (Witness excused.)

          **THE COURT:**  Why don't we call our next witness, please?

          **MR. REIDY:**  Your Honor, the next witness is on her way.  If we could just have a short break, I think 10, 15 minutes, Your Honor?

          **THE COURT:**  4:30 on her way.  She's not outside?  I mean --

1              **MR. REIDY:**  4:30 is what we were told, Your

2     Honor.

3              **THE COURT:**  Let's take a 10-minute recess

4     then.  Thank you.

5              **MR. REIDY:**  Thank you, Your Honor.

6              (Short break.)

7              **THE COURT:**  All right.  Please call your next

8     witness.

9              **MS. YU:**  Yes, Your Honor.  The Government

10    calls Valerie Aquino.

11             **THE COURT:**  All right.  Step forward, ma'am,

12    if you would.  If you wouldn't mind, please.

13             (WHEREUPON, the witness was sworn in by the

14             Courtroom Deputy.)

15             **THE COURT:**  Watch your step as you're

16    stepping, please.

17             **THE COURTROOM DEPUTY:**  Please state and spell

18    your name for the record.

19             **THE WITNESS:**  Valerie Aquino, V-A-L-E-R-I-E,

20    A-Q-I-U-I-N-O.

21             **THE COURT:**  Counsel, you may proceed.

22    //

23    //

24    //

25    //

```
 1                          * * *

 2                    VALERIE AQUINO,

 3   was called as a witness, and after having been duly sworn,

 4   took the witness stand and testified as follows:

 5

 6                   DIRECT EXAMINATION

 7   QUESTIONS BY MS. YU:

 8   Q.    Ms. Aquino, do you know Estrellita Callahan?

 9   A.    Yes.

10   Q.    How do you know her?

11            THE DEFENDANT:  Before we continue, is this

12   witness's husband in the courtroom?

13            THE COURT:  I don't know.

14            THE DEFENDANT:  I'm inclined to call him at a

15   later time through evidence that I extract.  If he's --

16            THE COURT:  Are you making a motion to exclude

17   the witnesses?

18            THE DEFENDANT:  Yeah.  If he's in the

19   courtroom.

20            THE COURT:  Is the husband in the courtroom?

21            MS. YU:  He is, Your Honor.  But we already

22   litigated the issue of whether you would allow Defendant

23   to call the husband, and you had denied his request for a

24   subpoena.

25            THE COURT:  Is there a motion to exclude
```

 1   witnesses on both sides?  He saying it's a potential

 2   witness.  I don't know what's going to come out this

 3   trial.  I just don't know.  I mean, respectfully, I just

 4   don't know.  I don't know.  So I'm going to have to ask

 5   the witness to leave the courtroom, just in the abundance

 6   of caution.  It's not personal.  It's just -- I'm

 7   familiar with what you said, but I don't know what's

 8   going to happen during the course of this direct or

 9   cross.

10            So, sir, I'm going to have to ask you to

11   leave.  Thank you.

12            (Ms. Aquino's husband is leaving the

13   courtroom.)

14            **THE COURT:**  Go ahead.  Please proceed.

15   *BY MS. YU:*

16   *Q.*   I was asking you, how do you know Estrellita

17   Callahan?

18   *A.*   She was my nanny.

19   *Q.*   Do you ever call her Estrellita, though?

20   *A.*   I call her "Yaw-Yaw."

21   *Q.*   So, if I refer to her as "Yaw-Yaw," would you

22   understand that to be Estrellita Callahan?

23   *A.*   Yes.

24   *Q.*   Have you known "Yaw-Yaw" most of your life, then?

25   *A.*   Yes.

1    Q.    Approximately how many years?

2    A.    Over 40 years.

3    Q.    Have you kept in touch with her over those 40

4    years?

5    A.    Yes.

6    Q.    In what way?

7    A.    Phone calls, letters, birthday cards.  She has also

8    been to my graduation and my wedding.

9    Q.    How would you characterize your relationship with

10   "Yaw-Yaw"?

11   A.    She's like a mother to me.

12   Q.    Do you still keep in touch with her?

13   A.    Yes.

14   Q.    In what way?

15   A.    Phone calls and visits.

16   Q.    I want to show you what's been marked as Exhibit 8,

17   which is a series of photographs.

18          Do you recognize these photographs that are

19   depicted as Exhibit 8?

20   A.    Yes.

21   Q.    And what do they show?

22   A.    Her -- she was with me during my birthday,

23   graduation in New York, and my wedding.

24          MS. YU:  Your Honor, the Government moves to

25   admit Exhibit 8.

```
 1                  THE COURT:  Any objection?

 2                  THE DEFENDANT:  No.

 3                  THE COURT:  All right.  8 will be admitted.

 4                  (WHEREUPON, an item was marked as Exhibit

 5                  Number 8.)

 6      BY MS. YU:

 7      Q.    You mentioned that "Yaw-Yaw" took care of you when

 8      you were in the Philippines.  Is that what's depicted on

 9      Page 1 of Exhibit 8?

10      A.    Yes.

11      Q.    What's depicted on Page 2 of Exhibit 8?

12      A.    My birthday.

13      Q.    And is that when you were a toddler?

14      A.    Yes.

15      Q.    What is depicted on Page 3 of Exhibit 8?

16      A.    A trip to New York together.

17      Q.    I think you mentioned --

18                  THE DEFENDANT:  When did you take the photo?

19                  THE COURT:  Wait, wait.  Counsel let her ask

20      the questions.  If you've got a question, you follow-up

21      afterwards.  Come on.  You know the drill.

22                  THE DEFENDANT:  I was just asking when --

23                  THE COURT:  You know the drill, Mr. Gasca.

24      Stop playing games.  She has a time to ask the witness a

25      question.  Then you come afterwards.  I told you that
```

 1  several times.  You can't keep interjecting when you want

 2  during a witness's testimony.  Please.

