1            **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE ANDRÉ BIROTTE, JR., U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**              )
                                                 )
6                        **Plaintiff,**          )
                                                 )
7        **v.**                                  )  **Case No. CR 21-351 AB**
                                                 )
8    **JOHNNY RAY GASCA,**                       )
                                                 )
9                        **Defendant.**          )
     _____)

10

11            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
                      **STATUS CONFERENCE**
12            **TUESDAY, APRIL 18, 2023**
                      **10:09 A.M.**
13            **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22  _____

23        **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                  FEDERAL OFFICIAL COURT REPORTER
24                350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305

1                           **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       E. MARTIN ESTRADA
        United States Attorney
5       BY:  KATHY YU
        BY:  KEVIN B. REIDY
6            Assistant United States Attorneys
        312 North Spring Street
7       Los Angeles, California  90012

8

9   **ADVISORY COUNSEL FOR THE DEFENDANT:**

10      LAW OFFICE OF MARK A. CHAMBERS
        BY:  MARK A. CHAMBERS
11           Attorney at Law
        14241 East Firestone Boulevard, Suite 150
12      La Mirada, California  90638

13

14  **ALSO PRESENT:**

15      JOEL WYENN, Investigator

16

17

18

19

20

21

22

23

24

25

|     |     |
| --- | --- |
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:09AM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:09AM | 10 |

                    TUESDAY, APRIL 18, 2023; 10:09 A.M.

                         LOS ANGELES, CALIFORNIA

                                 -oOo-

          THE COURTROOM DEPUTY:  Calling criminal case 21-351,

United States of America versus Johnny Ray Gasca.

          Counsel, please state your appearances.

          MR. REIDY:  Good morning, Your Honor.  Kevin Reidy

and Kathy Yu on behalf of the United States.

          THE COURT:  All right.  Good morning.

          Ms. Yu, don't you have a trial to be in?

          MS. YU:  Justice was swift.

          THE COURT:  Verdict?

          MS. YU:  Yes.

          THE COURT:  When?  Yesterday?

          MS. YU:  Closed yesterday, we got a verdict

yesterday.

          THE COURT:  Okay.  All right.  Okay.

          Mr. Chambers.

          MR. CHAMBERS:  Good morning, Your Honor.

Mark Chambers as advisory counsel for Mr. Gasca, who is present

before the Court.

          THE COURT:  All right.  Good morning to you both.

          And I think I see in the audience, Mr. Gasca, your

investigator.  Is that right, sir?

          THE DEFENDANT:  Yes, sir.

**UNITED STATES DISTRICT COURT**

1                    MR. WYENN:  Good morning, Your Honor.  Joel Wyenn,

2       W-y-e-n-n.  Good morning, sir.

3                    THE COURT:  All right.  Good morning.

4                    Mr. Gasca, what, if anything, have you gotten since

10:10AM   5       we met last?  Have you received the PDF file or no?

6                    THE DEFENDANT:  Yeah.  I've gotten, I think,

7       25 gigs.  I'm missing 100-something gigs.  I'm missing like

8       120-something gigs on the phone.

9                    THE COURT:  And when you say you're missing

10:10AM  10       120 gigs, what makes you say that?

11                    THE DEFENDANT:  The Government provided a disc.  So

12       what I've got converted is only 25 gigs.

13                    THE COURT:  So -- wait.  So you're saying you got a

14       disc, and you can tell from the disc there's only 25 gigs and

10:11AM  15       you know there's 120 or --

16                    THE DEFENDANT:  I know there's 120-something more.

17       In fact, the Government's disc says, like, 150 or -60-something

18       gigs.  And then the one that's converted was, like, only 25.

19                    THE COURT:  Okay.  Mr. Reidy, what, if anything, do

10:11AM  20       you know about this?

21                    MR. REIDY:  Your Honor, so my understanding -- we

22       reached out to the FBI about the -- apparently there's a size

23       disparity between the first drive that was provided to defense

24       counsel after our last hearing on March 17th, and then we

10:11AM  25       provided another drive a couple of weeks ago that was a mirror

```
  1    image of the defendant's phone.

  2           So apparently the first drive that we provided is

  3    bigger than the second drive.  And my understanding is that's

  4    because the first drive had a software program called

  5    Cellebrite that FBI and a lot of people use to process and

  6    review data that's collected from cell phones.  And that's a

  7    really large program.

  8           Apparently that's not able to be used or it takes a

  9    long time to load at MDC.

 10           THE COURT:  Okay.

 11           MR. REIDY:  And so the second drive that we provided

 12    a couple of weeks ago did not have that program.  Um, and so I

 13    think that that accounts for a large chunk of the size

 14    difference in gigabytes between the first and the second drive.

 15           THE COURT:  But is it the Government's position that

 16    the disc that you provided, the second disc, contains all the

 17    information that was -- or that was mirrored or taken off the

 18    phone?

 19           MR. REIDY:  Yes, Your Honor.

 20           THE COURT:  Okay.

 21           MR. REIDY:  And I think it's also smaller, that

 22    second drive, because -- so the FBI has technicians that do

 23    this.  This wasn't, like, the case agent that was doing this

 24    manually.  I don't think the case agent has that sort of --

 25    frankly, has that kind of technical know-how to do that.
```

