1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4  UNITED STATES OF AMERICA,        )
                                    )
5                   PLAINTIFF,      )
                                    )
6            vs.                    ) No. CR 21-0351-AB
                                    )
7  JOHNNY RAY GASCA,                )
                                    )
8                   DEFENDANT.      )
   _____ )

9

10

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13            FRIDAY, DECEMBER 2, 2022

14                  10:04 A.M.

15            LOS ANGELES, CALIFORNIA

16            PAGES 24 THROUGH 58

17

18

19

20

21

22  _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA 90012
25               cmjui.csr@gmail.com

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3          OFFICE OF THE UNITED STATES ATTORNEY.
            BY: KEVIN B. REIDY
4              KATHY YU
            ASSISTANT U.S. ATTORNEYS
5          312 NORTH SPRING STREET
            13TH FLOOR
6          LOS ANGELES, CALIFORNIA 90012
            (213) 894-2434
7

8    FOR THE DEFENDANT:

9          JOHNNY RAY GASCA, IN PRO SE

10                 - AND -

11   FOR THE DEFENDANT - ADVISORY COUNSEL:

12         LAW OFFICE MARK A. CHAMBERS
            BY:  MARK ALLEN CHAMBERS, ATTORNEY AT LAW
13         500 LA TERRAZA BOULEVARD
            SUITE 150
14         ESCONDIDO, CALIFORNIA 92025
            (760) 489-1808
15

16   ALSO PRESENT:

17         MICHAEL FUKUDA, FBI SPECIAL AGENT

18

19

20

21

22

23

24

25
```

```
 1           LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 2, 2022

 2                          10:04 A.M.

 3                          - - -

 4      (Pages 1 through 23 heard in closed courtroom ordered

 5       sealed by the Court.)

 6      (Whereupon the government counsel and FBI Special Agent

 7       Michael Fukuda re-enter the courtroom.)

 8      (The following was held in open court.)

 9           THE COURT:  We're back on the record with the

10    parties with the government.

11           Look.  I don't see how this trial proceeds on

12    Monday.  Some of the issues that have been discussed I need

13    the government's assistance.  He is representing himself.

14    He has advisory counsel.

15           There are some issues with respect to discovery,

16    and I want to just confirm or question.  It has been

17    represented that the government has provided a hard drive I

18    believe that's largely encrypted.  Is that accurate?

19           MR. REIDY:  Your Honor, the hard drive we

20    provided -- so defendant's former advisory counsel asked for

21    us to reproduce all the discovery that had been produced up

22    to that point on a single hard drive.

23           And because we did produce that and there is a

24    protective order in the case with victim information -- so

25    we produced it encrypted, but we did provide the password to
```

1    the defendant's previous advisory counsel.

2              THE COURT:  There may be an issue at MDC as to the

3    ability to look at encrypted files even with a password.

4    I'm not blaming the government.  I am just saying that may

5    be an issue.

6              My question is can there be a file that's produced

7    that's not encrypted, number one; and, number two, I guess

8    related to that is I guess I know there are some concerns

9    from the government as relates to certain discovery with

10   victim identifying information.  Is there a way to segregate

11   the files, one that contains the file that's of information

12   the government's comfortable with going to an investigator

13   consistent with the protective order and then one with the

14   stuff that the government's particularly concerned with?

15             MR. REIDY:  Your Honor, the terms of the

16   protective order provide that the investigator is a member

17   of the defense team and he can review even protected

18   information with the defendant.

19             So I'm not sure that the -- the encryption of the

20   hard drive I think is just something that we have to do as

21   part of best practices to protect personal identifying

22   information in discovery.

23             THE COURT:  I am sorry.  I interrupted you.  But

24   my understanding is at MDC there may be an issue with the

25   ability to look at these files.  I don't know if the

