1                UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE ANDRE BIROTTE JR., U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,          )
                                        )
6                     Plaintiff,        ) CASE NO.
                                        ) CR 21-351-AB
7          vs.                          )
                                        )
8    JOHNNY RAY GASCA,                  )
                                        )
9                     Defendant.        )
     _____)
10

11

12

13

14               REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  WEDNESDAY, MARCH 8, 2023

16                       10:06 A.M.

17                  LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23               MAREA WOOLRICH, CSR 12698, CCRR
             FEDERAL OFFICIAL COURT REPORTER
             350 WEST FIRST STREET, SUITE 4311
24           LOS ANGELES, CALIFORNIA 90012
                 mareawoolrich@aol.com
25

                     UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF:**

4        OFFICE OF THE UNITED STATES ATTORNEY
         BY:  KEVIN REIDY
5        ASSISTANT UNITED STATES ATTORNEY
         312 NORTH SPRING STREET, 13TH FLOOR
6        LOS ANGELES, CALIFORNIA 90012
         (213) 894-2434
7

8    **FOR THE DEFENDANT:**

9
         JOHNNY RAY GASCA, IN PRO SE
10       -AND-
         FOR THE DEFENDANT - ADVISORY COUNSEL:
11       LAW OFFICES OF MARK A. CHAMBERS
         14241 EAST FIRESTONE BOULEVARD, SUITE 150
12       LA MIRADA, CA 90638
         (213) 489-1958
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 8, 2023

 2                        10:06 A.M.

 3                          -oOo-

 4

 5            THE COURTROOM DEPUTY:  Calling Criminal Case 21-351,

 6   United States of America versus Johnny Ray Gasca.

 7            Counsel, please state your appearances.

 8            MR. REIDY:  Good morning, Your Honor.  Kevin Reidy

 9   on behalf of the United States.

10            THE COURT:  Good morning.

11            MR. CHAMBERS:  Good morning, Your Honor.

12   Mark Chambers as advisory counsel on behalf of Mr. Gasca who is

13   before the Court in custody.

14            THE DEFENDANT:  Good morning.

15            THE COURT:  All right.  Good morning to you both.

16            So what issues -- well, I guess there's a change of

17   heart which is good to have hopefully a last meeting before our

18   trial that's scheduled, I think, for March the 20th.

19            Mr. Gasca, what outstanding issues are there, if

20   any?

21            THE DEFENDANT:  Okay.  The last time that we were in

22   court, I specifically asked for my audio messages of the texts

23   and Facebook and various sorts.  Miss Kelly Yu [sic] told the

24   Court that she had handed them over.  I said at the time I

25   didn't see them.  I didn't have the hard drive at the time.  I
```

```
 1    had only glanced at it with my lawyer.  I didn't see any audio
 2    messages.  I got the hard drive.  I checked, and there are no
 3    audio messages on here.  So I didn't get any of the audio
 4    messages that she sent.
 5              THE COURT:  Well, I think she said what we have is
 6    what we sent.  I don't think she said there are audio messages
 7    and I gave them to you.
 8              But, Mr. Reidy, your response?
 9              MR. REIDY:  Your Honor, my understanding is that we
10    did produce those messages.  I spoke to --
11              THE COURT:  Are there audio messages?
12              MR. REIDY:  My understanding is that whatever audio
13    messages were on the phone were produced to the defendant other
14    than the ones that the defendant had with -- I think there's
15    some audio messages that were produced in earlier productions
16    that the defendant already has.  And then he asked for whatever
17    other audio messages were on the phone, and we produced
18    whatever messages were on the phone to the defendant.
19              THE COURT:  And what -- do you have like a
20    production number or something --
21              MR. REIDY:  I think the -- I'm sorry, Your Honor.  I
22    think that the production number is No. 23 that was produced
23    back in February.  So that contained photos, videos, and
24    audio messages in their native format -- in their original
25    formats.
```

