**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

-oOo-

**HONORABLE ANDRE BIROTTE JR., UNITED STATES DISTRICT JUDGE**

UNITED STATES OF AMERICA,

                   Plaintiff,

   v.                              No. 2:21-cr-00351-AB-1

JOHNNY RAY GASCA,

                  Defendant.

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**LOS ANGELES, CALIFORNIA**

**MAY 12, 2023**

_____

SUZANNE M. MCKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

```
 1   APPEARANCES:

 2

 3   On Behalf of the Government:

 4        KEVIN B. REIDY, Assistant United States Attorney
          KATHY YU, Assistant United States Attorney
 5             United States Attorney's Office
               General Crimes Section
 6             312 N Spring Street, Suite 1100
               Los Angeles, California 90012

 7

 8

 9   On Behalf of the Defendant as Advisory Counsel:

10        MARK A. CHAMBERS, Attorney at Law
               Law Office of Mark A. Chambers
11             14241 East Firestone Boulevard, Suite 150
               La Mirada, California 90638

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings commenced on May 12, 2023, at 11:50 a.m.)

2               THE COURTROOM DEPUTY:  Calling Case 21-351, United

3    States of America versus Johnny Ray Gasca.

4          Counsel, please state your appearances.

5               MR. REIDY:  Good morning, Your Honor.  Kevin Reidy

6    and Kathy Yu on behalf of the United States.

7               THE COURT:  Good morning.

8               MS. YU:  Good morning.

9               MR. CHAMBERS:  Good morning, Your Honor.  Mark

10   Chambers as advisory counsel for Mr. Gasca, who is present

11   before the Court, in custody.

12               THE COURT:  Good morning to you both.

13         So where do we stand?  We have a trial coming up in a

14   couple weeks.

15         Mr. Gasca, have you gotten all the disks and all of that

16   stuff?

17               THE DEFENDANT:  No.  I don't know what's the status

18   on anything.  I haven't been informed on anything yet.

19               THE COURT:  What's happened?  Mr. Chambers, can you

20   enlighten me at all?

21               MR. CHAMBERS:  Yes, Your Honor.  After the last

22   hearing, the government provided Drive Number 3.

23         And at the Court's request, our expert compared Drive

24   Number 2 to Drive Number 3 from the government.  The expert

25   came back with a report.  That report has been given to

1  Mr. Gasca along with the Drive Number 3 and in a searchable,

2  viewable format.

3      The expert's findings as a result of the difference

4  between Drive Number 2 and Drive Number 3 are "There are

5  absolutely zero evidentiary differences between the evidence

6  found on the original media, which was processed on April 8,

7  2023, versus the evidence found in the media received on

8  May 29, 2023."

9      So Drives 2 and 3 are exactly the same, Your Honor.

10          THE COURT:  Mr. Gasca, you have both of those drives;

11  correct?

12          THE DEFENDANT:  No.

13          THE COURT:  You don't have them at all?

14          THE DEFENDANT:  No.  I haven't received --

15          THE COURT:  Stop.  You have not received 2 or 3?

16  That's what you're telling me?

17          THE DEFENDANT:  No.

18          THE COURT:  Last time you were here, I thought you

19  said you had Drive 2?  Did you have it or not?

20          THE DEFENDANT:  No.

21          THE COURT:  You never got it?

22          THE DEFENDANT:  I never got it.  And I've asked for

23  the tracking number that he says he sent it three times, and I

24  have not received it.

25      But before we go there, there's some double-talk going on

```
 1    here.  What Your Honor asked the last time was that you wanted
 2    to know the difference of why I received 28 gigs and why the
 3    drive --
 4              THE COURT:  I asked for the difference between 2 and
 5    3.
 6              THE DEFENDANT:  Excuse me, Your Honor.  You asked for
 7    the difference --
 8              THE COURT:  I am not doing this all day with you.
 9              THE DEFENDANT:  I know.  May I please, Your Honor?
10    Please.
11              THE COURT:  Make your record.
12              THE DEFENDANT:  Okay.  You said the last time we were
13    here -- I stated to the Court that I've only received 28 gigs
14    and that there is a drive difference of 150-something gigs.
15    Now, the report that I've been given said that the drive of
16    which I was given the 28 gigs, that drive is the same one of
17    the next drive that the government gave him.
18              THE COURT:  I am going to have to stop you there.
19    You said the report that you were given.  What report?
20              THE DEFENDANT:  That report there, the same one he
21    had.
22              THE COURT:  You received that report and not the
23    disk?
24              THE DEFENDANT:  No.  That report only says --
25              THE COURT:  So you got the report?
```

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.

3          THE DEFENDANT:  The report says that the drive the

4    government gave them, the new drive was the same drive as the

5    one they gave before.  Now, that was not the question in

6    dispute last time and that was not the one Your Honor asked me.

7       Your Honor specifically --

8          THE COURT:  I know what I asked, Mr. Gasca.  You

9    don't need to tell me that.  But go ahead.

10          THE DEFENDANT:  The difference between --

11          THE COURT:  Go ahead.  Make your point.

12          THE DEFENDANT:  The difference between why I have 28

13    gigs and why that drive is a hundred-and-something gigs, that

14    was what the technical question was supposed to answer; not if

15    the drive they gave me was the same one they gave me last time.

16    That is irrelevant.  I am not even contesting that.  The

17    question is --

18          THE COURT:  Sir, we have a trial date set for

19    May 22nd.  Are you going to be ready to go at that time?

20          THE DEFENDANT:  I don't have my evidence.

21          THE COURT:  You want to continue this again.  I am

22    going to find out from the Bureau of Prisons whether you got

23    that disk.  And if I find out that you got it, we're going to

24    trial on the 22nd.

25          THE DEFENDANT:  Why would I tell you I didn't get

1  it --
2          THE COURT:  Because just now I asked you about what
3  you got and what you didn't get.
4          THE DEFENDANT:  Yes, Your Honor.
5          THE COURT:  And then five minutes later, you said, "I
6  got the letter about the report."
7          THE DEFENDANT:  Your misunderstanding me.
8          THE COURT:  I didn't misunderstand.  That's what you
9  said.  So you said you got nothing, and then two minutes later,
10  you said you got the report.  So you got something; right?
11          THE DEFENDANT:  I haven't gotten any of the answer
12  what you asked for.
13          THE COURT:  You got the report, but you are saying
14  you didn't get the disk.  And that seems to odd to me.  I just
15  want you to understand that.
16          THE DEFENDANT:  That report, okay, is nothing to me.
17          THE COURT:  But you got it.
18          THE DEFENDANT:  Yeah, okay.
19          THE COURT:  And Mr. Chambers is saying he sent those
20  things to you.
21          THE DEFENDANT:  Okay.
22          THE COURT:  And you only got, you're telling me, the
23  report --
24          THE DEFENDANT:  Yes.
25          THE COURT:  -- and not the CD?