 3              Next question.

 4  BY MS. YU:

 5  Q.    What's depicted on Page 4 of Exhibit 8?

 6  A.    My nursing school graduation.

 7  Q.    And I think you mentioned your wedding earlier.  Is

 8  that what's depicted on Page 5 of Exhibit 8?

 9  A.    Yes.

10  Q.    I want to ask you some background questions about

11  "Yaw-Yaw".

12              Is she employed right now?

13  A.    No.

14  Q.    How long has she been in the United States?

15  A.    Since the '90s.

16  Q.    How old is she approximately?

17  A.    Seventy.

18  Q.    How tall is she?

19  A.    About 4'11".

20  Q.    How much does she weigh?

21  A.    115.

22  Q.    Is she close to the rest of her family?

23  A.    She speaks to her sister occasionally.

24  Q.    What about any daughters or step-daughters?  Is she

25  close to them?

*EXAMINATION OF VALERIE AQUINO*

1   A.   No, they're estranged.

2   Q.   Was she married at one time?

3   A.   Yes.

4   Q.   Do you know what her husband did for a living?

5   A.   He was a veteran.

6   Q.   Did he pass away at some point?

7   A.   Yes.

8   Q.   Do you remember approximately when he passed away?

9   A.   2004.

10  Q.   Now, you've known her for a long period of time.

11  Did you notice any changes in her health as she got

12  older?

13  A.   Over the last couple of years, I noticed some of

14  her messages were a little strange, a little off.

15  Q.   What -- sorry, what do you mean by "strange"

16  or "off"?

17  A.   That she would -- in some of the messages, she

18  would tag different people or create large groups, and I

19  wasn't sure why she would send these messages.

20  Q.   How about in person?  Did you see anything when you

21  would meet up with her?

22  A.   Yes.  When I saw her in May of 2021.

23  Q.   Let's talk about May 2021.  Is Page 6 from

24  Exhibit 8 when you saw her in May 2021?

25  A.   Yes.

1   Q.   Why did "Yaw-Yaw" tell you that she was here?

2   A.   They were here for a wedding, and Johnny Ray was

3   here for work.

4   Q.   And when you say "they" do you mean just

5   Defendant Gasca and your "Yaw-Yaw"?

6   A.   Yes.

7   Q.   What did she tell you about her relationship with

8   him?

9   A.   She said that she worked for him.

10  Q.   Is that what he told you about the relationship?

11  A.   He said that he was her boyfriend.

12  Q.   How many times did you see Mr. Gasca in total?

13  A.   Twice.

14  Q.   Did you also communicate with him by text message?

15  A.   Yes.

16  Q.   I want to talk about your text messages.  Showing

17  you what's been marked as Exhibit 14.  Do these appear to

18  be true and accurate communications between you and

19  Mr. Gasca?

20  A.   Yes.

21  Q.   And just to orient the Court, is the blue -- is the

22  gray text Mr. Gasca and the blue text you?

23  A.   Yes.

24           **MS. YU:**  Your Honor, the Government would move

25  to admit Exhibit 14.

*EXAMINATION OF VALERIE AQUINO*

```
 1              THE COURT:  Any objection?
 2              THE DEFENDANT:  Only as the one previously,
 3   the completion.
 4              THE COURT:  So same objection as before.  It
 5   will be overruled without prejudice.
 6              (WHEREUPON, an item was marked as Exhibit
 7              Number 14.)
 8   BY MS. YU:
 9   Q.    Now, were they in Los Angeles starting on or about
10   May 12, 2021?
11   A.    Yes.
12   Q.    And what was the plan for "Yaw-Yaw" in terms of
13   visiting you?
14   A.    That she would stay with me for a few days while he
15   worked.
16   Q.    And was she supposed to stay with you starting
17   about May 12, 2021?
18   A.    Yes.
19   Q.    Where were you supposed to pick her up from?
20   A.    At Blow Me Away salon.
21   Q.    Now when you went to the salon, though, did you
22   find her there?
23   A.    No.
24   Q.    Where did she go?
25   A.    She had walked off to an adjacent restaurant.
```

*EXAMINATION OF VALERIE AQUINO*

1    Q.    During the two days that she stayed with you, did

2    you have an opportunity to talk to her?

3    A.    Yes.

4    Q.    Did you take her places?

5    A.    Yes.

6    Q.    Did you see her interact with other people?

7    A.    Yes.

8    Q.    And in so doing, did you notice anything that was

9    different about her this time than from the other times

10   that you had seen her?

11   A.    Yes, she was forgetful.  She would get disoriented.

12   She would forget where she was and forget names of family

13   members she was familiar with.

14   Q.    Did she tell you anything that alarmed you?

15   A.    Yes.

16            **THE DEFENDANT:**  Objection.  Hearsay.

17            **MS. YU:**  Effect on the listener, Your Honor.

18            **THE COURT:**  All right.  For that purpose only.

19            **THE WITNESS:**  Yes.  She said that he takes my

20   mail and he chokes me and he takes my cards.

21   *BY MS. YU:*

22   Q.    What did you understand "he" to mean?

23   A.    Johnny Ray.

24   Q.    What effect did hearing her say these things have

25   on you?

1  A.    I took -- I filed a police report and also, went to

2  the bank to verify, you know, any transaction she wasn't

3  aware of financially.

4  Q.    Let's talk with the financial -- talk about the

5  financial stuff first.

6         Did you take her to a local Chase bank to

7  sort out her financial affairs?

8  A.    Yes.

9  Q.    Did the Chase manager there show her some of her

10 statements?

11 A.    Yes.

12 Q.    And what did she say?

13 A.    She said that she did not make those transactions.

14 Q.    Now, did her statements, coupled with her previous

15 statements about being strangled, cause you to be

16 concerned about her?

17 A.    Yes.

18 Q.    Was her checking account with Chase?

19 A.    Yes.

20 Q.    What that one of the accounts that you reviewed

21 with her in the presence of a Chase representative in

22 this May 2021 timeframe?