1          The second drive, when the FBI creates a mirror

2     image of a phone, they present it in compressed format.  And so

3     the compression, I think, also -- you know, sort of like a ZIP

4     file.  And so the compression of the material in the second

10:13AM    5     drive, I think that -- the first drive that we provided was not

6     compressed.  And so I think that also accounts for part of the

7     delta we're talking about in size between the first drive and

8     the second drive.

9          THE COURT:  Okay.  Just one moment, please.

10:13AM    10          Okay.  So, Mr. Gasca, have you had a chance to look

11     at all of the -- what you've received?

12          THE DEFENDANT:  Yes.  Um, the first drive that they

13     provided, it was sent to me.  I don't know what happened.  It

14     got lost.  Mr. Chambers, I guess, has a tracking number.  I've

10:13AM    15     tried to look it up at MDC when I get that number.

16          The second drive was supposed to be a mirror image,

17     but it was, again, in Cellebrite.  So I don't -- the FBI, when

18     they give it to me -- the purpose was for him to put it not in

19     Cellebrite so I can view it.  It came again in Cellebrite, so

10:14AM    20     that was another two weeks wasted.

21          THE COURT:  Right.  The most recent one is not in

22     Cellebrite; correct?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And you can look at everything on there?

10:14AM    25          THE DEFENDANT:  No.  It is in Cellebrite that they

```
 1    gave me.  I then had Mr. Chambers take it to a tech, and that
 2    tech converted it.  But when that tech converted it, he only
 3    gave me 25 gigs.  He didn't give me all the information that
 4    was in the Cellebrite.
 5           THE COURT:  So you're -- wait.  So you're saying
 6    that you got a disc that is -- was in Cellebrite.  You asked
 7    Mr. Chambers to have a tech guy convert it.
 8           THE DEFENDANT:  Yeah.
 9           THE COURT:  And you're saying that, when it was
10    converted, it contained less information?
11           THE DEFENDANT:  Yes.  It was in Cellebrite.  And
12    when it was converted, I got 25 gigs.  So I don't know if the
13    25 gigs is -- if Mr. Chambers says that that's all that he
14    gave, then that's certainly not the phone.  It's only 25 gigs
15    of phone.
16           THE COURT:  Okay.  Mr. Chambers, can you chime in at
17    all?
18           MR. CHAMBERS:  Um, there were two drives,
19    Your Honor, and the drive we're currently discussing is the
20    second drive.  That's the mirror image of his phone.  I sent a
21    hard drive to the Government.  They gave it to the FBI.  The
22    mirror image was loaded on that and returned to me April 7th,
23    maybe.
24           I sent it to the defense cell phone expert who
25    converted it into a searchable, viewable format.  I think it
```

may have 25, probably like 30 gigs of material.  And then I

picked that up from the expert on the 10th of April.  And

Mr. Gasca now has that drive.  So he has a mirror image of what

the FBI had copied and it is in a searchable, viewable format.

THE COURT:  So, Mr. Gasca, have you -- you're saying

that there's stuff missing.  You believe that there's stuff

missing.  Just listen to me.

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  The question I have is:  Have you

had a chance to look at the stuff that you've been given?

THE DEFENDANT:  Yes.

THE COURT:  All of it.  You've had --

THE DEFENDANT:  Yes.  Not all of it, but I've --

I've gone through it.

It's a little difficult because, since it's all in

one PDF file -- so you know when you have -- when you pull a

slider on the side to go down the file, if I even just pull it

very slightly, it jumped 500 pages so I have to literally

scroll through it.  Through 110 pages, I've been scrolling and

scrolling.

So, you know, there's stuff there -- there's a lot

of apps that are missing, there's a lot of audio that's

missing, there's a lot of video and file images.

Now, I don't -- I don't know about the cell -- the

Cellebrite program, so I don't know if what the Government gave

me is all that they have.  So I don't know who the defense

expert is.  I've asked my investigator to have someone

reconvert what I have because what I received looked like it

was all in my phone.  It's 170-something gigs.  I don't know

10:17AM  anything that's going to compress that.  And then when you

uncompress it, it's only going to be 25 gigs.  Even a

Cellebrite program would not take 150 gigs to operate 25 gigs.