```
 1  encryption is -- I don't know if the computer systems at MDC
 2  are antiquated such that it makes it difficult to access
 3  encrypted files.
 4           Mr. Chambers, is that your understanding?
 5           MR. CHAMBERS:  Your Honor, it's a huge drive.  The
 6  computers are really not up to date.  And so, basically, the
 7  procedure that I have used for years now is basically I get
 8  the encrypted drive from the government because that's the
 9  way they produce it -- okay? -- and then I unencrypt it and
10  I produce it on my own drive, and that's what I take to MDC.
11           Now, Your Honor, since I have been on the case we
12  have had Production Number 14, 15, and 16.
13           THE COURT:  What?
14           MR. CHAMBERS:  14, 15, and 16.
15           THE COURT:  What are those numbers?
16           MR. CHAMBERS:  Those are different productions
17  that have --
18           THE COURT:  Oh, production.
19           MR. CHAMBERS:  Those are not encrypted because
20  they are put on something called USAfx, and I log in, and I
21  actually download them and without encryption.
22           So it's an ongoing process, but the bulk of the
23  discovery is on a, you know, 1 terabyte hard drive, and it's
24  all encrypted.  So it takes a lot to pull it out.
25           MR. REIDY:  Your Honor, I want to clarify that was
```

1    at the request of defendant's former lawyer that he provided

2    the drive access to put all the discovery on that drive.

3              THE COURT:  This is not about blaming anyone.  I

4    am just trying to figure out how we can rectify this given

5    MDC's computer issues if --

6              THE DEFENDANT:  Your Honor, if I may.

7              THE COURT:  Yes, Mr. Gasca.

8              THE DEFENDANT:  I have reviewed the computers.  I

9    can't attest to the ones in the visiting room, but the ones

10   in the unit they play media --

11             THE COURT:  But you can't --

12             THE DEFENDANT:  Can I explain something?

13             What encryption are they talking about?  Because a

14   password is password protected.  And encryption means that

15   you encrypt the files a certain way that they can only be

16   played a certain way.  So what is going on here?

17             THE COURT:  But you are not -- you are not going

18   to be able to look at the files on your own in the unit.  I

19   am just telling you that.  You can be upset about it.  You

20   can challenge it if you want.  You can look at it with the

21   investigator in the visiting room, and I am trying to get

22   you the ability to do that.

23             THE DEFENDANT:  There is only some stuff they have

24   protected.  As far as videos and stuff, that would not be

25   the case because, when I was in San Bernardino, I have seen

1    the video of some of them.

2            THE COURT:  On your own?

3            THE DEFENDANT:  Well, the attorney or whoever it

4    was sent me.  I looked at them on my own.  They came in the

5    mail, and I looked at them like everybody else, and I looked

6    at them.

7            THE COURT:  I'm not sure that should have been the

8    case but --

9            THE DEFENDANT:  I don't think the government has a

10   problem with me seeing videos.

11           THE COURT:  Well, based on the protective order

12   that was signed originally in the case, you were supposed to

13   look at the stuff with your lawyer and/or investigator, and

14   then they were supposed to take it with them.  You were not

15   supposed to have that stuff to take back to your unit.

16           MR. REIDY:  Your Honor, I am sorry.  The videos

17   that the defendant I think is referring to were not subject

18   to the protective order.

19           THE COURT:  Okay.  But then what is subject to the

20   protective order?  That's where I am confused.

21           MR. REIDY:  Your Honor, there's some address and

22   personal identifying information of witnesses and victims in

23   the case.

24           THE COURT:  Is that all part of this larger

25   1 terabyte file?

```
1          MR. REIDY:  Yes.  Again, the defendant's prior

2    lawyer asked for all of the discovery both protected and

3    unprotected to be placed on 1 terabyte drive.

4          Our understanding was he was having difficulty

5    opening some of the files.  And he believed, if all the

6    files were on the one hard drive, he would be able to open

7    them.

8          THE COURT:  My question is can we separate it out

9    protected versus unprotected?

10          MR. REIDY:  Yeah.  Maybe skipping ahead, we have

11   been in contact with the defendant's investigator.  If he

12   has suggestions or ideas about how to work this so he can

13   review the discovery with the defendant, we'd be happy to do

14   that.

15          THE COURT:  I appreciate that.  But why not for

16   the -- I am -- again, we are just talking out loud here.  If

17   there is protected and unprotected, let's get all the stuff

18   that's unprotected, get that on a file or several files that

19   are bite sizes so they can be played.  Then he gets the

20   unprotected stuff.

21          At least he said to me -- okay.  The protected

22   stuff at least right now he's not fighting or quibbling

23   about, but he wants to he see the unprotected stuff, and

24   there is a debate as to how much he has seen.

25          I'm not blaming anyone.  I am saying that's what I
```

1    am trying to address.  So if we can get -- if we can break

2    up the files, protect it and maybe break up protected into

3    smaller pieces so that -- I am making this up -- three or

4    four thumb drives, this way he can take it to MDC, they can

5    look at it, and he can play it as much as he wants.

6             The protected stuff, put that in another drive and

7    then give that to Mr. Chambers or the investigator.

8             MR. REIDY:  I think that that's -- something like

9    that we can work that out with Mr. Chambers and the

10   investigator.  We have been trying.

11            THE DEFENDANT:  I don't want to go through

12   anybody.  That shouldn't need to be going through anybody.

13   I should be able to do what you just said.

14            THE COURT:  They are not just going to go to MDC

15   and drop it off.

16            THE DEFENDANT:  Sure.  If we are clear they are

17   just talking about handing it to them.

18            THE COURT:  They have got to -- look.  You are in

19   custody.

20            THE DEFENDANT:  Yes, I know.  I just want to make

21   it clear -- the language to me sounded like they were

22   saying, "We'll go over it with the investigator."

23            THE COURT:  No, no.  He said go over it with the

24   investigator, figure out, "okay, here.  How do you want us

25   to break this down?  We'll break it up and here," and they

```
1    get it to you.  So that's that issue.