```
 1              And then we also produced text message data in
 2   redacted format so that we could redact phone numbers and other
 3   personally identifying information so that defendant could use
 4   that -- could have a copy of that information with him at MDC.
 5              THE COURT:  And so I want to make sure I understand.
 6              Mr. Gasca, you got Production No. 23?
 7              THE DEFENDANT:  Yes.  Would you like to check for
 8   yourself?  There's nothing --
 9              THE COURT:  I don't want to check it myself.
10              THE DEFENDANT:  There's no audio messages in here.
11              THE COURT:  Mr. Reidy, do you have Production
12   No. 23?
13              MR. REIDY:  I don't have it with me, Your Honor.  I
14   can double check to see if, you know -- that the copy of the
15   production that we have, if it has audio messages and if those
16   were produced.  I'm pretty sure that whatever -- I'm pretty
17   sure that 23 contains the contents of the phone that we were
18   directed to produce to Mr. Gasca.  And I can double check to
19   see if that contains audio messages.
20              THE COURT:  How soon can you do that?  Because we
21   got a trial the --
22              MR. REIDY:  I can do that by Friday, Your Honor.
23              THE COURT:  What's that?
24              MR. REIDY:  By Friday.
25              THE DEFENDANT:  Two things I'd like to say,
```

1    Your Honor.

2              THE COURT:  Okay.

3              THE DEFENDANT:  When we were here last, she was

4    arguing against not turning it over, and she was arguing for

5    hearsay.  And you said we'll deal with the hearsay issue later.

6    First, I want to make sure he got the messages.

7              And then I asked her clearly the Facebook messages?

8    And she said, yeah.  She wouldn't have been arguing not to turn

9    it over for hearsay if I had them already.  I always said from

10   the very beginning the government wasted a month when you first

11   asked them to produce the phone, leading my lawyer on to

12   believe he was going to get the phone.  They asked for a

13   2 terabyte hard drive because this is 1 gigabyte of stuff.

14   They asked for 2 terabytes.

15             After a month they came, and she argued against

16   giving up the phone.  You went back and forth with her saying,

17   well, if there's things there, then block out the numbers and

18   do whatever.  And she said, okay, so we only have to hand over

19   the texts and -- she went over the thing.  Then I didn't get

20   that.  This is the one that she -- at that time that she said

21   she was going to hand over.  From that time I've got no

22   audio messages.

23             At that time, at that same hearing, I attempted to

24   say to you, look, they are not going to give it up because

25   there's exculpatory evidence on there.  And you said to me just

```
 1   wait and see till you get it.  And then if you have any
 2   problem, you let me know.
 3            On the last hearing we were here, it was somewhere
 4   in the mail, but then I got it right after.  I wrote Your Honor
 5   immediately after I received it.  There are no audio messages
 6   on here.  There's -- what I've got on here is, when you take a
 7   phone, you have some memory stuff that's very compressed, very
 8   small files that stay on the phone.  So even if I take some
 9   files and transfer them off, there's very small stuff, like
10   when I'm looking at my phone, it stays on there.
11            I have -- I have about 15,000 texts with stuff.  I'm
12   looking through it.  You know what I mean?  I'm about halfway
13   through it.  I'll work my way best on it.  But there are no
14   audio -- the primary evidence is the audio.  That's what I
15   communicated with on the phone, you know.  And I've got -- and
16   there's no audio messages on here at all.  There's just maybe
17   about five or six video messages that were very small, very
18   imbedded.
19            My phone is a 48-gig phone.  You know what I mean?
20   And it has an SD card on it also as well that's like
21   200-something-75 gigs.
22            THE COURT:  Okay.  So, Mr. Reidy, by Friday I want
23   you to -- I want you to check the drive --
24            Mr. Chambers, will you be available to have meetings
25   leading up to Friday to do a compare and contrast on what
```

1   Mr. Gasca has versus what the government has to make sure -- if

2   the information is supposed to be contained in Production 23, I

3   just want to make sure what was produced is what Mr. Gasca

4   received.  And then we can deal with whatever is missing or

5   not.

6           MR. REIDY:  That's fine, Your Honor.

7           THE DEFENDANT:  I have it right here, Your Honor.

8   They can check, and I can come back later.

9           THE COURT:  I don't have time.  I have other cases

10  today.  Okay?  I don't have time.  I'm not doing it.  Your

11  advisory counsel and Mr. Reidy is going to meet.  They'll go

12  through it, compare and contrast, and then let's see.

13          All right.  What's next?

14          THE DEFENDANT:  There's an issue of a Nurse Terry.

15  I think --

16          THE COURT:  Carlotta Terry?

17          THE DEFENDANT:  Yes.  I've been tracking this nurse

18  for some time.  I suspected she was Valerie's friend.  And last

19  time that my investigator contacted her, the AUSA said they

20  contacted her -- that she contacted them, but she actually

21  contacted Valerie first I found out since then, and then she

22  contacted them.

23          And now they are saying -- they both said they don't

24  know anything about her.  But her name has since come up in the

25  last -- I've been asking for that stuff for months.  But in the

UNITED STATES DISTRICT COURT