```
1              THE DEFENDANT:  Yes.
2              THE COURT:  I find that hard to believe.  That's all
3    I'm saying.
4              THE DEFENDANT:  I don't know why when I say something
5    you find it hard to believe.
6              THE COURT:  Because one minute you said you got
7    nothing, and then two minutes later you said, "I got the
8    report," when you just said you got nothing.
9              THE DEFENDANT:  You asked me the status of --
10             THE COURT:  I said what -- have you received this?
11             THE DEFENDANT:  I said I have nothing.  I have no
12   information.
13             THE COURT:  "I have nothing."  But you got something.
14             THE DEFENDANT:  All right.  I received the report.
15   It say this -- it enlightens nothing about what the hearing is.
16             THE COURT:  All right.  I am letting you know why I
17   have concerns about it.  Okay?
18             THE DEFENDANT:  Okay.  Fine.  Prior to that,
19   Mr. Chambers stood up and said that he sent another disk to me
20   and that I received it, and I never received that disk.  What I
21   did receive was a copy that they gave the very -- the second
22   time, that Mr. Reidy stood up and said that the reason why that
23   drive is a little shorter is because the FBI agent zipped that
24   disk.  I had no way to dispute that.
25             But when Your Honor asked him to give my investigator the
```

1  other drive, you said, "I want to know the difference of the
2  128 gigs and the 156, or what is the difference there?"
3      That's not the answer to that question.  What we've got
4  now is we've got a report that says that the drive that they
5  gave is the same size as the drive they gave before.  Okay.
6  Fine.  That's the same size.
7      Why am I getting 28 gigs out of 127-something?
8          THE COURT:  Again, our conversation, sir, they said
9  that the disks that they had, the information they had
10  represented everything that was on there.
11         THE DEFENDANT:  Yes.
12         THE COURT:  So if that's what they say they have, I
13  can't do much more than that.
14         THE DEFENDANT:  I am not disputing that.  The size of
15  that disk, Your Honor, is 150 -- 157-something gigs.
16         THE COURT:  But the government is representing -- and
17  you can litigate that matter at a later point.  They've
18  represented that they have everything on the phone on that
19  disk, and they've said that they've given that to Mr. Chambers.
20      Let me ask the government, do you have another copy of
21  this disk so we can give it to Mr. Gasca now?
22         THE DEFENDANT:  No.
23         MR. REIDY:  Your Honor, I do.  I do have a copy.
24         THE COURT:  So let's give it to him now so that
25  there's no -- so there's no dispute about whether or not he got

1    it.

2            MR. REIDY:  Your Honor, I'm just -- my understanding

3    is that I gave -- so I gave a copy of this.  It's actually two

4    flash drives -- one of Mr. Gasca's SD card; another one of his

5    SIM card from his phone.  And my understanding is that it

6    needed to be given to an expert in order to -- so they could

7    process it because the computers at MDC are not --

8            THE COURT:  But what did you -- you gave -- what did

9    you give to Mr. Chambers?

10           MR. REIDY:  I'm sorry, Your Honor.  Do you want me to

11   go back?  I know that there is --

12           THE COURT:  Yeah.  I just want to make sure I

13   understand.

14           MR. REIDY:  So the day of the -- March 17th, which

15   was two status hearings ago, I gave Mr. Chambers a copy of the

16   defendant's phone, the data collected from it, along with

17   Cellebrite software, which is what we typically use and what is

18   pretty commonly used to review data from phones.

19       Mr. Gasca said that he couldn't use Cellebrite on MDC

20   computers, and so I think at the last hearing or shortly before

21   the last hearing, we gave another disk that did not have the

22   Cellebrite software -- I think that is the Drive Number 2 we're

23   talking about and that, apparently, the data from the phone was

24   compressed onto that drive.  And so that was what I gave to

25   Mr. Chambers.

1      After our last hearing on April 18th, I spoke with the FBI
2  about exactly what I had been given, and I asked them to just
3  give me, without any processing, just the raw data that was
4  collected from the defendant's phone.
5              THE COURT:  Okay.
6              MR. REIDY:  And Mr. Chambers was in Roybal, and I
7  walked these same two drives over to him on April 26th.
8              THE COURT:  And can those drives be viewed at MDC?
9              MR. REIDY:  I don't -- I guess I would defer to
10  Mr. Chambers on that.
11             THE COURT:  Mr. Chambers?
12             MR. CHAMBERS:  Yes, Your Honor.  Both the second and
13  third drive were given to our expert.  They are in their raw
14  form.  They were transformed into a viewable, searching format,
15  and they were given to Mr. Gasca.
16             THE COURT:  When you say, "Given to Mr. Gasca," what
17  do you mean by that?
18             MR. CHAMBERS:  Well, I sent them by tracking mail.
19  And Drive Number 2, Mr. Gasca actually referenced in court last
20  time we were here.
21             THE COURT:  What about Drive Number 3?
22             MR. CHAMBERS:  Drive Number 3 is the same as Drive
23  Number 2.  It's the same processed material, so it was changed
24  into the same viewable, searchable format.  That has also been
25  sent to him.  I think it got there Tuesday.

```
 1            THE COURT:  Okay.

 2            MR. CHAMBERS:  In regards to the differences, Your

 3    Honor, the expert wrote another report document titled,

 4    "Explanation of Differences in Size and Content Between Cell

 5    Phone Reports."  And he notes that "The volume of data provided

 6    on this cell phone dump is considerably larger than the first

 7    dump due to several factors.  Mostly due to the redundancy of

 8    information and to the inclusion of a considerable amount of

 9    Cellebrite considers uncategorized data."

10       So there is no difference on the size and the content of

11    the two drives.

12            THE COURT:  So, Mr. Gasca, you have Disk Number 2;

13    correct?

14            THE DEFENDANT:  I have the one that was -- the second

15    one they gave --

16            THE COURT:  You have it?

17            THE DEFENDANT:  I have two versions.  I have an uncut

18    version, which they gave that was unreadable, which was

19    supposed to be -- the FBI was supposed to not use Cellebrite,

20    but I got that.  Okay?

21       That is nearly -- it's, like, 170-something gigs; right?

22       Then I got what supposedly is the converted version of

23    that, of the information to viewable, which is only 28 gigs.

24            THE COURT:  Right.

25            THE DEFENDANT:  And I know from looking at it it's
```

1    not even half -- a bunch of stuff I'm looking for is not on

2    there, so I know that is not the full information on my phone.

3         Now, of that dispute, I'm not saying that the FBI -- cause

4    I don't know what they gave -- I don't know what's on the

5    original drive.  But the expert was supposed to come here today

6    and explain what's the difference to you of why I only have

7    28 gigs, or why this is --

8              THE COURT:  The letter, doesn't that explain it?  It

9    may not explain it to your satisfaction, but the letter he just

10   read says why there's a difference --

11             THE DEFENDANT:  I don't have that letter.  And,

12   secondly --

13             THE COURT:  Hold on.  Hold on.

14        Mr. Chambers, the items that you just read from, is that

15   all part and parcel of the report from the expert?

16             MR. CHAMBERS:  That letter, the expert's second

17   letter, from May the 5th would have probably got to him

18   Wednesday or Thursday.

19             THE COURT:  So it's two letters?

20             MR. CHAMBERS:  Yes.  Two separate -- I received them

21   separately, and so I sent them to Mr. Gasca separately.  As

22   soon as I receive something from the expert, it goes to

23   Mr. Gasca --

24             THE COURT:  Okay.

25             MR. CHAMBERS:  -- in the next day Priority mail.