23 A.    Yes.

24      **MS. YU:**  Your Honor, I'm going to publish

25 what's been previously been admitted as Exhibit 28.

 1                THE COURT:  It's been admitted?

 2                MS. YU:  Yes.

 3                THE COURT:  If it's been admitted, you can

 4      just go ahead and publish it.

 5                MS. YU:  Okay.  Thank you, Your Honor.

 6      BY MS. YU:

 7      Q.   Does this first page reflect that it's your

 8      "Yaw-Yaw"'s checking account?

 9      A.   Yes.

10      Q.   And what is the date period that's reflected on

11      here?

12      A.   October 14, 2020, through November 12, 2020.

13      Q.   What was the beginning balancing?

14      A.   $608.07.

15      Q.   And what were the ATM and debt card withdrawals?

16      A.   $701 - oh, actually a credit -- no, $701.

17      Q.   And are you familiar with of the types of deposits

18      she would get monthly?

19      A.   Yes.

20      Q.   What type of deposits was she receiving monthly?

21      A.   VA benefits, Social Security, and unemployment, I

22      think.

23      Q.   Publishing Page 4 of Exhibit 28.

24           What time period does this reflect?

25      A.   November 13, 2020, through December 10, 2020.

1   Q.    And what were the ATM and card withdrawals this

2   period?

3   A.    $1,162.92.

4   Q.    Was that more than the prior period that we saw?

5   A.    Yes.

6   Q.    Turning to the next page on that document.  I want

7   to look at the transaction detail for that particular

8   month.

9         Do you see charges for MoneyGram and Venmo

10  and Amazon?

11  A.    Yes.

12  Q.    Were these some of the charges that she said she

13  had no knowledge of?

14  A.    Yes.

15  Q.    Now looking at Page 6 of Exhibit 28, what's the

16  time period reflected there?

17  A.    January 14, 2021, through February 10, 2021.  And

18  there's --

19  Q.    And again, were there similar charges for Venmo,

20  MoneyGram, and Amazon during that time period?

21  A.    Yes.

22  Q.    Did you know her to use any of these vendors?

23  A.    No.

24  Q.    Now looking at the Page 11 of Exhibit 28, what date

25  period does that reflect of "Yaw-Yaw"'s checking account?

 1              **THE DEFENDANT:**  I'm sorry, Your Honor.  Is

 2    there a foundation for this?

 3              **THE COURT:**  The document's already been

 4    admitted into evidence.

 5              **THE DEFENDANT:**  Okay.

 6              **THE WITNESS:**  December 11, 2020, through

 7    January 13, 2021.

 8    *BY MS. YU:*

 9    *Q.*   And I want to call your attention here to an entry

10    here for Big Filmmakers.  Do you see that?

11    *A.*   Yes.

12    *Q.*   Was that a vendor that you knew that she had ever

13    used?

14    *A.*   No.

15    *Q.*   Turning to Page 32 of Exhibit 28, what's this time

16    period for "Yaw-Yaw"'s checking account now?

17    *A.*   April 13, 2021, through May 12, 2021.

18    *Q.*   And I've blown up a portion on here.  Do you see

19    this entry for www.cinema?

20    *A.*   Yes.

21    *Q.*   Is that something that you knew your "Yaw-Yaw" to

22    frequent?

23    *A.*   No.

24    *Q.*   Then there's an entry for OnlyFans.com.  Do you

25    know what "OnlyFans" is?

*EXAMINATION OF VALERIE AQUINO*

1    A.    It's a site for adult content.

2    Q.    Is that a site that you had ever heard your

3    "Yaw-Yaw" talk about?

4    A.    No.

5    Q.    Turning to page -- sorry, excuse me.  Turning to

6    Page 34 of Exhibit 28.  What is the time period reflected

7    for this checking account statement?

8    A.    April 13, 2021, through May 12, 2021.

9    Q.    And in the middle of the page, there's a payment to

10   something called -- via PayPal to something called Magic

11   Booty.  Have you ever heard her use PayPal or anything

12   called Magic Booty?

13   A.    No.

14   Q.    Had you ever heard her mention someone by the name

15   of Genesis that she would make PayPal payments to?

16   A.    No.

17   Q.    Now, in going over these statements with her at the

18   bank, were you -- what steps did you take next?

19   A.    I closed her accounts and then opened new ones and

20   then filed a claim with the bank.

21   Q.    Did Chase bank return the money that she believed

22   to believe fraudulently used?

23   A.    Yes.

24   Q.    About how much was that?

25   A.    It was over $10,000.

*EXAMINATION OF VALERIE BLASINO*

1   Q.    In the course of sorting out "Yaw-Yaw"'s financial

2   accounts, did you become familiar with her credit cards?

3   A.    Yes.

4   Q.    Did she have them with Chase bank?

5   A.    Yes.

6   Q.    And did you look at statements in connection with

7   that, as well?

8   A.    Yes.

9   Q.    Is that what's reflected in Exhibit 27?

10  A.    Yes.

11           **MS. YU:**  Your Honor, the Government would move

12  to admit Exhibit 27.

13           **THE COURT:**  Any objection?

14           **THE DEFENDANT:**  No.

15           **THE COURT:**  All right.  27 will be admitted.

16           (WHEREUPON, an item was marked as Exhibit

17           Number 27.)

18  *BY MS. YU:*

19  Q.    Now, what is the opening and closing date of this

20  particular credit card statement?

21  A.    Let's see, July 18, 2020, to August 17, 2020.

22  Q.    And what are the payments and credits?

23  A.    $66.04.

24  Q.    What were the purchases?

25  A.    $9.75.

*EXAMINATION OF VALERIE SOLINO*

1    Q.    Is it accurate that "Yaw-Yaw" had a balance,

2    meaning she had a credit in the amount of $35.11?

3    A.    Yes.

4    Q.    Now was this spending typical for her?

5    A.    Yes.

6    Q.    And turning to Page 3 of Exhibit 27 which details

7    the types of things that she had she made purchases on.