That doesn't make any sense.

I'm pretty versed in technology.

10:17AM  So I'm assuming the Government gave me what they

have.  I don't know it's a mirror image because a mirror image,

from my understanding, is supposed to be an exact copy of my

phone.  And then this has Bates numbers and all kinds of

things.  So it can't be an exact copy of my phone.  My phone

10:17AM  doesn't come with Bates numbers and things on them.

But assuming that's the case, that I've gotten at

least most of the data, when it's converted -- I don't know.

If the tech only gave him 25 gigs, I don't believe that was an

accurate conversion.

10:18AM  THE COURT:  Okay.  All right.  Well, the

Government's representing that what they gave you represents

the mirror image of the phone.

Is that right, Mr. Reidy?

MR. REIDY:  Yes, Your Honor.

10:18AM  THE COURT:  Okay.  I mean, that's what they're

saying.

THE DEFENDANT:  But when I first got it, I only got
1 gig from them.  Now I've got 175 gigs.  So before I can
contest any of that, all I know is I need to convert it
properly.  The conversion that was done for our defense expert,
that certainly is not correct because it doesn't have all the
material there.

So I've asked my expert to have it reconverted to
have -- to have all that information given to me.

THE COURT:  And when is that supposed to happen?

THE DEFENDANT:  I don't know.  I haven't had a
chance to talk with him.  I told him when he came to see me.

THE COURT:  Okay.  When did that happen?

THE DEFENDANT:  Four, five days ago.  Maybe -- maybe
you can ask him.

THE COURT:  I'm sorry.  Tell me your name again,
sir.

MR. WYENN:  Your Honor, Joel Wyenn.

THE COURT:  Why don't you step forward.  We're all
going to become friendly at some point during the course of
this.

MR. WYENN:  Thank you, Your Honor.

THE COURT:  So what is the status -- Mr. Gasca
indicated that he had a conversation with you about getting
some more information analyzed.  Can you shed some light on

```
 1   that?
 2            MR. WYENN:  Sure.
 3            At -- in discussion with Mr. Chambers, I was able to
 4   be put in touch with the -- the expert who, when I reviewed the
 5   situation and the problems we were having, indicated that there
 6   are a couple of things -- and, first of all, I am not a
 7   technical expert, so I can only speak from a layman's point of
 8   view.
 9            He indicated, first of all, that when a phone is
10   downloaded into a forensic format, it is challenging to be able
11   to go through it.  It's different than when you plug a hot --
12   or a fire wire into your phone and you look at everything
13   coming down.  That's way different.
14            So because of that, he said the only thing you can
15   do is utilize the applications that are in the computer, which
16   come with the computer, whether it's at MDC or mine or anyone
17   else's, to go ahead and try to review that and see what's
18   there.
19            I certainly don't have any personal knowledge of how
20   much data.  And the data includes video and images, text
21   messages, phones, things like -- whatever it might be in the
22   phone.  So I don't really know because that's something that's
23   being given to us by the Government itself.
24            My only suggestion might be that there might need to
25   be a technical expert provided -- brought in by the Court to
```

10:19AM (line 5)
10:19AM (line 10)
10:19AM (line 15)
10:20AM (line 20)
10:20AM (line 25)

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | actually take a look at this and make a pronouncement one way                 |
| 2   | or another as to what is there and what is available and if                   |
| 3   | there's anything that's missing because I certainly would not                 |
| 4   | be able to make that representation to the Court.                             |

10:20AM 5   THE COURT:  The expert that you've contacted, have

6   they looked at this information yet or no?

7   MR. WYENN:  That -- that individual was the

8   individual that was brought in by Mr. Chambers and he was

9   provided that particular drive by the Government to take a

10:20AM 10  look.

11  So I can't -- I wouldn't be able to speak for him as

12  to what it is.  But I'm assuming, because he did the

13  conversion, that he would then know what was on the drive

14  itself and to the extent of the size and what is -- what the

10:21AM 15  contents might be.

16  THE COURT:  Okay.  All right.  So he's an expert for

17  the defense.  So I would assume that, if there's an issue

18  with -- with respect to the contents, he would probably be in a

19  position to ascertain if there's an issue with respect to the

10:21AM 20  contents.  Is that a fair statement?

21  MR. WYENN:  Your Honor, if -- if he was aware -- and

22  obviously Mr. Chambers could certainly assist in this.  If he

23  was aware of the contents that were supposed to be there, then

24  when he reviews it, he'd be able to opine on what he sees there

10:21AM 25  in terms of a size and also what the contents are.

1    So I might defer to Mr. Chambers.  He might be able

2    to give us a little more clarity.