2              Am I misrepresenting anything, Mr. Reidy?

3              MR. REIDY:  No, Your Honor.

4              THE COURT:  So we'll do it that way as relates to

5    that.

6              Let me just see here.  Contained in the

7    unprotected stuff or maybe the protected stuff.  Is there a

8    folder that you are aware of that's entitled just "Photos"?

9    Literally the file name is "Photos."

10             THE DEFENDANT:  That's in my stuff that was taken

11   in New York.

12             THE COURT:  Okay.  So the files and hard drive

13   stuff that was taken in New York, is that in Los Angeles?

14             MR. REIDY:  Yes, Your Honor.

15             THE COURT:  Are you aware or can you have the

16   investigator look to see if there is a file in those folders

17   that's entitled "Photos"?

18             MR. REIDY:  Your Honor, there were several hard

19   drives recovered.

20             THE COURT:  Literally the name of the file is

21   entitled "Photos."

22             MR. REIDY:  I am not aware of it, Your Honor.

23             THE COURT:  Can you ask your folks to see if there

24   is such a file?  And if there is, can you pull it -- okay.

25   And he is asking to take a look at it, determine whether
```

1  it's protected or not.  He believes it contains evidence

2  that may be exculpatory.  So let's get that to him.

3       MR. REIDY:  Yes, Your Honor.

4       THE DEFENDANT:  The agent is present.  He has seen

5  the hard drive.  He would know if the file exists.  I want

6  to know what hard drive the agent claims he found the file

7  with her banking information.

8       THE COURT:  Apparently there is an allegation -- I

9  don't know enough about the case -- about a file being

10  discovered that contains bank statements amongst --

11       THE DEFENDANT:  He put an affidavit -- in the last

12  opposition that they did to my evidence, he filed an

13  affidavit saying he discovered a file on the hard drive.  So

14  I want to know what hard drive it is and a copy of that

15  file, and that's the one that I also want to have imaged.

16       THE COURT:  Hold on.  I am trying to find which

17  opposition.

18       MR. REIDY:  The 41(g) motion, Your Honor, there

19  has been a supplemental affidavit that was filed, I believe,

20  last week.

21       THE COURT:  Is that Document 1231?

22       MR. REIDY:  That is the original --

23       THE COURT:  The supplemental declaration in

24  support of the opposition?  Let me just see here.

25       Mr. Gasca, are you talking about there is a

```
1    statement in the declaration that says, "However, after
2    reviewing the contents of the hard drive recently on
3    November 22nd, 2022, I realized it was not a scanned copy of
4    a piece of paper with handwritten notes but actually two
5    photographs or screenshots of typed-up notes containing
6    E.C.'s personal identifying information including her
7    account information" --
8               THE DEFENDANT:  I didn't --
9               THE COURT:  -- "user name, and password?"  Is that
10   what you're talking about?
11              THE DEFENDANT:  I didn't receive that one yet.
12              THE COURT:  No, I --
13              THE DEFENDANT:  Yeah, that's the one.  But I
14   received the first -- his claim that he found the
15   handwritten document scanned, that's what I received, and
16   that's what I want to know where.
17              But now he's changing it.  I didn't see the new
18   one he's changed.  Maybe you can read it to me again.  What
19   was it saying?
20              THE COURT:  You said there was a declaration that
21   they read in opposition that makes reference to a hard drive
22   where some statements were recovered.
23              THE DEFENDANT:  That's the one.  But the one I
24   read said he just found the handwritten statement.  But any
25   rate, two picture files are fine.  Whatever he found, I
```

```
 1    would like to know what hard drive he found it on and --
 2              THE COURT:  That's not making sense to me.  Maybe
 3    it is to the government.  You are saying you want to know
 4    what hard drive these handwritten notes containing E.C.'s
 5    account information, usernames, and passwords was found on.
 6              THE DEFENDANT:  Yeah, what drive they claimed to
 7    find it on.  It's not listed --
 8              THE COURT:  Hold on.
 9              Does that question make sense to you?
10              MR. REIDY:  It does, Your Honor.  I think we can
11    provide that information.
12              THE COURT:  You can provide an answer to that
13    question?
14              MR. REIDY:  Yes.
15              THE COURT:  You are asking for something else,
16    Mr. Gasca?
17              THE DEFENDANT:  I want to know which hard drive
18    it's found on.  I want a copy of what they are saying they
19    found.
20              THE COURT:  A copy like a screenshot of that hard
21    drive that contains the names of these files?
22              THE DEFENDANT:  A copy of whatever that file is.
23    Do you know what I mean?
24              THE COURT:  Hold on.
25              Mr. Reidy.
```

```
 1              MR. REIDY:  Those have been produced.