```
 1   stuff they just recently gave me, which is the medical reports,
 2   her name is all over the medical reports.  So she's the main
 3   nurse.  She's the one who's been in charge of seeing the
 4   person.
 5            As I respectfully understand, and I believe you were
 6   a prosecutor before, why would you not want -- I mean, it would
 7   be severely damaging to me to -- why would they not bring the
 8   nurse who took care of her during the two months?
 9            THE COURT:  What's the issue, sir?
10            THE DEFENDANT:  I want to subpoena that nurse.  That
11   nurse is the one who took care of her, who can give her honest
12   assessment so --
13            THE COURT:  Did your investigator -- I thought the
14   last time we were here your investigator was going to try to
15   reach her.
16            THE DEFENDANT:  He contacted her.  She was surprised
17   to hear from him.  She said okay, I have to check the medical
18   file and I'll get back to you.  She then called Valerie.
19   Valerie, whatever conversation she had.  Then she called her,
20   whatever conversation they had.  And now she suddenly
21   disappeared.
22            Just like the last witness, Billy Joe.  Whenever
23   they talk to the government, then they disappear.
24            THE COURT:  So you want -- so you want a subpoena
25   for that witness?
```

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  You want me to just order -- I

3    mean, I don't understand.  Your investigator can do that, can't

4    he?

5          Mr. Chambers?

6          MR. CHAMBERS:  Your Honor, this is the

7    Southern District of California witness, the out-of-district

8    witness that we addressed briefly last time.  So --

9          THE COURT:  So then I'll order an out-of-district

10   subpoena be ordered for Carlotta Terry.  Then your investigator

11   can go try to contact her and serve her.

12         THE DEFENDANT:  And also there's an issue of HIPAA.

13   So he said that you would need to order her to bring the

14   medical file.

15         THE COURT:  All right.  So the - well, wait a

16   minute.  Does the government intend to introduce any medical

17   files or discuss any medical files?

18         MR. REIDY:  No, Your Honor.

19         THE COURT:  What do you need the medical files for?

20   She's going to testify -- if she comes, she's going to testify

21   to the treatment of the alleged victim in this case; right?

22         THE DEFENDANT:  Yes.  As I understand it, my

23   investigator told me that she can come and that she can't

24   divulge the medical files unless there's a subpoena for them.

25         MR. REIDY:  Your Honor, we would object to the

1   production of any medical files.  I can understand the

2   defendant wanting this woman's testimony.  I disagree with the

3   characterization of this witness as, you know, sort of

4   essential.

5           I think she was a nurse at a temporary care facility

6   where the victim was at for less than a week.  So I don't

7   really know -- I don't think that she has as much information

8   as the defendant believes she does.  But I don't think that the

9   production of the victim's medical records is appropriate.

10          THE COURT:  Right.  But if she comes and testifies,

11  right, then she testifies and says I treated her.  What did you

12  treat her for?  X, Y, and Z.  He's not allowed to ask -- okay.

13  What if she forgets?  He's not allowed to try to refresh the

14  recollection or do anything with those documents?

15          I mean, it's one thing to subpoena them.  It's

16  another thing whether they get admitted.  And, I mean, look, if

17  he has this theory, I don't think I can deny him the request.

18  He can -- we'll do an out-of-district subpoena for her

19  testimony and subpoena any medical records that she may need in

20  support of her testimony for purposes of trial.  I'm not saying

21  it's going to come in.  But I think I have to allow him that

22  opportunity.

23          MR. REIDY:  Your Honor, I think -- I mean, I think

24  that there's a need to make sure that the records that are

25  produced to the defendant now that he's his own counsel and

1    there's a protective order in the case, that the PII or

2    whatever health information be redacted before defendant gets

3    his whole -- before defendant gets his hands on them.

4            Otherwise I think that, you know -- I don't think

5    that Miss Terry or whatever hospital she works for is aware of

6    the existence of the protective order and necessarily aware of

7    all the contours of this case that require some significant

8    safeguards to be in place whatever information -- before

9    whatever information gets in defendant's hands.  So I think

10   that -- I would ask that the government have the opportunity to

11   review those records first before we produce them to the

12   defense.

13           THE COURT:  Mr. Chambers?

14           MR. CHAMBERS:  Your Honor, I believe that the

15   subpoena is a subpoena for her production at trial on the first

16   day of trial.

17           THE COURT:  Right.

18           MR. CHAMBERS:  To bring the records with her.  So --

19           THE COURT:  That's what my -- she would have to

20   bring them here.  If anything, it's to the Court.  I'd see them

21   arguably before Mr. Gasca sees them.

22           MR. REIDY:  That's fine, Your Honor.  I just want to

23   make sure the defendant --