```
 1              THE DEFENDANT:  Is the expert here in court today?
 2              THE COURT:  No.
 3              THE DEFENDANT:  Okay --
 4              THE COURT:  Hold on.  Well, go ahead.  Go ahead.  Go
 5     ahead.
 6              THE DEFENDANT:  So according to that letter, he's
 7     saying that the Cellebrite to transfer was 120-something gigs?
 8     That is what the Cellebrite information is?
 9              THE COURT:  That is what he's saying, apparently.  I
10     haven't read the letter but --
11              THE DEFENDANT:  He can't be saying that, because that
12     can't be -- I use video-editing programs --
13              THE COURT:  I get it, but, sir --
14              THE DEFENDANT:  Please.
15              THE COURT:  -- where we are right now is that you
16     dispute how much evidence there is on the disk or what's in
17     there.  The government says this is everything that we have.
18     So you have everything at this point.  You can fight the issue
19     of whether the government hid it or destroyed it, but right
20     now, there is no other information for the government to give
21     to you.
22              THE DEFENDANT:  Okay, Your Honor, may I please?  Very
23     simply, I can prove.  They can bring the phone -- you don't
24     need to be a technical expert -- and you can look at the phone.
25     You can look right there.  It says 170 gigs.  You can see all
```

1    the stuff that's on the phone --

2            THE COURT:  I'm not --

3            THE DEFENDANT:  -- that I don't have.

4            THE COURT:  I am not going to do that.  So you have

5    what you have.  The government has made a representation that

6    everything on that phone is on that disk.  That's what the

7    government has said.  You dispute that.  That's fine.  But that

8    is the state of the discovery.  There is not -- I can't squeeze

9    water out of a rock.  You say it's not -- that it doesn't have

10    everything.  They say, "We gave you everything."  There's not

11    much more I can do.

12        So you have all the discovery.

13            THE DEFENDANT:  With the utmost respect to the Court,

14    I don't want you to perceive me as disrespecting the Court.

15    Like you said last time, I disrespected the Court.  I don't

16    want to disrespect the Court.

17        I have 28 gigs, you know?  Where's the 125 gigs?  That's

18    all I'm asking.  And that's what I'm entitled to.

19            THE COURT:  And there's a letter from the expert that

20    purports to explain that.  I don't know what more you want me

21    to do.

22            THE DEFENDANT:  Okay.  Then please let my

23    investigator use his expert and give him the same two

24    drives --

25            THE COURT:  Who's the expert?

```
1          THE DEFENDANT:  He said he had a video expert that
2   can take a look at the drive and can transfer the
3   information --
4          THE COURT:  Right now?  He's already signed up?
5          THE DEFENDANT:  No.  He said he came into court last
6   time.  And I said in court last time, with all respect to Your
7   Honor, can we use that expert?  You know what I mean?
8      And you said, "Well, I prefer you use the one that we
9   have."  But, you know -- he was supposed to be here today.
10  That's what I understood.
11         THE COURT:  Who?
12         THE DEFENDANT:  The expert.
13         THE COURT:  No, no.  Mr. Gasca, you're -- I'm sorry.
14  That is, look --
15         THE DEFENDANT:  My investigator came to see me --
16         THE COURT:  Look -- listen, you want to have a trial
17  on another date?  We can do that.  But, Mr. Gasca, I think you
18  are delaying now.  I really do.  I've tried to do everything I
19  can to help you.  You have a dispute.  If you want to find an
20  expert that you claim is going to show that there is more
21  information on this phone, I suppose you can make that request.
22         THE DEFENDANT:  Thank you.
23         THE COURT:  But I am not going to waste anymore time
24  talking about this.
25         THE DEFENDANT:  May I say something?  My investigator
```

1     came to see me.  He is in court now.  And he discussed with me

2     that that expert -- he spoke to that expert.  That expert was

3     seeing if he could pull more stuff off there, but that he would

4     be in court to explain the difference to you.

5                 THE COURT:  Whose expert?

6                 THE DEFENDANT:  The experts that reviewed this phone.

7                 THE COURT:  I don't know why you thought that.

8                 THE DEFENDANT:  Okay.  My investigator must have been

9     misinformed, because he was informed that the investigator was

10    coming to court.  That's what he was coming for.  He was going

11    to explain today what the difference is, why I have only

12    28 gigs.  It's impossible, Your Honor, that gigs -- the

13    Cellebrite program is -- he can look at it right there.

14    Mr. Reidy said -- he says he has a Cellebrite program on there.

15        Is their Cellebrite program over 100 gigs?

16                THE COURT:  What do you want to do, sir?

17                THE DEFENDANT:  I would like all the information on

18    my phone.  That's all I'm asking for.

19                THE COURT:  What do you want to do, sir?  Because

20    I've explained to you, sort of, the status of things.

21        Do you want to now get an expert to look at the disk that

22    you received?

23                THE DEFENDANT:  Yes.

24                THE COURT:  Okay.  And who -- and your investigator

25    has an expert lined up?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Sir, step forward.  Tell me your name

3   again and tell me who this expert is.

4          THE INVESTIGATOR:  Good morning, Your Honor.  Joel,

5   J-O-E-L; Wyen, W-Y-E-N.  Court investigator for Mr. Gasca.

6      Good afternoon, Your Honor.

7          THE COURT:  All right.  So do you have an expert that

8   you've met with to look at this issue about whether the disk

9   has other information on it?

10          THE INVESTIGATOR:  Your Honor, there is an expert who

11   I've worked with on many occasions for a number of years.  His

12   name is Thomas Blackburn.  He's in San Jose.  And he'd be fully

13   capable once -- if appointed, with the appropriate amount of

14   hours, to be able to receive whatever the Court would provide

15   to him.  He would review and then come back with a report based

16   upon --

17          THE COURT:  Okay.  I don't want to get into the

18   discussions between you and Mr. Gasca, but he could look at a

19   disk and then determine if there is more information on the

20   disk than what appears to be?  I am trying to understand what

21   the expert would do.

22          THE INVESTIGATOR:  Well, Your Honor, not speaking for

23   the expert, but my understanding would be that, if the expert

24   had the thumb drive or whatever the media is from the

25   government and it was to be compared with something else, he

1  would be able to opine on is there a difference, is there
2  things missing, so on and so forth, because he would look at
3  the contents -- look at the contents and make a determination
4  as to if it's the same or different.
5          THE COURT:  And what would the -- a comparison
6  between what and what?  That's what I want to make sure I
7  understand.
8          THE INVESTIGATOR:  Your Honor, I suppose -- it really
9  has to do -- I think Mr. Gasca is talking about the contents.
10 In other words, the contents of a phone would be things like
11 text messages, apps, videos, photographs, things like that,
12 whatever is incorporated or encased in the phone itself.  That
13 would be what an expert would be able to opine on, whether or
14 not -- whatever the government has provided versus whatever
15 else that you need to compare it to.  He would be able to make
16 that determination.
17         THE DEFENDANT:  Your Honor, not just to opine, to
18 transfer it.  I just need it transferred.  I don't need no
19 special format or nothing.  I just need the data transferred to
20 me.  That's all.  Whatever data can't be read or requires a
21 special format, I don't need it.  The thing that I am asking
22 for is simple.
23     For example, there is a memo pad.  I don't have the memos
24 that are in my phone.  It's a simple memo you transfer.  There
25 is no complicated program.  They've made this very complicated.

1    I don't know why it's such a complicated thing.  I just want
2    the data off my phone.
3         And they've given me 28 gigs.  As you remember, last time
4    I had 1 gig, and they said they know they had more or whatever,
5    and then they produced -- okay, we have 156.
6         It appears that they are willing to give me the phone now.
7    But now -- first of all, I don't know that what they give me --
8    he's here now.  You can ask him.
9         Is this Cellebrite -- is he representing that the
10   Cellebrite takes up over 100 gigs?  Is that what Mr. Reidy is
11   representing?  We don't need an expert for that.  He has the
12   drives there.  You can put them in and say, well, the
13   Cellebrite, it requires over 100 gigs.
14            THE COURT:  What is the government's position, if
15   any, with respect to this?
16            MR. REIDY:  Your Honor, I just don't see the -- I
17   think the expert evaluating the different drives is a sideshow.
18   The main contention is whether -- the main issue, I suppose, is
19   whether or not the drive/drives that we provided have the
20   information that Mr. Gasca believes is on --
21            THE COURT:  He just made reference to some memo or
22   notepad, as an example of something that he says he knows is on
23   the phone and that has not been turned over.
24            MR. REIDY:  Your Honor, I don't think that that's
25   accurate.  I think that we're probably dealing with, when we

1    turn over phone data in its raw format, without a program to

2    collate and sort the data, I imagine that it's probably

3    difficult for somebody not as -- who is not a technical expert

4    to review -- to find and review that data.  So I think, just

5    because Mr. Gasca can't find it doesn't mean that it hasn't

6    been produced.

7              THE COURT:  No but -- again, you've got to help me

8    understand this.  The government downloaded -- represents that

9    they've downloaded everything that was on this phone?

10             MR. REIDY:  Yes, Your Honor.

11             THE COURT:  And put it on these thumb drives?

12             MR. REIDY:  Yes, Your Honor.  Three times now.

13             THE COURT:  And there is nothing more on those

14   phones?

15             MR. REIDY:  No, Your Honor.

16             THE DEFENDANT:  Let my -- let him have an expert

17   convert it, and then his expert --

18             THE COURT:  But you've already had an expert convert

19   it.

20             THE DEFENDANT:  No.  He converted and gave me only

21   28 gigs.

22             THE COURT:  No.  But the expert converted what he was

23   given.

24             THE DEFENDANT:  I don't believe that is accurate.

25             THE COURT:  I know you don't believe it, but that --