8         What types of purchases did she use with

9    this credit card with Chase?

10   A.    MTA tickets.

11   Q.    Turning to Page 5 of Exhibit 7.

12        Is this the same credit card that we've been

13   looking at for "Yaw-Yaw"?

14   A.    Yes.

15   Q.    And is it the next month?

16   A.    Yes.

17   Q.    And again, for this particular month, did she make

18   no purchases?

19   A.    None.

20   Q.    Did she continue to carry a credit in that account?

21   A.    Yes.

22   Q.    And up to this point, she had also had no cash

23   advances?

24   A.    None.

25   Q.    No balance transfers?

1   A.    None.

2   Q.    No fees charged?

3   A.    No.

4   Q.    No interest charged?

5   A.    No.

6   Q.    And is it your understanding that she was not yet

7   in a relationship with Defendant as of this timeframe?

8   A.    Yes.

9   Q.    Turning to page 17 of Exhibit 27.

10         Now, is this a statement for the next month

11  or so?

12  A.    Yes.

13  Q.    What's the opening and closing date?

14  A.    November 18, 2020, and to December 17, 2020.

15  Q.    What was the total purchase amount?

16  A.    $1,814.77.

17  Q.    Were there also cash advances, fees charged, and

18  interest charged?

19  A.    Yes.

20  Q.    Is it your understanding that she was in a

21  relationship with Defendant by this point?

22  A.    Yes.

23  Q.    And was this type of spending atypical for

24  "Yaw-Yaw"?

25  A.    Yes.

*EXAMINATION OF VALERIE SQUITINO*

1    Q.    I want to specifically look at the types of charges

2    incurred.

3        I'm blowing this up.  It's Page 19 of

4    Exhibit 27.

5        What types of vendors was her credit card

6    used for during this time period?

7    A.    The Amazon, Apple, MoneyGram.

8    Q.    In addition to trying to help "Yaw-Yaw" sort out

9    her checking account, her credit card account, did you

10    also become aware that she had a retirement account?

11    A.    Yes.

12    Q.    What did you, in general, learn about what had

13    happened to the funds in that account?

14    A.    That they had been depleted.

15        **MS. YU:**  I'm publishing what's been marked as

16    Exhibit 26 and previously admitted.

17    *BY MS. YU:*

18    Q.    Who was her retirement account with?

19    A.    Primerica.

20    Q.    Did you try to investigate and get her money back?

21    A.    Yes.

22    Q.    Were you able to, though?

23    A.    No.

24    Q.    In addition to sorting out her finances, I think

25    you mentioned that you went to contact the police; is

1   that correct?

2   A.    Yes.

3   Q.    Why did you contact the local police department?

4   A.    I was afraid for her safety, and I'm a mandated

5   reporter.

6   Q.    What do you mean when you say you're a "mandated

7   reporter"?

8   A.    I have to report any evidence of abuse to

9   authorities.

10  Q.    When you talk to the local police department, did

11  they have someone come out?

12  A.    Yes.

13  Q.    Did they send someone from adult protective

14  services, as well?

15  A.    Yes.

16  Q.    What person, in particular, did they send?

17  A.    Social worker named Jose Hernandez.

18  Q.    Did he run any tests or assessments of "Yaw-Yaw"?

19  A.    Yes.

20  Q.    Were you present during the assessment?

21  A.    Yes.

22  Q.    What type of assessment did he do?

23  A.    A clock drawing test.

24              (Reporter clarification.)

25

*EXAMINATION OF VALERIE AQUINO*

1   *BY MS. YU:*

2   Q.    Can you explain what a clock drawing test is?

3   A.    So he asks her to draw the face of a clock and she

4   has to attempted to do so.

5   Q.    Do you know what this test is aimed at assessing?

6   A.    Yes.  So, if it's inaccurate, it can show early

7   signs of dementia, memory loss, Alzheimer's, it

8   demonstrates ability to plan and organize and recall.

9   Q.    Were you present when he did this particular clock

10  test on "Yaw-Yaw"?

11  A.    Yes.

12  Q.    I'm showing you what's been marked as Exhibit 17.

13        Do you recognize this?  Whenever it appears

14  on the screen.

15  A.    Yes.

16  Q.    What is it?

17  A.    That is her attempt at drawing a clock.

18  Q.    Sorry.  How do you know that's "Yaw-Yaw"'s attempt

19  at drawing a clock?

20  A.    How do -- oh --

21  Q.    Were you there?

22  A.    I was there.  I was there, yes.

23        **MS. YU:**  Your Honor, the Government moves to

24  admit Exhibit 17.

25        **THE COURT:**  Any objection.?

*EXAMINATION OF VALERIE AQUINO*

1    **THE DEFENDANT:**  One second, Your Honor.

2            (Conferring with elbow counsel.)

3            Yeah, I raise the objection.  There's no

4    evidence that Estrellita drew that.

5            **THE COURT:**  All right.  The Objection's noted

6    but overruled.  It will be admitted.

7            (WHEREUPON, an item was marked as Exhibit

8            Number 17.)

9    *BY MS. YU:*

10   *Q.*    How did "Yaw-Yaw" do on the clock test?

11   *A.*    A lot of inaccuracies.

12   *Q.*    Can you point out the inaccuracies, starting with

13   the clock that's on the top?

14   *A.*    The numbers are not in a correct order, and there

15   are different lines to each number.

16   *Q.*    What about the bottom clock?  What was she supposed

17   to be drawing?

18   *A.*    He had asked her to draw a time reflected on the

19   clock.

20   *Q.*    So a specific time like 4:15 p.m.?

21   *A.*    Yes.

22   *Q.*    And was she able to do that based on this drawing?

23   *A.*    No.

24   *Q.*    Did you contact the police department, and did

25   adult protective services come in this May 2021

1    timeframe?