3    THE COURT:  All right.  Thank you, sir.  I

4    appreciate it.

10:21AM    5    MR. WYENN:  Thank you, Your Honor.

6    THE COURT:  Mr. Chambers.

7    MR. CHAMBERS:  Your Honor, Ernie Koeberlein is the

8    defense expert, and he's on the panel of certified experts for

9    the Court.  That's where he came from.

10:22AM    10    THE COURT:  Right.

11    MR. CHAMBERS:  And that's who he's funded through.

12    He received the exact drive that I received from the

13    Government/FBI, and he took that exact drive and he converted

14    it to the drive that Mr. Gasca now has.  Okay?  It is a carbon

10:22AM    15    copy made viewable and searchable by our -- by the defense

16    expert for Mr. Gasca.

17    THE COURT:  But Mr. Koeberlein has not expressed one

18    way or the other, like, oh --

19    MR. CHAMBERS:  He was only given the one drive.

10:22AM    20    This first drive that the Government turned over on March 17th

21    and stuff, that drive was -- I couldn't open it, but Mr. Gasca

22    wanted it so we sent it to Mr. Gasca.  Mr. Gasca has it.

23    There is no other drive to compare.  Okay?  And we

24    have received the exact -- according to the Government, the

10:23AM    25    exact contents of what's on the phone.  We converted that, and

|     |                                                                          |
|-----|--------------------------------------------------------------------------|
| 1   | we sent it to Mr. Gasca.                                                  |
| 2   | THE COURT:  Okay.  Mr. Gasca.                                             |
| 3   | THE DEFENDANT:  Yeah.  My investigator can confirm,                      |
| 4   | because we put both drives there in the room, that one drive             |
| 5   | is -- what appears to be exact because I know it was on my               |
| 6   | phone so I have about 175 gigs on my phone.  That drive had              |
| 7   | about 175 gigs.                                                          |
| 8   | The one that was --                                                      |
| 9   | THE COURT:  Where is that drive?                                         |
| 10  | THE DEFENDANT:  I have it.  But that drive was made                      |
| 11  | unviewable.  It can only be opened with the Cellebrite program.          |
| 12  | THE COURT:  And can you give that drive to your                          |
| 13  | investigator to give to the expert?                                      |
| 14  | THE DEFENDANT:  Yes.  You know, that's what I --                         |
| 15  | that was the last conversation we had.  He said he was going to          |
| 16  | try to get another expert.  I don't know if he was diverted or           |
| 17  | somehow talking with Mr. Chambers.  But the plan was for him to          |
| 18  | get an expert and have an expert convert that drive.                     |
| 19  | Somewhere it was lost in the communication because I                     |
| 20  | got a drive that's 25 gigs, and I know there's stuff on there            |
| 21  | that -- that I am personally looking for is not there.  And I            |
| 22  | did find some stuff that was quite useful to me, but some stuff          |
| 23  | is not there.                                                            |
| 24  | So, you know, there's some loss -- there's some loss                     |
| 25  | there in the communication.  I know that the -- the explanation          |

that's given is that they somehow gave 175 gigs, and then --

that was the Cellebrite program that used all that.  And then

they unconverted it and it only came out 25 gigs.  No, that

wouldn't make sense.

I don't think Mr. Reidy is representing that

correct.  He may just not understand because you would not get

25 gigs from just unconversion.  If anything, a ZIP file is

going to be smaller than the regular file.  It would not be

bigger.  So if I had a phone and you took it in a Cellebrite

program, it was only 25 gigs, I would not get 175 gigs out of

that.

So --

THE COURT:  So --

THE DEFENDANT:  I believe the Government has given

me my phone or most of it.  I don't think it's a mirror image

because, as I said, when the program -- when what I've received

was opened up, it came with Bates numbers and things on that.

So that wouldn't be an exact mirror of the phone because I

didn't have that on my phone.

But in any case --

THE COURT:  What are you asking right now?

THE DEFENDANT:  Just for more time for my

investigator to have a tech properly unconvert my phone.

I don't know what happened.  I didn't speak to

the -- that expert that did ours.  But I believe that error is

thus far on our end because I have -- I have a drive that I'm

looking at.  It says, like, 170-something gigs on it.  So I

believe that I've gotten a majority of what I need to get from

the Government.  I just need to convert that.  That's what I

10:25AM   believe is going on.

THE COURT:  So what are you asking for?  How much

time?

THE DEFENDANT:  Oh, I don't know.  I haven't spoken

with the investigator.  It appears that, since I spoke to him

10:25AM   last, he got caught up in this conversation, Mr. Chambers and

the expert.  I guess he attempted to try to resolve it through

speaking with that expert, but I need an expert to convert what

the Government gave me.