 2              THE COURT:  A screenshot that contains --

 3              MR. REIDY:  Yes, Your Honor.  The two screenshots

 4     that Agent Fukuda referred to in the supplemental

 5     declaration have been produced to defendant's counsel.  I

 6     don't know the exact production number.

 7              THE COURT:  If you could identify -- find that

 8     production number again and then provide that specific --

 9     say, "In response to our hearing today," to the investigator

10     say, "These are the pages," so that Mr. Gasca's clearly --

11     that's what you are referring to.

12              So that's one.  But now you want what else?

13              THE DEFENDANT:  I want an image of that hard drive

14     that he claims he found it on.

15              THE COURT:  An image of the hard drive?

16              THE DEFENDANT:  That he claims he found it on.

17              THE COURT:  Is that different than the screenshot

18     that shows that?

19              THE DEFENDANT:  That's for the technical

20     investigator that will show when that file was created.  Do

21     you know what I mean?

22              He says he recently found that file.  I know that

23     file was not on my hard drives.  But fine.  He found it on

24     there; so I want an image of that hard drive and when that

25     file was created.
```

```
 1              THE COURT:  But aren't you really asking to have

 2   an investigator look at that hard drive?

 3              THE DEFENDANT:  Yes.  But it wouldn't be an

 4   investigator.  It would be a technical investigator.

 5              THE COURT:  You want some sort of forensic

 6   analysis done on the hard drive that this information was

 7   found on.

 8              THE DEFENDANT:  Yes, yes, and to provide me which

 9   hard drive they say they found it on so that we can --

10              THE COURT:  But the screenshot will tell you --

11   the screenshot should tell you where the file was found

12   from.

13              THE DEFENDANT:  Yeah, sure.  I mean I don't know

14   what -- because my files are, as they know, they're all in

15   order; right?

16              So if they found a file on there -- I don't want

17   to give too much information to him, but I want to know

18   what -- where it was found at.  Do you know what I mean?

19   And I want a copy of the file that they say it was found.

20              First they said it was a scanned handwritten

21   document.  That's what he said.  Do you know what I mean?

22   But now he's changed it.  He said a screenshots.  Do you

23   know what I mean?  Okay.  So we'll got with that.