24           THE COURT:  Yeah.  It's not a -- it's not a

25   production to -- it's not discovery.  I mean, she's being

1  called as a witness.  She's supposed to bring those records

2  with her.

3            MR. REIDY:  Yes, Your Honor.

4            THE COURT:  What's next, Mr. Gasca?

5            THE DEFENDANT:  (No audible response.)

6            (Discussion held off the record.)

7            THE DEFENDANT:  Your Honor, I'd like to call the

8  doctor.  He's a doctor at the -- he's a primary physician at

9  the Boulder Creek institution where she was taken.

10            THE COURT:  For what purpose?

11            THE DEFENDANT:  For the same purpose, to review her

12  medical review.

13            Just to give Your Honor a little background, she was

14  taken first to a Boulder Creek institution.  There are medical

15  reports that have no signature to them.  There are three with

16  Nurse Clarita on her, being the supervisor.  But above her, the

17  doctor who is the supervising physician, this is his name.  So

18  he would be the one who would be most aware of her.

19            THE COURT:  So why do you need both?

20            THE DEFENDANT:  Because Nurse Clarita is Valerie,

21  who took the girl, is Valerie's friend.  So what she was doing

22  was basically playing -- she would go the -- she doesn't work

23  at any of these hospitals.  She would go to the hospital and

24  say, yeah, I'm her primary nurse care.  And they would let her

25  treat her.  And then she would write reports on her.  When she

 1    would get discharged, she would be the one writing the reports.

 2            But even still, that authority, you know, she was

 3    taking that authority, there had to be a doctor supervising her

 4    there.  So when she was here, they say at our place and when we

 5    saw them, this is the care we gave to her.

 6            THE COURT:  Hold on.  There's no difference between

 7    what the doctor did -- it's all one document.  There's nothing

 8    that -- at least that you know of that suggests that Miss Terry

 9    would say something different than what the doctor would say?

10            THE DEFENDANT:  Yes.

11            THE COURT:  What is that?

12            THE DEFENDANT:  It's different.  Because the reports

13    I have.  You know what I mean?

14            THE COURT:  Are signed by both of them, yes?

15            THE DEFENDANT:  No.  They are only signed by her.

16    She --

17            THE COURT:  So what are the reports that are signed

18    by the doctor?

19            THE DEFENDANT:  None.  But he --

20            THE COURT:  Right.  Then you don't need the doctor.

21    I understand he's listed.  You've got the nurse.  She's the

22    treating physician.  She's on the paperwork.  This doctor is

23    not signed off on it.  So you don't get both.  You have the

24    nurse.  The nurse will come in.  She can testify.  She can

25    review the records.  So I'm not going to have both people come

1    in.

2                What's the next issue?

3                THE DEFENDANT:  Okay.  I just want to say his name

4    is on that report --

5                THE COURT:  I understand that.  I understand that.

6    But you have the nurse, the same treating nurse on the same

7    reports.

8                THE DEFENDANT:  There's an e-mail.  We believe we

9    have production of it, but I don't have it.  So he said I just

10   have to clear it with the Court.  There's an e-mail that

11   Valerie has talking about her progress and her condition and

12   the stuff, and it updates with the agent.  So I'd like to have

13   that.

14               THE COURT:  An e-mail from whom to whom?

15               THE DEFENDANT:  From Valerie to the agent.  She's

16   conversing with the agent during this time that the --

17               THE COURT:  What's the relevance of the e-mail?

18   Help me understand.

19               THE DEFENDANT:  It talks -- she's talking about the

20   progress of her, what's going on with her.  And that's going to

21   go directly to what I'm going to cross-examine her with.  She's

22   talking about, you know, how she's doing, what's her

23   observation of her while she's at the place.

24               THE COURT:  Does the government know anything about

25   this e-mail?

1          MR. REIDY:  Yes, Your Honor.  We produced it to the

2    defendant already.  So I'm not sure what he's asking for.

3          THE COURT:  You say you don't have it?

4          THE DEFENDANT:  Yeah, it was protective.  It was

5    protective.  So I need just a copy of it.

6          THE COURT:  Wait.  I don't -- Mr. Chambers, do you

7    have it?

8          MR. CHAMBERS:  We have it, Your Honor.  I can't

9    recall right now whether or not it's unprotected so Mr. Gasca

10   could have it.  Mr. Gasca and I have reviewed it.  I -- that's

11   what I can tell the Court.

12         MR. REIDY:  I'll check, Your Honor.  If it's not --

13   if we didn't produce it with redactions, we will do that this

14   week.

15         THE COURT:  Let's get this Friday so he can have

16   this document.

17         MR. REIDY:  Yes, Your Honor.

18         THE COURT:  I mean, are you familiar with the

19   e-mail, Mr. Reidy?

20         MR. REIDY:  I think I know what he's talking about,

21   Your Honor.  I know --

22         THE COURT:  Is there anything that's sort of -- of

23   concern?  I mean --

24         MR. REIDY:  It's the victim's e-mail address and her

25   contact information.