```
1    that's the point.  That is the challenge is that you don't
2    believe it.  But an expert has taken this information.  So what
3    is going to be different this time?
4              THE DEFENDANT:  Well, take what he just said.  He
5    just said that a simple memo pad, an expert wouldn't he be able
6    to --
7              THE COURT:  I'm not getting into that.  What I am
8    trying to understand is you are asking for it to be done a
9    second time, because you are asking for them to give the disk
10   to your expert to make a comparison.  That has already been
11   done.
12             THE DEFENDANT:  I don't even want a comparison.  I
13   just want the stuff transferred.
14             THE COURT:  Right.  But that's already been done.
15             THE DEFENDANT:  Once he got it, and he'll be able to
16   take the information off without any fancy programs, nothing.
17       Why would I delay my trial?
18             THE COURT:  Mr. Gasca, I don't think you're hearing
19   me.  That has already been done, according to the government.
20   They've taken everything off the phone and put it on two -- at
21   least two disks.  You claim it's missing something.
22             THE DEFENDANT:  I'll take their word for it.  I
23   haven't seen that all that data has been given to me.  I only
24   seen 28 gigs that was transferred in some searchable format --
25   which Mr. Chambers says is a searchable format.
```

1      So suppose there was some data that couldn't go into that

2    searchable format?  Does that mean that he left it out?

3          THE COURT:  No.

4          THE DEFENDANT:  I don't understand.

5          THE COURT:  What is on that disk is everything on the

6    phone.

7          THE DEFENDANT:  28 gigs that I have?  It's missing --

8    stuff I had on my phone is not on there.  For example, it has

9    other programs that are far more elaborate, far more

10    complicated on the phone.  But it doesn't have my notepad,

11    which has very valuable information.  Just as an example,

12    there's a lot of things that I'm missing that are very simple.

13    There's certain pictures I'm missing, certain videos I'm

14    missing.  You don't need any special program.  You just

15    transfer that over.  I've done it at my house on the phone.  It

16    requires no special program.

17          THE COURT:  Look, Mr. Gasca, I'm sorry.  I'm not

18    going to appoint another expert to do this, because I don't

19    think it's going to result in any difference.  I mean, they --

20    the government has said that they've transferred the disk in

21    different formats.  Everything that's on the phone is, at

22    least, on the disk that you have.  So I am not going to appoint

23    another expert to do the same thing over and over again.

24      So your request is denied.

25      We have a trial date set for May 22.  I intend to proceed

1    on that date.  We're going to go through the trial.  You have

2    what you have.  I don't know what else I can do at this point.

3              THE DEFENDANT:  Can I have those two?  I don't have

4    any raw data.  He represented he had two of his raw data.  I

5    don't have anything.  You said he has two disks.  I don't have

6    that.

7              THE COURT:  Has the raw data -- I thought the raw

8    data was provided in the first disk.

9              MR. REIDY:  Yes, Your Honor.  Out of an abundance of

10   caution, I asked the FBI to make two copies of the flash

11   drives, and I gave one copy that looked just like this to

12   Mr. Chambers on April 26th, so this is the unprocessed --

13             THE COURT:  So you have the raw data as well as

14   the -- you turned over the raw data as well as whatever -- in a

15   searchable format?

16             MR. REIDY:  No, Your Honor.  So I provided

17   Mr. Chambers with the raw data from the phone.  Mr. Chambers

18   then provided it to the experts to do the comparison between

19   the two drives and then also to make it searchable and usable

20   to the defendant in MDC.

21             THE COURT:  Okay.

22             MR. REIDY:  This does not have that second step of

23   making it --

24             THE COURT:  Convertible.

25             MR. REIDY:  -- usable to the defendant at MDC.