2    A.    Yes.

3    Q.    In light of these issues that you noticed, did you

4    talk with "Yaw-Yaw" about her financial and other

5    affairs?

6    A.    Yes.

7    Q.    What did you both decide to?

8    A.    That I could be her power of attorney.

9    Q.    And what was the point of entering into a power of

10   attorney?

11   A.    To help her with her finances.

12   Q.    In addition to sorting out her finances and

13   reporting it to the police station, did you take any

14   steps in May 2021, regarding her Medicare?

15   A.    Yes.

16   Q.    What types of steps did you take?

17   A.    So, I helped her fill out her medical advance

18   directive.  I took her to the hospital for a medical

19   evaluation to run some tests to make sure she was doing

20   okay.

21   Q.    Did you take her anywhere after you took her to the

22   hospital?

23   A.    In terms of --

24   Q.    In terms of her Medicare?

25   A.    Oh.  So to get her psychologically evaluated, yes.

1   Q.   Did you take her to a nurse practitioner called

2   Carlota Terry?

3   A.   Yes.

4   Q.   And in what county is Ms. Terry based?

5   A.   San Diego County.

6   Q.   Why did you take her to someone in San Diego

7   County?

8   A.   So that she would not be here in LA.

9   Q.   Did you have a concern about "Yaw-Yaw"'s safety?

10  A.   Yes.

11  Q.   Why?

12  A.   Because Johnny Ray had threatened to come to my

13  home and to my work.

14  Q.   Are you related to Nurse Practitioner Terry,

15  though?

16  A.   Yes.

17  Q.   Is she related to "Yaw-Yaw"?

18  A.   No.

19  Q.   Did you ask her if it would be a conflict of

20  interest given your close relationship with "Yaw-Yaw" and

21  your familial relationship with Nurse Practitioner Terry?

22  A.   Yes.

23  Q.   And did she say that it wouldn't be?

24  A.   Yes.

25  Q.   Did Ms. Terry examine her?

1    A.    Yes.

2    Q.    And what did she conclude?

3    A.    That she had dementia.

4    Q.    And upon hearing that, what did that cause you to

5    do?

6    A.    Placement, basically, in a facility that would keep

7    her safe.

8    Q.    You mentioned earlier that "Yaw-Yaw" had come to

9    Los Angeles for a wedding with the defendant?

10   A.    Yes.

11   Q.    What did she tell you about the wedding when she

12   was with you, though?

13   A.    When I asked her about the wedding she said she was

14   afraid that he would drown her because the wedding was

15   close to the beach.

16   Q.    What effect did hearing these statements have on

17   you?

18   A.    Again, fear for her safety.

19   Q.    Did she -- did you want her to stay behind with

20   you?

21   A.    Yes.

22   Q.    Did she agree to stay behind with you?

23   A.    Yes.

24   Q.    Now, I'm showing you the bottom of

25   Exhibit 1 -- sorry, the bottom of Exhibit 14, Page 1.

*EXAMINATION OF VALERIE TOSINO*

1          Were your messages -- are these your

2   messages with the defendant trying to meet up with

3   him?

4   A.    Yes.

5   Q.    And was the original plan for "Yaw-Yaw" to go back

6   with him?

7   A.    Yes.

8   Q.    So that was what was supposed to happen on May 14?

9   A.    Yes.

10  Q.    Turning to Page 2 of Exhibit 14, were these

11  basically your back and forth messages with the defendant

12  setting up where to go, where to meet him, things of that

13  nature?

14  A.    Yes.

15  Q.    Now, when you met him at the hotel, was that the

16  first time that you met him in person?

17  A.    Yes.

18  Q.    Did you tell him about the joint decision for

19  "Yaw-Yaw" not to go to the wedding?

20  A.    Yes.

21  Q.    How did he respond?

22  A.    He seemed accepting of it at first.

23  Q.    Did you two talk about her financial affairs?

24  A.    Yes.

25  Q.    Did you explain to him what you had discovered?

1    A.    Yes.   He -- we asked him about what their financial

2    situation was, and he said that they kept their finances

3    separate.

4    Q.    Did you two also discuss what you perceived as

5    "Yaw-Yaw"'s declining mental health?

6    A.    Yes.

7    Q.    And what did he say to you?

8    A.    He said that it only happens occasionally.

9    He -- yeah, that's what he said.

10    Q.    Did he show you anything in particular to convince

11    you of that?

12    A.    Yes.

13    Q.    What did he show you?

14    A.    He showed me a video of her confusing him for

15    someone else.

16    Q.    And did she call this someone else a certain name?

17    A.    Yes.

18    Q.    What was the name?

19    A.    Edward.

20    Q.    So after you told defendant that "Yaw-Yaw" would

21    not be going to the wedding, did you then go home?

22    A.    Yes.

23    Q.    Did you continue -- did the defendant follow-up via

24    text message, though, about "Yaw-Yaw"?

25    A.    Yes.

*EXAMINATION OF VALERIE TINO*

1    Q.    And is that what's reflected on Page 4 of

2    Exhibit 14?

3    A.    Yes.

4    Q.    In his messages to you, did it seem like he cared

5    about her?

6    A.    Yes.

7    Q.    Did you believe him at this time?

8    A.    I think he did to some degree, yes.

9    Q.    But did you believe he cared about her during this

10   time?

11   A.    No.

12   Q.    Did he make any statements acknowledging her mental

13   conditions?

14   A.    Yes.

15   Q.    What did he say?

16   A.    He said, "I don't want her to get worse."

17   Q.    Now, you mentioned a video that he showed you when

18   you met with him in person.

19   A.    Yes.

20   Q.    Did he also follow up on text messages about this

21   video?