Originally the Government was given a drive, and it

10:26AM   was asked to convert the stuff and give it to me.  But this

conversation we had way back months ago when I was asked for

certain stuff, and the Court ordered them to give them to me so

I can view the stuff.  So they knew what they were supposed to

give me.  So giving me a Cellebrite thing makes no sense.

10:26AM   And then they were given another drive by

Mr. Chambers.  And the FBI said it would take about two weeks

to do it.  And then they, again, gave us back the Cellebrite

drive.  You know, it's the same thing again, they can't be

opened or viewed at MDC.

10:26AM   So I -- I -- whatever time's been used.  Originally

I just wanted the phone --

       THE COURT:  Hold on one second.  So I'm just trying to figure out what -- I mean, you want this trial, but you -- we have no idea how long this is going to take.

       THE DEFENDANT:  Mr. Chambers had it done in a few days, so I don't know what -- I just -- I don't need it converted into a special PDF format, I don't need anything.  I just need it dumped, and I can go through -- I know where to look and what I'm looking for.  I just need it dumped, dumped over.

       In fact, the good intention intent to put it in a PDF actually made it more difficult for me to search because, as I said, I have to go through things individually, scrolling down.  I can't attempt to scroll with the slider because it just is too compact, it jumps too much.  So I have to go little by little.  And even that, I've been doing it and going through, and I found some stuff that was useful that way.  But --

       THE COURT:  So are we thinking that you need a couple of weeks to do this?

       THE DEFENDANT:  Sure.  There's an issue, also, of a doctor that my investigator was attempting to get.  I don't know where we are with that as well.

       THE COURT:  I don't know where we are either.  I mean, I don't know what you're talking about.

1          THE DEFENDANT:  Mr. Wyenn?

2          THE COURT:  Why are you pointing to him?  What's the

3    issue?

4          THE DEFENDANT:  I'm sorry.  I'm supposed to get a

10:27AM    5    medical doctor.

6          THE COURT:  For what purpose?

7          THE DEFENDANT:  For an expert, for my trial.

8          THE COURT:  I know it's a trial.  But what's the

9    issue?  The expert is going to opine about what?

10:28AM   10          THE DEFENDANT:  Oh --

11          THE COURT:  Talk about what?

12          THE DEFENDANT:  Against the Government's expert

13    witness.

14          The Government's going to have an expert witness

10:28AM   15    who's going to opine about a video, and then the video -- I

16    read some of the things he's going to say.  You know, they're

17    quite ridiculous.  I can't even spot the things that he's

18    talking about, and I know they're not in the video.

19          So he's basically a hack who's going to come in and

10:28AM   20    say all the things they want him to say.  So I just need a guy

21    to come, just give an honest opinion of the appraisal, the

22    video.

23          THE COURT:  And have you identified an expert?

24          THE DEFENDANT:  I don't know.  My expert was working

10:28AM   25    on that.  So I haven't had a chance to see him since the last

time he came to see me at MDC, which was just about -- what?

Tuesday?  Thursday or Friday I saw him at MDC.  So he raced out

to try to take care of these two issues.  He was working on

contacting a doctor.  I don't know where at.

Can we ask him where we are with that?

THE COURT:  Hold on a second.

All right.  Let me -- if I can have the investigator

come back up again.  I'm trying to avoid getting into sort of

the client privileged, perhaps, information.  But can you give

me -- with that as a backdrop, can you give me some sense of

status as it relates to a medical expert, what your thoughts

are on that?

MR. WYENN:  Sure.  Sure, Your Honor.

What I did was I consulted the psychology panel of

experts in L.A. County Superior Court.  And there were three

individuals who I made contact with, which I've had extensive

conversations with all three, of which two have determined that

they were -- would not want to go ahead and take on the

appointment at this time.  The third one, I'm still waiting

for.  It may be a day or two before he gets back to me.

There are two doctors and one Ph.D.  The Ph.D. and

one doctor were the ones who indicated they would not want to

take on the assignment.  The other doctor, the psychiatrist,

I'm waiting to hear from him.  I'm hoping that within the next

day or so, I'll be able to get -- his office will call me and

|   |   |
|---|---|
| | 1 |

indicate whether they are willing to take on the case.

And then, again, as the Court knows, at that point in time we'll need to provide them with the discovery, the amount of discovery just like we did with Dr. Rothberg and for them to go ahead and -- in order to review and opine -- or come up with a report.

THE COURT:  Okay.  Thank you.

MR. WYENN:  Okay, sir.

THE COURT:  So I guess, Mr. Gasca, I'm just trying to figure out sort of what the bottom line is.  You're asking for more time or -- I mean, what are you saying?  And how much more time?