24              Either way, I want that hard drive to be

25   separated.  Your Honor have to rule on my evidence -- we can
```

1    rule on the other hard drives then.

2         But that one there that they're claiming, I want

3    an image of that hard drive that will show when that file he

4    is saying was produced.

5         THE COURT:  Mr. Reidy, were you going to say

6    something or not?

7         MR. REIDY:  I think I understand what the

8    defendant is asking for.  My guess is that he would have to

9    work something out with FBI in order to arrange for --

10        THE COURT:  A forensic analysis be done.  But I

11   think you can answer -- you indicate that you already have a

12   screenshot of the image of where this information came from.

13        MR. REIDY:  I'm sorry, Your Honor.  We just have

14   the screenshots themselves.

15        THE COURT:  The screenshots of what?

16        MR. REIDY:  There were two screenshots of the

17   victim's -- that contain the victim's social security

18   number.

19        THE COURT:  So you have a screenshot of that.  But

20   is there a screenshot or some document that shows from where

21   those documents came from?

22        MR. REIDY:  No, Your Honor.

23        THE COURT:  Can that be done?  In other words --

24   again, I am a Luddite here.  Is there some document that

25   shows when you pull up the file explorer and go E drive,

1  case number, photos, and then like it shows the tabs that

2  will show where the file originated?

3          MR. REIDY:  I think it's possible, Your Honor, but

4  I -- I don't know standing here.

5          THE DEFENDANT:  So we could be clear so there

6  is -- we are talking about files that were found on a hard

7  drive in New York.  We're not talking about screenshots that

8  they found on my phone.  That's what we're talking about;

9  right?  I want to make sure.

10         THE COURT:  He said that what first -- what he

11 just said is what he has in the screenshot of the notes.

12 And I said, no.  What you want is where did those

13 screenshots come from -- like I am just looking on my

14 computer now, I have a file that says, "AB, case files,

15 Gasca, notes."  Is there some sort of image that can

16 demonstrate the source of the screenshot in question?

17         MR. REIDY:  I think we could find that,

18 Your Honor, and we'll produce that.

19         THE COURT:  If you could look into that, talk with

20 the investigator about that.  The investigator I think is

21 on -- he is on point as it relates to that issue and try to

22 ascertain that information.

23         He is going to make a follow-up request to have an

24 analysis done.  I have got to figure out how to accomplish

25 that but just so you understand what he is asking for.

1          MR. REIDY:  Yes, Your Honor.

2          THE COURT:  Okay.

3          THE DEFENDANT:  Next is the FBI takes -- to help

4   Your Honor, when the FBI takes evidence of a phone or a hard

5   drive, they make an image of that phone.  They don't -- for

6   them -- they don't go inside and play with the phone.  They

7   make an image of the phone.  So if I request an image, they

8   make another copy.  So if there is any files erased, it says

9   exactly when they're erased.

10          THE COURT:  As relates to that --

11          THE DEFENDANT:  That relates to my phone.  I want

12   a full image of my phone.

13          THE COURT:  Well, wait a minute.  We talked -- I

14   thought you were more specific about you wanted documents or

15   screenshots or files that show conversations that you have

16   had with E.C. and other folks.  Correct?

17          THE DEFENDANT:  On my phone there are messages.

18   So they've provided one or two -- do you know what I mean?

19   I --

20          THE COURT:  Let me stop.

21          Are you -- I assume there are certain messages

22   that you are going to use in your case in chief.

23          MR. REIDY:  Yes.

24          THE COURT:  He said there are other messages

25   contained in that same phone that he is going to show on his

1   side showing another context.  Have all of those other

2   messages been provided or only the messages that the

3   government intends to use in their case?

4          MR. REIDY:  I think that we only produced --

5   pursuant to the terms of the search warrant, I think that

6   the agent looked at the data retrieved from the phone and

7   identified items both I guess arguably exculpatory and

8   inculpatory but were relevant to the case and obtained --

9   and flagged that information, and then we collected it and

10  produced it to the defendant.

11         I'm not sure what other -- I guess it's -- I'm not

12  sure what other messages he could be referring to.

13         THE COURT:  Well, what he is saying is there are

14  other messages on that phone.  I am assuming he is going

15  to -- he has not told us this -- I am assuming there are

16  other messages that may show another side of conversations

17  and/or relationships.  So I am making this up.

18         Let's say you have got a message in your thing

19  that says, "Stop bothering me."  There may be other messages

20  on that same phone that's like, "Oh, I miss you.  When are

21  you going to come see me," that he is saying that he says

22  are contained in that phone that he's not been produced.

23         Is there a way to image the phone drive and

24  provide him either more of those messages or the whole file?

25         MR. REIDY:  I'm not sure, Your Honor, but I can

 1   look into that as well.

 2           THE COURT:  Okay.

 3           THE DEFENDANT:  I am requesting an image of the

 4   phone that has everything on the phone --