```
 1              THE COURT:  You can redact that.  I mean --

 2              MR. REIDY:  Yes, Your Honor.  If we haven't --

 3              THE COURT:  I think what he's saying is the point of

 4     it is the contents where, you know, to the extent that Valerie

 5     is saying she's doing well, that he wants to, you know, impeach

 6     her with that.

 7              MR. REIDY:  Yes, Your Honor.  There is -- I will go

 8     through to see if there were -- if it hasn't been produced in a

 9     redacted format, we'll do that this week.

10              THE DEFENDANT:  It's where I got the name

11     Nurse Clarita from.

12              THE COURT:  Okay.

13              THE DEFENDANT:  I don't have my glasses.  Give me a

14     second.

15              The last thing I'd just like to go over is last time

16     Your Honor ruled that the medical expert can give an opinion

17     about his review that day, but he couldn't give an opinion for

18     anything before or anything after.

19              But then on a different day Your Honor reviewed --

20     ruled that he could also look at some videos from that date.

21     So I just --

22              THE COURT:  From that date.

23              THE DEFENDANT:  No, from when I took her nine months

24     earlier.

25              THE COURT:  And he can say based on his, you know,
```

1   expertise, I suppose he could say what he thinks.  And you can

2   cross-examine him on it.

3           THE DEFENDANT:  With respect, I just -- I didn't

4   understand the reasoning there.

5           THE COURT:  I'm not -- I'm not -- you may -- we are

6   going to have to agree to disagree.  An expert can testify.  He

7   has his qualifications.

8           THE DEFENDANT:  He doesn't --

9           THE COURT:  We can go back and forth --

10          THE DEFENDANT:  That's not --

11          THE COURT:  We can go back and forth --

12          THE DEFENDANT:  I think --

13          THE COURT:  Are you going to keep interrupting me?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  All right.  We can go back and forth on

16  what his expertise is.  If he lays -- if there's a sufficient

17  foundation laid as to what his expertise is and he's saying

18  based on my expertise, I looked at this video and this is what

19  I think, the first thing you are going to say is you haven't

20  talked to her in how long?  You weren't with her before.

21  That's all cross-examination.  So he's allowed to testify.

22          THE DEFENDANT:  So he has to lay a foundation then

23  that he has video expert testimony?  Because nowhere in his

24  credentials did I see that he has video expert testimony to --

25          THE COURT:  What do you mean video expert testimony?

1          THE DEFENDANT:  He's going to be looking at a person

2     on a video.  She's hugging me, kissing me.  He's going to be

3     saying no, that's not a hug and a kiss.  That's a hug and a

4     kiss under duress.

5          THE COURT:  I don't know what he's going to say.

6     But to your specific question, I'm not sure what is video

7     expert testimony?  He lays out his qualifications, what he

8     does, how he does it.  If he's designated as an expert, he can

9     say based on my expertise, I believe X.  You will say you are

10    lying, you are incorrect, you don't have the foundation.  But

11    that's cross-examination.

12         THE DEFENDANT:  Okay.

13         THE COURT:  All right.  Next?

14         THE DEFENDANT:  I believe that's it for me.  There's

15    a medical issue.

16         THE COURT:  Okay.

17         THE DEFENDANT:  Just very briefly, when I -- you

18    cut me off last time, which you never do, but you just -- you

19    were a little frustrated with me that day in the hearing.  It

20    was a long hearing.  You said you had to listen to me.  But I

21    was trying to explain to you that, when I come back on these

22    1:00 o'clocks -- no problem from here on in.  I'll come at

23    1:00.

24         THE COURT:  Hold on.  I'm going to stop you there

25    because I'm not going to let this record be that I cut you off.

UNITED STATES DISTRICT COURT

1    It's because you started going on your rant about you want to

2    come at a certain time, only certain times.  You never said

3    anything about any medical condition.  You went on for a good

4    while.  Never said boo about a medical condition.  So I'm

5    not -- I'm not playing that game.

6              THE DEFENDANT:  I'm not playing -- I'm not playing

7    any game.

8              THE COURT:  You did say nothing about a medical

9    condition.  You went on and on about the fact that it was an

10   inconvenience because of the meals and getting back on the

11   early bus.  That's what you said.

12             THE DEFENDANT:  Can I continue?

13             THE COURT:  Now go ahead.

14             THE DEFENDANT:  I never played no games with you.

15             THE COURT:  Well, i just said but don't come now and

16   say I cut you off and I couldn't -- you couldn't raise a