```
1              THE COURT:  Right.
2         So, Mr. Chambers, what have you provided to Mr. Gasca?
3              MR. CHAMBERS:  Your Honor, I provided Mr. Gasca with
4    a viewable, searchable format for the first one that they
5    turned over, the raw data, and the second one.
6              THE COURT:  So I want to make sure.  You provided the
7    viewable, searchable format as well as the raw data?
8              MR. CHAMBERS:  No.  The raw data is absolutely
9    useless to him.  Okay?  It has to be converted; otherwise,
10   we're back to the first drive that the government turned over,
11   that I gave to him, that I couldn't open; he can't open.  It's
12   worthless.  So that's why we got the raw data back from the
13   government, Drive Number 2, and that was given in viewable,
14   searchable format form and provided to him, and he referenced
15   that at the last hearing we were at.
16        After the last hearing, the government provided Drive
17   Number 3, raw data.  That was provided to the expert.  It was
18   turned in to a viewable, searchable format and again provided
19   to Mr. Gasca.  He's got it.
20             THE DEFENDANT:  I haven't received it.  Don't say I
21   got it.  I haven't received it.
22             THE COURT:  Now, what are you asking for?  You want
23   the raw data, even though you can't access it at MDC?
24             THE DEFENDANT:  I have a simple question to ask.
25             THE COURT:  Is that what you want, sir?
```

1          THE DEFENDANT:  May I ask --

2          THE COURT:  Is that what you want, sir?  You've got

3    to answer my question now.

4          THE DEFENDANT:  If that's what they have on them,

5    yes, I would like it, you know.

6       But I would ask is this question:  An SD card, when you

7    stick it into the phone, regardless of whatever you did, that

8    SD card, when it comes out, has a bunch of data that you can

9    put into any computer and any computer to read.  Just give me

10   a simple copy of the SD card.

11      What's the problem with that?  It doesn't require any

12   expert or anything.  Why can't the FBI just give me that?

13         THE COURT:  Mr. Reidy?

14         MR. REIDY:  Your Honor, the drive that was provided

15   to Mr. Chambers on April 26 contained data from both the SIM

16   card and the SD card.  He has both.  I think he has three

17   copies of it now.

18         THE DEFENDANT:  So that's the same data that he would

19   pull right out of the phone, the same card?  The SD drive you

20   have there is a copy of the same card?

21         THE COURT:  It's the data from the SD card, and what

22   else?

23         MR. REIDY:  The SIM card, Your Honor, on the phone,

24   and the SD card.

25         THE DEFENDANT:  That would be fine, because I don't

1    have that.  What was given to me --

2              THE COURT:  But he --

3              THE DEFENDANT:  What was given to me was a drive in

4    Cellebrite that required Cellebrite, not the phone.  Because

5    when I take the disk out of my phone and I put it into a

6    computer, it doesn't require Cellebrite to read it.  So what

7    was given to me --

8              THE COURT:  Are you going to place this SD card in

9    the computer at MDC?  How are you going to read it?

10             THE DEFENDANT:  If it's an exact copy of my phone --

11   you know what I mean? -- and it just needs to be copied, I'll

12   find some way to read it there.  I'll find some way.

13             THE COURT:  I think that is the problem.  I don't

14   think you can find a way to read it.

15             THE DEFENDANT:  An adapter goes into the SD card --

16   as long as I know that that's not a converted file -- or if

17   not, then they can put -- here.  Listen, please listen to me,

18   Your Honor.  The first drive they gave -- right? -- they gave a

19   first drive.  That drive had on it data that couldn't be read

20   in MDC.  They said it was Cellebrite'd.  Okay?  So then --

21             THE COURT:  Hold on.  I'm going to stop you.  I'm

22   going to stop you.  Here's what we're going to do.  We're going

23   to come back at 3:00.  I want you to copy this disk with the

24   raw data, have it in a disk, and you're going to hand it to

25   Mr. Chambers, who is going to hand it to Mr. Gasca.  Then

1    you'll have everything.

2              THE DEFENDANT:  Okay.

3              THE COURT:  Then we'll do that at 3:00.

4              MR. REIDY:  I can just hand it to him right now, Your

5    Honor.

6              THE COURT:  Right.

7              THE DEFENDANT:  It's on an SD drive.  You can put in

8    on a thumb drive.  If it's the same thing that he's saying, you

9    can transfer it to a thumb drive, and then I'll have it at -- I

10   can read it at MDC.

11             THE COURT:  I am not sure I'm following you.

12             THE DEFENDANT:  Okay.

13             THE COURT:  He has a -- what kind of drive is that,

14   Mr. Reidy?

15             MR. REIDY:  Your Honor, it looks like a flash drive

16   and then -- oh, it is an SD card, Your Honor.

17             THE COURT:  So, okay, there's an SD card and a flash

18   drive.

19             MR. CHAMBERS:  Yes.

20             THE DEFENDANT:  So the flash drive, you can give me,

21   and the SD card drive, he's representing that it's the same SD

22   card that you put into the phone.  So that SD card has no

23   Cellebrite, no nothing.  You know what I mean?  That's the same

24   thing.  So I should be able -- you can transfer it to a thumb

25   drive, and then I can use it at MDC.

```
 1          THE COURT:  We'll find out.  But now -- but when you
 2   have this, this -- he's saying this represents everything that
 3   is on the phone.  Okay?
 4          THE DEFENDANT:  I would say that, when the expert in
 5   that report, there is a picture -- it's the same thing that
 6   Mr. Reidy says he's giving to the expert.  And that says that,
 7   on the SD drive, there's 100-something gigs and on the phone --
 8          THE COURT:  I don't need to have that discussion.
 9   You wanted the raw data, so I am going to give you the raw
10   data.  Okay?  And we're going to start our trial on May 22nd.
11          THE DEFENDANT:  I haven't shown my doctor.  I don't
12   know where --
13          THE COURT:  What doctor?
14          THE DEFENDANT:  A doctor.  He was supposed to get me
15   an expert investigator.  I haven't had time to check with him.
16   He's looking into it getting me a doctor.
17          THE COURT:  Well, you need to find one by May 22nd,
18   because we have a trial that is starting that day.
19          THE DEFENDANT:  I don't know what the status of that
20   is.
21          THE COURT:  Mr. Chambers?
22          MR. CHAMBERS:  Yes, Your Honor.  The investigator
23   located an expert.  I submitted an application for funding on
24   April the 23rd.  CJA reached back and requested clarification.
25   That clarification was supplied by the doctor, and then I
```

| | |
|---|---|
| 1 | resubmitted it -- or I submitted a supplemental on April the |
| 2 | 25th.  Since then, there has been no movement on the funding of |
| 3 | the expert.  The other -- |
| 4 |        THE COURT:  That was -- I'm drawing a blank on her |
| 5 | name.  Ms. Eskenazi.  Does she review those? |
| 6 |        MR. CHAMBERS:  Yes. |
| 7 |        THE COURT:  All right.  So I'll reach out to her |
| 8 | today. |
| 9 |        MR. CHAMBERS:  The other funding matter, that is |
| 10 | currently pending, is for the investigator to be present during |
| 11 | the trial, Your Honor. |
| 12 |        THE COURT:  Okay.  So expert funding and |
| 13 | investigator.  All right. |
| 14 |        THE DEFENDANT:  And assuming that there is data there |
| 15 | that I can read and it matches -- |
| 16 |        THE COURT:  Sir, at this point, sir, I am just being |
| 17 | blunt with you.  We've done all kinds of iterations.  They're |
| 18 | saying that they're giving you the raw data. |
| 19 |        THE DEFENDANT:  Okay. |
| 20 |        THE COURT:  I don't know if you're going to be able |
| 21 | to read it or not, because -- I think we've done this dance |
| 22 | before.  I think we're going to end at the same point.  And at |
| 23 | that point, sir, you've gotten everything that the government |
| 24 | has given to you in various different formats.  And so I am not |
| 25 | going to continue this case because you say that this time you |

1    can't read this.  Okay?

2           THE DEFENDANT:  May I make the record clear on one

3    subject, please?

4           THE COURT:  Go ahead, please.  Briefly.

5           THE DEFENDANT:  When the first --

6           THE COURT:  No.  I don't need a record clear about

7    the past.  I'm just telling you where -- I'm telling you where

8    I stand.  We have a trial set for May 22nd --

9           THE DEFENDANT:  Okay.  But there is some

10   misunderstanding there.

11          THE COURT:  There is not a misunderstanding, and I'm

12   not going to go through this with you, sir.  We have a trial

13   set for May 22nd.  You have lodged your objections and disputes

14   about what has happened beforehand.  I've tried to address at

15   each and every turn.  I've tried to give you different formats

16   of the discovery that the government claims they have,

17   including today, giving you a raw version of the discovery,

18   which you asked for.  So I'm giving you everything you want.

19   Okay?

20       But we have a trial date set for May 22nd.  I just want to

21   make sure you understand that.

22          THE DEFENDANT:  That's next week.  I can't be ready

23   by next week.  I just need another week.  Just one week is all

24   I'm asking for.

25       Why would I delay my trial?  It's my trial.