22   A.    Yes.

23        **THE DEFENDANT:**  I'm sorry.  I just want the

24   record to reflect that when she asked the last question,

25   she was pulling a text on the screen, and she read the

*EXAMINATION OF VALERIE AQUINO*

```
 1    text.  She asked her -- she was answering.
 2              THE COURT:  But the document is in evidence.
 3              THE DEFENDANT:  I know.  But she didn't ask to
 4    read the document, she asked her if you asked him
 5    about her mental condition, she said yeah.  He said it
 6    gets worse, and she was reading the screen.
 7              THE COURT:  The record will reflect that.
 8               Go ahead, Ms. Yu.
 9    BY MS. YU:
10    Q.    Sorry.  I'm trying to remember my question.
11            So, earlier, you talked about a video that
12    Defendant showed you when you met with him at the
13    hotel; is that correct?
14    A.    Yes.
15    Q.    Did he follow up with a text message about this
16    video?
17    A.    Yes.
18    Q.    What did he say about the video in his message to
19    you?
20    A.    He says it's a three-to-five-percent thing that
21    just came up.  And that they were both laughing in it
22    because it's a three-to-five-percent thing that just came
23    up.
24    Q.    At some point, though --
25              THE DEFENDANT:  Your Honor, if she's going to
```

1    be reading the answer, she should read the whole answer.

2              **THE COURT:**  It's in evidence so I have it,

3    so ...

4              **THE DEFENDANT:**  Okay.

5    *BY MS. YU:*

6    *Q.*    After that message about it being only a

7    three-to-five-percent thing, did he say that he was going

8    to step completely out of the photo?

9    *A.*    Yes.

10   *Q.*    Did he?

11   *A.*    No.

12   *Q.*    Did he send you a message following up with -- that

13   you perceived as a threat?

14   *A.*    Yes.

15   *Q.*    What types of things did he say to you?

16   *A.*    So, he typed in my full name and my husband's name,

17   which indicated that he knew who we were.

18   *Q.*    And had you given him your full first and last

19   names prior to that?

20   *A.*    No.

21   *Q.*    Did he also threaten to go to your job?

22   *A.*    Yes.

23   *Q.*    Did he say that he was still investigating your

24   address?

25   *A.*    Yes.

*EXAMINATION OF VALERIE TANINO*

1   Q.   Did he call you names?

2   A.   Yes.

3   Q.   What types of names did he call you?

4   A.   Let's see, "Piece of shit, stupid."  That's all I

5   see in this one.

6   Q.   What did you do in response to the threats that he

7   would go to your job and that he was trying to get your

8   address?

9   A.   So, regarding my job, I spoke to -- I informed my

10  manager and hospital security and also campus security.

11  Q.   Did you perceive these as genuine threats?

12  A.   Yes.

13  Q.   Following these series of messages, did you respond

14  to the defendant?

15  A.   I did not.  My husband sent the final text message

16  to him.

17  Q.   And after the message where your husband said don't

18  contact you guys ever again, what did you guys do with

19  Defendant's number?

20  A.   I blocked him.

21  Q.   So, you never received the messages following that?

22  A.   No.

23  Q.   Did you also talk to Mr. Gasca on the phone?

24  A.   Yes.

25  Q.   Approximately how many times did you talk to him?

*EXAMINATION OF VALERIE AQUINO*

1   A.   There was -- maybe twice.  The first time, hoping

2   to arrange her staying over with me and then the second

3   time was after we met with him and told them that

4   Estrellita would be staying with us.

5   Q.   And so, would that have been around May 14, 2021?

6   A.   Yes.

7   Q.   Focusing on that second time when you talked to

8   Mr. Gasca, did he express concern for her at first on the

9   phone?

10  A.   Yes, I recall that, yes.

11  Q.   What types of things was he saying, if you can

12  remember?

13  A.   Just to, you know, get in touch with her friends

14  and, you know, not to commit her.  He kept saying "Not to

15  commit her."

16  Q.   At some point did the phone call become aggressive?

17  A.   Yes.

18  Q.   What did he say?

19  A.   He said if you move forward with this, you're going

20  to get to know the real Johnny Ray.

21  Q.   And what was your reaction upon hearing this?

22          **THE DEFENDANT:**  Speculation.  I mean, hearsay.

23          **THE COURT:**  Overruled.  Overruled.

24          **THE WITNESS:**  So I said, "Are you threatening

25  me?"  And then I just told him my plan was just to take

*EXAMINATION OF VALERIE TAQUINO*

```
 1    care of her.  I was for concerned for her mental health,
 2    her physical health, and her safety.  And I felt
 3    responsible for her.  So she was going to be my priority.
 4    BY MS. YU:
 5    Q.    Did you do anything in particular with "Yaw-Yaw"'s
 6    phone?
 7    A.    Yes.
 8    Q.    What did do you with it?
 9    A.    I kept it.
10    Q.    Why?
11    A.    I felt like he would try to contact her.
12    Q.    Prior to doing so, did you and "Yaw-Yaw" talk about
13    it?
14    A.    Yes.
15    Q.    And did she agree?
16    A.    She did.
17    Q.    At anytime did she ask you for her phone back?
18    A.    No.  She would ask to like speak to her sister and
19    then she would speak -- I would have her speak to her
20    sister or different family members.
21    Q.    So you just didn't keep her from contacting people
22    through her phone?
23    A.    No.
24    Q.    We've talked about the first time that you met
25    Mr. Gasca, what was the second time that you saw
```

*EXAMINATION OF VALERIE TOSTINO*

1    Mr. Gasca?

2    A.    When he took her in July.

3    Q.    So, in this July timeframe, had you already blocked

4    him via text message?

5    A.    Yes.

6    Q.    Were you in communication with him at all?

7    A.    No.

8    Q.    You were not expecting to see him at the VA?

9    A.    No.

10   Q.    Walk me through what you and "Yaw-Yaw" were

11   supposed to do at the VA that day.

12   A.    So I had made an appointment for her, a doctor's

13   appointment, and then when we went in, this was in the

14   morning, they said they were no longer seeing her through

15   the VA because she was over 65.  And so, we headed back

16   to the -- were heading back to the car.  And then after a

17   certain point, I realized maybe I can get some medical

18   records from them at least to bring to a new provider.