THE DEFENDANT:  I guess I can resolve these matters in two weeks.  If I can't resolve them in two weeks, I don't know what's going to happen.  You know, I certainly want to do my trial more than anybody here.  So I don't want to delay it anymore.

But I'm supposed to start next week.  I can't start next week.  I don't have my things in order.  But I've gotten mostly everything in order.  I just need those two issues.

THE COURT:  What if this expert that your investigator's indicated is not willing to -- doesn't want to sign on?  He said there's a couple that have said I'm not available or not willing to do it.  Then what?

THE DEFENDANT:  Well, I can't force somebody to be a

|       |                                                                                      |
|-------|--------------------------------------------------------------------------------------|
| 1     | medical expert if they can't take on a case.  So I have to go                         |
| 2     | forward.  I'm not going to ask the Court to wait on an expert,                        |
| 3     | so I'll just have to battle their hack.  You know what I mean?                        |
| 4     | THE COURT:  Okay.  Mr. Chambers.                                                      |

10:32AM

5  MR. CHAMBERS:  Yes, Your Honor.  For the Court's

6  consideration, the drive that Mr. Gasca wants converted --

7  THE COURT:  The larger one.

8  MR. CHAMBERS:  Yes, drive No. 1, is currently in his

9  possession at MDC.  So he has to send that out to the

10:33AM

10  investigator and --

11  THE COURT:  Like via the mail or --

12  MR. CHAMBERS:  Yes.

13  THE COURT:  -- whatever --

14  MR. CHAMBERS:  Yes.  And I believe that's kind of

10:33AM

15  challenging, according to the investigator.  And then that

16  drive has to go to -- I would probably direct it to the same

17  expert that converted the second drive so that there can be an

18  analysis of the two different drives too.

19  THE COURT:  I'm going to throw this out there.  I

10:33AM

20  think the Government probably knows where I'm going with this.

21  Are you able to burn another one of those drives?  This way,

22  you can just get it to the investigator.  Because I'm just

23  worried out of MDC, back, I mean --

24  MR. REIDY:  I think so, Your Honor.  I'd have to

10:33AM

25  double-check with the technology people, but I don't see why we

|   | |
|---|---|
| 1 | wouldn't be able to make a copy. |
| 2 | THE COURT:  That would be a lot easier. |
| 3 | MR. REIDY:  I agree. |
| 4 | THE COURT:  The larger drive, which I think |
| 5 | Mr. Gasca says is 175-plus gigabytes -- |
| 6 | MR. REIDY:  Yes, Your Honor. |
| 7 | THE COURT:  -- get that to the investigator.  If we |
| 8 | can get that to him in the next few days, that would facilitate |
| 9 | things that would help, I think. |
| 10 | Mr. Gasca, unless -- unless you want only the drive |
| 11 | you have. |
| 12 | THE DEFENDANT:  No.  If they can get that drive, |
| 13 | that would be fine, whatever's the most easiest. |
| 14 | THE COURT:  All right.  I'm sorry.  Sir, step |
| 15 | forward again. |
| 16 | MR. WYENN:  Your Honor, thank you. |
| 17 | Okay.  So logistically -- I want to place it before |
| 18 | the Court.  Obviously either I would get the drive from |
| 19 | Mr. Gasca or from the Government.  Okay?  At that point in |
| 20 | time, I suppose there are two choices.  One is we utilize the |
| 21 | services of our prior expert who is already on board to do the |
| 22 | analysis, so on and so forth, or I have another -- there is |
| 23 | another expert that I've used currently, locally here on |
| 24 | Wilshire Boulevard, who would be able to work on it as well. |
| 25 | One of the things that I understand from my |

10:33AM — line 5
10:34AM — line 10
10:34AM — line 15
10:34AM — line 20
10:34AM — line 25

communications with -- and I'm only going to use the first name

Ernie because I don't remember his last name -- indicated that

he may not be available, you know, within the next day, three

or four, five days, something like that.  Mr. Chambers might be

able to give me some insight there.

So my thought was, if we utilize another expert,

then I would provide that information to Mr. Chambers,

Mr. Chambers would go ahead and make the appointment and put it

through the -- the proper system and already have that

individual appointed.

So there is some time issues here.  And

logistically, I'd like to be sure the Court is aware of that.

THE COURT:  All right.  I appreciate that.  I guess

my leaning is -- you know, I guess my preference would be that

we have an expert signed up.  I recognize he may have some

conflict issues, but at least he can make a comparison, like

here's what was on this one -- Drive 1, I'll call it, here's

what's on Drive 2, here are the differences and -- and try to

account for the difference in gigabytes.  And then once that's

done, at least we know where we're at.  And --

MR. REIDY:  Your Honor?

THE COURT:  Yes.