 5           THE COURT:  Every message on that phone.

 6           THE DEFENDANT:  Well, when the technical adviser

 7   goes through it, he will separate them.  He will separate

 8   them in category so there won't be a bunch of data that I

 9   have to go through.  He will separate them.  He'll say all

10   the Facebook messages, all the stuff, all the photos --

11   everything that goes there.  Including on that phone are

12   videos that's also evidence in this case.  So I want a full

13   image of the phone.

14           MR. REIDY:  Your Honor, those videos I believe the

15   defendant's referring to are videos that he took of the

16   defendant [sic] immediately after the kidnapping in which he

17   attempted to have the victim say she was happy to be with

18   him.  Those videos have been produced.

19           THE COURT:  Those have.  But there may be other --

20   but I guess you don't know what other videos are contained

21   on that phone.

22           MR. REIDY:  No.  And neither --

23           THE COURT:  Can you inquire of the agents or the

24   team what else is on that phone?  And work with the

25   investigator to try to ascertain -- I still have to decide

1  relevance and things like that, but I have to know the

2  universe of things.

3       MR. REIDY:  Your Honor, I understand.  I just want

4  to make sure the reason why we did what we did is because

5  that's all we were allowed to do in terms of the search

6  warrant.  So if the Court can enter an order.

7       THE COURT:  Before I do that, I want to understand

8  sort of -- again I am making this up.  The government is

9  using ten videos on the phone, but there are another 90

10  videos.

11       I'd like to know are there another 90 videos and

12  then I may at that point say, "I order you to turn over the

13  remaining ones to him."  I am not going to have you violate

14  the search warrant.

15       MR. REIDY:  What I am hearing the Court saying is

16  you are authorizing us to go back in the defendant's phone

17  and look through -- and go back in the data.

18       THE COURT:  Mr. Gasca, I am doing this because

19  this is your request.

20       THE DEFENDANT:  I want to make this clear.  As the

21  investigator explained to me -- right? -- an image is taken

22  of the phone before they do anything in the phone.

23       THE COURT:  Right.

24       THE DEFENDANT:  I am entitled -- he said I am

25  entitled to get an image copy of that phone as well.

1          THE COURT:  I understand that.  But what the

2    government is saying is that, when they took an image of the

3    phone but they only looked for things that they thought were

4    relevant to their search warrant, which means they didn't

5    look at everything in the phone.

6          And in theory if what I am asking them to do --

7    their concern is it may violate the original search warrant.

8    And I am asking you are you okay with that because you want

9    the image of the entire phone.

10          THE DEFENDANT:  Yes.

11          THE COURT:  Okay.  So I hope the record is at

12    least clear enough to cover your backside.

13          MR. REIDY:  Thank you, Your Honor.

14          THE COURT:  I am just going to ask you -- you are

15    going to have to do a lot of work with this investigator so

16    I can ascertain what's going on here.  It's a unique

17    situation given Mr. Gasca's status, but we need to just work

18    through this to make sure we dot our Is and cross our Ts.

19    Nobody wants to do this more than once.  So I want to ensure

20    that we minimize our risk as relates to that.

21          I think that's everything for now, Mr. Gasca.

22          THE DEFENDANT:  I need an order for the

23    technical --

24          THE COURT:  Before -- I want the investigator to

25    talk with the government first.  Let me see what we have

 1  because I don't know -- you are asking me for a forensic

 2  person, but I don't know what it's for or why.  So I am

 3  hesitant to do that right now.  Okay.

 4          THE DEFENDANT:  You said you need his name.

 5          THE COURT:  Right.  I need to know who he is, what

 6  he is going to do and why.  So --

 7          MR. REIDY:  Your Honor, Ms. Yu can just go

 8  through, for lack of non-corporate speak terms, the action

 9  items.

10          THE COURT:  Yes, please.  Go ahead.

11          MS. YU:  Your Honor, this is what we have down.

12          As to discovery, we will look into getting one set

13  of not protected by the protective order to the defendant

14  segregated by whatever number of thumb drives or whatever

15  the investigator thinks is necessary.

16          Number 2, the second bucket as to the hard drive

17  CD's from New York, first we are going to figure out which

18  particular hard drive had the two snapshots in question.  We

19  are going to figure out the file path and then work with the

20  investigator to obtain whatever forensic analysis he thinks

21  needs to be done.

22          THE COURT:  As relates to that drive.

23          MS. YU:  As relates to that particular drive.

24          THE COURT:  In addition, I think in those drives

25  that were seized in New York there is a file named "Photos"

1    that Mr. Gasca says contains photographs -- again, I don't

2    know the case in detail that I believe has photographs of

3    either him and the victim and/or other witnesses.

4            And I am assuming it's based on some -- to the

5    extent the witness says, "I don't know him, I'm not friends

6    with him," and then he's got photos of them eating

7    Thanksgiving dinner.  I am making this up, but there is a