17   medical issue.

18             THE DEFENDANT:  I said I didn't get --

19             THE COURT:  That's not accurate.

20             THE DEFENDANT:  I said I didn't get to the issue

21   what I was going to explain to you which is that I'm diabetic.

22   I have proof that I'm diabetic.

23             THE COURT:  You know what?  And here's my response

24   then.  If that was the case, you should have led with that.

25   You didn't.  It's not the first time we've been here where

1    you've raised the timing issue.  So, again, I'm not going to go

2    for this notion that somehow I cut you off of you expressing a

3    medical condition because you have repeatedly stated I need to

4    be on the early bus and have never said it was a medical

5    condition.  You always said it's because I -- because of food

6    and getting back on the bus at an earlier time.  If you had

7    said it was a medical condition, it would be a different story.

8                    THE DEFENDANT:  That issue, Your Honor, I don't want

9    to disturb the grace of the Court and --

10                    THE COURT:  It's not disturbing the grace -- I don't

11    want to have this -- look, listen.  What you do is you say all

12    these things.  You don't like the answer, and you come back and

13    say it again and add something to it.  And I'm just saying I

14    heard you every time.  You never -- and you've always had more

15    than enough time in hearings.  You've never raised a medical

16    condition.  And you have raised the issue about early buses.

17    And I've accommodated you every time.

18                    In fact, I told you the only reason why I couldn't

19    do it is because I have other matters.  And I said do you want

20    to have a status conference?  Your response was no.  And I told

21    you then you are making a mistake, and we let it go.  Then I

22    hear later, oh, now you do want to have a status conference.

23    And once again I move things around to do it in the morning to

24    accommodate you.

25                    So I just want -- so the record is clear, I'm not

UNITED STATES DISTRICT COURT

1   going to have this notion that somehow I didn't allow you to be

2   heard or that you didn't have a chance to tell me about this

3   medical condition because you've never raised it until now.

4          THE DEFENDANT:  May I explain?

5          THE COURT:  Go ahead.

6          THE DEFENDANT:  Okay.  During those issues, an issue

7   of me going back early solved my issue.  On a visit with him, I

8   explained that I was going to bring up something for trial

9   having nothing to do with those hearings, something pertaining

10  to trial.

11         He said it's a medical issue.  You didn't raise that

12  issue.  I didn't even know about the medical issue.  You need

13  to bring that to the Court.  I mean, and that's why I'm

14  emphasizing it now because he said to me there was something I

15  needed to emphasize to the Court because I'm going to trial.

16         So if I could just explain, and then we can end this

17  hearing.  It will just take a minute to explain.  At the times

18  in the past that I've explained this, I'm a diabetic.  So I get

19  medication in the morning.  It has no effect with anything

20  here.  But by 1:30, I get a medication called gabapentin.  By

21  1:30, my feet start to hurt like they're being stabbed.

22         So when I go back, I don't get a meal until the

23  nighttime.  And I miss that medication.  I have to call that

24  medication.  Sometimes they say well, the nurse said she'll be

25  up.  They never come up at night.  So I miss that medication.

By the time the evening comes, it becomes quite a painful

thing, you know.  So that's what that meant to.

You know, I was going to say that on the trial if

there's some way it can be worked out that I get my medication.

I brought it up pertaining to trial.  Mr. Chambers said that's

a medical issue.  You need to raise that with the Court.  I

said okay.

My issue before was saying that I get diabetes

medication.  I get Metformin in the day, and I get it in the

evening.  You know, that regulates how much I'm going to be

needing the gabapentin a day.  I get a gabapentin, which is a

medication for nerve damage.

Most of the time this thing doesn't affect me.  When

I have the shackles on my feet, they are on my feet all day.

When I'm in the back in the bullpens there -- I'm not

complaining.  I'm just explaining to Your Honor.  They are on

my feet all day.  So when I lay down, it begins to hurt, and I

have the nerve damage.  So by 1:30, 2:00, I start hurting,

you know.

So if I'm on an early go back, when I do go back, by

the time I get to eat and I get settled and I get back about

3:00, I can take care of it.  The difference is when I go back

later, you know, I don't get back until 7:30 at night.  You

know, I come back out of here 4:00, 5:00, if they are rushing,

then MDC got to process me.  I got to check in with accounts.