```
 1              THE COURT:  I don't know why.  You keep talking about
 2    it, but every time we come you're asking for the delay of the
 3    trial.  So you want to delay it another week, let me find
 4    another date for you, sir, since this is all about you.
 5          And remember, virtually, every request you've made, you
 6    have been given.  Okay?  So I don't want to hear all of this
 7    nonsense about, oh, you're upset with me; oh, you're not doing
 8    what I want.  I need to state a record.  I'm granting every
 9    request you've made.  So let me find another date.
10              THE DEFENDANT:  Okay.
11              MR. REIDY:  I apologize.  The trial is actually set
12    for the following week.
13              THE COURT:  May 22nd.  Right.  It's ten days from
14    now.  You want another week.  Okay.  So that puts you into
15    Memorial Day.  We're closed on Memorial Day, so let's see what
16    the 30th looks like or June 6th.  Let me just look.  Or
17    June 5th, for that matter, given that it's a bench trial, so --
18          Mr. Gasca, you want to do it on May 30th or June the 5th?
19              THE DEFENDANT:  June the 5th.
20              THE COURT:  All right.  June 5th will be the trial
21    date.
22              MR. REIDY:  Does Your Honor know the Court's schedule
23    as far as if any days are going to be dark or if --
24              THE COURT:  I would like to proceed Monday through
25    Thursday.  We'll be dark on Friday.  And then I presume we're
```

1    going to need to go into the second week, and there may be some

2    adjustments that I'll need to make, but we'll start on the 5th.

3                MR. REIDY:  9:00 to 5:00, Your Honor?

4                THE COURT:  Yes.  My intent is going 9:00 to 5:00.

5                MR. REIDY:  Thank you, Your Honor.

6         Your Honor, do you mind if, while the Court is on the

7    bench, I just walk over and hand this to the defendant?

8                THE COURT:  Give it to Mr. Chambers, and Mr. Chambers

9    can hand it to Mr. Gasca.

10                THE DEFENDANT:  I need to put it on a thumb drive.

11   The SD drive --

12                THE COURT:  It is.  It's on a flash drive.

13                THE DEFENDANT:  One.  But the second drive is a

14   little drive.  It needs to be transferred to a thumb drive.

15                THE COURT:  I thought both -- they're not on flash

16   drives?

17                MR. REIDY:  One is on a SD drive, and one is on a

18   flash drive, Your Honor.

19                THE COURT:  So everyone come back at 3:00.  Convert

20   it, and then we'll give it to him.  Okay?

21                MR. REIDY:  Yes, Your Honor.

22                THE COURT:  I'll see you all at 3:00.  Thank you.

23                THE COURTROOM DEPUTY:  All rise.

24         (Adjourned at 12:23 p.m. until 3:13 p.m.)

25                THE COURT:  All right.  Mr. Reidy, you have the disk?

```
 1              MR. REIDY:  Yes, Your Honor.
 2              THE COURT:  So what do you have that you're going to
 3    give to Mr. Gasca?
 4              MR. REIDY:  Yes, Your Honor.  So I have a flash drive
 5    containing a copy of the data from his phone.  I have another
 6    smaller flash drive containing a copy of the data from his SD
 7    card.  And then I kept the original -- or the SD card that we
 8    were provided by the FBI.
 9              THE COURT:  So it's three.
10              MR. REIDY:  It's three items, Your Honor.
11              THE COURT:  Three items.  Okay.
12              MR. REIDY:  Yes.
13              THE COURT:  So can you give those to Mr. Chambers,
14    and he can give them to Mr. Gasca.
15              MR. CHAMBERS:  Here you go.
16              THE COURT:  So, Mr. Gasca, you now have those three
17    items.  Look at them, do what you need to do.  We have the
18    trial for set June.
19         Anything further we need to discuss today?
20              MR. REIDY:  No, Your Honor.  Thank you.
21              THE COURT:  Anything further?
22              THE DEFENDANT:  Yes.  In the report that was
23    generated for -- it wasn't the report I asked for.  The Court
24    didn't ask for it either, but the report was very detailed.  It
25    was, like, ten pages.  It said how much memory was on each
```

1   disk, how it was converted.  There was no difference between

2   the disks.  It was nothing because it was not what we asked

3   for.  But the point of it, it was extremely detailed and

4   explained that there was no difference from the last drive or

5   to the new one he changed.

6       Now, there is a secondary letter that gives an

7   explanation, oh, by the way, the 28 gigs, the reason for that

8   being is because the Cellebrite.  But I got no data, no

9   explanation or nothing.  Nothing that I could look at and say,

10  well, there is a reason why this is -- and I explain that

11  because I do intend to do that issue for appeal.  I'm probably

12  going to wind up in appeal.  Your Honor's attitude toward me is

13  that --

14          THE COURT:  Hold on.  Hold on.  You're not doing

15  that.  Okay.

16      Because, number one, I just was about to say, you said

17  "appeal," I'm, like, we haven't had a trial.  We don't know

18  what is going to happen.  You can smirk, and you can do all

19  that stuff.  I'm not going for it.  Okay?  I don't appreciate

20  how you're treating me.  I've afforded you --

21          THE DEFENDANT:  I don't appreciate you lying.

22          THE COURT:  I've afforded you more than enough

23  respect during the course of this trial.  Every request you

24  have made, you've been granted.  Okay?  We've moved the trial

25  date I don't know how many times.  You've raised the issue of

1    discovery numerous times, and every time I've tried to

2    accommodate you.  Today I told you I'm not going to appoint

3    another expert to deal with this issue.

4             THE DEFENDANT:  That's fine.

5             THE COURT:  You can think what you want, but you are

6    not going to insult me in this courtroom, sir.

7             THE DEFENDANT:  I don't mean to insult you.  I don't

8    mean to insult you.

9             THE COURT:  Anything further you have to say?

10            THE DEFENDANT:  I don't mean to insult you.

11            THE COURT:  But you just did, and you know you did.

12   Don't play smart with me.

13            THE DEFENDANT:  I'm not playing smart.  You called me

14   a liar.

15            THE COURT:  I didn't call you a liar.  I repeated to

16   you what you just said earlier today.

17            THE DEFENDANT:  That doesn't make me a liar.

18            THE COURT:  "I've got nothing."  And then five

19   minutes later you said, "I got a document."

20            THE DEFENDANT:  This is what I'm discussing.

21            THE COURT:  There's a difference between nothing and

22   getting a document.  That's all I pointed out.

23            THE DEFENDANT:  Perhaps I misspoke.

24            THE COURT:  I never said the word "liar."  I never

25   accused use of lying.  I said, you said --