19   And as we were heading back, that's when Johnny Ray

20   showed up.

21   Q.    So why were you at the VA in particular?

22   A.    Oh, she was being seen through the VA previously.

23   So I just wanted to know more about her medical history

24   and also to get her evaluated.

25   Q.    What was "Yaw-Yaw" wearing that day?

1    A.    A pink sweater.

2    Q.    What were you wearing that day?

3    A.    A beige sweater.

4    Q.    Was she on any medication?

5    A.    Vitamins.

6    Q.    So, as you see the defendant approach, what

7    happens?

8    A.    I was very shocked at first that he was there.  And

9    then as he's coming towards us he says, like, "What lies

10    have they been telling you about me?"  And then he

11    proceeds to put himself between me and her, like, forming

12    a barricade between us.

13    Q.    Did he say anything to you?

14    A.    "Stay the fuck away from me."

15    Q.    And as he's saying to "Yaw-Yaw "What lies have they

16    been telling you," what's "Yaw-Yaw"'s response?

17    A.    She started crying and then she said, no, no, I'm

18    sick.

19    Q.    At some point, did Defendant put his hands on

20    "Yaw-Yaw"?

21    A.    Yes.

22    Q.    In what way?

23    A.    He was kind of pulling her towards the truck.

24    Q.    And at some point, what did he do once the truck

25    arrived?

1    A.    So she kind -- it looked like she braced herself

2    and then he picked her up and threw her in the backseat

3    of the car.

4    Q.    And you were able to see this?

5    A.    Yes.

6    Q.    And as he picked her up and threw her in the car,

7    what was she saying or doing?

8    A.    She said "No, no."  She was crying.

9    Q.    Did it seem like she wanted to go with him?

10   A.    No.

11   Q.    Now, when I met with you, did I show you an excerpt

12   from a video from the VA?

13   A.    Yes.

14   Q.    And what did the video from the VA show?

15   A.    It showed him taking her.

16        **MS. YU:**  Your Honor, the Government moves to

17   admit and publish Exhibit 35.

18        **THE COURT:**  Any objection?

19        **THE DEFENDANT:**  What's Exhibit 35?

20        **THE COURT:**  It's a video, I assume.

21        **MS. YU:**  Yes.

22        **THE DEFENDANT:**  Okay.

23        **THE COURT:**  All right.  35 will be admitted.

24        (WHEREUPON, an item was marked as Exhibit

25        Number 35.)

*EXAMINATION OF VALERIE SORINO*

 1              **MS. YU:**  So I want to start by orienting the
 2    Court, up on the top right corner --
 3              **THE COURT:**  You can touch the screen.  Just
 4    tell me where it is on the screen.
 5              **MS. YU:**  On the top right -- actually, I'll
 6    wait for it to play.
 7              **THE COURT:**  Oh.  It's not on the larger
 8    screen, or -- if you touch it, there will be a mark.
 9              **MS. YU:**  I think it has to be on that screen,
10    yeah.  Understood.
11    *BY MS. YU:*
12    *Q.*    Will you and "Yaw-Yaw" be appearing on the top
13    right of the screen?
14    *A.*    Yes.
15    *Q.*    And there are two women that just appeared on the
16    screen, is that you and "Yaw-Yaw"?
17    *A.*    Yes.
18    *Q.*    So I'm going to ask you to kind of narrate as this
19    video plays.
20    *A.*    Okay.
21    *Q.*    So you and "Yaw-Yaw" -- are you and "Yaw-Yaw"
22    walking through the parking lot?
23    *A.*    Yes.
24    *Q.*    Are you parked in this particular parking lot,
25    though?

```
 1   A.    No.

 2   Q.    So what were you doing now?

 3   A.    We were just walking through this parking lot to

 4   get to the car.

 5   Q.    And was this after -- you described earlier when

 6   you couldn't get services at the VA?

 7   A.    Yes.

 8   Q.    Now, it looks like you and "Yaw-Yaw" are stopped.

 9   What's going on now?

10   A.    Oh, this is when I realize that I should go back

11   and try to get medical records.

12   Q.    And does Mr. Gasca appear on the left side of the

13   screen at some point?

14   A.    Yes.

15   Q.    Is that Defendant appearing on the screen in a blue

16   shirt now, waiving his arm?

17   A.    Yes.

18   Q.    So at this point, you're walking.  Have you seen

19   him yet?

20   A.    No.

21   Q.    So now you're turned around, what is he saying or

22   doing to you?

23   A.    This is when he's saying, you know, "What lies have

24   they been telling you?"

25   Q.    And is he physically in between you and "Yaw-Yaw"?
```

1    A.    Yes.

2    Q.    Does he have his arm around her at this point?

3    A.    Yes.

4    Q.    Was he pushing her?

5    A.    Yes.

6    Q.    Is that the gold truck that you described earlier

7    that came up?

8    A.    Yes.

9    Q.    And what happened just now with the car?

10   A.    He threw her in the car and kidnapped her.

11   Q.    So, at this point, they're driving off.  What are

12   the first thoughts going through your head?

13   A.    Yeah, it was very shocking and very frightening.

14   But I -- you know, I had to call the police.  They

15   directed me to the VA police.

16   Q.    Were you trying to memorize the plate at the same

17   time?

18   A.    Yes.

19   Q.    When I met with you, did I also, at one point, show

20   you a zoomed-in version --

21   A.    Yes.

22   Q.    -- of what was previously marked as Exhibit 35?

23   A.    Yes.

24   Q.    And is that what's reflected in Exhibit 36?

25   A.    Yes.

1  Q.    So, again, this is when you and "Yaw-Yaw" were

2  debating on whether or not to go back to the VA?

3  A.    Yes.

4  Q.    And, again, is that Defendant appearing on the left

5  of the screen?

6  A.    Yes.

7  Q.    And so, looking at the bottom ...

8        And is Exhibit 36 that more zoomed-in

9  version of that original video?