MR. REIDY:  I apologize.

I think that -- I just don't want to get lost here.

I think that what the defendant is saying is that there is

something on his phone that he thinks should be there that is

not there.

THE COURT:  Right.

MR. REIDY:  So I'm not sure that comparing -- what

the benefit would be of comparing what he ultimately received

after Mr. Chambers and his expert tried to put something

together for him to be -- for his ease of access at MDC versus

what the Government's going to provide the copy of it.

THE COURT:  I guess my response is that, to the

extent -- if -- I'm making some of these numbers up because I

don't have it.  Let's say Drive 1, the one with the Cellebrite

information, had 175 gigs.  Okay?  Drive 2 has 25 gigs.  Maybe

Cellebrite accounts for 150 gigs.  But I want someone to tell

me that.  I mean, I want to know, okay, these are the two

drives.  Here's why there's a difference.

Maybe -- maybe Cellebrite does account for some

portion of.  Maybe there's other stuff that I don't -- I'm

making this up, I'm not a tech guy -- gets consumed with

Cellebrite that can get parsed out so that we can know.  And if

the answer is 150 gigs account for Cellebrite and the other 25

is 25, then we'll know and Mr. Gasca has made his record and he

says he believes there's more, the Government says we gave

everything we have, the issue about the two drives and what the

difference is is resolved and then we can move forward.

My concern is right now there's a record of two

drives, one has 25 gigs, one has more, and we haven't accounted

for why there's a difference.  I'm not suggesting that you've

delayed it or that the answer you've given is not -- not

accurate.  I just want an expert to look at both and say here's

10:37AM   why there's a difference.

The Government has said repeatedly, we have --

everything that's on this phone is on these hard drives and

we've mirrored it and given it over to the defense.  I just

want to get that buttoned up.  And maybe that expert will say,

10:38AM   I'm able to tease out more information.  I don't know.

But at least one person looking at both drives,

whether it's Mr. Koeberlein -- and I don't know how to spell

his last name, but I'll just -- I'll just guess it,

K-o-b-a-l-i-n-e *[sic]* or someone else.  But I'd like someone to

10:38AM   look at both from the defense side to just make sure that that

issue has been nailed down.  That's my thinking.

MR. REIDY:  And the Court's not asking for -- it's

not commissioning a report or anything; right?  You're just

asking for --

10:38AM   THE COURT:  No.  No.  I mean, I want -- let's figure

out what is the difference.  If this expert says, oh, there's

all this other stuff on there, given this trial, maybe that's

what might happen, we'll cross that bridge if and when we have

to.  But right now Mr. Gasca has two drives with a significant

10:38AM   difference in information.  And I just want to make sure I know

```
 1   and Mr. Gasca knows what the -- why there is that difference.

 2            MR. REIDY:  Okay.  Understood.

 3            THE COURT:  All right.

 4            THE DEFENDANT:  Your Honor.

 5            THE COURT:  Yes.

 6            THE DEFENDANT:  I believe, if I understood my

 7   investigator correctly, he said that the investigator that we

 8   currently have now is not available within the few days.

 9            THE COURT:  In the next couple of days.

10            THE DEFENDANT:  Yeah.

11            THE COURT:  Right.  But look, I'm -- I'm not

12   continuing this trial for just two weeks.  I'm just not going

13   to do it.  I want to pick a date that gives your investigator

14   time to look at it, gives you time to find -- whether or not

15   you're going to have an expert, and then we go.

16            THE DEFENDANT:  Yes.  I wasn't referring to that.

17   The second option he mentioned was that he had an expert that

18   he deals with that is available now.

19            THE COURT:  Right.  But then, that expert then has

20   to go through both drives after never having dealt with the

21   first drive.  I'd rather have an expert that's already been

22   signed up, he has Drive 1, now he looks at Drive 2, he can make

23   the comparison.  That's my thinking.  So --

24            THE DEFENDANT:  With respect, Your Honor, he was

25   given the instruction to convert the phone the first time.  So
```

1    if there's any error, it would be on his part.

2                THE COURT:  I don't know that.

3                THE DEFENDANT:  Okay.

4                THE COURT:  So I'm hoping perhaps -- again, it's

10:40AM    5    hope -- we can get all this resolved so we can start a trial on

6    May the 22nd or the 29th.  Do either of those dates pose any

7    major conflicts for anyone involved?

8                MR. CHAMBERS:  I think May 29th is Memorial Day,

9    Your Honor.

10:41AM   10                THE COURT:  Oh, okay.  So then it would be, I guess,

11    May the 30th.

12                MR. REIDY:  The Government would prefer the 22nd,

13    Your Honor.

14                THE COURT:  The 22nd.

10:41AM   15                MR. REIDY:  With our trial schedules.