8    file that he says is as clear as day that's named "Photos"

9    that contains this information.

10           MS. YU:  Understood, Your Honor.  So we will look

11   in one of the various hard drives for a folder named

12   "Photos."

13           THE COURT:  Right.

14           THE DEFENDANT:  They mentioned in one of their

15   oppositions to my property that they selected photos of that

16   drive.  So, for example, in one of the motions, they say I

17   made a statement pertaining to Facebook messages.  But in

18   their recent motion, they say those statements are relating

19   to hard drives.  Do you know what I mean?  So they know the

20   file.

21           THE COURT:  Fine.

22           Next.

23           MS. YU:  Last bucket as to defendant's phone that

24   was seized from him, we are going to look into obtaining a

25   forensic image of the phone to which defendant consented to

1  today.

2         THE COURT:  Yes.  Okay.  All right.

3         So now, Mr. Gasca, we need to talk about a -- your

4  trial is supposed to start Monday.  Based on what you have

5  told me both privately and even today, you are not ready to

6  proceed to trial on Monday.  Is that correct?

7         THE DEFENDANT:  Unfortunately, no, Your Honor.

8         THE COURT:  So you are asking that the trial date

9  be moved; correct?

10        THE DEFENDANT:  Yes.

11        THE COURT:  So I don't want to set a trial date

12  because I don't know what has to be done, and I'm not

13  sure -- you have an idea, but, until the investigator talks

14  to the government, we're not going to know what's happening

15  here.

16        THE DEFENDANT:  Sure.

17        I need one other item also.

18        THE COURT:  Okay.

19        THE DEFENDANT:  The hotel computer found in the

20  room, I want an image of that also.

21        THE COURT:  I don't know what you are talking

22  about.

23        THE DEFENDANT:  In the hotel where I was staying

24  with her, they -- the rest of this is outside the hotel.

25  But in the hotel in the room they confiscated a camera and

1   laptop, and they are contesting the camera or whatever.  But

2   I want an image of that -- as I understand it, whenever I

3   request --

4           THE COURT:  Let me stop you.

5           Is there a computer that was seized inside a hotel

6   room?

7           MR. REIDY:  Yes, Your Honor.

8           THE COURT:  Has that been either imaged and/or

9   searched or evaluated at all?

10          MR. REIDY:  Can I have a second.

11          THE COURT:  Please.

12      (Brief pause in the proceedings.)

13          MR. REIDY:  There was a laptop seized, and we did

14  search it pursuant to a search warrant, and we didn't find

15  anything pertinent to the case.

16          THE COURT:  So nothing was turned over relative to

17  that?

18          MR. REIDY:  No, Your Honor.  There are photographs

19  of the laptop itself but nothing from the contents of the

20  laptop.

21          THE COURT:  So I guess, Mr. Gasca, I need to

22  understand why do you need that.

23          THE DEFENDANT:  There is some evidence on there.

24          THE COURT:  You are going to -- before I do that,

25  I need you to send me a letter indicating what you think is

1  on there and why it's relevant to the case because they are

2  not using anything from it.  So I am just -- that's what he

3  has just said.

4            THE DEFENDANT:  Yes.

5            THE COURT:  So I need you to write me a letter.

6  Let me know what's on there, get it to your investigator,

7  have the investigator file it, or get it to Mr. Chambers,

8  have Mr. Chambers file it so I know what's on there, and

9  then I can make a decision as to whether or not I am going

10 to order them to make an image and provide it to your

11 investigator.

12            THE DEFENDANT:  The last question is it was told

13 to me by my last attorney -- I don't know how accurate it

14 was -- that they copied my movie onto a hard drive.

15            THE COURT:  What movie?

16            THE DEFENDANT:  I have a movie in production.

17            THE COURT:  What relevance as it relates to this

18 trial?

19            THE DEFENDANT:  Sure.

20            THE COURT:  Is it relevant to this trial?

21            THE DEFENDANT:  Sure.

22            THE COURT:  Why?

23            THE DEFENDANT:  That's the money she gave me to

24 invest in the movie.  They know that.  It's in my motions.

25            THE COURT:  You are saying the movie is relevant

1  to show what?

2         THE DEFENDANT:  Two witnesses that I have coming

3  are in the movie.  Two witnesses that they have coming are

4  in the movie.  And the movie -- I can show, Your Honor, this

5  is the production we were doing -- extra leaders on some of

6  the footage there.

7         THE COURT:  My question to you is you can ask the

8  witnesses about this movie and either they are going to deny

9  it or confirm it.  Right?  Is it your concern they are going

10 to deny it?

11        THE DEFENDANT:  No.

12        THE COURT:  I am not sure why you need the movie

13 itself.

14        THE DEFENDANT:  I was told that they copied the

15 movie.

16        THE COURT:  I get that, and I'm not here to answer

17 that question.  My concern is let's assume they did copy it.

18        THE DEFENDANT:  Okay.

19        THE COURT:  What's the relevance as relates to the

20 trial?  You are going to ask the witness, "Is it true, sir,

21 ma'am, we did the movie together?  And isn't it true that

22 so-and-so gave money for that movie?"  They are either going

23 to either say "yes" or "no"; right?

24        THE DEFENDANT:  Yeah.

25        THE COURT:  So I am not sure you need -- because