```
 1    And by the time I get upstairs, it's that easy.  So by then I'm
 2    hurting.
 3              So I'm confused that I didn't make it clear before.
 4    That's all I'm trying to explain, you know.  I wasn't
 5    complaining before, yeah, I got to get there.  But sometimes
 6    I'm here and you don't get an early go back.  So it's not all
 7    the time, you know.  I just raised it when I raised it.  I
 8    didn't try to manipulate the Court or BS you or bring up
 9    something later.  You know, that's all.  I just want to say
10    that.
11              THE COURT:  What do you want, sir?
12              THE DEFENDANT:  He said I should bring it up with
13    the Court just to make sure that --
14              THE COURT:  Do you want to have trial from 9:00 to
15    12:00?  Is that what you're saying?
16              THE DEFENDANT:  No, no, no.
17              MR. CHAMBERS:  Your Honor, I think that there's a
18    medication that needs to be -- he needs to have in the
19    afternoon.  And so -- and he has the name of it.  And that
20    needs to follow him over here.  I would request --
21              THE COURT:  Is that self -- who gives you the
22    medication?  Is it a pill?  Is it an injection?
23              THE DEFENDANT:  It's a pill I get over there.  And
24    I've tried several times.  I can't carry any medication.  Even
25    the ones I can self-carry, the marshals say I can't bring
```

**UNITED STATES DISTRICT COURT**

1    anything to court.  Sorry.

2                THE COURT:  What's the name of the medication?

3                THE DEFENDANT:  Gabapentin.  Sorry.  I tried to do

4    it other ways around.  Just there's no other way.

5                THE COURT:  You don't have to apologize.  Again, we

6    have a difference of opinion.  Every time you raised this, you

7    never said "I'm diabetic."  You never said it.  And so I get

8    frustrated when you are like, oh, I cut you off.  It's just not

9    accurate.  It's just not accurate.

10               So I will -- I'll look into it.  I don't know what I

11   can do.  I mean, I don't know what -- if the marshals are going

12   to let you take -- you are at MDC, or where are you?

13               THE DEFENDANT:  I'm at MDC.

14               THE COURT:  Yeah.  I don't know if they are going to

15   let you take it.  I'll call -- make some calls and see if

16   there's something I can do.  But I don't know if I can order

17   them to allow you to bring this medication when they otherwise

18   wouldn't allow anyone to bring medication.

19               THE DEFENDANT:  Okay.  No problem, Your Honor.

20               THE COURT:  All right.  What's next?

21               THE DEFENDANT:  That's it.

22               THE COURT:  So trial is set for March 20th.  Just

23   so --

24               MR. REIDY:  Your Honor, I apologize.  If I could

25   just raise a couple matters.

```
 1              THE COURT:  Go ahead.

 2              MR. PRENDERGAST:  The defendant raised the

 3  possibility of calling one witness by Zoom.

 4              THE COURT:  From New York; right?

 5              MR. REIDY:  Yes, Your Honor.  Odalis Carrero.

 6              THE COURT:  Yes.

 7              MR. REIDY:  And I think our office would be okay

 8  with that witness being called by Zoom.  But I would just ask

 9  the Court to sort of take a waiver from the defendant, advise

10  him of his right, you know, to potentially --

11              THE COURT:  I thought I did that last time, but

12  we'll double check.

13              Mr. Gasca, you have a right under the Constitution

14  to confront and cross-examine your witnesses in person.  Okay?

15  We've talked about the challenges of the out-of-district

16  subpoena, but you want this woman to testify.  I was the one --

17  I think I was the one who said would you consider Zoom.  I

18  thought your response was yes, but I want to confirm if that's

19  the case.

20              THE DEFENDANT:  Yes.

21              THE COURT:  And does that -- that means that you

22  would not be able to confront and cross-examine her in person.

23  You would do it via Zoom.  Assuming the technology works, you

24  would see her on the screen.  She would see you.  You would ask

25  questions.  She would respond.  It would be transcribed.  Are
```

```
 1    you okay with doing that in lieu of live testimony?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  All right.

 4              MR. REIDY:  Thank you, Your Honor.  I think just

 5    based on some calls we've heard between the defendant and this

 6    witness, I think she's a native Spanish speaker.  So I don't

 7    know --

 8              THE DEFENDANT:  She speaks English.

 9              THE COURT:  Okay.  Well, we'll see if we have an

10    interpreter on standby in case.  But she's not indicated that

11    she needs an interpreter.