```
 1              THE DEFENDANT:  You said I was stalling.
 2              THE COURT:  -- and now you're telling me something
 3   different.
 4              THE DEFENDANT:  You also said I was stalling.
 5              THE COURT:  No.  I said I'm worried that this is
 6   being used as a delay tactic.  You say you're not, so be it.
 7   Cut the nonsense out, Mr. Gasca.
 8              THE DEFENDANT:  I'm not doing any nonsense.
 9              THE COURT:  You want a trial, you're going to get it.
10              THE DEFENDANT:  I want the trial.
11              THE COURT:  Go talk to MDC.  Find a fair judge that's
12   going to deal with the nonsense that you are putting up.  Go
13   ahead.  If you want to go down that road, we can do that.
14              THE DEFENDANT:  Can I say this?  Can I finish?
15              THE COURT:  Okay?  With all of this nonsense you are
16   pulling.
17              THE DEFENDANT:  I would not be stupid enough to
18   accuse you of being unfair.  Remember it was me that chose to
19   have a Judge trial.  So you could say that and that doesn't
20   stick, because I haven't accused you of being unfair.  But at
21   times -- you know, there are times that -- anyway forget that.
22       The issue is, I would like a report to say what that thing
23   was, not just a letter that says, hey, that's the difference of
24   what that was.  Because if it does come up on appeal, that's
25   something that he could just say, hey, I didn't say that it
```

1    took up 120 gigs.  I said that there was a -- that report is
2    not a professional document.  And I would ask for a
3    professional document of record to explain why the difference
4    is that I have 28 gigs and that these drives here contain 200
5    gigs among them.  There's 200 gigs among these drives here.
6            THE COURT:  Well, I'm not going to -- the expert has
7    laid out his or her opinion.  I haven't seen the report.
8    You've laid your objection.  To that extent that you're worried
9    that it's not preserved for appeal, you just laid out the
10   issues.  I think this has been vetted very thoroughly.  So to
11   the extent you're worried about appeal, all these issues have
12   been laid out.
13           THE DEFENDANT:  Okay.  Secondly, I have about three
14   weeks before I prepare for trial.  All I needed was that and
15   the doctor.  Your Honor seems to be taking care of the doctor.
16           THE COURT:  I am going to try to do that as soon as
17   we get out of here today.
18           THE DEFENDANT:  So I'm all good to go.  And you
19   already said that, whatever that is, it is.  I would appreciate
20   a more detailed document, but if you say that's it, then that's
21   it.
22       But the last thing I need is I need an attorney to help me
23   prepare.  I have a motion I need to prepare.
24       And I did find --
25           THE COURT:  So you --

```
1              THE DEFENDANT:  Out of 28 gigs --
2              THE COURT:  So you need -- you're going pro se?
3              THE DEFENDANT:  I am going pro se.
4              THE COURT:  You don't want to work with Mr. Chambers.
5    Are you asking me now to appoint an attorney?
6              THE DEFENDANT:  No.  I need one to help me prepare
7    for trial.  Just like I needed an advisory counsel.  He didn't
8    advise me nothing.
9              THE COURT:  Well, you have to -- you've made
10   a decision to go pro per.
11             THE DEFENDANT:  Right.
12             THE COURT:  I'm not going to appoint another lawyer
13   now.
14             THE DEFENDANT:  Fine.  May I finish?
15        I did find quite substantial stuff in the 28 gigs, and if
16   this is legit here, I expect to find more, because I still
17   haven't found the stuff that I am looking for.  I still need to
18   prepare those motions to make them submittable to use at trial.
19   So I need someone to help me with those motions.
20             THE COURT:  Wait.  You can't have it both ways,
21   Mr. Gasca.  You said you wanted to go pro per, and then I
22   appoint advisory counsel.  You don't like that, so now you're
23   telling me appoint another lawyer to just help you do the
24   motions?
25        You're going pro per.  You can write the motions and
```

1   submit them to the Court.  Other people -- I get that all the
2   time.
3             THE DEFENDANT:  Well, when I had my last attorney and
4   I chose to go pro per, if you may remember, I asked that he be
5   kept on to do the motions.  You know what I mean?  So he was
6   doing the motions for me at that time.  You know what I mean?
7   I didn't expect to have any other the motions come up, but I
8   have two important ones that I'm going to need to --
9             THE COURT:  You're going to have to -- look, you have
10  an advisory counsel.
11            THE DEFENDANT:  I also --
12            THE COURT:  If you don't want to work with them, I
13  can't --
14            THE DEFENDANT:  I also have stuff I need to prepare
15  such as video frames and -- I got -- the government has -- for
16  example, the government has a video, and they've got frames and
17  stills and all that stuff, you know.  But I want to do -- if
18  they're going to do it, I'm going to do the same thing, too.  I
19  need to make video stills and --
20            THE COURT:  That is one of the reasons why you have
21  the advisory counsel.
22            THE DEFENDANT:  Advisory -- I already told you I
23  don't get along with that dude.  I don't speak to him --
24            THE COURT:  That is an issue that you've created.
25            THE DEFENDANT:  How do you know I created that?

1          THE COURT:  You don't get the choice, advisory

2    counsel of your choice.  And I think we've gone through this

3    before.  You've had more than one lawyer on this case that's

4    been assigned to you.

5          THE DEFENDANT:  That's right.

6          THE COURT:  And you've asked.  I've changed it.  You

7    asked.  I changed it.  I think twice.  Maybe once, maybe twice.

8          THE DEFENDANT:  Twice.

9          THE COURT:  Now you're not happy with this person and

10   now saying two weeks before trial I need another lawyer to come

11   in to help you.  I'm not going to do that.

12         THE DEFENDANT:  Okay.  Well, like you said before,

13   they don't do what I want to do when I want to do it, and

14   that's why I changed them, and that was not why I changed them.

15   I changed them because they --

16         THE COURT:  I didn't talk about that now, so stop

17   going back in history.

18         THE DEFENDANT:  Okay.

19         THE COURT:  I'm just saying you asked for lawyers.

20   I've given them to you.

21         THE DEFENDANT:  This lawyer sabotaged my doctor, you

22   know, and then I don't trust any of this stuff that he's done.

23   He just had the guy -- he just had a guy do a whole test that

24   we didn't even ask him to do.  And then, where is my test to --

25   why didn't I get a test showing what the difference is between

1   the 25 gigs?  I would appreciate that test.  Where is that

2   coming from?  How is that helping me?

3          THE COURT:  If you need to file motions, you are

4   going to have to file them and submit them to the Court.  Okay?

5   And you have advisory counsel.  You can choose how you want to

6   use that person or not.  But that's what they're there for.  If

7   you don't want to do it, I can't force you to do it.

8          THE DEFENDANT:  Okay.  Well, I'll dismiss this

9   advisory counsel if they're not doing me no help.  I have

10   gotten nothing from him that I need.

11          THE COURT:  Okay.

12          THE DEFENDANT:  So I could dismiss him, and I'll just

13   write my motions --

14          THE COURT:  The thing is, last time I checked, you're

15   the judge.  I decide who is the advisory counsel or not.

16   You've made a request to go pro se.  You asked for advisory

17   counsel.  I gave you advisory counsel.  You don't like that

18   person.  Now, you want someone else.  I'm not doing that three

19   weeks before trial.  So we don't need to -- there is nothing

20   further to discuss.  You've made your request.  It's denied.

21          THE DEFENDANT:  Okay.  So you are going to have him

22   sit there in trial --

23          THE COURT:  Yes.

24          THE DEFENDANT:  -- and just sit there for the hell of

25   sitting there?