10  A.    Yes.

11        **MS. YU:**  Your Honor, the Government moves to

12  admit Exhibit 36.

13            **THE COURT:**  Any objection?

14            **THE DEFENDANT:**  No.

15            **THE COURT:**  All right.  It's admitted.

16            (WHEREUPON, an item was marked as Exhibit

17            Number 36.)

18            **THE COURT:**  All right.  Look, it's late.  In

19  the interest of time, and just given all the other

20  variables we have to deal with, we're going to have to

21  wrap up for today.  So I'm going to ask Ms. Aquino if you

22  can come back tomorrow at 1:00 p.m., we'll resume your

23  testimony at that time.

24            All right.  Thank you.  You can step

25  down.

1          Mr. Chambers.

2          **MR. CHAMBERS:**  Yes, Your Honor.  Regards to

3    the witness' scheduling, we have a Zoom witness that we

4    would like to put on, on Thursday morning at 9:00.

5          **THE COURT:**  Thursday at 9:00, okay.  I don't

6    think that will be an issue -- obviously 9:00 pacific

7    time.  Just remind me -- is there any objection by the

8    Government?

9          **MR. REIDY:**  No, Your Honor.

10         **THE COURT:**  So just remind me tomorrow, and

11   we'll make sure we get that done.

12         **MR. CHAMBERS:**  Thank you, Your Honor.

13         **THE COURT:**  Ms. Aquino, why don't you step

14   outside because I have to talk with the lawyers for a

15   minute.

16          Just real quick, what's the run of the

17   show tomorrow, if you know?

18         **MS. YU:**  We think the run of the show tomorrow

19   will be the remainder of Ms. Aquino's testimony,

20   Officer Miller from the VA, and then the Co-defendant

21   Driver David Tscherny, and we think that should lead us

22   to 6:00 p.m.

23         **THE COURT:**  Okay.  Then after that?

24         **MS. YU:**  On Wednesday?

25         **THE COURT:**  Yes.

1          **MS. YU:**  Right now, I haven't spoken to

2    Mr. Reidy about this, but I think our plan is to have

3    that Dr. Lande who examined Ms. Callahan and then we

4    would have Arnaz Ifopo, who was the Chase employee when

5    the money was withdrawn.  I think, at that time, I think

6    we would also make Ms. Callahan available since Defendant

7    has asked for her.

8          **THE COURT:**  Yes.  And then, obviously, on

9    Thursday morning, we would have to interpose the witness

10   at 9:00 a.m.

11         **THE DEFENDANT:**  I would object to having

12   Ms. Callahan try to come on that day if she's going to

13   come at the end of day --

14         **THE COURT:**  If they want to call a witness,

15   they can call the witness.

16         **THE DEFENDANT:**  They're not calling her, I'm

17   calling her.  They're bringing her, they're not calling

18   her.

19         **THE COURT:**  We'll cross that bridge if and

20   when we need to.

21          Okay.  Couple things just real quick

22   before we -- Mr. Gasca, I'm just going to ask you to

23   try at least if you can, you've got to make sure you

24   look up the definition of hearsay.  Because you're

25   throwing out a lot of stuff.  I've been very lenient

1    about allowing stuff -- and on both sides quite

2    frankly.

3              But you can't sit -- hearsay is out of

4    court statement offered for the truth of the matter,

5    okay?  Talk with your lawyer about it, talk with

6    your investigator about it.  I'm very concerned that

7    there's a lot of stuff that you're throwing out

8    that's hearsay.

9              And this, I don't expect you to

10   necessarily know, the Government gets to introduce

11   statements that you make.  You can't introduce

12   statements that you make, unless there's an

13   exception.  That is just the rules.  So just be

14   mindful of that because I'm worried that you're

15   trying to introduce hearsay going forward.

16             All right.  Anything else we need to

17   discuss this evening from the Government's

18   perspective?

19             **MR. REIDY:**  No, Your Honor.

20             **THE COURT:**  Anything further, Mr. Gasca?

21             **THE DEFENDANT:**  I just would like to reiterate

22   because that's going to be a problem.  Estrellita, she's

23   an elderly person.  She should come on the first day --

24   if they're going to bring her whatever morning, she

25   should come in the early morning, not trying to fit her

```
 1   in at the end of the day.  That's not going to be --
 2            THE COURT:  So we'll cross that bridge if and
 3   when we need to.  Tomorrow, she's not planning on being
 4   called so that's not an issue.
 5            THE DEFENDANT:  My expert witness didn't come.
 6   I didn't want to delay the trial so as it appears now, if
 7   the Court's going to be dark on Friday, he's supposed to
 8   come see me Friday and then testify Monday.
 9            THE COURT:  Right.  No, I know that.
10            THE DEFENDANT:  I didn't know.
11            THE COURT:  I know that.
12            I'm just curious, who created all the
13   defense exhibit binders?
14            MR. CHAMBERS:  I did, Your Honor.
15            THE COURT:  Oh, you did.  Okay.  All right.
16            So I'll see you-all tomorrow at 1:00
17   p.m.  Thank you.
18            (WHEREUPON, the foregoing proceedings were
19            adjourned at 5:42 p.m., THEREUPON, resuming on
20            June 6, 2023 at 1:00 p.m.)
21                  (Adjournment.)
22
23
24
25
```

1

2                              C E R T I F I C A T E

3          I, April Lassiter-Benson, do hereby certify that the

4     foregoing 284 pages are, to the best of my knowledge,

5     skill and ability, a true and accurate transcript from my

6     stenotype notes in the matter of:

7

8     UNITED STATES OF AMERICA

9     vs.

10    JOHNNY RAY GASCA

11

12         Dated this 5th day of February, 2024.

13

14    S/*APRIL LASSITER-BENSON*
      Official Court Reporter
15    United States District Court
      Central District of California

16

17

18

19

20

21

22

23

24

25