16                MR. CHAMBERS:  I have a sentencing in front of

17    Judge Wilson, and the client is coming in from out of district

18    for that.

19                THE COURT:  On the 22nd?

10:41AM   20                MR. CHAMBERS:  On the 22nd, yes, Your Honor.  And I

21    believe those calendars are probably 11:00 o'clock.

22                THE COURT:  Okay.  Well, look, given that it's a

23    bench trial, we can take -- I mean, unless it's a huge

24    inconvenience, we'll take the break, you go do the sentencing.

10:41AM   25    I mean, we're not worrying about jury schedules, so we can get

UNITED STATES DISTRICT COURT

1    in, for lack of -- you know, get in when we need to get in, get

2    as much trial time so we can just get it started at least.

3            So we'll start the trial on the 22nd.  And I guess

4    in an abundance of caution, we'll probably need to have a

10:42AM    5    status conference.  I'm hoping we can get some answers in the

6    next two weeks.  So maybe a status conference on May the -- May

7    the 10th or the 12th.

8            MR. REIDY:  Either works for the Government,

9    Your Honor.

10:42AM    10            THE COURT:  All right.  Mr. Chambers.

11            MR. CHAMBERS:  That's fine, Your Honor.

12            THE COURT:  Let me check with the boss and see what

13    our calendars look like on the 10th or the 12th.

14            How about May 12th at 11:00 a.m.?  And no objection

10:43AM    15    for a status conference May 12th, 11:00 a.m.  Hopefully by that

16    time we'll know the status -- we'll know one way or the other

17    whether there's an expert for the defense.  We'll have some

18    answers from the computer expert with respect to looking at

19    both of these drives.  So obviously I'm going to need the

10:43AM    20    Government to do what they can today to get another copy of

21    this hard drive.

22            All right.  Is there anything else that we need to

23    discuss from the Government?

24            MR. REIDY:  Your Honor, could we set a date certain

10:43AM    25    for the expert issue?  I'm just worried that this is --

1          THE COURT:  Well, I'm hopeful we're going to have an

2   answer by May the 12th --

3          MR. REIDY:  Okay.

4          THE COURT:  -- at our status conference.  Did I

10:43AM   5   say -- yeah, May the 12th, right.

6          Yes.  So we'll know -- I mean, that's the whole

7   reason -- because he indicated that he's -- the investigator

8   has indicated he's reached out to some experts, waiting to hear

9   back.  I'm hoping we'll get an answer one way or the other by

10:44AM  10   the 12th.

11          MR. REIDY:  Yes, sir.

12          Oh.  And, Your Honor, do you happen to know what

13   days you'd be available for trial that week or not yet?

14          THE COURT:  On that week, it would -- for lack of a

10:44AM  15   better term, it's sort of a standard week.  We'd go Monday

16   through Thursday.  I don't -- hold on a second.

17          Right.  I don't know what my calendar looks like on

18   Friday.  Depending on how heavy it is, we might push it into

19   Friday.  But you can safely assume we'll go Monday through

10:44AM  20   Thursday.  Then the following week Monday is the holiday, then

21   we'll resume after that.  And so --

22          MR. REIDY:  Thank you, Your Honor.

23          THE COURT:  All right.  So I guess, Mr. Gasca, I

24   want to make sure you're okay with us moving the trial to

10:45AM  25   May 22nd.  Is that right?

| | | |
|---|---|---|
| | 1 | THE DEFENDANT:  Yes. |
| | 2 | THE COURT:  Okay.  Any other issues we need to |
| | 3 | discuss today? |
| | 4 | THE DEFENDANT:  No. |
| 10:45AM | 5 | THE COURT:  Okay.  All right.  So then I will see |
| | 6 | you all May 12th at 11:00 a.m. |
| | 7 | Thank you to the investigator providing insights. |
| | 8 | And obviously, you know the Government, Mr. Chambers.  Do what |
| | 9 | you can to try to get as much of that information as soon as |
| 10:45AM | 10 | possible for us.  All right? |
| | 11 | MR. CHAMBERS:  All right. |
| | 12 | THE COURT:  Thank you all.  I appreciate it. |
| | 13 | MR. REIDY:  Thank you, Your Honor. |
| | 14 | THE COURTROOM DEPUTY:  All rise.  This court is |
| 10:45AM | 15 | adjourned. |
| | 16 | (Proceedings concluded at 10:45 a.m.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

        I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

        DATED THIS 1ST DAY OF MARCH, 2024.

        /S/ MYRA L. PONCE

        _____
        MYRA L. PONCE, CSR NO. 11544, CRR, RDR
        FEDERAL OFFICIAL COURT REPORTER