```
 1   if -- if you say "no," I guess you want to have a screenshot

 2   of the movie to show isn't this you in the movie; is that

 3   it?

 4           THE DEFENDANT:  No, I don't need that.

 5           THE COURT:  Okay.

 6           THE DEFENDANT:  But I don't know the answer to the

 7   question because my lawyer told me one thing I just want to

 8   know did they give me a copy of the movie?

 9           THE COURT:  But again, look.  I get it, but for me

10   I am trying to decide what's the relevance?  How does it

11   matter to this case?

12           You're saying, look, it matters because you are

13   using the money for this movie.  But you can ask those

14   witnesses those questions.

15           THE DEFENDANT:  I also have footage of Estralita

16   in there.

17           THE COURT:  And I am not trying to be harsh, but

18   so what?  So she's in a movie -- I'm not sure that the movie

19   is relevant.

20           THE DEFENDANT:  Well, in her mental capacity there

21   is several people on the set, she's dealing with everybody

22   on the set, and some of those witnesses are going to come

23   and say, "We dealt with her on the set, and we didn't see a

24   problem with her."

25           THE COURT:  Right.  But they are going to come and
```

 1    say that; right?

 2              THE DEFENDANT:  Okay.

 3              THE COURT:  I am trying to understand.  I'm not

 4    sure you need the movie if the witnesses are going to say

 5    that.

 6              THE DEFENDANT:  No.  But the clips, I would like

 7    to show the clips.  But fine.  I don't need to at this

 8    moment.  I will bring it up later.

 9              THE COURT:  If you think you need it, bring it up

10    later.  What I am hearing -- if you have witnesses to say,

11    "We did this movie, she was fine," I think that will be

12    enough.

13              THE DEFENDANT:  Okay.

14              THE COURT:  So what I think we need to do is set

15    another status conference just to see how things are going.

16              Mr. Gasca, I am just going to just, like I have

17    tried to always, work with Mr. Chambers and the investigator

18    to get stuff done.  Okay?

19              Like you said, you get more bees with honey than

20    vinegar.  Keep using the honey.  I don't need an answer

21    back.  Keep using the honey.  We got some time now.

22              In fairness to Mr. Chambers, he will probably be

23    mad at me because I put him in this position.

24              I said, "Get in this case," because I know he is

25    good.  I know what he can do.  But I recognize that perhaps

1   in hindsight it's a little too much in too short a time, and

2   that might have caused some friction in the beginning.  I am

3   just saying use honey.

4           Work with Mr. Chambers and work with the

5   investigator.  You are good with the investigator.  And all

6   I am saying, as relates to Mr. Chambers, if you need

7   something filed, write it up and say, "Mr. Chambers, can you

8   get this filed for me?"

9           Because if you mail it, I still -- this letter you

10  say you wrote I haven't seen it.  If you get it to the

11  investigator or Mr. Chambers and say, "Just file this," it

12  can get on the docket.

13          Do you understand what I am saying?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Mr. Chambers, again, I appreciate you

16  jumping in.  I would just ask if he gives you something,

17  let's just try to get it on the docket so I know what the

18  issues are.  Okay?

19          MR. CHAMBERS:  Yes, Your Honor.

20          THE COURT:  I am going to propose a status

21  conference -- again going to take a couple weeks for all

22  this stuff to happen.

23          THE DEFENDANT:  The investigator left me a card

24  and said, "Just leave me a message, and I will arrange to

25  come see you."  But the MDC phones he has to approve the

```
 1   call before the call goes through on the investigator.  So

 2   can you just -- I don't know --

 3           THE COURT:  Mr. Chambers, do you have the

 4   investigator's number for the contact information?

 5           MR. CHAMBERS:  I do, Your Honor.

 6           THE COURT:  Can you reach out to the investigator

 7   to convey that message to the investigator about approving

 8   the number --

 9           THE DEFENDANT:  Just come -- if he can't get it

10   just come see me, and I will work it out with the

11   investigator when the investigator comes.

12           THE COURT:  Can you do that for us, Mr. Chambers?

13           MR. CHAMBERS:  Contact the investigator and have

14   him --

15           THE DEFENDANT:  Come see me as soon as possible.

16           THE COURT:  Perfect.  Thank you.  Okay.

17           Given everything that is going on here, I am going

18   to propose January 6th is our first date, start the new year

19   figure out what's happening.

20           Hopefully by then you'll get your investigator.

21   If there are issues, you can file them with the Court

22   beforehand.  That will give enough time to get the files.

23   You can talk with the investigator about the forensic

24   people, get a document through.  We can get all that stuff

25   rolling.
```

```
 1              My proposal is to have a status conference

 2     January 6th and, hopefully, January 6th we can pick a trial

 3     date from there.

 4              Is that okay with you, Mr. Gasca?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  Does that date work for the

 7     government?  We'll do January 6th at 1:30 P.M.

 8              MR. REIDY:  Yes, Your Honor.

 9              For the record, could we remind the defendant he

10     does have rights under the Speedy Trial Act.

11              THE COURT:  Mr. Gasca, we have talked about this

12     before, but you have the right under what's known as the

13     Speedy Trial Act to have a trial within 70 days of your

14     initial appearance.  We've gone beyond that.  You have been

15     in jail for 16 months.

16              You have asked today to continue the case so we

17     can get the investigator -- get things teed up.  I'm not

18     blaming anyone for it.  It's just these are the facts.

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  I want to make sure are you okay with

21     us continuing the trial date so that you can get the

22     information that you have, work with the investigator and

23     your advisory counsel in order to prepare for trial?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  We'll continue the case --
```

```
 1            THE DEFENDANT:  Can we do it in the morning

 2    instead of 1:30?

 3            THE COURT:  For you, Mr. Gasca, yes.  What time,

 4    9:30 in the morning?

 5            THE DEFENDANT:  Sure, Your Honor.

 6            THE COURT:  January 6th, 9:30 A.M.

 7            THE DEFENDANT:  It's just there is a go back

 8    early, go back -- sometimes I can catch it if I finish early

 9    enough.

10            THE COURT:  January 6th, 9:30 A.M.  We'll do it on

11    that date and time.

12            Anything further, Mr. Gasca?

13            THE DEFENDANT:  No, thank you.

14            THE COURT:  Anything further from the government?

15            MR. REIDY:  No, Your Honor.  Thank you.

16            THE COURT:  Thank you all.  Have a wonderful

17    holiday.  We'll see you all in 2023.

18            THE DEFENDANT:  Merry Christmas.

19            THE COURT:  All right.  Thank you.

20            We'll go off the record.

21        (Discussion held off the record.)

22        (Proceedings concluded at 10:39 a.m.)

23                        --oOo--

24

25
```

```
 1                        CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  February 28, 2024.

11

12

13

14                    /S/ CHIA MEI JUI

15              Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```