12              MR. REIDY:  Okay, Your Honor.

13              And then for -- we would just make a -- reiterate --

14    I guess we'd reiterate our Rule 16 request for reciprocal

15    discovery.  I know the defendant isn't a lawyer.  I'm not sure

16    he's familiar with all the rules.  But any documents or any

17    material that he would seek to introduce at trial, he's

18    got to --

19              THE COURT:  Mr. Gasca, I'd advise you you should

20    look at Rule 16.  You have an obligation, just like the

21    government has, to provide discovery.  I'll leave it at that.

22    Look at the rule, and if there's any discovery that you believe

23    that you should turn over, do it.  But I'll leave it at that.

24    I'm not going to order anything more.

25              MR. REIDY:  I understand, Your Honor.
```

1      And just the defendant has indicated that he's going

2  to call an expert.  And I guess part of that Rule 16 would be

3  he would need to give us a disclosure about what that expert is

4  going to say.

5      THE COURT:  Do you -- Mr. Chambers?  I'm sorry.

6      MR. CHAMBERS:  We've been turning over the reports

7  as quickly as possible, as quickly as we get them.  The

8  government asked for a CV of the expert.  And we provided that

9  last week because that was available to provide.  So we are in

10  tune with Rule 16 and in compliance the best we can.

11      THE COURT:  All right.  Anything else?

12      MR. REIDY:  Just for logistics, Your Honor, what

13  time do you want us to start?

14      THE COURT:  Right.  So that's what I was going to

15  talk about.  Look, I mean, unless this gabapentin thing becomes

16  a real issue, generally on a bench trial I'm going to try to go

17  from 9:00 to 12:00, take an hour break, and then go 1:00 to

18  4:30, try to get as much trial time as we can.

19      The government indicated it's going to be six days,

20  five days?

21      MR. REIDY:  Your Honor, I think, if those are the

22  hours, I think we could try to do it in three or four, I mean,

23  depending on how much -- how long the crosses are.

24      THE COURT:  So the hope is that we would do it -- I

25  don't know -- well, let me see something here.  Right.  So

```
 1   yeah, we would do it starting Monday and push through through
 2   Thursday.  Friday I have my calendar.  So I'm not -- I don't --
 3   I can't squeeze trial in then.  If it goes into the following
 4   week, we'll go into the 27th and just keep going until the
 5   trial is done.
 6              MR. REIDY:  You'd be dark the entire day,
 7   Your Honor, on Friday?
 8              THE COURT:  What's that?
 9              MR. REIDY:  You'd be dark the entire day?
10              THE COURT:  Right, yeah, the entire day.  I've got a
11   calendar that I need to deal with.
12              MR. REIDY:  Yes, Your Honor.  And then for closing
13   arguments, do you have a preferred format for -- I mean,
14   typically during jury trials the government prepares a
15   PowerPoint and does a presentation.  Would you --
16              THE COURT:  It's a bench trial.  I mean --
17              MR. REIDY:  Would you just prefer us to just address
18   you at the lectern?
19              THE COURT:  Look, do what you both need to do.  But
20   remember, it's a bench trial.  I don't need the whole song and
21   fireworks and neon signs.  I mean, I'm here.  I'm listening to
22   the evidence every day.  I've heard it all.  So --
23              MR. REIDY:  Yes, Your Honor.
24              THE COURT:  -- a synopsis of what the evidence
25   showed and why you think it demonstrates that he's guilty and
```

```
 1   then a synopsis of the evidence of why you are not guilty.  I

 2   mean --

 3            MR. REIDY:  Yes, Your Honor.  Thank you.

 4            THE COURT:  Okay.  So, I guess, Mr. Chambers, I'll

 5   ask -- or I'll ask Mr. Gasca.  Do you believe that there's a

 6   need for another conference between now and the 20th?

 7            MR. CHAMBERS:  No, Your Honor.

 8            THE COURT:  If there becomes a need after you guys

 9   meet and confer to talk about this Production No. 23, I'll ask

10   Mr. Chambers if you wouldn't mind letting our courtroom deputy

11   know, and if we need to figure out another time to squeeze

12   Mr. Gasca in, we'll do it.  Okay?

13            MR. CHAMBERS:  Understood, Your Honor.

14            THE DEFENDANT:  Thank you, Your Honor.

15            THE COURT:  Anything further from either side?

16            MR. REIDY:  No, Your Honor.  Thank you.

17            THE COURT:  Mr. Gasca?

18            MR. CHAMBERS:  No, Your Honor.

19            THE DEFENDANT:  Thank you.  Thank you.

20            THE COURT:  Thank you.

21            (At 10:36 a.m. the proceedings adjourned.)

22

23

24

25
```

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  1ST  DAY OF MARCH, 2024.

/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**