```
 1              THE COURT:  Yes.
 2              THE DEFENDANT:  Because I have no communications with
 3    him.  I don't know why you insist on him being my advisory
 4    counsel.  I've expressed to you three times that we don't get
 5    along.  It's not working out.  I don't know why you insist on
 6    him being my lawyer.
 7              THE COURT:  Because I get to do that in this
 8    position.  Based on the evidence that has been presented, based
 9    on the law that I'm aware of, you've asked for advisory
10    counsel, I've appointed it.  You don't get the choice.
11              THE DEFENDANT:  But at the time --
12              THE COURT:  You don't get the choice --
13              THE DEFENDANT:  Okay.
14              THE COURT:  -- as to who the advisory counsel is.  I
15    could say this over and over again.
16              THE DEFENDANT:  No, Your Honor.
17              THE COURT:  There is no point.
18              THE DEFENDANT:  With respect to the Court, I would
19    just say, from the first time that we met, we didn't clash.  We
20    clashed.  We came back to the Court.  And you said, "Okay.
21    Maybe it was my fault.  I put you together," or whatever.  You
22    said, "Look, he's good.  I know he's good."
23         And because you said that, I did my best to work with him,
24    writing him thank you letters, everything.  I did my very best.
25    This guy is a truck.  Maybe he was good, and maybe he is good,
```

1    you know, in your opinion.  But, for me, he hasn't been good.

2        And the biggest proof of that was the doctor.  I knew he

3    was going to do that.  I told my investigator he was going to

4    do that.  And he did that.

5            THE COURT:  Sir, you told me this before.

6            THE DEFENDANT:  He sabotaged my doctor.  That's why

7    we have this delay.  Aside from the fact the government's done

8    numerous --

9            THE COURT:  What is the next issue, sir?

10           THE DEFENDANT:  I need the government -- I have

11   some -- I need a copy of the -- whatever the docket is for the

12   Court that requests Minutes.  I requested some of -- the last

13   time I was speaking to Mr. Chambers, I requested some, and he

14   didn't do it.  He sent it back to me to file myself.

15           THE COURT:  What are you asking?

16           THE DEFENDANT:  A list of the dockets, when you

17   request Minutes of the Court.  I don't have it.  I don't have

18   any.

19           THE COURT:  You want a copy of the docket?

20           THE DEFENDANT:  Yeah.  The list of Minutes, like,

21   when I've come to court, what it's been for, so I can know what

22   Minutes to request.

23           THE COURT:  You don't have access to the docket at

24   MDC?

25           THE DEFENDANT:  No.  I was given one before by

1   Mr. Chambers, but I don't have an updated one.

2       Where would I get it at MDC?

3           THE COURT:  Mr. Chambers, can you get a copy of the

4   docket?

5       You want the whole docket?  I mean, it's like -- I mean,

6   this case has been going on for quite some time.  You want

7   every entry -- I'm not sure I'm following you.

8           THE DEFENDANT:  Well, yeah.  Of my recent dates, I

9   have most -- the recent dates -- or the five times I've come to

10  court, I don't have that.  I don't know what dates to ask for

11  or transcripts or what reporter to ask for.

12          THE COURT:  What are you asking -- I'm trying to

13  understand what are you looking for?

14          THE DEFENDANT:  I'm looking for the transcripts of

15  one or two days that I've been in court before.  I don't know

16  the dates.  I don't have the -- I did have them.  I marked them

17  down.  I sent it to Mr. Chambers and told him, when I was

18  speaking to him, would he please do that and just send it on.

19  He sent it back to me two weeks later for me to fill out

20  myself, two of the things --

21          THE COURT:  But you want the transcripts or the

22  Minutes?

23          THE DEFENDANT:  The Minutes.

24          THE COURT:  The Court Minutes?

25          THE DEFENDANT:  Yeah, the Court Minutes.

```
 1            THE COURT:  What happened on this day?
 2            THE DEFENDANT:  Yeah.  And then I can request a
 3   transcript, if Your Honor will grant them.
 4            THE COURT:  For purposes of the trial?
 5            THE DEFENDANT:  Well, yeah.  I don't know.  It
 6   depends, you know.  If I can get it before then.  There is one
 7   or two days that I need.
 8            THE COURT:  What is the relevance?  That is what I am
 9   trying to understand.  Like, there is something that happened
10   in the Minutes that you think you're going to be able to use at
11   trial?
12            THE DEFENDANT:  Yes.
13            THE COURT:  I mean, sir, this is --
14            THE DEFENDANT:  I just want a copy of the Minutes,
15   and then you can decide if you want to grant delay of when I
16   ask for the transcript or not.  They have a transcript that
17   they've requested.  It's already been transcribed.  I requested
18   a copy of that from Mr. Chambers.  I never got it.  I believe
19   it was my bail hearing that they were asking for.  So since
20   it's already been transcribed, I would like a copy of that.
21            THE COURT:  Mr. Reidy, what is the story with this
22   transcript?  I'm not sure I'm following you.  What is he
23   talking about?
24            MR. REIDY:  To be honest, Your Honor, I am not sure.
25   I think we've asked for a transcript of -- I think he's correct
```

1    that we did ask for a transcript of the bail hearing, but I

2    think it might still be in that review period, before it's

3    available publicly.

4            THE COURT:  Okay.

5            MR. REIDY:  But we can -- I can --

6            THE COURT:  The bail hearing?  Do you intend to use

7    it at the trial?

8            MR. REIDY:  No, Your Honor -- well, I'm sorry.  If he

9    testifies, we might, because there were some statements that

10   the defendant made about his criminal history.

11       So I'm happy to provide a copy of that to Mr. Chambers.

12           THE COURT:  Go ahead.  Yeah, please do.

13       And then, with respect to the docket, the docket is, like,

14   probably 20, 30 pages.

15           THE DEFENDANT:  I just need the last five times that

16   I've appeared in court.  That's all.

17           MR. REIDY:  Your Honor, if it will move this along,

18   we'll do the --

19           THE COURT:  All right.  So get the docket for the

20   last, I guess, last six or so appearances.  Just print out a

21   docket and get it to Mr. Chambers.

22           MR. REIDY:  Okay.

23           THE COURT:  Okay.  What else?

24           THE DEFENDANT:  That's it.

25           THE COURT:  All right.  So then I will see you all

1    for the trial in June.  Thank you all.

2            MR. REIDY:  Thank you, Your Honor.

3            THE COURTROOM DEPUTY:  All rise.

4        This court is adjourned.

5        (Adjourned at 3:26 p.m.)

6                            -oOo-

7                    REPORTER'S CERTIFICATE

8

9        I certify that the foregoing is a correct transcript of

10   proceedings in the above-entitled matter.

11

12   /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                        Date:  03/18/2024
13   United States Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25